No. 22–1280
No. 22–1376

# United States Court of Appeals
# for the Third Circuit

EPSILON ENERGY USA, INC.,

*Plaintiff–Appellant,*

v.

CHESAPEAKE APPALACHIA, LLC,

*Defendant–Appellee.*

On Appeal from the United States District Court
for the Middle District of Pennsylvania
Case No. 1:21–cv–658

## APPENDIX VOLUME II
### (Pages Appx0065 to Appx0571)

Gregory J. Krock
MCGUIREWOODS LLP
Tower Two–Sixty
260 Forbes Ave., Suite 1800
Pittsburgh, PA 15222–3142
(412) 667–6042

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
(804) 775-4716

Elizabeth M. Thomas
MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
(704) 373-8060

*Counsel for Appellant/Cross–Appellee*
*Epsilon Energy USA, Inc.*

# TABLE OF CONTENTS

<div align="right">Page</div>

**Volume I**

Dkt. 121:
    Memorandum (Entered: 09/22/2021) ...................................................................Appx0001

Dkt. 122:
    Order (Entered: 09/22/2021)........................................................................Appx0028

Dkt. 133:
    Memorandum (Entered: 01/18/2022) ...................................................................Appx0029

Dkt. 134,:
    Order (Entered: 01/18/2022)........................................................................Appx0048

Dkt. 135:
    Notice of Appeal in Non-Prisoner Case (Entered: 02/15/2022) ..........................Appx0049

Docket Sheet (Case No. 1:21-cv-00658-JPW) ......................................................Appx0052

**Volume II**

Dkt. 104:
    Amended Complaint (Entered: 07/02/2021)......................................................Appx0065
        Dkt. 104-1: Exhibit 1 ...............................................Appx0109
        Dkt. 104-2: Exhibit 2 ...............................................Appx0177
        Dkt. 104-3: Exhibit 3 ...............................................Appx0244
        Dkt. 104-4: Exhibit 4 ...............................................Appx0321
        Dkt. 104-5: Exhibit 5 ...............................................Appx0444
        Dkt. 104-6: Exhibit 6 ...............................................Appx0451
        Dkt. 104-7: Exhibit 7 ...............................................Appx0453
        Dkt. 104-8: Exhibit 8 ...............................................Appx0461
        Dkt. 104-9: Exhibit 9 ...............................................Appx0481
        Dkt. 104-10: Exhibit 10 ...........................................Appx0489
        Dkt. 104-11: Exhibit 11 ...........................................Appx0496
        Dkt. 104-12: Exhibit 12 ...........................................Appx0500
        Dkt. 104-13: Exhibit 13 ...........................................Appx0503
        Dkt. 104-14: Exhibit 14 ...........................................Appx0507
        Dkt. 104-15: Exhibit 15 ...........................................Appx0512
        Dkt. 104-16: Exhibit 16 ...........................................Appx0516
        Dkt. 104-17: Exhibit 17 ...........................................Appx0519

**Volume III**

Dkt. 104-18: Exhibit 18 ...................................................................Appx0572
Dkt. 104-19: Exhibit 19 ...................................................................Appx0575
Dkt. 104-20: Exhibit 20 ...................................................................Appx0581
Dkt. 104-21: Exhibit 21 ...................................................................Appx0590

Dkt. 23-1:
    Exhibit A to Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0643

Dkt. 23-2:
    Exhibit B to Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0751

Dkt. 23-3:
    Exhibit C to Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0775

Dkt. 23-4:
    Exhibit D to Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0788

Dkt. 23-5:
    Exhibit E to Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0812

Dkt. 23-6:
    Exhibit F to Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0835

Dkt. 32-1:
    Exhibit A to Reply Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0852

Dkt. 32-3:
    Exhibit C to Reply Brief in Support of Motion to Dismiss for Failure to Join
    Necessary and Indispensable Parties filed by Chesapeake Appalachia, LLC ......Appx0882

Dkt. 109-2:
    Exhibit A to Motion to Dismiss for Failure to State a Claim ...............................Appx0952

Dkt. 109-3:
    Exhibit B to Motion to Dismiss for Failure to State a Claim...............................Appx0961

Dkt. 109-4:
    Exhibit C to Motion to Dismiss for Failure to State a Claim...............................Appx1015

# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EPSILON ENERGY USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHESAPEAKE APPALACHIA, LLC, <br><br> Defendant. | Civil Action No. 1:21-dv-00658 <br><br> Judge Jennifer P. Wilson |

## AMENDED COMPLAINT

Plaintiff Epsilon Energy USA, Inc. ("Epsilon"), by and through its attorneys, files this Amended Complaint against Defendant Chesapeake Appalachia, LLC ("CHK") and alleges as follows:

### PARTIES

1.  Epsilon is an Ohio corporation with its principal place of business in Houston, Texas.

2.  The citizenship of a corporation is determined by its state of incorporation and the location of its principal place of business. *See* 28 U.S.C. § 1332(c)(1).

3.  Thus, Epsilon is a citizen of Texas and Ohio.

4.  CHK is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma.

5.     CHK's sole member is Chesapeake Energy Corporation, an Oklahoma corporation with a principal place of business in Oklahoma City, Oklahoma.

6.     Chesapeake Energy Corporation is an Oklahoma citizen.

7.     The citizenship of a limited liability company is determined by the citizenship of its members.  *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (3d Cir. 2010); *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337 (3d Cir. 2013)).

8.     CHK is therefore a citizen of Oklahoma.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Epsilon and CHK and the amount in controversy exceeds $75,000, excluding interest and costs.  28 U.S.C. § 1332(a).

10.     Venue for this matter lies in this District pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to Epsilon's claims took place in this District and (2) the property that is the subject of this action is located within this District in Susquehanna County, Pennsylvania.  28 U.S.C. § 1391(b)(2).

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201, *et seq.*, with respect to CHK's duties to Epsilon under the Settlement Agreement and certain Operating Agreements ("JOAs").

2

## FACTUAL BACKGROUND

**A.    The Operating Agreements**

12.    Beginning in 2009, Epsilon, CHK, and other oil and gas companies (each a "JOA Party" and collectively the "JOA Parties") began entering into JOAs for drilling units covering acreage subject to oil and natural gas leases which had been (or would be) combined for the purposes of natural gas development.

13.    Epsilon and CHK are parties to an Operating Agreement dated October 18, 2010 for the Baltzley North Unit ("Baltzley North JOA"). A true and correct copy is attached hereto as Exhibit 1.

14.    Epsilon and CHK are parties to an Operating Agreement dated October 18, 2010 for the Baltzley South Unit ("Baltzley South JOA"). A true and correct copy is attached hereto as Exhibit 2.

15.    Epsilon and CHK are parties to an Operating Agreement dated December 16, 2010 for the Craige Unit ("Craige JOA"). A true and correct copy is attached hereto as Exhibit 3.

16.    Epsilon and CHK are parties to a Farmout Agreement dated February 1, 2010, which covers the Blanche Poulsen North and Blanche Poulsen South Units ("Poulsen Units") and incorporates a draft model JOA that applies to those units ("Poulsen JOA").  A true and correct copy of the Farmout Agreement is attached hereto as Exhibit 4 (the Poulsen JOA appears in Schedule 7.1.2, at 61).

3

17.     In the JOAs, Epsilon and CHK agreed to contribute their interests in oil and gas leases and to jointly develop those leases as drilling units within the geographical areas set forth in the JOAs.

18.     Each JOA identifies each JOA Party's specific working interest in the drilling unit governed by the JOA.

19.     Each of the JOAs at issue covers a different pooled unit, which is identified as the "Contract Area." Exhibit 1, Baltzley North JOA, Article I.C.; Exhibit 2, Baltzley South JOA, Article I.C; Exhibit 3, Craige JOA, Article I.C; Exhibit 4, Poulsen JOA, Article I.C.

20.     Each JOA is a stand-alone agreement that governs a different geographical Contract Area.

21.     Any JOA Party is entitled to propose the drilling and completion of a new well (a "Well Proposal").  Exhibit 1, Baltzley North JOA, Articles VI.1 and XVI; Exhibit 2, Baltzley South JOA, Articles VI.1 and XVI; Exhibit 3, Craige JOA, Articles VI.1 and XVI; Exhibit 4, Poulsen JOA, Articles VI.1 and XVI.

22.     Upon receipt of the Well Proposal, the other JOA Parties are required to elect whether they will consent to participate with their working interests (and thereby pay a pro rata share of the costs of developing the well).  Exhibit 1, Baltzley North JOA, Article VI.1; Exhibit 2, Baltzley South JOA, Article VI.1; Exhibit 3, Craige JOA, Article VI.1; Exhibit 4, Poulsen JOA, Article VI.1.

4

23. If any JOA Party wishes to propose operations that conflict with the Well Proposal, it has 30 days to propose those conflicting operations. Exhibit 1, Baltzley North JOA, Article VI.6; Exhibit 2, Baltzley South JOA, Article VI.6; Exhibit 3, Craige JOA, Article VI.6; Exhibit 4, Poulsen JOA, Article VI.6.

24. If a conflicting proposal is received, the JOA Parties promptly vote to determine which of the two proposals will proceed. Exhibit 1, Baltzley North JOA, Article VI.6; Exhibit 2, Baltzley South JOA, Article VI.6; Exhibit 3, Craige JOA, Article VI.6; Exhibit 4, Poulsen JOA, Article VI.6.

25. Under each JOA, CHK was designated to serve as the default operator for wells drilled thereunder. Exhibit 1, Baltzley North JOA, Article V.A.; Exhibit 2, Baltzley South JOA, Article V.A; Exhibit 3, Craige JOA, Article V.A; Exhibit 4, Poulsen JOA, Article V.A.

26. If CHK elects not to participate in a Well Proposal and declines to serve as the operator, however, one of the consenting JOA Parties may serve as the operator in conjunction with that Well Proposal. Exhibit 1, Baltzley North JOA, Article VI.2; Exhibit 2, Baltzley South JOA, Article VI.2; Exhibit 3, Craige JOA, Article VI.2; Exhibit 4, Poulsen JOA, Article VI.2.

27. If less than all JOA Parties elect to participate, the proposing party is required to notify the other consenting JOA Parties of the working interests consenting and whether the proposing party recommends proceeding with the Well

5

Proposal. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

28. The consenting JOA Parties may participate with their proportionate share of working interest of those parties that are not participating. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

29. If the proposing party does not withdraw the Well Proposal, the proposing party is deemed to be participating with any outstanding interests needed to equal 100 percent subscription. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

30. Once 100 percent subscription is reached, the JOA Party serving as the operator must commence operations in accordance with the Well Proposal. Exhibit 1, Baltzley North JOA, Articles VI.2 and XVI; Exhibit 2, Baltzley South JOA, Articles VI.2 and XVI; Exhibit 3, Craige JOA, Articles VI.2 and XVI; Exhibit 4, Poulsen JOA, Articles VI.2 and XVI.

31. Article XVI of the JOAs sets forth the requirements for a proposal to drill a new well.

6

Appx0070

32.     In order to fulfill the requirements, a party proposing a horizontal well must include: "(1) the estimated commencement date; (2) the proposed depth; (3) the objective formation or formations to be penetrated or tested; (4) the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well. Operator's estimate of Completion costs should be included as an informational item." Exhibit 1, Baltzley North JOA, Article XVI.A.2(a); Exhibit 2, Baltzley South JOA, Article XVI.A.2(a); Exhibit 3, Craige JOA, Article XVI.A.2(a); Exhibit 4, Poulsen JOA, Article XVI.A.2(a).

33.     The JOAs contain a section entitled Order of Preference of Operations setting forth the protocol if JOA Parties submit conflicting proposals and cannot agree upon the manner in which to proceed with a proposed operation.  Exhibit 1, Baltzley North JOA, Article XVI.A.2(b); Exhibit 2, Baltzley South JOA, Article XVI.A.2(b); Exhibit 3, Craige JOA, Article XVI.A.2(b); Exhibit 4, Poulsen JOA, Article XVI.A.2(b).

34.     Article XVI states "In the event of a conflict of inconsistency between the provisions of this Article XVI and any other provisions of this Agreement, ***the provisions of this Article XVI shall control and prevail***."  Exhibit 1, Baltzley North JOA, Article XVI.N (emphasis added); Exhibit 2, Baltzley South JOA, Article

7

XVI.N; Exhibit 3, Craige JOA, Article XVI.N; Exhibit 4, Poulsen JOA, Article XVI.N.

35.    Finally, if any new well drilled is capable of producing oil and/or gas in paying quantities, the Consenting Parties must complete and equip the well to produce and then turn the well over to the Operator "**if the Operator did not conduct the operation**." Exhibit 1, Baltzley North JOA, Article VI.2(b) (emphasis added); Exhibit 2, Baltzley South JOA, Article VI.2(b); Exhibit 3, Craige JOA, Article VI.2(b); Exhibit 4, Poulsen JOA, Article VI.2(b).

36.    The Operator then operates the newly-drilled well at its expense and for the account of the Consenting Parties. Exhibit 1, Baltzley North JOA, Article VI.2(b) (emphasis added); Exhibit 2, Baltzley South JOA, Article VI.2(b); Exhibit 3, Craige JOA, Article VI.2(b); Exhibit 4, Poulsen JOA, Article VI.2(b).

**B.    The Settlement Agreement**

37.    In September 2018, Epsilon filed a complaint against CHK in this Court styled *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, L.L.C.*, No. 3:18-cv-01852.

38.    Among the allegations in that lawsuit, Epsilon asserted that CHK failed to follow the election processes in the JOAs at issue (which included the Baltzley South and Baltzley North JOAs) in order to improperly thwart Epsilon's efforts to propose and drill new wells.

8

39.     The dispute in the prior lawsuit involved new wells that Epsilon had proposed.  Epsilon had not proposed, and the dispute did not involve, work to be performed on existing wells.

40.     Epsilon sought declaratory and injunctive relief, among other demands for relief, and filed a motion for preliminary injunction.

41.     Before the Court conducted an injunction hearing, the parties settled the dispute.  A true and correct copy of the Settlement Agreement and Release entered on October 8, 2018 ("Settlement Agreement") is attached hereto as Exhibit 5.

42.     In the Settlement Agreement, CHK explicitly agreed:



Exhibit 5 at ¶¶ 8, 8(d).

43.     Accordingly, ███████████████████████

████████████

44.     CHK further agreed that, ████████████████████

████████████████████████████████

████████████████████████████████

9

████████████████████████████████████████████

█████████████████████████████

45.    In consideration for CHK's agreement to the above, █████████████

███████████████████████████████████████████

46.    Epsilon did not propose any new wells until 2020.

██   ██████████████████████████████████████

███████████████████████████████

48.    CHK drilled those new wells.

## C.    Ownership of Subsurface and Surface Rights

49.    Upon information and belief, CHK has obtained surface and subsurface easements for the estates that are subject to the Baltzley North, Baltzley South, Craige, Poulsen North, and Poulsen South Units.

50.    Under the JOAs, if any party owns or acquires an oil and gas interest in the estates subject to the Baltzley North, Baltzley South, Craige, Poulsen North, and Poulsen South Units, the interest is treated as if it were covered by the Oil and Gas Lease attached as an exhibit to the JOAs.  Exhibit 1, Baltzley North JOA, Article III; Exhibit 2, Baltzley South JOA, Article III; Exhibit 3, Craige JOA, Article III; Exhibit 4, Poulsen JOA, Article III.

51.    Oil and gas interest is a defined term that "shall mean unleased fee and mineral interest in Oil and Gas in tracts of land lying with the Contract Area which

10

are owned by parties to this Agreement." Exhibit 1, Baltzley North JOA, Exhibit B; Exhibit 2, Baltzley South JOA, Exhibit B; Exhibit 3, Craige JOA, Exhibit B; Exhibit 4, Poulsen JOA, Exhibit B.

52.    The exemplar lease attached to the JOAs provides broad rights to the subsurface and surface rights "as may be necessary or convenient . . . to explore for, develop produce, measure, and market production from the Leasehold, and from adjoining lands . . . to drill, maintain, operate . . . wells; to use or install roads, electric power . . . and to construct pipelines with appurtenant facilities . . . to use oil, gas and non-domestic water sources, free of cost . . ; to operate, maintain, repair and remove material and equipment." Exhibit 1, Baltzley North JOA, Exhibit B; Exhibit 2, Baltzley South JOA, Exhibit B; Exhibit 3, Craige JOA, Exhibit B; Exhibit 4, Poulsen JOA, Exhibit B.

53.    In addition, the JOAs require that CHK permit a Non-Operator (such as Epsilon) or its duly authorized representative "full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area." Exhibit 1, Baltzley North JOA, Article V.D.5; Exhibit 2, Baltzley South JOA, Article V.D.5; Exhibit 3, Craige JOA, Article V.D.5; Exhibit 4, Poulsen JOA, Article V.D.5.

11

54.    Accordingly, if any JOA Party obtains an easement or other right to use property within a JOA's Contract Area, the other JOA Parties have the same right to use that property.

55.    Finally, the JOAs expressly state that, while all parties "shall be free to act on an arm's-length basis in accordance with their own respective self-interest, [that freedom is] subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder." Exhibit 1, Baltzley North JOA, Article VII.A; Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII.A.

**D.    Ownership of Water Rights Associated with Wyalusing Creek**

56.    The Wyalusing Creek surface water withdrawal is the water source for the wells drilled under the Craige JOA.  *See* SRBC Commitment Letter, a true and correct copy is attached hereto as Exhibit 6.

57.    Epsilon's contractor (Turm Oil, Inc.) initially acquired the right to withdraw water from Wyalusing Creek from the Susquehanna River Basin Commission ("SRBC"), and subsequently transferred the SRBC permit evidencing that right into Epsilon's name as of August 9, 2019.  *See* Notice of Request for Transfer, a true and correct copy of which is attached hereto as Exhibit 7.

58.    In the Farmout Agreement, Epsilon conveyed an undivided one-half interest in its Wyalusing Creek surface water withdrawal to CHK.  *See* Exhibit 4,

12

Farmout Agreement, at 1.1 ("Epsilon agrees to farmout and convey and Chesapeake agrees to acquire and accept an undivided fifty percent (50%) interest . . . in all of the Properties for the Farmout Consideration . . . .").

59.　　Exhibit A sets forth the "Real Property Interests" covered under the Farmout Agreement, including two Poulsen Wells (B. Poulsen #1H and B. Poulsen #2H) and the Hardic Well (Hardic #2H), which were drilled and supported by the Wyalusing Creek surface water withdrawal.　Exhibit 4, Farmout Agreement, at Exhibit A.

60.　　The Farmout Agreement explicitly states that the "Real Property Interests" include "[a]ll easements, *permits*, licenses, servitudes, rights of way and *all other rights and appurtenances on or used in connection with the Real Property Interests*, Wells or any interests pooled or unitized therewith including, without limitation, those easements and rights of way described on Exhibit 'A'." Exhibit 4, Farmout Agreement, at 1.1.9 (emphasis added).

61.　　As a permit conveying the right to use the water source that Epsilon utilized to drill and support the Poulsen Wells and the Hardic Well, the Wyalusing Creek surface water withdrawal permit issued by the SRBC was among the conveyed assets under the Farmout Agreement.

62.　　The Wyalusing Creek surface water withdrawal also constituted a right or appurtenance "on or used in connection with the Real Property Interests"

13

described in Exhibit A to Farmout Agreement (namely, the Poulsen and the Hardic Wells).

63.    Consequently, the jointly-owned Wyalusing Creek surface water withdrawal permit (and the corresponding right to withdraw water from Wyalusing Creek) constitutes property that has been contributed for joint use under the JOAs.

64.    The JOAs require that "any [ ] facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement . . . . Facility includes, but is not limited to . . . water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation." Exhibit 1, Baltzley North JOA, Article XVI.B (Gathering Lines/Facilities); Exhibit 2, Baltzley South JOA, Article XVI.B; Exhibit 3, Craige JOA, Article XVI.B; Exhibit 4, Poulsen JOA, Article XVI.B.

65.    In March 2010, Epsilon transferred the jointly-owned SRBC permit evidencing the right to withdraw water from Wyalusing Creek into CHK's name. Exhibits 18, 19 (D. Ward Letter) (D. Ward Declaration).

66.    CHK did not pay any consideration to Epsilon in March 2010 in exchange for transferring the SRBC permit into CHK's name. Instead, Epsilon transferred the jointly-owned permit into CHK's name because CHK would be

14

Appx0078

serving as the operator under the Farmout Agreement and JOAs.  Exhibit 19 (D. Ward Declaration).

67.    The SRBC does not allow more than one entity to be identified as the "owner" of an SRBC water permit.  Accordingly, it was not possible to list both Epsilon and CHK as co-owners of the permit.

68.    When the SRBC issues a water permit, it expressly states that the permit does not establish that the named permittee possesses any property rights.  *See* Exhibit 7, Notice of Request for Transfer, at Decision ¶ 17 ("Commission approval confers no property rights upon the project sponsor.").

69.    While CHK subsequently combined the jointly-owned permit with a separate permit that CHK possessed (which entitled CHK to withdraw a separate quantity of water from a nearby location in Wyalusing Creek), that combination did not extinguish Epsilon's co-ownership interest.  Epsilon continues to co-own an undivided interest in the current consolidated SRBC permit that evidences the right to withdraw water from Wyalusing Creek.

**E.    Ownership of the Marbaker Impoundment**

70.    The consenting parties under the JOAs are required to pay their pro rata share of the expenses associated with the building, repair, and use of the water facilities used to develop the Contract Area.  CHK is subject to accounting audits to ensure that parties are accurately billed for such expenses.  *See* Exhibit 1, Baltzley

15

North JOA, Article VII.A (Liability of Parties); Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area."); *see also* Stipulation of Parties Regarding Testimony of Lane Bond, Exhibit 20.

71.    A water impoundment — known as the Marbaker Impoundment — and related water facilities were constructed in order to utilize the Wyalusing Creek water withdrawal to drill and further develop wells under the JOAs.  Exhibit 20 (Lane Bond Stipulation).

72.    Accordingly, Epsilon has paid the invoiced amounts issued by CHK in conjunction with water used in the operations of wells as permitted under the appropriate JOA procedures.  Exhibit 20 (Lane Bond Stipulation).

73.    Because CHK constructed and utilized the Marbaker Impoundment in order to develop jointly-owned wells under the JOAs, Epsilon is a co-owner of the Marbaker Impoundment.  Exhibit 20 (Lane Bond Stipulation).

**F.    Ownership of the Craige Well Pad**

74.    The consenting parties under the JOAs are also required to pay their pro rata share of the expenses associated with the building, repair, and use of the well pads that are used to develop the Contract Area.  CHK is subject to accounting audits to ensure that parties are accurately billed for such expenses.  *See* Exhibit 1, Baltzley

16

North JOA, Article VII.A (Liability of Parties); Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area."); Exhibit 20 (Lane Bond Stipulation).

75.    A well pad — known as the Craige Well Pad — was constructed in order to drill and further develop wells under the Craige JOA.  Exhibit 20 (Lane Bond Stipulation).

76.    Accordingly, Epsilon has paid the invoiced amounts issued by CHK in conjunction with the construction of the Craige Well Pad under the appropriate JOA procedures.  Exhibit 20 (Lane Bond Stipulation).

77.    Because CHK constructed and utilized the Craige Well Pad in order to develop jointly-owned wells under the JOAs, Epsilon is a co-owner of the Craige Well Pad.  Exhibit 20 (Lane Bond Stipulation).

**G.    The Proposed Wells**

78.    In May 2020, Epsilon began discussions with CHK regarding new well proposals that would advance Epsilon's goals of growth and production in the Auburn Development.  *See* E-Mail exchange attached hereto as Exhibit 8, May 12, 2020, H. Clanton to J. Woodard.

17

79.     In conjunction with these discussions, Epsilon shared its ideas for proposed wells at the Craige Well Pad, located in Rush Township, Susquehanna County, Pennsylvania.  Exhibit 8, May 26, 2020, H. Clanton to J. Woodard.

80.     Throughout June 2020, the parties continued to discuss the design and spacing of the wells that Epsilon desired to drill.  Exhibit 8, May–June 2020 E-mail Discussions, H. Clanton and J. Woodard.

81.     After an exchange between the parties regarding permitting, CHK requested further information on how Epsilon proposed to operate the wells.  Exhibit 8, September 28, 2020, J. Woodard to H. Clanton.

82.     Epsilon responded that it was "less interested in who operates the proposed program as long as we believe quality, safety and costs are controlled. We are prioritized on developing the Marcellus reserves in Auburn and the larger resource for the benefit of our shareholders."  Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

83.     Epsilon continued:

As we understand the JOA, CHK has the following options when well proposals are made by others. CHK can; consent and operate, non-consent but operate at the consenting parties request, or decline to operate. In a scenario where CHK elects not to participate and declines to operate, the consenting party or parties have the right to operate.  We need to understand how CHK would transfer operatorship and cooperate with the designated operator, no matter whom.

An alternative approach could be to have one of the consenting parties serve as contract operator (drill/complete/flowback/turn-over to CHK

18

@ TIL) with CHK remaining the operator of record.

Again, thank you for your attention to the resolution of this matter. We understand development in Auburn may not be a priority to CHK both from a manpower resources and commercial perspective, however it is obviously important to EPSN.

Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

84. After this exchange, the parties discussed various options for how to move forward with Epsilon's suggested wells. Exhibit 8, September 29, 2020– October 14, 2020, H. Clanton to J. Woodard.

85. On October 14, 2020, Epsilon advised CHK that Epsilon intended to move forward with the wells that Epsilon had suggested to ensure it could meet permitting timelines for those wells. Exhibit 8, October 14, 2020, H. Clanton to J. Woodard.

86. The next day, Epsilon reminded CHK that Article VI.2 of the JOAs enabled Epsilon to proceed with the wells even if CHK elected not to participate and declined to serve as the operator of those wells. Exhibit 8, October 15, 2020, H. Clanton to J. Woodard.

87. In a separate communication, Epsilon provided CHK with further reason to move forward with Epsilon's suggested wells, noting that CHK would benefit from a 10% discount on the gathering rate. *See* E-mail exchange attached hereto as Exhibit 9, October 16, 2020, M. Raleigh to J. Taylor.

19

88.    Two months later, on December 16, 2020, Epsilon reiterated its plan to drill new wells on the Craige Pad.  Exhibit 9, Dec. 16, 2020, M. Raleigh to J. Taylor.

89.    CHK responded that there was "not much incentive to CHK to work a deal here" and indicated that CHK wanted to come up with a scenario where "Epsilon agrees not to propose" any additional wells.  Exhibit 9, December 16, 2020 J. Taylor to M. Raleigh.

90.    Epsilon responded that it would be willing to consider other options but that it intended to continue pursuing its opportunities as allowed under the JOAs. Exhibit 9, December 17, 2020 M. Raleigh to J. Taylor.

91.    In response, CHK asserted that "CHK [was] not trying to prevent Epsilon from any rights that it may have under the JOA.  We simply feel that there is no obligation on the part of CHK to drill these wells."  Exhibit 9, December 18, 2020, J. Taylor to M. Raleigh.

92.    On December 22, 2020, Epsilon formally proposed four wells in accordance with the procedure set forth in the JOAs:  Craige N 1LH, Craige N 1UHC, Craige N 4UHC ("Craige North Wells") and Craige S 3LHC ("Craige South Well") to be located in Rush Township, Susquehanna County, Pennsylvania (the "Proposed Wells").  *See* Exhibit 17, an exemplar well proposal, Baltzley South Unit.

93.    In conjunction with the Proposed Wells, CHK could elect between three options:  (1) elect to participate in the drilling and completion of the Proposed Wells

20

and to serve as the operator; (2) elect not to participate in the Proposed Wells but to serve as the operator; or (3) elect not to participate in the Proposed Wells and decline to serve as the operator (such that Epsilon or another consenting party would serve as the operator).

94. The other JOA Parties for the Craige South Well included Equinor Onshore Properties, Inc. (f/k/a Statoil) ("Statoil"), Chief Oil & Gas LLC (formally, MKR Holdings, LLC) ("Chief"), Jamestown Resources, L.L.C. ("Jamestown"), Enerplus Resources (USA) Corporation ("Enerplus"), Radler 2000 Limited Partnership ("Radler"), Tug Hill Marcellus, LLC ("Tug Hill"), and Unconventionals Natural Gas, LLC ("Unconventionals").

95. The other JOA Parties for the Craige North Wells included Statoil and Jamestown.

96. Chief, Radler, and Tug Hill elected to participate in the Craige South Well. However, Statoil, Jamestown, Enerplus, and Unconventionals elected not to participate.

97. The other JOA Parties elected not to participate in the Craige North Wells.

**H.    CHK's Refusal to Cooperate and Allow Epsilon Access to Jointly-Owned Property**

98. On January 19, 2021, CHK advised that it would not participate in the drilling of the Proposed Wells and would not serve as the operator. CHK also

21

asserted that Epsilon is not permitted to serve as the operator, and on that basis, refused to grant Epsilon access to the Craige Well Pad in order to drill the Proposed Wells. *See* Letters attached hereto as Exhibit 10, January 19, 2021 Non-Consent Letters, C. Moad to R. Collins.

99.    In a letter dated that same day (although it was not delivered to Epsilon until January 21, 2021), CHK purported to propose a new well known as the Koromlan 107HC ("Koromlan Well") that would be located in Rush Township, Susquehanna County, Pennsylvania.  *See* Letter attached hereto as Exhibit 11, January 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

100.  CHK suggested that the Proposed Wells were in conflict "with the planned drilling of Chesapeake's Koromlan 107HC."  Exhibit 11, January 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

101.  On January 20, 2021, CHK further stated: "Chesapeake maintains the right to Operate the Craige pad site and associated wells, and hereby does not grant approval or authority to Epsilon, or anyone else, to Operate from referenced pad. . . . Subsequently, Chesapeake has plans to drill the Koromlan 107HC in early 2022, which is in conflict with Epsilon's proposed Craige S 3LHC. As such, Chesapeake's well proposal will be forthcoming along with all elections for Epsilon's proposed wells."  *See* E-mail attached hereto as Exhibit 12, January 20, 2021, Scott Glenn to Mike Raleigh.

22

102.   On February 9, 2021, Epsilon provided CHK with the required notice that it had received 100% Subscription to proceed with the Proposed Wells.  *See* Letter attached hereto as Exhibit 13, February 9, 2021 Epsilon's Notice of 100% Subscription.

103.   On February 11, 2021, Epsilon requested an update on the status of the letter that Epsilon needed CHK to sign so that Epsilon could obtain the water permit that it needed to drill the Proposed Wells (as discussed in the next section).  *See* E-mail exchange attached hereto as Exhibit 14, February 11, 2021, R. Collins to C. Moad.

104.   Ten minutes later, CHK responded by (1) asserting that the JOAs do not allow Epsilon to drill a new well if CHK elects not to participate in that well and (2) stating that CHK would not sign the letter that Epsilon needed to obtain a water permit for the Proposed Wells.  Exhibit 14, February 11, 2021, J. Woodard to R. Collins.

105.   Epsilon responded:

It is hard for Epsilon to understand why Chesapeake takes the position of stopping production by claiming a super veto power that is counter to the JOAs or our prior Settlement Agreement.  It is not in good faith and in fact it is deemed to be in bad faith. Of course, Article VI2 allows for another Operator when the designated Operator will not agree to operate.  Again, your interpretation is not in good faith.

Epsilon is interested in promoting the production of the joined resources, which is one of the base reasons for entering a JOA.  Epsilon is furthering this interest by proposing wells that will be beneficial for

23

the parties and has also been clear that it is willing to work with Chesapeake to ensure that Chesapeake can also proceed with its proposed well. Epsilon has continued to act in good faith and seeks only to have Chesapeake recognize its rights under the JOA and the Settlement Agreement and stop Chesapeake's obstruction of developing the resources. The first step in doing so is signing the SRBC letter, which Chesapeake has done in the past for other parties. The next step is confirming that Chesapeake will provide Epsilon with access to the properties, and otherwise cooperate with Epsilon, so that Epsilon can fulfill its responsibilities with respect to the four currently-proposed wells for which it has been designated as the operator.

Exhibit 14, February 11, 2021, R. Collins to J. Woodard and C. Moad.

106. Two minutes later, CHK curtly responded, making it clear to Epsilon at that time that the parties had reached an impasse: "Respectfully, this is not a good faith/bad faith discussion. The plain language of the JOA does not allow for Epsilon to assume operatorship." Exhibit 14, February 11, 2021, J. Tarantelli to R. Collins.

107. Epsilon's request for assistance in obtaining a water permit for the Proposed Wells was not a surprise to CHK. Back on July 1, 2020 — when Epsilon shared its development plans with CHK — Epsilon sought CHK's assistance in obtaining the requisite approval from the Pennsylvania Department of Environmental Protection ("PaDEP") and the SRBC for a water management plan. Exhibit 8, July 1, 2020, H. Clanton to J. Woodard (noting that "Operators are required to submit a Water Management Plan for approval.").

108.   In accordance with its rights under the JOAs, Epsilon intends to use the jointly-owned Marbaker Impoundment and jointly-owned Craige Well Pad to drill the Proposed Wells.

109.   On September 18, 2020, Epsilon sent CHK a draft SRBC commitment letter, which CHK was required to execute in order for Epsilon to be able to use the Wyalusing Creek water withdrawal (as the SRBC permit is issued in CHK's name) and the Marbaker Impoundment.  Exhibit 8, September 18, 2020, H. Clanton to J. Woodard.

110.   On September 25, 2020, Epsilon reiterated that it needed CHK to sign the SRBC commitment letter in order for Epsilon "to move forward with [Epsilon's] well permitting. It's a simple one page, self-explanatory form."   Exhibit 8, September 25, 2020, H. Clanton to J. Woodard.

111.   On September 28, 2020, Epsilon contacted CHK once again about the SRBC commitment letter, and this time referenced the parties' obligations under the Settlement Agreement (which expressly required CHK to provide access to jointly-owned assets and water sources).  Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

112.   On September 29, 2020, CHK stated that, until Epsilon was named as the operator of any formally-proposed wells, CHK would not sign the SRBC commitment letter.  Exhibit 8, September 29, 2020, J. Woodard to H. Clanton.

25

113.  After making its formal proposal in December 2020, Epsilon renewed its efforts to obtain the water permit necessary to drill the Proposed Wells.  On January 29, 2021, the SRBC provided Epsilon with a commitment letter that CHK had recently used to obtain a similar permit.  *See* E-mail exchange attached hereto as Exhibit 15, January 29, 2021, G. Miller to W. Jenko.

114.  Using the commitment letter that CHK had recently used, Epsilon prepared a draft commitment letter (to be signed by CHK) that would enable Epsilon to utilize the right to withdraw water from Wyalusing Creek — an asset that Epsilon co-owns with CHK — to drill the Proposed Wells.  After reviewing the draft letter, the SRBC confirmed that it was acceptable and would enable Epsilon to obtain the water permit that it required for the Proposed Wells.  Exhibit 15, January 29, 2021, G. Miller to W. Jenko.

115.  On February 9, 2021, Epsilon sent the proposed letter to CHK for execution so that Epsilon could finalize the permitting for its Proposed Wells. Exhibit 13, February 9, 2021, R. Collins to J. Woodard.

116.  On February 11, 2021, CHK advised that it would not sign the SRBC commitment letter.  CHK reiterated its position that, because CHK had not elected to participate, Epsilon could not proceed with its Proposed Wells.  Exhibit 14, February 11, 2021, J. Woodard to R. Collins.

26

117.   Furthermore, CHK made clear in its communications with Epsilon that it would not grant Epsilon access to the Craige Well Pad in order to drill certain of the Proposed Wells.  Exhibit 10, January 19, 2021 Non-Consent Letter, C. Moad to R. Collins.

118.   Finally, on March 17, 2021, CHK filed a notice of appeal of the permits that the PaDEP had issued for the Proposed Wells with the Pennsylvania Environmental Hearing Board in another attempt to obstruct Epsilon's development of the Proposed Wells.

## I.   The Defective Proposal for the Koromlan Well

119.   The proposal for the Koromlan Well, which CHK dated January 19, 2021 but did not provide to Epsilon until January 21, 2021, does not set forth a date on which operations on the well would commence.

120.   The proposal for the Koromlan Well indicates that the well would traverse the Craige, Poulsen North, Poulsen South, and Davis Units.

121.   The Koromlan Well would also traverse a drilling unit not yet formed, which CHK described as the Bradbury Unit.

122.   Because the Bradbury Unit has not yet been formed, the Koromlan Well would traverse acreage (including acreage owned by Epsilon) that cannot be pooled because it has not been unitized.

27

Appx0091

123.   In addition, the Koromlan Well's path is too close to the Craige South Well's path.

124.   Further, upon information and belief, the Koromlan Well would traverse a block of acreage known as the Rushboro Ventures block that is not leased (or whose lease is currently in question).

125.   The following is a projection of the path of the Koromlan Well (the only path that would comply with the JOA spacing rules) and depicts these issues:

28

Appx0092



126. On February 9, 2021, Epsilon informed CHK that the proposal for the Koromlan Well did not meet the JOA requirements for submitting a proposal. While Epsilon noted that the Koromlan Well's path would traverse non-unitized acreage, as well as acreage with a title defect, Epsilon indicated that it might support a similar well if these issues could be overcome (provided that CHK proposed such a well in

29

accordance with and compliance with the JOAs). *See* Letter attached hereto as Exhibit 16, February 9, 2021, Koromlan 107HC Well Proposal Response.

127. After submitting the proposal for the Koromlan Well, CHK did not seek to have the JOA Parties vote on whether to proceed with the Koromlan Well or the Craige South Well.

**J.  Epsilon Re-Proposes the Proposed Wells**

128. On May 14, 2021, this Court issued an opinion and order in which it concluded that the proposals Epsilon submitted on December 23, 2020 to drill the Proposed Wells had expired.

129. On May 26, 2021, Epsilon formally re-proposed the drilling of the Proposed Wells. *See* Four Well Proposals collectively attached hereto as Exhibit 21.

130. In light of the position that CHK has previously asserted in correspondence, and advanced in this lawsuit, Epsilon understands that CHK will not participate in the Proposed Wells and will not serve as the operator, but will nevertheless not cooperate so that Epsilon can drill the Proposed Wells.

**K.  <u>Wells That CHK Has Proposed and Drilled Under the JOAs</u>**

131. CHK has proposed the drilling of new wells under the JOAs in which the deadlines to commence operations set forth in the well proposals were greater than 120 days from the dates of the proposals.  For example:

> (a)  CHK submitted a proposal on February 25, 2011 to drill the Bluegrass 4H well.  In the proposal, CHK identified the date on

30

which operations would commence as July 24, 2011 (149 days later).

(b)    CHK submitted a proposal on September 28, 2011 to drill the GB N SUS 2H well. In the proposal, CHK identified the date on which operations would commence as February 14, 2012 (139 days later).

(c)    CHK submitted a proposal on September 25, 2013 to drill the Rosiemar SUS 1H well. In the proposal, CHK identified the date on which operations would commence as February 10, 2014 (138 days later).

132.    CHK submitted a proposal on or about April 5, 2012 to drill the Cook S SUS 2H well.

133.    Epsilon did not consent to participate in the Cook S SUS 2H well.

134.    CHK drilled the Cook S SUS 2H well even though not all of the JOA Parties had consented to participate in that well.

135.    CHK submitted a proposal on or about February 20, 2020 to drill the Przbyszewski 1HC well.

136.    One or more of the JOA Parties did not consent to participate in the Przbyszewski 1HC well.

137.    CHK drilled the Przbyszewski 1HC well even though not all of the JOA Parties had consented to participate in that well.

138.    CHK submitted a proposal on or about May 27, 2020 to drill the Maris 123HC well.

139.    One or more of the JOA Parties did not consent to participate in the Maris 123HC well.

31

140. CHK drilled the Maris 123HC well even though not all of the JOA Parties had consented to participate in that well.

141. CHK submitted a proposal on or about May 27, 2020 to drill the Maris 22HC well.

142. One or more of the JOA Parties did not consent to participate in the Maris 22HC well.

143. CHK drilled the Maris 22HC well even though not all of the JOA Parties had consented to participate in that well.

## COUNT I – DECLARATORY JUDGMENT
### (Epsilon's Right to Drill the Proposed Wells)

144. The allegations set forth in Paragraphs 1 through 137 are incorporated by reference as if fully set forth herein.

145. Under the terms of the JOAs, CHK is required to make an election with regard to both (1) its participation in the Proposed Wells and (2) its service as the operator for the Proposed Wells.

146. CHK has unambiguously communicated that it will not to participate in the Proposed Wells and will not serve as the operator for the Proposed Wells.

147. Upon emerging from bankruptcy protection in early February 2021, CHK was obligated to cooperate with Epsilon so that Epsilon can drill and operate the Proposed Wells.

Appx0096

148.   However, CHK continuously refuses to cooperate with Epsilon so that Epsilon (or an otherwise designated operator by the consenting parties) can drill and operate the Proposed Wells.[1]

149.   To the contrary, CHK continuously takes the position that Epsilon (or an otherwise designated operator by the consenting parties) may not drill on the Craige Well Pad because CHK controls the subsurface and surface estates and will not grant Epsilon access to the well pad.

150.   In addition, CHK continuously takes the position that it will not sign the SRBC commitment letter so that Epsilon can obtain the permit that it requires in order to use jointly-owned water facilities to drill the Proposed Wells.

151.   Rather than cooperate to assist with Epsilon's efforts to obtain drilling permits for the Proposed Wells, CHK filed a notice of appeal with the Environmental Hearing Board in an attempt to vacate the drilling permits that the PaDEP has issued which will enable the Proposed Wells to be drilled.

152.   CHK's continuously refuses to cooperate, after its emergence from bankruptcy, so that Epsilon can proceed with the development of the Proposed Wells

---

[1] For avoidance of doubt, all of Epsilon's claims in all Counts are based on conduct that CHK took (or refused to take) after emerging from bankruptcy on February 9, 2021.  The allegations contained herein regarding CHK's conduct before it emerged from bankruptcy are included for historical context.  However, Epsilon's requests for equitable relief — including a declaratory judgment as to the parties' current duties and obligations — are based exclusively on CHK's conduct since emerging from bankruptcy.

Appx0097

constitutes a continuing breach of both the Settlement Agreement and the JOAs.

153. Nothing in the Settlement Agreement and/or the JOAs entitles CHK to unilaterally veto a Well Proposal that Epsilon has submitted in accordance with the JOAs.

154. An actual, present and justiciable controversy exists between Epsilon and CHK concerning: (1) the Settlement Agreement and JOAs between the parties; (2) Epsilon's right to drill a new well if CHK elects not to participate and declines to serve as the operator; (3) CHK's refusal to provide access to the Craige Well Pad so that a party designated by the consenting parties may serve as the operator; (4) CHK's refusal to sign the SRBC commitment letter so that Epsilon may complete its permitting requirements to obtain water necessary to drill the Proposed Wells; (5) CHK's appeal of the drilling permits that the PaDEP issued to enable the Proposed Wells to be drilled; and (6) CHK's refusal to otherwise cooperate with Epsilon so that it can drill the Proposed Wells.

WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that, if CHK elects not to participate in a new well proposed by Epsilon and declines to serve as the operator, then (1) Epsilon (or another consenting party) has the right to drill and operate the proposed new well; (2) CHK has an obligation to allow Epsilon (or another consenting party) to access the jointly-owned assets in order to do so, including taking any actions required to facilitate such access; (3) the

34

permit evidencing the right to withdraw water from Wyalusing Creek, the Craige Well Pad, and the Marbaker Impoundment are co-owned assets that Epsilon is entitled to utilize to drill such a proposed new well; and (4) CHK must otherwise cooperate with the operator designated by the consenting parties to facilitate those drilling operations.

## COUNT II – SPECIFIC PERFORMANCE
## (SETTLEMENT AGREEMENT)

155. The allegations set forth in Paragraphs 1 through 148 are incorporated by reference as if fully set forth herein.

156. The Settlement Agreement is a binding contract between CHK and Epsilon.

157. CHK confirmed in the Settlement Agreement that ████████████████ ███████████████████████████████████████████

158. CHK expressly agreed in the Settlement Agreement that, if ██████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████

159. Since emerging from bankruptcy, CHK continuously refuses to cooperate with Epsilon with respect to the Proposed Wells. In particular, CHK continues to (1) refuse to sign the SRBC commitment letter so that Epsilon can

35

obtain the requisite water permitting, (2) deny Epsilon access to the Craige Well Pad that will be utilized to drill the Proposed Wells, and (3) challenge the PaDEP's decision to issue the drilling permits that enable the Proposed Wells to be drilled.

160.　CHK's continuing refusal to cooperate regarding the Proposed Wells, since it emerged from bankruptcy, constitutes a continuing material breach of the Settlement Agreement.

161.　Epsilon is being irreparably harmed and has no adequate remedy at law to enforce the Settlement Agreement other than specific performance.

162.　Monetary damages would be inadequate to compensate Epsilon for CHK's continuing violations of the Settlement Agreement because property rights are inherently unique and no two tracts of land are identical.

163.　Monetary damages would not allow Epsilon to carry out the same, unique exploration activities or prospects anywhere else.

164.　CHK's continuing breach of the Settlement Agreement, since its emergence from bankruptcy, have damaged the value of Epsilon's mineral interests in an amount that is speculative and difficult to determine.

165.　Epsilon needs to timely complete its proposed drilling activity while working conditions are adequate and support doing so, an extensive delay would change the factors Epsilon considered in forwarding the Well Proposals.

Appx0100

166.   The only adequate remedy for the continuing violation of Epsilon's rights (since CHK emerged from bankruptcy) is to compel CHK to specifically perform the terms and provisions of the Settlement Agreement.

WHEREFORE, Epsilon respectfully requests that this Court order CHK to specifically perform under the Settlement Agreement by requiring CHK to (1) allow Epsilon to access all co-owned assets — including (but not limited to) the Wyalusing Creek water withdrawal point, Marbaker Impoundment, and Craige Well Pad — in order to drill the Proposed Wells; (2) sign the SRBC commitment letter so that Epsilon may secure the required permits and use co-owned water sources to drill and operate the Proposed Wells; (3) withdraw its appeal of the issuance of the drilling permits that PaDEP issued in conjunction with the Proposed Wells; (4) otherwise reasonably cooperate with Epsilon so that it can drill the Proposed Wells; and (5) grant Epsilon such other and further equitable relief as it deems just and appropriate.

### COUNT III – SPECIFIC PERFORMANCE
### (JOAs)

167.   The allegations set forth in Paragraphs 1 through 160 are incorporated by reference as if fully set forth herein.

168.   The Baltzley North, Baltzley South, Craige, and Poulsen JOAs are binding contracts between CHK and Epsilon.

Appx0101

169.   Since emerging from bankruptcy, CHK continuously asserts that it may it may unilaterally prevent Epsilon from drilling the Proposed Wells by refusing to participate and declining to serve as the operator.

170.   Contrary to its assertion, CHK does not possess any such "veto power" under the JOAs.

171.   Since emerging from bankruptcy, CHK is continuously preventing Epsilon drilling of the Proposed Wells by preventing access to the Craige Well Pad.

172.   Since emerging from bankruptcy, CHK is continuously preventing Epsilon from using the jointly-owned Wyalusing Creek surface water withdrawal and associated Marbaker Impoundment for the drilling of the Proposed Wells by (among other actions) refusing to sign the SRBC commitment letter.

173.   After emerging from bankruptcy, CHK challenged the PaDEP's decision to issue the drilling permits that enable the Proposed Wells to be drilled.

174.   CHK does not have the authority to block access to the jointly-owned assets of Epsilon under the JOAs.

175.   CHK's continued refusal to allow Epsilon access to jointly-owned assets and to sign the SRBC commitment letter, following CHK's emergence from bankruptcy, constitutes a continuing material breach of the JOAs which has prevented — and continues to prevent — Epsilon from proceeding with the Proposed Wells.

Appx0102

176.   Further, the JOAs expressly incorporate a duty on the parties to act in good faith "in their dealings with each other with respect to activities" taken pursuant to the JOAs.

177.   By opposing Epsilon's efforts to develop its property rights and meet the shared goal of production, following CHK's emergence from bankruptcy, CHK has continuously acted in bad faith.

178.   Epsilon is being irreparably harmed and has no adequate remedy at law to enforce the JOAs other than specific performance.

179.   Monetary damages would be inadequate to compensate Epsilon for CHK's continuing violations of the JOAs because property rights are inherently unique and no two tracts of land are identical.

180.   Monetary damages would not allow Epsilon to carry out the same, unique exploration activities or prospects anywhere else.

181.   CHK's continuing breaches of the JOAs have damaged the value of Epsilon's mineral interests in an amount that is speculative and difficult to determine.

182.   Epsilon needs to timely complete its proposed drilling activity while working conditions are adequate and support doing so, an extensive delay would change the factors Epsilon considered in forwarding the Well Proposals.

Appx0103

183. The only adequate remedy for the continuing violation of Epsilon's rights is to compel CHK to specifically perform the terms and provisions of the JOAs, including the provisions regarding the election to participate and operate Well Proposals. *See* Exhibit 1, Baltzley North JOA, Articles VI.1, V.2; Exhibit 2, Baltzley South JOA, Articles VI.1., V.2; Exhibit 3, Craige JOA, Articles VI.1, V.2; Exhibit 4, Poulsen JOA, Articles VI.1, VI.2.

WHEREFORE, Epsilon respectfully requests that this Court order CHK to specifically perform under the JOAs by requiring CHK to (1) allow Epsilon to access all co-owned assets — including (but not limited to) the Wyalusing Creek water withdrawal point, Marbaker Impoundment, and Craige Well Pad — in order to drill the Proposed Wells; (2) sign the SRBC commitment letter so that Epsilon may secure the required permits and use co-owned water sources to drill and operate the Proposed Wells; (3) withdraw its appeal of the issuance of the drilling permits that PaDEP issued in conjunction with the Proposed Wells; (4) otherwise reasonably cooperate with Epsilon so that it can drill the Proposed Wells; and (5) grant Epsilon such other and further equitable relief as it deems just and appropriate.

### COUNT IV – DECLARATORY JUDGMENT
### (The Koromlan Well)

184. The allegations set forth in Paragraphs 1 through 177 are incorporated by reference as if fully set forth herein.

40

185.   Since emerging from bankruptcy, CHK continuously suggests that the Koromlan Well is a valid proposal — and should take priority over the Craig South Well that Epsilon proposed — even though the Craig South Well was previously proposed and received the required 100% Subscription to proceed.

186.   Article XVI.A.2(a)(1) of the JOAs states that a proposal for a horizontal well must include the date on which the operation will commence.

187.   Nowhere in the proposal for the Koromlan Well did CHK include the estimated commencement date.

188.   Article XVI(b) of the JOAs states that the proposal for a horizontal well must include the Authorized Objective, which is defined as the length of the later drain hole for the horizontal well.

189.   Nowhere in the proposal for the Koromlan Well did CHK include the Authorized Objective.

190.   Accordingly, CHK's proposal to drill the Koromlan Well is null, void, and of no effect under the JOAs because it does not comply with the requirements for a valid well proposal.

191.   An actual, present and justiciable controversy has arisen between Epsilon and CHK concerning whether the proposal for the Koromlan Well constitutes a valid well proposal under the JOAs.

41

WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that (1) CHK's proposal of the Koromlan Well does not comply with the requirements for a well proposal under the JOAs; (2) the Koromlan Well proposal is null, void, and of no effect; and (3) the defective proposal for the Koromlan Well does not restrict or otherwise interfere with Epsilon's right to drill the Proposed Wells.

Dated: June 1, 2021

Respectfully submitted,

*/s/ Gregory J. Krock*
Gregory J. Krock
Pa. I.D. No. 78308
Elizabeth M. Thomas
Pa. I.D. No. 322002

MCGUIREWOODS LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
(412) 667-6000 (Telephone)
(412) 667-6050 (Facsimile)
gkrock@mcguirewoods.com
ethomas@mcguirewoods.com

Jonathan T. Blank
*Pro Hac Vice*
MCGUIREWOODS LLP
652 Peter Jefferson Parkway
Suite 350
Charlottesville, VA 22911
(434) 977-2500 (Telephone)
(434) 980-2222 (Facsimile)

Appx0106

jblank@mcguirewoods.com

*Counsel for Plaintiff Epsilon Energy USA, Inc.*

43

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

**Amended Complaint** has been electronically served on counsel of record via the

CM/ECF filing system.

/s/ Gregory J. Krock
Gregory J. Krock

# EXHIBIT 1

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

October 18, 2010 ,
*year*

OPERATOR   **Chesapeake Appalachia, L.L.C.**

CONTRACT AREA        **Baltzley North Unit**
                     **Rush Township**

COUNTY OR PARISH OF   Susquehanna        STATE OF   Pennsylvania

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED
FORM.

A.A.P.L. NO. 610 – 1989

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 1 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | ~~11~~ |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

Appx0111

## TABLE OF CONTENTS

|  |  | D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: | 15 |
|  |  | E. WAIVER OF RIGHTS TO PARTITION: | 15 |
|  |  | F. PREFERRENTIAL RIGHT TO PURCHASE: | 15 |
| IX. | **INTERNAL REVENUE CODE ELECTION** |  | 15 |
| X. | **CLAIMS AND LAWSUITS** |  | 15 |
| XI. | **FORCE MAJEURE** |  | 16 |
| XII. | **NOTICES** |  | 16 |
| XIII. | **TERM OF AGREEMENT** |  | 16 |
| XIV. | **COMPLIANCE WITH LAWS AND REGULATIONS** |  | 16 |
|  |  | A. LAWS, REGULATIONS AND ORDERS: | 16 |
|  |  | B. GOVERNING LAW: | 16 |
|  |  | C. REGULATORY AGENCIES: | 16 |
| XV. | **MISCELLANEOUS** |  | 17 |
|  |  | A. EXECUTION: | 17 |
|  |  | B. SUCCESSORS AND ASSIGNS: | 17 |
|  |  | C. COUNTERPARTS: | 17 |
|  |  | D. SEVERABILITY | 17 |
| XVI. | **OTHER PROVISIONS** |  | 17 |

Appx0112

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Chesapeake Appalachia, L.L.C._____,

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes

hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land

identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil

and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.

### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A.      The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of an

AFE for the drilling of a vertical or horizontal well must be prepared in compliance with Article XVI hereof, incurred in conducting and

estimating the costs to be operation hereunder.

B.   The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and

Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production

testing conducted in such operation.

C.  The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be

developed and operated for Oil and Gas purposes under this agreement.   Such lands, Oil and Gas Leases and Oil and Gas

Interests are described in Exhibit "A."

D.  The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest

Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the

lesser.

E.  The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the

cost of any operation conducted under the provisions of this agreement.

F.   The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal

body having authority.   If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as

established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties. **The Drilling Unit for a**

**horizontal well shall be determined by the Operator in consultation with Non-Operator, and conform with**

**any restrictions in the agreement or conveyances creating the Oil and Gas Interests to be included in the Drilling Unit and**

**applicable laws and be formed in such size and shape as needed to  maximize the recovery of oil and gas through the use of multiple**

laterals.

G.  The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be

located.

**G.1  The term "Force Majeure"  shall mean anything act or occurrence beyond a party's control that delays  or prohibits**
**performance of any operation contemplated hereunder, including but not limited to the building of surface location, the drilling**
**completion or operating of a well, laying pipeline  or other physical operation. Force Majeure events include but are not limited to**
**Acts of God, inclement weather, governmental action or intervention, changes in existing laws or enforcement of existing laws and**
**permitting delays.**

H.  The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I.  The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as

provided in Article VI.B.2.

J.  The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a

proposed operation.

K.  The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous

hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is

specifically stated.

L.  The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts

2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of land lying within the Contract Area which are owned by parties to this agreement.

M.   The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N.   The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O.   The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P.   The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q.   The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R.   The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.

## EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

___x___   A.  Exhibit "A," shall include the following information:

     (1) Description of lands subject to this agreement,

     (2) Restrictions, if any, as to depths, formations, or substances,

     (3) Parties to agreement with addresses and telephone numbers for notice purposes,

     (4) Percentages or fractional interests of parties to this agreement,

     (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

     (6) Burdens on production. (7) Plat of Contract Area

___x___   B.  Exhibit "B," Form of Lease.

___x___   C.  Exhibit "C," Accounting Procedure.

___x___   D.  Exhibit "D," Insurance.

___x___   E.  Exhibit "E," Gas Balancing Agreement.

___x___   F.  Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

___x___   G.  Exhibit "G," Recording Supplement to Operating Agreement and Financing Statement.

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.

## INTERESTS OF PARTIES

**A.  Oil and Gas Interests:**

                      or acquires

If any party owns / an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B.  Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their

3

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens **shall** be payable by **Operator, and Operator** shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area, **provided Non-Operator elects to market its Oil and Gas with Operator under Operator's standard marketing letter agreement if Non-Operator elects to take its Gas in kind and separately market, then it shall bear and pay its proportionate share of all royalties and Operator shall have no obligation to distribute such burdens on behalf of Non-Operator.** . If any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefore.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

ARTICLE IV.

TITLES

**A. Title Examination:**

**Completed on the Drillsite tract and on all tracts in the well bore path in the Drilling Unit** unless otherwise agreed upon by the parties.

Title examination shall be / ~~made on the Drillsite of any proposed well~~ prior to commencement of drilling operations / ~~and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well.~~ The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator

4

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid **title agents and** attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Each party~~ Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by ~~such~~ each party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received

5

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or Interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

6

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

<div align="center">

**ARTICLE V.**

**OPERATOR**

</div>

**A. Designation and Responsibilities of Operator:**

    Chesapeake Appalachia, L.L.C.       shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

    1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

    Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. **A change of a corporate name or structure of Operator or transfer of all of Operator's interest (including operatorship)/ to any single  Failure of Operator to provide proof, reasonably satisfactory to Non-Operator(s), of the proposed entity's financial subsidiary, parent or successor corporation shall not be the basis for removal of Operator. / capability to conduct operations shall entitle Non-Operator(s) to prevent said transfer.**

    2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint **account.**

    3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall

<div align="center">7</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment, **in conducting operations hereunder** but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the

8

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise / ~~Non-Operators~~ **Consenting Party** of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to / ~~Non-Operators~~ **Consenting Party all** such reports, test results and notices regarding the progress of operations on the well including, but not limited to, daily drilling reports, completion reports, and well logs. **Consenting Party will provide Operator a distribution list of data to be sent, in the form of a well requirement sheet**

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith. **This provision is made expressly subject to Article XVI.P, below.**

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VI.
### DRILLING AND DEVELOPMENT

**Operations in the Contract Area:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.  If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made.  Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

    2. Underline{Operations by Less Than All Parties:}

    (a) Underline{Determination of Participation.} If any party to whom such notice / is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work.  The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party.  Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.  Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take.  Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal.  Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays).  The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.

10

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i)     200     % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that **proposed well or operation** interest which would have been chargeable to such Non-Consenting Party had it participated in the / ~~well~~ from the beginning of the operations; and

(ii)     400 *     % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and 400%_* of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein. **If the well to be drilled is the initial well in the Drilling Unit, the penalties in this subparagraph (ii) shall be 600/600% in lieu of 400//400%.**

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions

11

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount.   Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount.   Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties ___400___% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein.   If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings.   Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month.   In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests.   Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have

12

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-

13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have ~~fifteen (15)~~ / thirty (30) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. / Except as provided for in Article XVI.A, the ~~The~~ proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include: For (1) all horizontal wells in the Marcellus Shale formation and (2) all other horizontal wells with respect to which Non-Operator does not elect Option No. 2 all

☒ Option No. 1: / All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities. For (1) all vertical wells and (2) all horizontal wells not in the Marcellus Shale formation with respect to which Non-Operator elects Option No. 2 contemporaneously with Non-Operator making its initial election to participate in a proposed drilling operations, all if applicable Operator shall revise the AFE to reflect Non-Operator's election.

14

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

☒ Option No. 2: All / necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. / When

such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results

thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to

participate in a Completion attempt whether or not Operator recommends attempting to Complete the well; / **or to perform another operation described in Article XVI.A.,**

together with Operator's AFE for Completion costs / if not previously provided. The parties receiving such notice shall have **the costs of the operation**

forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of

notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an

accompanying AFE.   Operator shall deliver any such Completion proposal, or any Completion proposal conflicting

with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the

procedures specified in Article VI.B.6.   Election to participate in a Completion attempt shall include consent to all

necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface

facilities but excluding any stimulation operation not contained on the Completion AFE.   Failure of any party

receiving such notice to reply within the period above fixed shall constitute an election by that party not to

participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of

conflicting Completion proposals.   If one or more, but less than all of the parties, elect to attempt a Completion, the

provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging

Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations

thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each

separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting

Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party

in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier

Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any

recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in

which the Completion attempt is made.   Election by a previous Non-Consenting party to participate in a subsequent

Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable

materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,

insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a

Completion attempt.

   2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,

Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.   Consent to the Reworking,

Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and

Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

   Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____

__Fifty Thousand & No/100_____ Dollars ($ _50,000.00_____ ) except in connection with the

drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously

authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden

emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion

are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the

emergency to the other parties.   If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so

requesting an information copy thereof for any single project costing in excess of __Fifty Thousand & No/100_____ Dollars

($ _50,000.00_____ ).  Any party who has not relinquished its interest in a well shall have the right to propose that

Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as

salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but

not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall

be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the

amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles).   Operator shall deliver such

2  proposal to all parties entitled to participate therein.   If within thirty (30) days thereof Operator secures the written consent

of any party or parties owning at least _____ 50 _____ % of the interests of the parties entitled to participate in such operation,

3  each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated

4  to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms

5  of the proposal.

6  **E. Abandonment of Wells:**

7    1.  <u>Abandonment of Dry Holes:</u> Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has

8  been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

plugged and abandoned without the consent of all parties.   Should Operator, after diligent effort, be unable to contact any

9  party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after

10  delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the

11  proposed abandonment.   All such wells shall be plugged and abandoned in accordance with applicable regulations and at the

12  cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well.   Any party who objects to

plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday,

13  Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such

14  forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of

Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct

15  such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and

16  abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well.   The party

17  taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against

liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and

18  restoring the surface, for which the abandoning parties shall remain proportionately liable.

19    2.  <u>Abandonment of Wells That Have Produced:</u> Except for any well in which a Non-Consent operation has been

20  conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has

been completed as a producer shall not be plugged and abandoned without the consent of all parties.   If all parties consent to

21  such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk

22  and expense of all the parties hereto.   Failure of a party to reply within sixty (60) days of delivery of notice of proposed

23  abandonment shall be deemed an election to consent to the proposal.   If, within sixty (60) days after delivery of notice of the

proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its

24  operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the

25  applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties

26  against liability for any further operations on the well conducted by such parties.   Failure of such party or parties to provide

27  proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well

within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession

28  of such well and plug and abandon the well.

29      Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of

30  the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost

of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event

31  the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the

32  value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing

33  operations their proportionate shares of the estimated excess cost.   Each abandoning party shall assign to the non-abandoning

parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all

34  of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only

35  insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production.   If the

36  interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-

abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of

37

16

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing   __50__ % of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☒ **Option No. 1: Gas Balancing Agreement Attached**

Each party ~~shall~~ / take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform

18

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefore by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances:

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.

19

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may

20

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default.  Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made.  If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement.  Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5.  Costs and Attorneys' Fees:  In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense.  In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.  Any party may request, and shall be entitled to receive, proper evidence of all such payments.  In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so.  In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent.  Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest.  Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty.  When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

<div align="center">

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

</div>

**A. Surrender of Leases:**

<div align="center">21</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by

22

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation / . so that each Drilling Party receives its pro rata share of such contribution. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F.** Preferential Right to Purchase:

X (Optional; Check if applicable.)

From and after the payment of the Farmout Consideration payable unto the parties' Farmout Agreement, dated July 1, 2001, should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase

23

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

~~ARTICLE IX.~~

~~INTERNAL REVENUE CODE ELECTION~~

~~If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.~~

### ARTICLE X.

#### CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Fifty Thousand and No/100_____ Dollars ($ _50,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations ARTICLE XI.

#### FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

24

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ARTICLE XII.

### NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

## ARTICLE XIII.

### TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ ~~Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.~~

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of ___90___ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____90_____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of ~~180~~ / 90 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

25

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

### ARTICLE XIV.

### COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ____Texas_____ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence.   Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

### ARTICLE XV.

### MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations.  In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination.   In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest.    In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

26

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

C. Counterparts:

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. Severability:

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

<div align="center">

ARTICLE XVI.

OTHER PROVISIONS

</div>

A.    Well Proposal Requirements and Order of Preference of Operations:

    1.  (a) Requirements of Vertical Well Proposal: A proposal for a vertical well operation shall include the following:

        (1) the estimated commencement date;

        (2) the proposed depth;

        (3) the objective formation or formations to be penetrated or tested:

        (4) the Authorized Depth, the surface and bottomhole locations, proposed directional operations; and

        (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, or abandoning the well, itemization of all tangible and intangible costs. Operator's estimate of Completion costs should be included as an informational item.

      (b) Order of Preference of Operations - Vertical Well: The term "Authorized Depth" is the objective depth authorized in the AFE for vertical wells. Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a vertical well has been drilled to the Authorized Depth, and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in order enumerated hereafter:

        (1) a proposal to do additional logging, coring or testing;

        (2) a proposal to attempt to Complete the well at the Authorized Depth in the manner set forth in the Operator's AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

        (3) a proposal to attempt to Complete the well at the Authorized Depth in a manner different than as set forth in the Operator's AFE for Completion;

        (4) a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Depth, with priority given to objectives in ascending order up the hole;

        (5) a proposal to drill the well to a depth below the Authorized Depth, with priority given to objectives in descending order;

        (6) a proposal to Sidetrack the well to a new target objective for a vertical or deviated hole, but not a horizontal well or lateral drain hole, with the priority given first in ascending order to targets above the Authorized Depth, and then in descending order to targets below the Authorized Depth;

        (7) a proposal to Sidetrack to a horizontal well or lateral drain hole, with priority given to a lateral drain hole at the Authorized Depth, and then to objectives in ascending order above the Authorized Depth, and then to objectives in descending order below the Authorized Depth; and

        (8) plugging and abandoning the well.

    2.  (a)  Requirements of Horizontal Well Proposal:  A proposal for a horizontal well operation shall include the following:

        (1) the estimated commencement date;

        (2) the proposed depth;

        (3) the objective formation or formations to be penetrated or tested;

        (4) the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and

        (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well.  Operator's estimate of Completion costs should be included as an informational item.

<div align="center">

27

</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

(b)  Order of Preference of Operations – Horizontal Well:  The term "Authorized Objective" is the agreed upon length of the lateral drain hole for the horizontal well(s) as authorized in the AFE.  Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a horizontal well has been drilled to the Authorized Objective and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter:

(1)  a proposal to do additional logging, coring or testing;

(2)  a proposal to attempt to Complete the well at the Authorized Objective in the manner set forth in the Operator's AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

(3)  a proposal to attempt to Complete the well at the Authorized Objective in a manner different than as set forth in the Operator's AFE for Completion;

(4)  a proposal to extend the length of the lateral drain hole for specified number of feet in the direction it is drilling, with a priority given to the shortest additional length proposed by any of the participating parties;

(5)  a proposal to drill a new lateral drain hole in a different direction at the Authorized Objective;

(6)  a proposal to drill a new later drain hole at a different depth, with priority given in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective;

(7)  a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Objective with priority given to the objectives in ascending order up the hole;

(8)  a proposal to Deepen the well below the Authorized Objective;

(9)  a proposal to Sidetrack the well to a new target objective, with priority given first in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective; and

(10)  plugging and abandoning the well.

In drilling a horizontal well, the Operator shall have the right at its sole discretion to 1) cease drilling at any time, for any reason, after it has drilled the objective formation and has drilled laterally for a distance which is at least equal to fifty percent (50%) of the length of the total horizontal displacement (displacement from true vertical) proposed in the AFE or 2)  continue drilling laterally at any time, for any reason, beyond the total horizontal displacement proposed in the AFE, so long as such lateral does not exceed 25% more than that proposed in the AFE; if in such event the well be deemed to be at its "Authorized Objective" as that term is used in this Agreement.

B.   Gathering Lines/Facilities:

Notwithstanding anything herein to the contrary, any flow line necessary for the gathering of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement and an election to participate in such operation shall include participation in these associated facilities.  Facility includes, but is not limited to, any battery, separator, compressor, gathering system facility, production storage facility or water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation.

C.   Plugging and Abandoning:

It is understood and agreed that where the terms "plugging and abandoning" or "plugged and abandoned" are used in this agreement such terms shall be deemed to include all costs associated with plugging and abandoning a well including, but not limited to, any costs of remediating contamination and/or surface restoration, to the extent that such remediation and/or surface restoration is required by the lease(s), applicable laws or regulation or by prevailing oil field practices.

D.   Commencement of Operations:

Notwithstanding anything in Article VI.B. to the contrary, Operator's election to commence operations prior to or during the Notice Period (forty-eight (48) hours if applicable), will not alter or extend the Notice Period in which a party is required to make an election to participate in the proposed operation, or constitute an election by that party not to participate in the cost of the proposed operation.

E.   Headings:

The descriptive headings used in this Operating Agreement are for convenience only and will not be deemed to affect the meaning of this Operating Agreement.

F.   Memorandum of Operating Agreement:

Contemporaneously with the execution of this Agreement, the parties have executed a Memorandum of Operating Agreement substantially in the same form as Exhibit "G" attached hereto, for the purpose of giving notice to the third parties of the existence of this Agreement and of the mortgage lien and security interest created by each party as debtor, to all other parties, as secured parties.  Such Memorandum of Operating Agreement shall be recorded by Operator in any county in which the Contract Area is located and/or with the Secretary of State.

Appx0139

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

G.   Construction:

Each party has had the opportunity to contribute to the drafting of this agreement and/or opportunity to have it reviewed by its legal counsel; therefore, the parties agree that in the event of a dispute over the meaning or application of this agreement, it shall be construed as if drafted equally by the parties and no presumption shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this agreement.

H. INTEGRATION:

In the event the Pennsylvania Department of Environmental Protection ("DEP"), Federal, State or other governmental body having jurisdiction orders the integration of interests within a spacing unit, any resulting increase or decrease in the working interest of the parties shall be realized on a proportionate basis.

I. CONFIDENTIALITY:

Except as otherwise provided herein, during the term of this agreement no party shall divulge to any third party any geophysical data acquired, obtained or developed by the parties hereto involving the Contract Area subsequent to the effective date of this agreement, or any drilling information relative to any well or wells drilled as a result hereof, other than depth and information customarily publicized, without first obtaining the written consent of the other parties to release any such information, which consent shall not be unreasonably withheld; provided, however, that (1) such consent shall not be necessary for any party to divulge such information to a party who is the record owner of an interest in such a well, but only if such party to whom the information is to be disclosed agrees, in writing, to be subject to this provision prior to disclosure, and (2) access to such data shall be made available to a party's parent company or its subsidiaries, agents, employees and contractors engaged in the performance of any work hereunder.  All such information and data shall be treated as strictly confidential.  Nothing contained herein shall be deemed to prevent disclosure of any such information or data if such disclosure is required by applicable laws or rules and regulations of any administrative or governmental agency or entity.

After the expiration of this agreement all information, data and/or materials acquired jointly pursuant to this agreement shall be independently owned by each party who participated in such Geoscience operation and such participating party shall have the right to separately sell, trade or otherwise dispose of such data without the obligation to share any remuneration received with the other participating parties.

J. PROSPECT AREA:

i.   Shall mean the unique Contract Area covered by the JOA for each Initial Prospect Well and all related Subsequent Prospect Wells.  For each Initial Prospect Well the corresponding Prospect Area shall be a contiguous area in size and configuration as determined by the Operator in consultation with Non-Operator in order to accommodate anticipated wells, wellbore paths and wellbore lengths located within the anticipated production unit established by the Operator as permitted by the underlying oil and gas leases, as may be amended, or allowed/required by Federal, State or other governmental body having jurisdiction, or other means, (the "Drilling Unit") but in no event shall the Drilling Unit exceed 1,280 acres without the mutual consent of the Parties.  The Prospect Area shall not include any portion of any other Prospect Area in effect at the time of the Initial Prospect Well proposal without the mutual consent of the Parties, except as otherwise provided for herein.  For purposes of this Agreement, the Prospect Area, Contract Area, Drilling Unit and Prospect JOA Contract Area shall have the same meaning and be considered one and the same.

ii.  (A) It is recognized by the Parties that it may be prudent and/or necessary to expand or reduce the size of an existing Prospect Area, or include within an existing Prospect Area acreage which was not initially included in such existing Prospect Area ("Outside Acreage") and/or acreage from an existing and adjoining Prospect Area.   In the event an existing Prospect Area is expanded or reduced in size, the working interests of the Parties in proposed new wells, wells previously proposed and drilled and all wells drilled subsequent thereto within the modified Prospect Area shall not change unless agreed to by the Parties or proportionately reduced by a participating third party working interest owner in the Prospect Area.  For purposes of the Parties maintaining their same working interest throughout the Prospect Area, any Outside Acreage included by the Parties shall be owned in proportions of the Parties' initial working interest in the Prospect Area being expanded and all Parties shall be obligated to pay their share of acquisition costs to acquire such Outside Acreage.  The modified Prospect Area(s) and associated Unit boundary(ies) shall be revised to reflect the change in Prospect Area. New Memorandums of Operating Agreement and modified Declarations of Pooled Units shall be prepared and filed of record, if necessary.  No Outside Acreage that would constitute more than 20% of the Prospect Area and be necessary to drill longer or additional horizontal lateral shall be included in the Prospect Area and/or Drilling Unit without Non-Operators consent.

(B) If, while drilling a horizontal well, it becomes necessary to accommodate a well bore path which may extend outside of an existing Prospect Area, Operator shall have the right at its sole discretion to reconfigure such Prospect Area in such a way as to encompass acreage necessary for such horizontal well and the corresponding Unit and shall provide notice to Non-operator of the revised Prospect Area and corresponding working interests.  The working interests of the Parties in resulting Prospect Area shall remain unchanged as a result of such reconfiguration.  Should it be necessary to equalize any additional Prospect Area acreage to accommodate such reconfiguration as it relates to existing working interests, then assignments of interests necessary to equalize shall be made, and the assignee shall reimburse assignor for actual acquisition costs associated therewith.

K.  INITIAL PROSPECT WELL:

Shall mean the initial well drilled on the Prospect Area.

L.  GATHERING LINES / FACILITIES:

Notwithstanding anything herein to the contrary, any gas gathering line necessary for the gathering or transportation of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be proposed in accordance with the method prescribed for under Article VI.B.-Operations of

29

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

this Agreement.  Facility includes, but is not limited to, any battery, separator, compressor stations, gathering system or production storage facility.

**M. MEDIA/NEWS RELEASES:**

No party hereto shall, at any time, issue to the press or other media any news release, concerning the Contract Area (also referred to herein as "Prospect Area"), without the prior approval of all the other parties hereto, which approval shall not be unreasonably withheld.  Any request for approval hereunder shall be responded to within 24 hours if receipt of such request and any failure to timely respond shall be deemed to be an approval.  When all of the parties have reviewed such material and all parties have approved the issuance of the material, the party desiring such release shall have the principal responsibility for its issuance.  The only other exception to the foregoing shall be that in the event of any emergency involving extensive property damage, operations failure, loss of human life or other clear emergency, the party designated as Operator hereunder is authorized to furnish such minimum, strictly factual information as shall be necessary to satisfy the legitimate public interest on the part of the press and duly constituted authorities, if time does not permit obtaining prior approval by the other parties.  Said Operator shall thereupon promptly advise parties of the information so furnished. Notwithstanding the foregoing, either party may issue a media or news release required by applicable laws, rules or regulations, including those of applicable stock exchanges.

**N. CONFLICTING PROVISIONS:**

In the event of a conflict between the provisions of this Article XVI and any other provisions of this agreement, the provisions of this Article XVI shall control and prevail.

**O. DEFAULTS AND REMEDIES:**

Except as expressly provided herein, nothing in this Operating Agreement entitles any person or party other than the Operator and Non-Operator to any claim, cause of action, remedy, or right of any kind.

**P.       AFE OVERRUNS**

In the event expenditure against an AFE exceeds, or in Operator's reasonable judgment, are likely to exceed, twenty percent (20%) or more of the total AFE prior to finishing the approved operations, the Operator, shall promptly furnish to Non-Operator a supplemental AFE and a summary description as to the purpose and/or cause of the overrun.  Upon receipt of a supplemental AFE, Non-Operator may call for partner's meeting by notifying the Operator with full details of the purpose of the meeting, including a time, place and agenda that meet the Operator's reasonable business schedule and do not interfere unreasonably with the Operator's ongoing operations under this Agreement.

IN WITNESS WHEREOF, this agreement shall be effective as of October 18, 2010.

Henry Hood, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications have been made, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes.

ATTEST OR WITNESS:                                    CHESAPEAKE APPALACHIA, L.L.C.,
                                                                          OPERATOR

_____          By _____

_____              Henry J. Hood
                                                                   Type or print name

                                                                   Title  Senior Vice President – Land and Legal &
                                                                   General Counsel

                                                                   Date _____

                                                                   Tax ID or S.S. No.     20-3774650

ATTEST OR WITNESS:                                    EPSILON ENERGY USA, INC.,
                                                                          NON-OPERATORS

_____          By _____

_____              Zoran Arandjelovic
                                                                   Type or print name

                                                                   Title  Executive Chairman, President and CEO

                                                                   Date  24 May 2011

                                                                   Tax ID or S.S. No. _____

Signature Page to that certain Operating Agreement dated October 18, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Baltzley North Unit.

30

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ATTEST OR WITNESS:**                                 **STATOIL USA ONSHORE PROPERTIES INC.,**
                                                              **NON-OPERATORS**

_____

_____        By _____

_____           __M. K. Williams_____
                                           Type or print name

                                           Title __Land Manager -- Onshore Gas USA & Mexico___

                                           Date _____

                                           Tax ID or S.S. No. ____FEIN 26-3666667_____

Signature Page to that certain Operating Agreement dated October 18, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Baltzley North Unit.

31

Appx0142

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

# ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of <u>OKLAHOMA</u>    )
               ) ss.
County of <u>OKLAHOMA</u>   )

This instrument was acknowledged before me on

<u>May 13, 2011</u> by Henry J. Hood, Senior Vice President – Land and Legal & General Counsel of Chesapeake Appalachia, L.L.C., a limited liability company.

(Seal, if any)

JESSICA S. MEEK
NOTARY
# 08000292
EXP. 01/08/12
PUBLIC
STATE OF OKLAHOMA

Title (and Rank) <u>Land Tech</u>

My commission expires: <u>1/8/12</u>

---

Acknowledgment in representative capacity:

<s>State of</s> <u>Province of Ontario</u> )
<u>City of Vaughan</u> ) ss.
<s>County of</s> )

This instrument was acknowledged before me on

<u>May 24, 2011</u> by Zoran Arandjelovic as <s>Executive Chairman</s>, President <s>and CEO</s> of Epsilon Energy USA, Inc.

(Seal, if any)

Title (and Rank) <u>Notary Public</u>

My commission expires: <u>n/a</u>

---

Acknowledgment in representative capacity:

State of _____ )
                ) ss.
County of _____ )

This instrument was acknowledged before me on

_____ by M.K. Williams as Land Manager – Onshore Gas USA & Mexico of Statoil USA Onshore Properties Inc.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

33

EXHIBIT "A"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT**
**DATED OCTOBER 18, 2010**
**BY AND BETWEEN CHESAPEAKE APPALACHIA, L.L.C., OPERATOR,**
**EPSILON ENERGY USA, INC., AS NON-OPERATOR, AND STATOIL USA ONSHORE PROPERTIES**
**INC., AS NON-OPERATOR**

1. **DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT**

   THOSE CERTAIN LEASES AND/OR INTERESTS LOCATED WITHIN THE CONTRACT AREA AS FURTHER DESCRIBED ON EXHIBIT "A-1" (LEASE LISTING) AND AS SHOWN ON THE PLAT OF THE CONTRACT AREA ATTACHED AS EXHIBIT "A-2" HEREOF.

2. **RESTRICTIONS, IF ANY, AS TO DEPTHS, FORMATIONS AND SUBSTANCES**

   None

3. **PARTIES TO AGREEMENT WITH ADDRESS AND TELEPHONE NUMBER FOR NOTICE PURPOSES**

   Chesapeake Appalachia, L.L.C.
   6100 N. Western Avenue
   P. O. Box 18496
   Oklahoma City, Oklahoma
   Attention: Serena Branch, Land Manager
   Telephone:     (405) 935-7952
   Facsimile:      (405) 849-7952

   Epsilon Energy USA, Inc.
   3343 State Route 3004
   Meshoppen, PA  18630
   Attention:  Zoran Arandjelovic – President and CEO
   Telephone:     (570) 869–2000 ext. 103
   Facsimile:      (570) 869–4444

   Statoil USA Onshore Properties Inc.
   2103 CityWest Boulevard, Suite 800
   Houston, TX  77042
   Attention: Mike Williams, Land Manager
   Telephone:     (713) 918 – 8200
   Facsimile:      (713) 918 – 8290

4. **PERCENTAGES OR FRACTIONAL INTERESTS OF PARTIES TO THIS AGREEMENT**

   **BALTZLEY NORTH UNIT**

| PARTIES | WORKING INTEREST CARRIED TO COMPLETION | WORKING INTEREST AFTER COMPLETION |
|---|---|---|
| Chesapeake Appalachia, L.L.C.* | 40.876769% | 29.345274% |
| Statoil USA Onshore Properties, Inc.* | 19.417242% | 13.865041% |
| Epsilon Energy USA, Inc.** | 0.000000% | 17.083696% |
| Third Party Interests** | 39.705989% | 39.705989% |
| | 100.000000% | 100.000000% |

5. **OIL AND GAS LEASES AND/OR OIL AND GAS INTEREST SUBJECT TO THIS AGREEMENT**

   The oil and gas lease or oil and gas interest, or portions thereof, included in the Contract Area and described on Exhibit A-1 attached hereto.

6. **BURDENS ON PRODUCTION**

   Lease Royalty                                           15.433533%***

7. **PLAT OF CONTRACT AREA**

   See attached prelimninary Exhibit A-2 which will be substituted with the final unit plat after the initial well is drilled.

*The working interests of the Parties above are to be determined in accordance with the terms and conditions of that certain Development Agreement ("DA") by and between the Parties dated November 10, 2008.
It is understood by the Parties hereto that in the event additional interest is acquired in the Contract Area and all Parties with a right under the DA do not elect and pay for their proportionate share of said interest, the interests above shall be adjusted to reflect actual interest owned by the Parties in the Contract Area.  An interest adjustment shall also occur in the event of participation from unleased mineral interests and/or third parites.

**See Exhbit A-1 for third party information.

***Lease burdens reflected are estimates and subject to change upon verification of royalty provisions of non-operated leasehold.

Exhibit "A-1"
Attached to and made a part of the Operating Agreement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Operator, Epsilon Energy USA, Inc., as Non-Operator, and Statoil USA Onshore Properties Inc., as Non-Operator
Baltzley North Unit
Rush Township
Susquehanna County, Pennsylvania

### CHK/STO 67.5/32.5

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-298558-000 | Brett & Christel Flynn | Chesapeake Appalachia LLC | 1/7/2010 | 201004957 | 157.00-1-019.00 | 10.1510 | 1.310000 |
| 1-298570-000 | Robert and Arlene G Blom | Chesapeake Appalachia LLC | 9/26/2009 | 201004963 | 157.00-1-020.00 | 21.3400 | 15.635010 |
| 1-271016-000 | Lorna G Hall | Chesapeake Appalachia LLC | 3/28/2009 | 200906705 | 157.15-1-004.00 | 2.7400 | 2.740000 |
| 1-255277-000 | J Robert and Betty Hiles | Chesapeake Appalachia LLC | 3/3/2008 | 200811255 | 157.00-1-016.00 | 13.0000 | 13.000000 |
| 1-292364-000 | John M and Denise Hlivia | Chesapeake Appalachia LLC | 12/8/2009 | 201002407 | 158.00-1-014.00 | 22.0000 | 0.150772 |
| 1-247550-000 | Wayne P & Donna L Martin | Chesapeake Appalachia LLC | 11/1/2007 | 200802809 | 157.00-1-050.00 | 23.4200 | 16.209998 |
| 1-289128-000 | Clara McGavin | Chesapeake Appalachia LLC | 9/29/2009 | 200917945 | 157.00-1-041.00 | 0.5000 | 0.500000 |
| 1-280918-000 | Anthony J and Betty A Onuska | Chesapeake Appalachia LLC | 3/28/2009 | 200910165 | 157.00-1-046.00 | 1.0700 | 1.070000 |
| 1-266222-000 | Sandra L and James D Rogers | Chesapeake Appalachia LLC | 8/7/2008 | 200917964 | 157.15-1-028.00 | 0.9200 | 0.920000 |
| 1-271016-000 | Ronald D & Cathy L Severs | Chesapeake Appalachia LLC | 3/22/2009 | 200906706 | 157.15-1-030.00 | 0.9500 | 0.950000 |
| 1-273840-000 | Robert D and Julie A Shindar | Chesapeake Appalachia LLC | 3/30/2009 | 200908612 | 157.15-1-027.00 | 1.1188 | 1.118750 |
| 1-259349-000 | Wayne and Linda Smith | Chesapeake Appalachia LLC | 4/28/2008 | 200814786 | 157.15-1-028.00 | 3.8600 | 3.860000 |
| 1-273846-000 | Charles E Warner Jr | Chesapeake Appalachia LLC | 4/14/2009 | 200908605 | 157.00-1-038.00 | 1.7900 | 1.790000 |
| 1-249048-000 | Terry and Karin Wescott | Chesapeake Appalachia LLC | 11/27/2007 | 200805343 | 157.15-1-001.00 | 4.4897 | 4.489700 |
| 1-306756-000 | Jacob Fissler | Chesapeake Appalachia LLC | 3/31/2010 | 201012052 | 157.15-1-005.00 | 0.5000 | 0.500000 |
| 1-307026-000 | Robert L JR and Jamie S Heft | Chesapeake Appalachia LLC | 4/23/2010 | 201012064 | 157.00-1-040.00 | 1.6338 | 1.633750 |
| 1-304364-000 | Christopher P Warner | Chesapeake Appalachia LLC | 3/8/2010 | 201006507 | 157.15-1-009.00 | 0.5241 | 0.524100 |
| 1-273827-000 | Rodney S and Stephanie M Brace | Chesapeake Appalachia LLC | 3/31/2009 | 200907531 | 157.15-1-012.00 | 0.8426 | 0.842600 |
| 1-273819-000 | William T Chance | Chesapeake Appalachia LLC | 4/6/2009 | 200907534 | 157.00-1-100.00 | 2.0700 | 2.070000 |
| 1-321731-000 | Rush United Methodist Church | Chesapeake Appalachia LLC | 4/16/2010 | 201100188 | 157.15-1-011.00 | 0.2875 | 0.287500 |
| | David L and Sandra L Beaumont | Southwestern Energy Production Company | 9/20/2007 | 200709957 | 157.00-1-052.00 | 60.0000 | 68.038567 |
| | Holly Decker | Southwestern Energy Production Company | 9/24/2009 | 200917967 | 157.15-1-013.00 | 0.4000 | 0.400000 |
| | Judy Y Krupinski | Southwestern Energy Production Company | 5/10/2007 | 200707270 | 158.00-1-010.00 | 23.6400 | 0.347414 |
| | | | | | | **Total:** | 135.394161 |

### CHK 100% (STO Declined)

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-301800-000 | Michael and Nicole M Repchick | Chesapeake Appalachia LLC | 1/9/2010 | 201005317 | 157.15-1-014.00 | 0.3000 | 0.300000 |
| 1-301823-000 | Francis and Patricia Flynn | Chesapeake Appalachia LLC | 1/7/2010 | 201005724 | 157.15-1-026.00 | 0.9900 | 0.990000 |
| 1-313723-000 | Alar Family Limited, Partnership | Chesapeake Appalachia LLC | 7/8/2010 | 201020876 | 157.00-1-032.01 | 0.3300 | 0.330000 |
| 1-313225-000 | Odd Fellows Hall Association of Rush | Chesapeake Appalachia LLC | 4/20/2010 | 201019871 | 157.15-1-008.00 | 0.1900 | 0.190000 |
| 1-308497-000 | Robert J and Mary T Rudolph | Chesapeake Appalachia LLC | 3/30/2010 | 201015807 | 157.00-1-099.00 | 39.3000 | 0.349668 |
| 1-309702-000 | Edward P and Jessica R Warner | Chesapeake Appalachia LLC | 4/10/2010 | 201016802 | 157.15-1-010.00 | 0.4645 | 0.464500 |
| 37-000070-000 | William R and Arlene J Tonzelli | Chesapeake Appalachia LLC | 10/18/2010 | 201102552 | 157.15-1-023.00 | 0.3440 | 0.344000 |
| | | | | | | **Total:** | 2.968568 |

### Epsilon/CHK/STO 50/33.75/16.25

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-297572-000 | David Evan Baltzley | Epsilon Energy USA, Inc. | 5/16/2007 | 200708064 | 176.00-1-012.00 | 107.8000 | 19.815173 |
| 1-297594-000 | Colin and Diana Burridge | Epsilon Energy USA, Inc. | 9/18/2007 | 200800145 | 157.00-1-048.00 | 55.3400 | 55.340000 |
| 1-297538-000 | Robert and Brenda Decker | Epsilon Energy USA, Inc. | 11/7/2007 | 200800774 | 158.00-1-008.00 | 439.8500 | 14.566554 |
| 1-297597-000 | David C Jenner | Epsilon Energy USA, Inc. | 3/21/2007 | 200704240 | 157.00-1-049.01 | 13.8800 | 13.880000 |
| 1-297597-000 | David C Jenner | Epsilon Energy USA, Inc. | 3/21/2007 | 200704242 | 157.00-1-055.00 | 40.3500 | 1.814034 |
| 1-297589-000 | Paul A Jones | Epsilon Energy USA, Inc. | 7/17/2007 | 200709894 | 157.00-1-042.00 | 67.7000 | 50.300285 |
| 1-297646-000 | Thomas I and Cynthia L Moore | Epsilon Energy USA, Inc. | 10/31/2007 | 200801949 | 157.00-1-100.00 | 1.7400 | 0.503576 |
| 1-297646-000 | Thomas I and Cynthia L Moore | Epsilon Energy USA, Inc. | 10/31/2007 | 200801949 | 157.00-1-030.00 | 9.3500 | 0.443710 |
| 1-297606-000 | Kenneth B and Janice Pittman | Epsilon Energy USA, Inc. | 5/7/2007 | 200708072 | 176.00-1-009.00 | 40.9300 | 27.331418 |
| 1-297684-000 | Elmer W and Karen A Jr Richie | Epsilon Energy USA, Inc. | 12/5/2007 | 200802016 | 157.00-1-102.00 | 2.0000 | 1.374015 |
| | | | | | | **Total:** | 184.868765 |

### Third Party Interests (Not Subject to Operating Agreement)

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| | Douglas W Brown | Talisman Energy USA Inc. | | | 157.00-1-048.01 | 4.0500 | 4.050000 |
| | Gordon and Sandra J Jr Knipe | Talisman Energy USA Inc. | | | 176.00-1-043.00 | 11.0300 | 11.030000 |
| | Gordon and Sandra J Jr Knipe | Talisman Energy USA Inc. | | | 157.00-1-094.00 | 11.8000 | 11.800000 |
| | Gordon and Sandra J Jr Knipe | Talisman Energy USA Inc. | | | 176.00-1-008.00 | 33.7100 | 33.710000 |
| | Gordon and Sandra J Jr Knipe | Talisman Energy USA Inc. | | | 176.00-1-007.00 | 26.0000 | 19.097787 |
| | Gordon and Sandra J Jr Knipe | Talisman Energy USA Inc. | | | 157.00-1-045.00 | 46.9200 | 46.920000 |
| | Jamie Olszewski | Talisman Energy USA Inc. | | | 157.15-1-020.00 | 9.9900 | 9.990000 |
| | Howard E and Barbara Riner | Talisman Energy USA Inc. | | | 176.00-1-005.00 | 51.0000 | 3.234965 |
| | Hugh K and Diane M Rodden | Talisman Energy USA Inc. | | | 157.00-1-047.00 | 0.3760 | 0.376000 |
| | Hugh K and Diane M Rodden | Talisman Energy USA Inc. | | | 157.00-1-049.00 | 108.4200 | 59.634791 |
| | Hugh K and Diane M Jr. Rodden | Talisman Energy USA Inc. | | | 157.00-1-048.00 | 6.0300 | 1.704455 |
| | David M and Kathleen M Yulke | Talisman Energy USA Inc. | | | 176.00-1-004.00 | 68.7760 | 4.211620 |
| | John Sershen | Talisman Energy USA Inc. | | | 157.00-1-092.00 | 0.9978 | 0.997800 |
| | Gerald N Daly | Cabot Oil & Gas Corporation | | | 157.15-1-005.00 | 0.9900 | 0.990000 |
| | Michael E and Alayne D Kipar | Cabot Oil & Gas Corporation | | | 157.15-1-029.00 | 1.1700 | 1.170000 |
| | Stephen C and Norma J Lewis | Cabot Oil & Gas Corporation | | | 157.00-1-033.00 | 0.3489 | 0.348900 |
| | Leroy and Judy Warriner | Cabot Oil & Gas Corporation | | | 157.00-1-017.00 | 5.5700 | 5.570000 |
| | | | | | | **Total:** | 214.836338 |

### Uncontrolled Interests (Not subject to the Operating Agreement)

| LESSEE | | | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|
| Open Interest | | | 157.00-1-018.00 | 45.9900 | 45.990000 |
| Open Interest | | | 157.15-1-022.00 | 0.5699 | 0.569900 |
| Open Interest | | | 157.15-1-026.00 | 0.7500 | 0.750000 |
| Open Interest | | | 157.15-1-025.00 | 1.0000 | 1.000000 |
| Open Interest | | | 157.15-1-007.00 | 0.1860 | 0.186000 |
| Open Interest | | | 157.15-1-006.00 | 1.0000 | 1.000000 |
| Open Interest | | | 157.00-1-044.00 | 0.4200 | 0.420000 |
| Open Interest | | | 157.15-1-019.00 | 0.3400 | 0.340000 |
| Open Interest | | | 157.00-1-031.00 | 0.5100 | 0.369526 |
| | | | | **Total:** | 50.625426 |

| | |
|---|---|
| Total Leasehold Subject to Operating Agreement: | 326.231494 |
| Total Acres in Unit: | 541.067822 |
| Total Acres in Contract Area: | 591.693248 |

END OF EXHIBIT "A-1"

EXHIBIT "A-2"

Attached to and made a part of the Operating Agreement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------|
| 1 | 157.00-1-016.00 |
| 2 | 157.00-1-017.00 |
| 3 | 157.00-1-018.00 |
| 4 | 157.00-1-019.00 |
| 5 | 157.00-1-020.00 |
| 6 | 157.00-1-030.00 |
| 7 | 157.00-1-031.00 |
| 8 | 157.00-1-032.01 |
| 9 | 157.00-1-033.00 |
| 10 | 157.00-1-039.00 |
| 11 | 157.00-1-040.00 |
| 12 | 157.00-1-041.00 |
| 13 | 157.00-1-042.00 |
| 14 | 157.00-1-043.00 |
| 15 | 157.00-1-044.00 |
| 16 | 157.00-1-045.00 |
| 17 | 157.00-1-046.00 |
| 18 | 157.00-1-047.00 |
| 19 | 157.00-1-048.00 |
| 20 | 157.00-1-048.01 |
| 21 | 157.00-1-049.00 |
| 22 | 157.00-1-049.01 |
| 23 | 157.00-1-050.00 |
| 24 | 157.00-1-052.00 |
| 25 | 157.00-1-060.00 |
| 26 | 157.00-1-092.00 |
| 27 | 157.00-1-094.00 |
| 28 | 157.00-1-100.00 |
| 29 | 157.00-1-102.00 |
| 30 | 157.00-1-105.00 |
| 31 | 157.15-1-001.00 |
| 32 | 157.15-1-002.00 |
| 33 | 157.15-1-003.00 |
| 34 | 157.15-1-004.00 |
| 35 | 157.15-1-005.00 |
| 36 | 157.15-1-006.00 |
| 37 | 157.15-1-007.00 |
| 38 | 157.15-1-008.00 |
| 39 | 157.15-1-009.00 |
| 40 | 157.15-1-010.00 |
| 41 | 157.15-1-011.00 |
| 42 | 157.15-1-012.00 |
| 43 | 157.15-1-013.00 |
| 44 | 157.15-1-014.00 |
| 45 | 157.15-1-015.00 |
| 46 | 157.15-1-019.00 |
| 47 | 157.15-1-020.00 |
| 48 | 157.15-1-022.00 |
| 49 | 157.15-1-023.00 |
| 50 | 157.15-1-024.00 |
| 51 | 157.15-1-025.00 |
| 52 | 157.15-1-026.00 |
| 53 | 157.15-1-027.00 |
| 54 | 157.15-1-028.00 |
| 55 | 157.15-1-029.00 |
| 56 | 157.15-1-030.00 |
| 57 | 158.00-1-008.00 |
| 58 | 158.00-1-010.00 |
| 59 | 158.00-1-014.00 |
| 60 | 176.00-1-004.00 |
| 61 | 176.00-1-005.00 |
| 62 | 176.00-1-007.00 |
| 63 | 176.00-1-008.00 |
| 64 | 176.00-1-009.00 |
| 65 | 176.00-1-012.00 |
| 66 | 176.00-1-043.00 |

Legend:
- CHK - 2.968568 AC
- Epsilon/CHK/STO - 184.868765 AC
- CHK/STO - 138.394161 AC
- Cabot - 8.078900 AC
- Talisman - 206.757428 AC
- Uncontrolled - 50.625426 AC
- Contract Area - 591.693248 AC

5/11/2011

CONTRACT AREA

**Chesapeake** ENERGY

**Baltzley North Common Pad**
Susquehanna Co., PA
1 inch = 1,000 feet

Appx0147

Exhibit "B"

**[THIS LEASE IS SUBJECT TO STATE RECORDING LAWS AND MODIFICATIONS TO REFLECT THE TYPE OF INTEREST CONVEYED.]**

**FOR THE PURPOSES OF THE COMMONWEALTH OF PENNSYLVANIA**

**PAID-UP**

**OIL & GAS LEASE**　　　　　Lease No. _____

8/08 - PA

This Lease made this _____ day of _____, 2008, by and between:

_____
_____

hereinafter collectively called "Lessor".　　　　　　　hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the Township of _____, in the County of _____, in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number:_____

and is bounded formerly or currently as follows:
　　　　　　On the North by lands of _____;
　　　　　　On the East by lands of _____;
　　　　　　On the South by lands of _____;
　　　　　　On the West by lands of _____;

including lands acquired from _____, by virtue of deed dated _____, and recorded in _____ Book _____, at Page _____, and described for the purposes of this agreement as containing a total of _____ Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of five (5) years from 12:00 A.M. _____(effective date) to 11:59 P.M._____ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

    1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal fifteen percent (15%) part of all oil and any constituents thereof produced and marketed from the Leasehold.

    2. GAS: To pay Lessor an amount equal to fifteen percent (15%) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

    (D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease. There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants. Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages

caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.


IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____        _____ (Seal)

Witness _____        _____ (Seal)

Witness _____        _____ (Seal)

Witness _____        _____ (Seal)


## ACKNOWLEDGMENT

STATE OF _____ )
                                          ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that _____ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                          ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of _____, a corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



## EXHIBIT "C"

<u>Attached to and made a part of that certain Operating Agreement between Chesapeake Appalachia, L. L. C., Epsilon Energy USA, Inc.,</u>
<u>and Statoil USA Onshore Properties Inc. dated October 18, 2010.</u>

# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

## I. GENERAL PROVISIONS

**1.**   **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.**   **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.**   **Advances and Payments by Non-Operators**

A.   Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within thirty (30) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.   Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at ____Bank One of Oklahoma, N.A.____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.**   **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

## COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.

Appx0151

Recommended by the Council
of Petroleum Accountants
Societies



5.     **Audits**

A.     A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.     The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.     **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.     **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.     **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3.     **Labor**

A.     (1)     Salaries and wages of Operator's field employees or consultants directly employed on the Joint Property in the conduct of Joint Operations.

(2)     Salaries of First level Supervisors in the field.

(3)     Salaries and wages of **on-site** Technical Employees or consultants directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)     Salaries and wages of **off-site** Technical Employees or consultants either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.     Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.     Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.     Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.     **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

Appx0152

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.   **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations.  The accumulation of surplus stocks shall be avoided.

6.   **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties.  No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges.  The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.   **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates.  The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.   **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation.  Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed **ten percent (10%)** per annum.  Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, **less 20%.**   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.   **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct.  Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.   **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, **except no charge for services of operator's legal staff or fees of outside attorneys performing services other than title examination** shall be made unless previously agreed to by the parties.  All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.   **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

Appx0153

Recommended by the Council
of Petroleum Accountants
Societies



12. **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties unless insurance coverage is already secured individually outside the Joint Operations in accordance with Exhibit D of that the Operating Agreement **to which this is attached** dated December 16, 2010.

2009. In the event Joint Operations are conducted in a state in which Operator may set as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at

its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13. **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14. **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15. **Other Expenditures**

Other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

1. **Overhead - Drilling and Producing Operations**

   i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

   ( X ) Fixed Rate Basis, Paragraph 1A, or
   (  ) Percentage Basis, Paragraph 1B

   Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

   ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

   ( x ) shall be covered by the overhead rates, or
   (  ) shall not be covered by the overhead rates.

   iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

   ( X ) shall be covered by the overhead rates **except that the salaries, wages and Personal Expenses of those positions set forth on Exhibit C-1 employed directly in the operation of the Joint Property shall not be covered by the overhead rates and shall be chargeable as direct labor to the extent such services are supported by detailed timesheets and further provided the services shall not include managerial supervision or administratve services associated with such operations.**

   (  ) shall not be covered by the overhead rates.

   A. Overhead - Fixed Rate Basis

   (1) Operator shall charge the Joint Account at the following rates per well per month:

   Drillg Well Rate    $ 13,000 (Prorated for less than a full month)

   Producing Well Rate $_____1,300_____

   (2) Application of Overhead - Fixed Rate Basis shall be as follows:

   (a) Drilling Well Rate

   (1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations

Appx0154

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)   Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3) The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached by the percent increase or decrease published by COPAS

2.   **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $____25,000.00____ :

A.   ____3.0____ % of first $100,000 or total cost if less, plus

B.   ____2.0____ % of costs in excess of $100,000 but less than $1,000,000, plus

C.   ____1.0____ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.   **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.   ____3.0____ % of total costs through $100,000; plus

B.   ____2.0____ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.   ____1.0____ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.   **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

Appx0155

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



## IV.     PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.     Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2.     Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.     New Material (Condition A)

(1)     Tubular Goods Other than Line Pipe

(a)     Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)     For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c)     Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d)     Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)     Line Pipe

(a)     Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b)     Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch thick and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus the percentage recommended by COPAS, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c)     Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d)     Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)     Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)     Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

Appx0156

Recommended by the Council
of Petroleum Accountants
Societies

COPAS

B.    Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)    Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)    Material used on and moved from the Joint Property

(a)    At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)    At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)    Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.    Other Used Material

(1)    Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2)    Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)    Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)    Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)    Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.    Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.    Pricing Conditions

(1)    Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)    Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

(3)    **Operator will pass along to Non-Operator a proportionate share of all bulk savings Operator receives from its vendors.**

Appx0157

COPAS 1974 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished as Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of its share of such Material suitable for use and acceptable to Operator.

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

Appx0158

## EXHIBIT C-1

Attached to and made a part of ___ that certain Operating Agreement dated October 18, 2010, by and between Chesapeake Appalachia , L.L.C., as Operator, Epsilon Energy USA, Inc., as Non-Operator and Statoil USA Onshore Properties Inc., as Non-Operator

### TECHNICAL EMPLOYEES EXCLUDED FROM OVERHEAD RATES

| TITLE | CATEGORY |
|---|---|
| ASSOCIATE GEOLOGIST | Technical Labor |
| ASSOCIATE GEOPHYSICIST | Technical Labor |
| GEOLOGIST | Technical Labor |
| GEOPHYSICIST | Technical Labor |
| SR GEOLOGIST | Technical Labor |
| SR GEOPHYSICIST | Technical Labor |
| ASSET MANAGER | Technical Labor |
| ASSOCIATE ASSET MANAGER | Technical Labor |
| DRILLING ENGINEER I | Technical Labor |
| DRILLING ENGINEER II | Technical Labor |
| FIELD ENGINEER | Technical Labor |
| SR DRILLING ENGINEER | Technical Labor |
| SR ASSET MANAGER | Technical Labor |

EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated October 18, 2010  between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator

**Insurance Provisions**

I.    As to all operations hereunder, Operator shall at all times while operations are conducted by it for the Joint Account, carry or cause to be carried, pay for, and charge to the Joint Account the following minimum insurance:

> Worker's Compensation, including Employer's Liability Insurance with limits of not less than $1,000,000, covering the employees of Operator engaged in operations hereunder and in compliance with all applicable state and federal laws.

II.    In addition, as to all operations hereunder, except as provided in Paragraph III below, each party shall carry for its own interest the following types and limits of insurance, or insurance which will provide coverage for a party's interest to the extent required below:

> (a)    Automobile Insurance including non-owned and hired vehicles, coverage with combined single limit per occurrence of not less that $1,000,000 for bodily injury and property damage.

> (b)    General Liability Insurance with a combined single limit per occurrence of not less than $1,000,000 for bodily injury and property damage. Such policy shall be endorsed to provide Blanket Contractual Liability covering obligations assumed herein.

> (c)    Excess Umbrella Liability Insurance with a combined limit per occurrence coverage of not less than $25,000,000.

> (d)    Operator's Extra Expense policy with limits of $25,000,000 per occurrence covering all losses or damages resulting from loss of well control, explosions, fire, cratering, including expenses of clean-up containment, seepage, pollution or contamination.

The premiums for all such insurance to be carried in Paragraph II shall be paid solely by each party.

To the extent of the liabilities assumed by each party herein, all of the above insurance, to the extent carried by a party as provided in Paragraph III below, shall be endorsed to provide that each party's insurers waive their right of subrogation (equitable or by assignment, express or implied, loan receipt or otherwise) against the other party. Each party's insurance coverage shall be primary over any insurance coverage maintained by the other party. Each party hereto may acquire at its own expense, any additional insurance to protect itself. Each such policy shall provide for underwriters waiver of subrogation in favor of each party to the extent of those liabilities assumed by each party herein.

III.    With regard to the aforementioned, Operator shall have the right, but not the obligation, to require satisfactory evidence of adequate insurance or self-insurance. Operator shall not provide this coverage for the benefit of the Joint Account. In the event that any party fails to provide evidence of insurance or evidence of ability to self insure as required herein ("failing party"), the other Party may, at its sole discretion, provide such insurance for and at the direct expense of the failing party. A party is under no obligation to provide such insurance for the party so failing to provide satisfactory evidence of its own insurance or evidence of ability to self insure and nothing contained herein shall be construed to alter the obligations of any party hereunder. Notwithstanding any of the foregoing, each party shall be allowed to self-insure for its interests.

# EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated October 18, 2010 between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator.

## Gas Balancing Agreement

I. <u>DEFINITIONS</u>:

For the purposes of this Gas Balancing Agreement ("GBA") the following terms shall be defined as follows:

(a)  "Affiliate" shall have the meaning ascribed to such term in the Operating Agreement.

(b)  The "Allowable" is the maximum rate of Gas production from each Gas Well permitted from time to time by the regulatory authority having jurisdiction.

(c)  "Balance" is the condition occurring when a party has utilized, sold or disposed of a Quantity of Gas equal to the same percentage of the cumulative Gas production as such party's Percentage Ownership during the period of such cumulative Gas production.

(d)  "Deliverability" shall mean the maximum sustainable daily Gas withdrawal from a Gas Well which may be accomplished without detriment to ultimate recovery of reserves as determined by Operator acting in good faith and taking into account relevant operational factors including, but not limited to, pipeline capacity and pressure and the maximum producing capability of the Gas Well based on data reported to the appropriate governmental agency having jurisdiction.

(e)  "Gas" shall mean all gaseous hydrocarbons produced from each Gas Well but shall not include liquid hydrocarbons.

(f)  "Gas Well" shall mean each well subject to the Operating Agreement that produces gas.  If a single Gas Well is completed in two or more reservoirs, such Gas Well will be considered a separate Gas Well with respect to, but only as to, each reservoir from which the Gas production is not commingled in the well bore.

(g)  "MMBtu" shall mean one million British thermal units.

(h)  "Operating Agreement" means the operating agreement between the Parties to which this GBA is attached.

(i)  "Operator" means the Party designated as operator under the Operating Agreement.

(j)  "Overproduced"  is the  condition  occurring when a party has utilized, disposed of or sold a greater Quantity of Gas from a particular Gas Well at any given time (individually or through its gas purchaser) than if such party were in Balance.

(k)  "parties" means the legal entities that are signatory to the Operating Agreement, or their successors and assigns.  Parties shall be referred to individually as a party.

(l)  "Percentage Ownership" is the percentage interest of each party in each Gas Well as set forth in or determined in accordance with the provisions of the Operating Agreement, as such interest may change from time to time.

(m)  "Percentage of Proceeds Sale" means a sale of Gas processed in a gas processing plant the price for which is computed as a percentage of the proceeds from the resale of residue gas and natural gas liquids attributable to such Gas.

(n)    "Quantity" shall mean the number of units of Gas expressed in MMBtus.

(o)    "Underproduced" is the condition occurring when a party has utilized, disposed of or sold a lesser Quantity of Gas from a particular Well at any given time (individually or through its gas purchaser) than if such party were in Balance.

## II.  APPLICATION OF THIS AGREEMENT

The provisions of this GBA shall be separately applicable to each Gas Well to the end that Gas production from one Gas Well may not be utilized for the purposes of balancing underproduction of Gas from any other Gas Well.

## III.  OVERPRODUCTION

### A.  Right to Take All Gas Produced

Subject to the other provisions herein, during any period when any party hereto is not marketing or otherwise disposing of or utilizing its Percentage Ownership of the Allowable or Deliverability, as applicable, of Gas from any Gas Well, the other parties shall be entitled--but shall not have the obligation--to take, in addition to their own Percentage Ownership of Gas, that portion of such other party's Percentage Ownership of Gas which said party is not marketing, utilizing  or otherwise disposing of, and shall be entitled to take such Gas production and deliver same to its or their purchasers in accordance with the provisions herein. Each such taking party shall have the right to take its pro rata portion of each such non-taking party's share, said pro rata portion being based on the ratio of its Percentage Ownership to the Percentage Ownership of all parties in the same balancing status (either Overproduced or Underproduced) who elect to take such non-taking party's share of gas; provided, however, an Underproduced party desiring to take a non-taking party's share of Gas shall take precedence over an Overproduced party which wishes to take such non-taking party's Gas, and an Overproduced party shall be entitled to take a non-taking party's share of Gas only to the extent that an Underproduced party has elected not to take said Gas.  The Gas of a party not taking its production shall be allocated to a taking party hereunder prior to calculation of percentage entitlement to make up Gas from an Overproduced party under Article IV, below.

Notwithstanding the foregoing, all parties shall share in and own the liquid hydrocarbons recovered from Gas by primary separation equipment in accordance with their respective Percentage Ownership, which liquid hydrocarbon ownership shall be unaffected by this GBA.  One or more parties may arrange to have their Gas processed in a gas processing plant for the recovery of liquefiable hydrocarbons. Nothing in this GBA shall afford a basis for balancing any liquefiable hydrocarbons recovered from a Gas processing plant.  Each party taking Gas shall own all of the Gas delivered to its purchaser.

### B.  Limitation on Overproduced Party's Right to Take Gas

Notwithstanding the provisions of Article III.A., above, if during any time and from time to time an Overproduced party shall have taken more than one hundred percent (100%) of such party's Percentage Ownership share of the estimated ultimate recoverable reserves for a Gas Well as determined by Operator acting in good faith, said Overproduced party shall not, after receipt of written notice of said fact from Operator, be entitled to take, sell or otherwise dispose of Gas from such Gas Well until such time as said party is no longer Overproduced; provided, however, said Overproduced party may take Gas from such Gas Well without restriction if and for so long as the other parties are not taking Gas from such Gas Well their full share of the Gas or as otherwise authorized by all of the Underproduced parties.  Also, no Overproduced party shall at any time be entitled to take, sell or otherwise dispose of more than 300% of its Percentage Ownership of the Allowable from a Gas Well or, if there is no Allowable established, of the Deliverability of a Gas Well.

2

DB1/64243914.1

C.    Credit For Gas in Storage

Each party who markets less than its Percentage Ownership of the Gas produced shall be credited with Gas in storage equal to its Percentage Ownership share of the Gas produced, less the Gas actually marketed and taken by said party, and less such Party's Percentage Ownership share of the Gas, vented, used or lost in lease operations.

## IV. RIGHT OF UNDERPRODUCED PARTY TO MAKE UP PRODUCTION

Any Underproduced party may commence making up its underproduction provided it has given written notice to the Operator not later than the fifth day of the month preceding the month in which it wishes to commence making up its underproduction, or within such other time as Operator may from time to time reasonably establish.

In addition to its Percentage Ownership and its rights to a non-taking party's Gas under Article III, above, each Underproduced party will be entitled to take up to an additional twenty-five percent (25%) of the monthly Quantity of each Overproduced party's Percentage Ownership in Gas produced during any month; provided, however, nothing in this Article IV shall reduce the right of any Overproduced party to take a Quantity of Gas available for sale during any month less than seventy-five percent (75%) of its Percentage Ownership in Gas produced in said month.

If at any time more than one Underproduced party is taking a Quantity of Gas in excess of its Percentage Ownership in Gas production in order to balance its Gas production account ("Makeup"), then each such Underproduced party shall be entitled to take such Makeup in proportion that its Percentage Ownership bears to the total Percentage Ownership of all Underproduced parties desiring to take Makeup from the Well.  Any portion of the Makeup to which an Underproduced party is entitled and which is not taken by such Underproduced party may be taken by any other Underproduced party in the proportion that its Percentage Ownership bears to the total Percentage Ownership of all Underproduced parties desiring to take such untaken portion of Makeup.

## V. MONTHLY DATA AND STATEMENTS TO BE PROVIDED

The Operator will establish and maintain a current Gas account which shows the Gas balance which exists for all the parties and will furnish each of these parties a monthly statement showing the total Quantity of Gas sold and taken in kind and the current and cumulative over and under account of each party within ninety (90) days following the end of each applicable month.  Operator shall not incur any liability to any party for errors in the data provided by each party or third parties or for other matters pertaining to gas balancing statements (e.g., transporter's allocation of Gas).  Each party shall be responsible for promptly providing written notification to Operator of any error(s) or inaccuracy(ies) contained in any gas balancing statement which it receives.

## VI. PAYMENT OF ROYALTIES AND PRODUCTION TAXES

At all times while Gas is produced from a Well, each party hereto will make, or cause to be made, settlement with respective royalty owners to whom each is accountable in accordance with the actual volumes of Gas taken by such party.  Upon written request from any party, any other party shall provide on a monthly basis, any additional information which such requesting party may require in order to comply with its obligation to pay royalty pursuant to the terms hereof including, without limitation, name, address, decimal interest, tax identification and, to the extent it has same, title opinions and abstracts of ownership.  The term "royalty owner" includes owners of royalty, overriding royalties, production payments and similar interests.  Each party agrees to indemnify and hold harmless each other party from any and all claims asserted by its royalty owners and its Gas Purchasers for which said indemnifying party is responsible. Each party producing and/or delivering Gas to its purchaser shall pay, or cause to be paid, any and all production, severance and other similar taxes due on such Gas in accordance with the actual volumes of Gas taken by such party.

3

## VII.  CASH SETTLEMENTS

### A.   Events Occasioning Cash Settlements

A cash settlement of any imbalance of Gas production: (i) shall be made when production from a Gas Well permanently ceases or the Operating Agreement otherwise terminates (each being referred to herein as "Termination"); and (ii) shall be made by an Overproduced party at the request and option of any Underproduced party or parties upon the sale, transfer, assignment, mortgage or other disposition to an unaffiliated entity (herein individually or collectively referred to as a "Transfer"), by an Overproduced party of all or any portion of its Percentage Ownership in any Gas Well unless (x) the Transfer documentation clearly provides that the assignee has expressly assumed the gas balance position of, and the liability for gas imbalances from, the assignor, (y) the assignee is not a known credit risk and the assignor has provided to the other parties evidence of the creditworthiness of assignee prior to the date that the applicable Transfer becomes effective taking into account the potential liability associated with the applicable gas imbalance.  (A cash settlement pursuant to clause (ii) above may hereinafter be referred to as an "Optional Cash Settlement".)  The parties acknowledge that a cash settlement may be made on more than one occasion pursuant to the terms of this GBA.

### B.   Notification of Proposed Transfer By Overproduced Party

When an Overproduced party elects to Transfer all or a portion of its Percentage Ownership (except to an Affiliate, or where the liability for prior period gas imbalances is assumed by an assignee), it shall give notice to all other parties to the Operating Agreement of its intended Transfer and the anticipated closing date.  Each Underproduced party shall have fifteen (15) days from the receipt of such notice in which to elect to receive a cash settlement from the transferring party for the transferring party's share of overproduction allocable to the Underproduced party.  Such election shall be made in writing and sent to the transferring party and Operator.  An Underproduced party's election not to request a cash settlement at the time of Transfer by an Overproduced party shall not, subject to the provisions of Article VII.E, below, preclude said Underproduced party from sharing in cash settlement at Termination or from requesting a cash settlement upon subsequent Transfer by an Overproduced party.

### C.   Quantity of Gas

Within one hundred twenty (120) days after Termination, Operator shall provide a statement captioned "Final Quantity Statement" showing on a party-by-party basis the net unrecouped underproduction, the overproduction and the months and years in which such underproduction and overproduction occurred.  Quantities of Gas for which settlement is due shall be determined by accruing the monthly overproduction and underproduction in the order of accrual of said overproduction and underproduction; i.e. makeup Quantities taken by an Underproduced party shall be applied against the oldest overproduction and underproduction then outstanding.  In the event an Optional Cash Settlement is requested, Operator shall provide to the parties, within fifteen business days, an Interim Quantity Statement through the end of the last quarter for which Operator has production data, which shall contain similar information as would be contained within a Final Quantity Statement.

### D.   Pricing

#### 1.   For Overproduction Sold

The amount to be paid by an Overproduced party to an Underproduced party for such Underproduced party's Gas upon cash settlement shall, where the Overproduced party has sold the Gas to an unaffiliated third party, be based upon the price received by the Overproduced party at the time such overproduction occurred (the "price received") shall be the gross proceeds received, less the following:

4

(a) production and/or severance taxes attributable to said Gas production paid by the Overproduced party;

(b) royalties, if any, paid by the Overproduced party to an Underproduced party's royalty owner(s) to the extent said payments amounted to a discharge of said Underproduced party's royalty obligation;

(c) any other payments made by the Overproduced party to obligees of the Underproduced party to the extent said payments by the Overproduced party were required by law and/or amounted to discharge of the obligations of the Underproduced party; and

(d) all reasonable costs and expenses incurred to third parties in connection with the sale of said Gas; e.g., gathering, transportation, compression, storage, marketing and similar fees.

In the event sales by the Overproduced party were made to an Affiliate and the price paid by such Affiliate was less than the prevailing market price in the area of the Well at the time of the sale, then the price received shall be deemed to be the WAHA Index price for the applicable month of overproduction, calculated from a pricing bulletin published at the time such overproduction occurred, less those items set forth in a-d above (the "Adjusted WAHA Index Price").  Any Underproduced party that is entitled to payment with respect to the applicable cash settlement may, based upon competent evidence, object that sales by the Overproduced party to an Affiliate were at a price less than the prevailing market price in the area of the Well at the time of the sale, in which case the Adjusted WAHA Index Price shall be used to price such sales in accordance with the prior sentence.

  2.    For Overproduction Taken or Utilized and Not Sold

    If there is no actual sale to establish the amount received by the Overproduced party because the Overproduced party took such Gas for its own purposes instead of selling it, the amount to be paid by an Overproduced party to an Underproduced party for such Underproduced party's Gas upon cash settlement shall be based upon the Adjusted WAHA Index Price.

  3.    Proceeds for Liquefiable Hydrocarbons Not Included

    The parties agree that the terms "price received by an Overproduced party" and "weighted average price received" shall not include any compensation received by a party for liquid hydrocarbons derived from processing its Gas in a Gas processing plant, unless the overproduction for which the Overproduced party is accounting was sold under a Percentage of Proceeds Sale.

E.    Calculation, Collection and Distribution of Payments

  1.    For Cash Settlements at Termination

    In the event of a cash settlement at Termination, within ten (10) days after receipt of the Final Quantity Statement from the Operator, each Overproduced party shall furnish to the Operator and the other parties a statement showing the price received for its overproduction on a monthly basis.  Within ten (10) days after receipt of such pricing information from all parties, Operator shall submit to each party a statement showing the calculations and the total amount to be paid by each Overproduced party and to be received by each Underproduced party. Cash settlement shall be calculated on the "FIFO" accounting method.

    Within twenty (20) days after receipt of said statement from Operator by an Overproduced party, the Overproduced party shall pay all amounts due and owing as reflected on such statement to the Underproduced parties.  In the event that all sums due and owing are not paid by an Overproduced party to the applicable Underproduced parties

DB1/64243914.1

within the time periods set forth in this provision, interest shall accumulate on such unpaid amounts as provided herein. The amount to be received by each Underproduced party shall be determined by apportioning the total amount to be received by all Underproduced parties from all Overproduced parties among all Underproduced parties in proportion to the total sum to be received by each Underproduced party as a percent of the total sum to be received by all Underproduced parties. The amount to be paid by each Overproduced party to each Underproduced party shall be determined by apportioning the total amount to by paid by all Overproduced parties to each such Underproduced party among all Overproduced parties in proportion to the total sum to be paid by each such Overproduced party to all Underproduced parties as a percent of the total sum to be paid by all Overproduced parties to all Underproduced parties.

    2.    <u>Optional Cash Settlement Pursuant to Article VII.A.(ii) from an Overproduced party Who Seeks to Transfer an Interest</u>

In the event of a request for an Optional Cash Settlement by an Underproduced party pursuant to Article VII.A.(ii) from an Overproduced party who wishes to Transfer all or a portion of its Percentage Ownership, within twenty (20) working days after receipt of Operator's Interim Quantity Statement, the Overproduced party from whom cash settlement is sought shall provide to Operator a statement showing the price received for its overproduction on a monthly basis. Within ten (10) working days after receipt of such pricing information, Operator shall: (a) calculate the total amount due and owing by the Overproduced party and the total amount to be received by each Underproduced party requesting cash settlement based on the "FIFO" accounting method; and (b) provide the Overproduced party and each such Underproduced party with a statement showing the calculations and the total sum to be paid to said Underproduced party. The Overproduced party shall pay to each such Underproduced party the total amount due and owing as reflected in said statement within twenty (20) working days after receipt of said statement. In the event that all sums due and owing are not paid by an Overproduced party to the applicable Underproduced parties within the time periods set forth in this provision, interest shall accumulate on such unpaid amounts as provided herein.

The parties acknowledge that production and sales data may not be available for a brief period immediately preceding the closing date and prior to the effective date of the Transfer, and the transferring Overproduced party agrees to cash settle for any Gas produced during said period promptly after closing. In the event that said transferring Overproduced party for any reason fails to make all cash settlement payments required under this GBA, the transferee shall be obligated to make said payments.

    3.    <u>Procedures Applicable to All Cash Settlements</u>

For purposes of all price calculations the overproduction of each Overproduced party shall be apportioned to each Underproduced party in proportion to each Underproduced party's underproduction as a percent of the sum of the underproduction of all Underproduced parties. Overproduced volumes shall be matched to Underproduced volumes based on the order in which the overproduction and underproduction arose. The parties recognize that the months of overproduction by an Overproduced party may not coincide with the months of underproduction by an Underproduced party.

    4.    <u>Amount Subject to Refund May Be Withheld.</u>

In the event that any portion of the price actually received by an Overproduced party shall be subject to possible refund pursuant to rules and regulations issued by the Federal Energy Regulatory Commission ("FERC"), any state, administrative agency or successor governmental authority having jurisdiction, or any court order, the amount which may be ultimately required to be refunded by FERC or any other entity may be withheld without interest by the Overproduced party until such time as a final determination is made with respect thereto or until the party to whom payment is to be made provides a bond or other security to indemnify the party obligated to make such payments in form satisfactory to the latter.

DB1/64243914.1

F.    Operator's Liability

Except as otherwise provided herein, Operator is obligated to administer the provisions of this GBA, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

VIII.  OPERATING EXPENSES

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using Gas or whether the sales and use of each are in proportion to their Percentage Ownership.

IX.  DELIVERABILITY TESTS

Nothing herein shall be construed to deny any party the right from time to time to produce and take or deliver to the purchaser its full share of the Gas production to meet the deliverability test required by its purchaser.  Also, nothing herein shall:  (a) require the Operator to produce a Gas Well in excess of its deliverability or the applicable maximum allowable rate where such rate is established by regulatory authority having jurisdiction from time to time; or (b) prevent an Operator from operating the Gas Well in order to conduct such tests as may be required by any applicable regulatory authority from time to time.

X.  NOMINATIONS

For each party wishing to sell, utilize or dispose of Gas from a Gas Well subject to this GBA, Operator shall provide each party an initial nomination by well/delivery point(s) six working days prior to the beginning of each month.    Operator shall provide each party a revised nomination by well/delivery point as necessary during the month to reflect any change in production.  Allocation of gas production in any month in which the total nominations vary from the total production shall be by the Operator according to such procedures as Operator from time to time may reasonably establish.  Each non-operator party agrees to indemnify Operator for any charges or penalties incurred because of over or underdeliveries as compared to its nominations, except where such charges or penalties are solely attributable to action taken by Operator in total disregard of such nominations.

XI.  TERM

This GBA shall remain in full force and effect for so long as the Operating Agreement is in effect and thereafter until the gas balance accounts are settled in full.

XII.  SUCCESSORS AND ASSIGNS

The terms, covenants and conditions of this GBA shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.  The parties hereto agree to give notice of the existence of this GBA to any successor in interest and to make any transfer of any interest subject to the Operating Agreement, or any part thereof, expressly subject to the terms of this GBA.

XIII.  AUDITS

Any Underproduced party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced party's accounts and records relating to such payment. The party conducting such audit shall bear its costs of the audit.

XIV. MISCELLANEOUS

7

DB1/64243914.1

A.   No assignment shall relieve the assignor from any obligation to the other parties with respect to any overproduction taken by assignor to such assignment.

B.   Any amount remaining unpaid under the GBA more than thirty (30) days after it is due shall bear interest (commencing the day after said payment was due) at the rate set forth in the Accounting Procedure (Exhibit C to the Operating Agreement).

C .   Unless the context otherwise clearly indicates, words used in the singular include the plural, and the plural includes the singular.

D.   Each party agrees to maintain the necessary records and documents to enable the gas balancing and cash settlements contemplated hereby to be made.

E.   If any party hereto fails to timely provide to Operator the data required hereby to enable gas balancing statements and cash settlements to be promptly made, Operator, or any other party, without prejudice to other remedies, is authorized to audit the records of the non-providing party and such audit shall be at the expense of the audited party.

F.   To the extent permitted by law, this GBA shall be in lieu of and take precedence over any law, statute, rule or regulation requiring Gas balancing, revenue sharing or marketing of Gas.

G.   In the event that any party is in default of any payment required by this GBA or fails to provide information required under this GBA, Operator is authorized--but not required--upon thirty (30) days notification to said defaulting party, without prejudice to any other remedies it may have, to curtail said party's Gas production from any and all Gas Wells subject to this GBA and such gas may be taken by the other parties in accordance with III.B. above.

H.   In the event of a conflict between the terms of this GBA and the Operating Agreement, the terms of this GBA shall govern except where the conflict is between Article VI of this GBA and the Operating Agreement, in which event the Operating Agreement shall govern.

I.   Nothing in this GBA shall be construed as precluding cash balancing at any time as may be agreed by the parties.

J.   Nothing contained in this GBA shall require an Overproduced Party to pay to an Underproduced Party a sum which would be violative of any law, rule or regulation.

DB1/64243914.1

Appx0168

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated October 18, 2010 between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator

**Equal Employment Opportunity**

During the performance of this agreement, the Operator shall be bound by and comply with all terms and provisions of Section 202 of Executive Order 11246 of September 24, 1965, all of which are incorporated herein by references to the same extent as if fully set out herein, and shall be bound by and comply with the rules, regulations and relevant orders adopted pursuant to such Executive Order.

Operator assures Non-Operator that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that he does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom or otherwise.  It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.  Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor, dated May 21, 1968, and the provisions of the equal opportunity clause enumerated in contracts between the United States of America and Non-Operator.

Appx0169

**RECORDING SUPPLEMENT TO**
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between Chesapeake Appalachia, L.L.C., hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A-1" and Exhibit "A-2" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A-1" and Exhibit "A-2";

WHEREAS, the parties hereto have executed an Operating Agreement dated October 18, 2010 (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, ~~which Agreement in its entirety is incorporated herein for reference,~~ and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

    A.  The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

    B.  The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

    C.  All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

    D.  Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

    E.  Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

    F.  An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

    G.  The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

       This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

    H.  The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

    I.  The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

    J.  Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

    K.  All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3.  The parties hereby grant reciprocal liens and security interests as follows:

    A.  Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

    B.  Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the

Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C.  To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.  If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the lien and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E.  If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F.  The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G.  Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder and under the Operating Agreement. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H.  The above described security may be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4.  This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5.  This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6.  Notwithstanding anything herein to the contrary, in the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7.  This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8.  Other Provisions:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Serena Branch, who has prepared and circulated this form for execution, represents and warrants
    that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model
2   Form Recording Supplemental to Operating Agreement and Financing Statement, as published in computerized forms by
    Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertions
3   ~~and that are clearly recognizable as changes in Articles _____~~, have been made to the form.

4

    **ATTEST OR WITNESS:**                    **CHESAPEAKE APPALACHIA, L.L.C.,**
5                                                        **OPERATOR**

6
7   _____          By _____

8   _____
                                                 Henry J. Hood
9                                                Type or print name

                                               Title __Senior Vice President – Land and Legal &
10                                             General Counsel_____

11                                             Date _____

12                                             Tax ID or S.S. No. ___20-3774650_____

13

14  **ATTEST OR WITNESS:**                    **EPSILON ENERGY USA, INC., NON-OPERATOR**

15

16
17  _____          By _____

18  _____
                                                 Zoran Arandjelovic
19                                               Type or print name

                                               Title __~~Executive Chairman,~~ President ~~and C.E.O.~~
20                                             Date __May 24, 2011_____

21                                             Tax ID or S.S. No._____

22

23  **ATTEST OR WITNESS:**                    **STATOIL USA ONSHORE PROPERTIES INC.,**
                                                        **NON-OPERATOR**
24
25                                             _____

26  _____          By _____

27  _____
                                                 M. K. Williams
28                                             Type or print name

                                               Title __Land Manager – Onshore Gas, Marcellus Asset__
29                                             Date _____

30                                             Tax ID or S.S. No. ___FEIN 26-3666667_____

31
32

33

34

35

36
    Signature Page to that certain Recording Supplement to Operating Agreement and Financing Statement dated October 18, 2010, between Chesapeake
37  Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Baltzley North Unit.

1

ACKNOWLEDGMENT

OPERATOR:

STATE OF <u>OKLAHOMA</u>        )

                                        ) SS:

COUNTY OF <u>OKLAHOMA</u>           )

On this, the **13th** day of **May**, 20 **11**, before me **Jessica S. Meek** the undersigned officer, personally appeared, <u>Henry J. Hood</u>, who acknowledged himself to be the <u>Senior Vice President - Land and Legal & General Counsel</u> of <u>Chesapeake Appalachia L.L.C.</u>, a corporation, and that he as such <u>Senior Vice President - Land and Legal & General Counsel</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Senior Vice President – Land and Legal & General Counsel</u>.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*(Notary seal: JESSICA S. MEEK, NOTARY, # 08000292, EXP. 01/08/12, PUBLIC, STATE OF OKLAHOMA)*

My Commission Expires: **1-8-12**
Signature/Notary Public: **(signature)**
Name/Notary Public (print): **Jessica S. Meek**

ACKNOWLEDGMENT

NON-OPERATORS:

**PROVINCE OF**
~~STATE OF~~ **ONTARIO**  )

                                        ) SS:

**CITY OF**
~~COUNTY OF~~ **VAUGHAN**  )

On this, the **24th** day of **May**, 20 **11**, before me _____, the undersigned officer, personally appeared, <u>Zoran Arandjelovic</u>, who acknowledged himself to be ~~Executive Chairman,~~ <u>President ~~and C.E.O.~~</u> of <u>Epsilon Energy USA, INC.</u>, a corporation, and that he as such <u>Executive Chairman, President and C.E.O.</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Executive Chairman, President and C.E.O.</u>.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: **n/a**
Signature/Notary Public: **(signature)**
Name/Notary Public (print): **Joseph Feldman**

STATE OF _____)

                                        ) SS:

COUNTY OF _____)

On this, the ____ day of _____, 20___, before me _____, the undersigned officer, personally appeared, <u>M.K. Williams</u>, who acknowledged himself to be the <u>Land Manager – Onshore Gas, Marcellus Asset</u> of <u>Statoil USA Onshore Properties Inc.</u>, a corporation, and that he as such <u>Land Manager – Onshore Gas, Marcellus Asset</u> of <u>Statoil USA Onshore Properties Inc.</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Land Manager – Onshore Gas, Marcellus Asset</u>.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

2

Exhibit "A-1"

Attached to and made a part of the Recording Supplement to Operating Agreement and Financing Statement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Operator, Epsilon Energy USA, Inc., as Non-Operator, and Statoil USA Onshore Properties Inc., as Non-Operator

**Baltzley North Unit**
**Rush Township**
**Susquehanna County, Pennsylvania**

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-298558-000 | Brett & Christel Flynn | Chesapeake Appalachia LLC | 1/7/2010 | 201004957 | 157.00-1-019.00 | 10.1510 | 1.310000 |
| 1-298570-000 | Robert and Arlene G Blom | Chesapeake Appalachia LLC | 9/26/2009 | 201004963 | 157.00-1-020.00 | 21.3400 | 15.635010 |
| 1-271016-000 | Lorna G Hall | Chesapeake Appalachia LLC | 3/28/2009 | 200906705 | 157.15-1-004.00 | 2.7400 | 2.740000 |
| 1-255277-000 | J Robert and Betty Hiles | Chesapeake Appalachia LLC | 3/3/2008 | 200811255 | 157.00-1-016.00 | 13.0000 | 13.000000 |
| 1-292364-000 | John M and Denise Hluvia | Chesapeake Appalachia LLC | 12/8/2009 | 201020407 | 158.00-1-014.00 | 62.0000 | 0.150772 |
| 1-247550-000 | Wayne P & Donna L Martin | Chesapeake Appalachia LLC | 11/11/2007 | 200802809 | 157.00-1-050.00 | 23.4200 | 16.209998 |
| 1-289128-000 | Clara McGavin | Chesapeake Appalachia LLC | 9/29/2009 | 200917545 | 157.00-1-041.00 | 0.5000 | 0.500000 |
| 1-280918-000 | Anthony J and Betty A Oruska | Chesapeake Appalachia LLC | 3/28/2009 | 200910165 | 157.00-1-046.00 | 1.0700 | 1.070000 |
| 1-266222-000 | Sandra L and James D Rogers | Chesapeake Appalachia LLC | 8/7/2008 | 200017964 | 157.15-1-022.00 | 0.9200 | 0.920000 |
| 1-271018-000 | Ronald D & Cathy L Severs | Chesapeake Appalachia LLC | 3/22/2009 | 200906706 | 157.15-1-030.00 | 0.9500 | 0.950000 |
| 1-273840-000 | Robert D and Julie A Shingler | Chesapeake Appalachia LLC | 3/30/2009 | 200908612 | 157.15-1-027.00 | 1.1188 | 1.118750 |
| 1-269349-000 | Wayne and Linda Smith | Chesapeake Appalachia LLC | 4/28/2008 | 200814786 | 157.15-1-028.00 | 3.8600 | 3.860000 |
| 1-273846-000 | Charles E Warner Jr | Chesapeake Appalachia LLC | 4/14/2009 | 200908605 | 157.00-1-039.00 | 1.7900 | 1.790000 |
| 1-249048-000 | Terry and Karin Wescott | Chesapeake Appalachia LLC | 11/27/2007 | 200805343 | 157.15-1-001.00 | 4.4887 | 4.489700 |
| 1-306756-000 | Jacob Fissler | Chesapeake Appalachia LLC | 3/31/2010 | 201012052 | 157.15-1-006.00 | 0.5000 | 0.500000 |
| 1-307028-000 | Robert L JR and Jamie S Heft | Chesapeake Appalachia LLC | 4/23/2010 | 201012064 | 157.00-1-040.00 | 1.6338 | 1.633750 |
| 1-304364-000 | Christopher P Warriner | Chesapeake Appalachia LLC | 3/9/2010 | 201006507 | 157.15-1-009.00 | 0.5241 | 0.524100 |
| 1-273827-000 | Rodney S and Stephanie M Brace | Chesapeake Appalachia LLC | 3/31/2009 | 200907531 | 157.15-1-012.00 | 0.8426 | 0.842600 |
| 1-273819-000 | William T Chance | Chesapeake Appalachia LLC | 4/6/2009 | 200907534 | 157.00-1-100.00 | 2.0700 | 2.070000 |
| 1-321731-000 | Rush United Methodist Church | Chesapeake Appalachia LLC | 4/16/2010 | 201100188 | 157.15-1-011.00 | 0.2875 | 0.287500 |
| | David L and Sandra L Beaumont | Southwestern Energy Production Company | 8/5/2007 | 200709957 | 157.00-1-052.00 | 80.0000 | 68.038667 |
| | Holly Decker | Southwestern Energy Production Company | 9/24/2009 | 200917567 | 157.15-1-013.00 | 0.4060 | 0.406000 |
| | Judy Y Krupinski | Southwestern Energy Production Company | 5/10/2007 | 200707270 | 158.00-1-010.00 | 23.6400 | 0.347414 |
| 1-301800-000 | Michael and Nicole M Repchick | Chesapeake Appalachia LLC | 1/9/2010 | 201005317 | 157.15-1-014.00 | 0.3000 | 0.300000 |
| 1-301823-000 | Francis and Patricia Flynn | Chesapeake Appalachia LLC | 1/7/2010 | 201005724 | 157.15-1-015.00 | 0.9900 | 0.990000 |
| 1-313723-000 | Alar Family Limited, Partnership | Chesapeake Appalachia LLC | 7/8/2010 | 201020876 | 157.00-1-032.01 | 0.3300 | 0.330000 |
| 1-313225-000 | Odd Fellows Hall Association of Rush | Chesapeake Appalachia LLC | 4/20/2010 | 201019671 | 157.15-1-008.00 | 0.1900 | 0.190000 |
| 1-308497-002 | Robert J and Mary T Rudolph | Chesapeake Appalachia LLC | 3/30/2010 | 201015807 | 157.00-1-060.00 | 39.3000 | 0.349668 |
| 1-309702-000 | Edward P and Jessica R Warner | Chesapeake Appalachia LLC | 4/10/2010 | 201016802 | 157.15-1-010.00 | 0.4645 | 0.464500 |
| 37-000070-000 | William R and Arlene J Tonzelli | Chesapeake Appalachia LLC | 10/18/2010 | 201102552 | 157.15-1-023.00 | 0.3440 | 0.344400 |
| 1-297572-000 | David Evan Baltzley | Epsilon Energy USA, Inc. | 5/16/2007 | 200708064 | 176.00-1-012.00 | 107.6000 | 19.615173 |
| 1-297594-000 | Colin and Diana Burridge | Epsilon Energy USA, Inc. | 9/19/2007 | 200800145 | 157.00-1-043.00 | 55.3400 | 55.340000 |
| 1-297539-000 | Ronald and Brenda Decker | Epsilon Energy USA, Inc. | 11/7/2007 | 200800774 | 158.00-1-008.00 | 439.8500 | 14.566554 |
| 1-297597-000 | David C Jenner | Epsilon Energy USA, Inc. | 3/21/2007 | 200704240 | 157.00-1-049.01 | 13.8800 | 13.880000 |
| 1-297597-000 | David C Jenner | Epsilon Energy USA, Inc. | 3/21/2007 | 200704240 | 157.00-1-105.00 | 40.3500 | 1.514034 |

Appx0174

| 1-297589-000 | Paul A Jones | Epsilon Energy USA, Inc. | 7/17/2007 | 200709894 | 157.00-1-042.00 | 67.7000 | 50.300285 |
| 1-297646-000 | Thomas I and Cynthia L Moore | Epsilon Energy USA, Inc. | 10/31/2007 | 200801949 | 157.00-1-092.00 | 1.7400 | 0.503576 |
| 1-297646-000 | Thomas I and Cynthia L Moore | Epsilon Energy USA, Inc. | 10/31/2007 | 200801949 | 157.00-1-030.00 | 9.3500 | 0.443710 |
| 1-297606-000 | Kenneth B and Janice Pittman | Epsilon Energy USA, Inc. | 5/7/2007 | 200708072 | 176.00-1-009.00 | 40.9300 | 27.331418 |
| 1-297684-000 | Elmer W and Karen A Jr Richie | Epsilon Energy USA, Inc. | 12/5/2007 | 200802016 | 157.00-1-102.00 | 2.0000 | 1.374015 |

END OF EXHIBIT "A-1"

Exhibit "A-2"

Attached to and made a part of the Recording Supplement to Operating Agreement and Financing Statement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------|
| 1 | 157.00-1-016.00 |
| 2 | 157.00-1-017.00 |
| 3 | 157.00-1-018.00 |
| 4 | 157.00-1-019.00 |
| 5 | 157.00-1-020.00 |
| 6 | 157.00-1-030.00 |
| 7 | 157.00-1-031.00 |
| 8 | 157.00-1-032.01 |
| 9 | 157.00-1-033.00 |
| 10 | 157.00-1-039.00 |
| 11 | 157.00-1-040.00 |
| 12 | 157.00-1-041.00 |
| 13 | 157.00-1-042.00 |
| 14 | 157.00-1-043.00 |
| 15 | 157.00-1-044.00 |
| 16 | 157.00-1-045.00 |
| 17 | 157.00-1-046.00 |
| 18 | 157.00-1-047.00 |
| 19 | 157.00-1-048.00 |
| 20 | 157.00-1-048.01 |
| 21 | 157.00-1-049.00 |
| 22 | 157.00-1-049.01 |
| 23 | 157.00-1-050.00 |
| 24 | 157.00-1-052.00 |
| 25 | 157.00-1-060.00 |
| 26 | 157.00-1-092.00 |
| 27 | 157.00-1-094.00 |
| 28 | 157.00-1-100.00 |
| 29 | 157.00-1-102.00 |
| 30 | 157.00-1-105.00 |
| 31 | 157.15-1-001.00 |
| 32 | 157.15-1-002.00 |
| 33 | 157.15-1-003.00 |
| 34 | 157.15-1-004.00 |
| 35 | 157.15-1-005.00 |
| 36 | 157.15-1-006.00 |
| 37 | 157.15-1-007.00 |
| 38 | 157.15-1-008.00 |
| 39 | 157.15-1-009.00 |
| 40 | 157.15-1-010.00 |
| 41 | 157.15-1-011.00 |
| 42 | 157.15-1-012.00 |
| 43 | 157.15-1-013.00 |
| 44 | 157.15-1-014.00 |
| 45 | 157.15-1-015.00 |
| 46 | 157.15-1-019.00 |
| 47 | 157.15-1-020.00 |
| 48 | 157.15-1-022.00 |
| 49 | 157.15-1-023.00 |
| 50 | 157.15-1-024.00 |
| 51 | 157.15-1-025.00 |
| 52 | 157.15-1-026.00 |
| 53 | 157.15-1-027.00 |
| 54 | 157.15-1-028.00 |
| 55 | 157.15-1-029.00 |
| 56 | 157.15-1-030.00 |
| 57 | 158.00-1-008.00 |
| 58 | 158.00-1-010.00 |
| 59 | 158.00-1-014.00 |
| 60 | 176.00-1-004.00 |
| 61 | 176.00-1-005.00 |
| 62 | 176.00-1-007.00 |
| 63 | 176.00-1-008.00 |
| 64 | 176.00-1-009.00 |
| 65 | 176.00-1-012.00 |
| 66 | 176.00-1-043.00 |

Contract Area

5/11/2011

CONTRACT AREA

Chesapeake ENERGY

**Baltzley North Common Pad**
Susquehanna Co., PA
1 inch = 1,000 feet

Appx0176

# EXHIBIT 2

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

_____ October _____ 18, __2010__ ,
<span style="font-variant:small-caps">year</span>

OPERATOR   **Chesapeake Appalachia, L.L.C.**

CONTRACT AREA          **Baltzley South Unit**
                       **Rush Township**

COUNTY OR PARISH OF   Susquehanna          STATE OF    Pennsylvania

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED
FORM.

A.A.P.L. NO. 610 – 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** ........................................................................................................ | 1 |
| II. | **EXHIBITS** ............................................................................................................... | 1 |
| III. | **INTERESTS OF PARTIES** ...................................................................................... | 2 |
| | A. OIL AND GAS INTERESTS: ............................................................................... | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: ................................. | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: ......................................................... | 2 |
| IV. | **TITLES** ................................................................................................................... | 2 |
| | A. TITLE EXAMINATION: ....................................................................................... | 2 |
| | B. LOSS OR FAILURE OF TITLE: ........................................................................... | 3 |
| |    1. Failure of Title ............................................................................................ | 3 |
| |    2. Loss by Non-Payment or Erroneous Payment of Amount Due ....................... | 3 |
| |    3. Other Losses ............................................................................................... | 3 |
| |    4. Curing Title ................................................................................................ | 3 |
| V. | **OPERATOR** ............................................................................................................ | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: ............................... | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: ... | 4 |
| |    1. Resignation or Removal of Operator ........................................................... | 4 |
| |    2. Selection of Successor Operator ................................................................. | 4 |
| |    3. Effect of Bankruptcy ................................................................................... | 4 |
| | C. EMPLOYEES AND CONTRACTORS: ................................................................... | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: .............................................................. | 4 |
| |    1. Competitive Rates and Use of Affiliates ...................................................... | 4 |
| |    2. Discharge of Joint Account Obligations ....................................................... | 4 |
| |    3. Protection from Liens ................................................................................. | 4 |
| |    4. Custody of Funds ....................................................................................... | 5 |
| |    5. Access to Contract Area and Records .......................................................... | 5 |
| |    6. Filing and Furnishing Governmental Reports ............................................... | 5 |
| |    7. Drilling and Testing Operations .................................................................. | 5 |
| |    8. Cost Estimates ........................................................................................... | 5 |
| |    9. Insurance .................................................................................................. | 5 |
| VI. | **DRILLING AND DEVELOPMENT** .......................................................................... | 5 |
| | A. INITIAL WELL: ................................................................................................... | 5 |
| | B. SUBSEQUENT OPERATIONS: ............................................................................ | 5 |
| |    1. Proposed Operations .................................................................................. | 5 |
| |    2. Operations by Less Than All Parties ........................................................... | 6 |
| |    3. Stand-By Costs ........................................................................................... | 7 |
| |    4. Deepening .................................................................................................. | 8 |
| |    5. Sidetracking .............................................................................................. | 8 |
| |    6. Order of Preference of Operations .............................................................. | 8 |
| |    7. Conformity to Spacing Pattern ................................................................... | 9 |
| |    8. Paying Wells ............................................................................................. | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: .................... | 9 |
| |    1. Completion ............................................................................................... | 9 |
| |    2. Rework, Recomplete or Plug Back .............................................................. | 9 |
| | D. OTHER OPERATIONS: ....................................................................................... | 9 |
| | E. ABANDONMENT OF WELLS: ............................................................................. | 9 |
| |    1. Abandonment of Dry Holes ........................................................................ | 9 |
| |    2. Abandonment of Wells That Have Produced ............................................... | 10 |
| |    3. Abandonment of Non-Consent Operations .................................................. | 10 |
| | F. TERMINATION OF OPERATIONS: ...................................................................... | 10 |
| | G. TAKING PRODUCTION IN KIND: ....................................................................... | 10 |
| |    (Option 1) Gas Balancing Agreement ............................................................. | 10 |
| |    ~~(Option 2) No Gas Balancing Agreement~~ .................................................... | 11 |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** .................................................... | 11 |
| | A. LIABILITY OF PARTIES: .................................................................................... | 11 |
| | B. LIENS AND SECURITY INTERESTS: ................................................................. | 12 |
| | C. ADVANCES: ....................................................................................................... | 12 |
| | D. DEFAULTS AND REMEDIES: ............................................................................. | 12 |
| |    1. Suspension of Rights ................................................................................. | 13 |
| |    2. Suit for Damages ....................................................................................... | 13 |
| |    3. Deemed Non-Consent ................................................................................ | 13 |
| |    4. Advance Payment ...................................................................................... | 13 |
| |    5. Costs and Attorneys' Fees .......................................................................... | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: ............ | 13 |
| | F. TAXES: .............................................................................................................. | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** ......................... | 14 |
| | A. SURRENDER OF LEASES: ................................................................................. | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: ........................................................... | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: ............................................................ | 14 |

i

## TABLE OF CONTENTS

     D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ..................................................... 15

     E. WAIVER OF RIGHTS TO PARTITION: ..................................................................................... 15

     F. PREFERRENTIAL RIGHT TO PURCHASE: ............................................................................. 15

IX.   **INTERNAL REVENUE CODE ELECTION** .................................................................................. 15

X.   **CLAIMS AND LAWSUITS** ....................................................................................................... 15

XI.   **FORCE MAJEURE** ................................................................................................................. 16

XII.   **NOTICES** ................................................................................................................................ 16

XIII.   **TERM OF AGREEMENT** ......................................................................................................... 16

XIV.   **COMPLIANCE WITH LAWS AND REGULATIONS** ................................................................. 16

     A. LAWS, REGULATIONS AND ORDERS: .................................................................................. 16

     B. GOVERNING LAW: ................................................................................................................ 16

     C. REGULATORY AGENCIES: .................................................................................................... 16

XV.   **MISCELLANEOUS** ................................................................................................................. 17

     A. EXECUTION: ......................................................................................................................... 17

     B. SUCCESSORS AND ASSIGNS: ............................................................................................... 17

     C. COUNTERPARTS: .................................................................................................................. 17

     D. SEVERABILITY ..................................................................................................................... 17

XVI.   **OTHER PROVISIONS** ............................................................................................................. 17

Appx0180

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

### OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Chesapeake Appalachia, L.L.C._____,

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

### WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

### ARTICLE I.

### DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A.      The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of an AFE for the drilling of a vertical or horizontal well must be prepared in compliance with Article XVI hereof, incurred in conducting and estimating the costs to be operation hereunder.

B.    The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C.   The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement.   Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D.    The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E.   The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F.   The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority.   If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties. **The Drilling Unit for a horizontal well shall be determined by the Operator in consultation with Non-Operator, and conform with any restrictions in the agreement or conveyances creating the Oil and Gas Interests to be included in the Drilling Unit and applicable laws and be formed in such size and shape as needed to  maximize the recovery of oil and gas through the use of multiple laterals.**

G.   The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

**G.1  The term "Force Majeure"  shall mean anything act or occurrence beyond a party's control that delays  or prohibits performance of any operation contemplated hereunder, including but not limited to the building of surface location, the drilling completion or operating of a well, laying pipeline  or other physical operation. Force Majeure events include but are not limited to Acts of God, inclement weather, governmental action or intervention, changes in existing laws or enforcement of existing laws and permitting delays.**

H. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I.   The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J.   The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K.   The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L.   The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts

2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of land lying within the Contract Area which are owned by parties to this agreement.

M.  The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N.  The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O.  The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P.  The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q.  The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R.  The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

## ARTICLE II.

### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

___x___  A.  Exhibit "A," shall include the following information:

      (1) Description of lands subject to this agreement,

      (2) Restrictions, if any, as to depths, formations, or substances,

      (3) Parties to agreement with addresses and telephone numbers for notice purposes,

      (4) Percentages or fractional interests of parties to this agreement,

      (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

      (6) Burdens on production. (7) Plat of Contract Area

___x___  B.  Exhibit "B," Form of Lease.

___x___  C.  Exhibit "C," Accounting Procedure.

___x___  D.  Exhibit "D," Insurance.

___x___  E.  Exhibit "E," Gas Balancing Agreement.

___x___  F.  Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

___x___  G.  Exhibit "G," Recording Supplement to Operating Agreement and Financing Statement.

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.

### INTERESTS OF PARTIES

**A.  Oil and Gas Interests:**

            or acquires
If any party owns / an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B.  Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their

3

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens **shall** be payable by **Operator,** and **Operator** shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area, **provided Non-Operator elects to market its Oil and Gas with Operator under Operator's standard marketing letter agreement if Non-Operator elects to take its Gas in kind and separately market, then it shall bear and pay its proportionate share of all royalties and Operator shall have no obligation to distribute such burdens on behalf of Non-Operator.** . If any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden.  However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefore.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest."  Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party.  If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

ARTICLE IV.

TITLES

**A. Title Examination:**

**Completed on the Drillsite tract and on all tracts in the well bore path in the Drilling Unit** unless otherwise agreed upon by the parties.

Title examination shall be / ~~made on the Drillsite of any proposed well~~ prior to commencement of drilling operations / ~~and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well.~~  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases.  Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator

4

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge.   All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys.   Copies of all title opinions shall be furnished to each Drilling Party.   Costs incurred by Operator in procuring abstracts, fees paid  **title agents and** attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Each party~~ Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by ~~such~~ each party.  Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder.  This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to    attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received

5

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment.   Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A."   This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended.   There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

6

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE V.

OPERATOR

**A. Designation and Responsibilities of Operator:**

_____Chesapeake Appalachia, L.L.C._____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a **Non-Operator. A change of a corporate name or structure of Operator or transfer of all of Operator's interest (including operatorship)/ to any single   Failure of Operator to provide proof, reasonably satisfactory to Non-Operator(s), of the proposed entity's financial subsidiary, parent or successor corporation shall not be the basis for removal of Operator. / capability to conduct operations shall entitle Non-Operator(s) to prevent said transfer.**

2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint **account.**

3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall

7

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  If it so desires, Operator may employ its own tools and equipment, **in conducting operations hereunder** but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.  All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B.  Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided.  Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto.  Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the

8

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise / ~~Non-Operators~~ **Consenting Party** of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to / ~~Non-Operators~~ **Consenting Party all** such reports, test results and notices regarding the progress of operations on the well including, but not limited to, daily drilling reports, completion reports, and well logs. **Consenting Party will provide Operator a distribution list of data to be sent, in the form of a well requirement sheet**

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith. **This provision is made expressly subject to Article XVI.P, below.**

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VI.

### DRILLING AND DEVELOPMENT

**Operations in the Contract Area:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice / is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.

10

Appx0189

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties.  If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties.  Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1.  Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate.  Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) __200__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the / ~~well~~ from the beginning proposed well or operation of the operations; and

(ii) __400 *__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and 400%_* of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein. **If the well to be drilled is the initial well in the Drilling Unit, the penalties in this subparagraph (ii) shall be 600/600% in lieu of 400//400%.**

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a).  If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions

11

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties ___400___% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have

12

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed.  Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2.  If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well.  The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C."  If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-

13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have ~~fifteen (15)~~ / thirty (30) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. **Except as provided for in Article XVI.A, the** / ~~The~~ proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

**For (1) all horizontal wells in the Marcellus Shale formation and (2) all other horizontal wells with respect to which Non-Operator does not elect Option No. 2 all**

☒ Option No. 1: / ~~All~~ necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

**For (1) all vertical wells and (2) all horizontal wells not in the Marcellus Shale formation with respect to which Non-Operator elects Option No. 2 contemporaneously with Non-Operator making its initial election to participate in a proposed drilling operations, all        if applicable Operator shall revise the AFE to reflect Non-Operator's election.**

14

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

☒ Option No. 2: ~~All~~ / necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. / When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to **or to perform another operation described in Article XVI.A.,** participate in a Completion attempt whether or not Operator recommends attempting to Complete the well; / **the costs of the operation** together with Operator's AFE for ~~Completion costs~~ / if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE.  Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6.  Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE.  Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party <u>not</u> to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals.  If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made.  Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

D. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____ Fifty Thousand & No/100 _____ Dollars ($ 50,000.00 _____) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties.  If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of ___ Fifty Thousand & No/100 _____ Dollars ($_ 50,000.00 _____). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under

15

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles).  Operator shall deliver such proposal to all parties entitled to participate therein.  If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least _____50_____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

E. Abandonment of Wells:

1.  Abandonment of Dry Holes:  Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties.  Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment.  All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well.  Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well.  The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2.  Abandonment of Wells That Have Produced:  Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties.  If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto.  Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal.  If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties.  Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost.  Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production.  If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of

16

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

F. Termination of Operations:

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing __50__% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

G. Taking Production in Kind:

☒ Option No. 1: Gas Balancing Agreement Attached
                    may
Each party shall / take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion-ate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform

18

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder.  Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party.  All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code.  The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.  In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas.  All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefore by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties.  The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed.  In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder.  Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof.  Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.

19

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may

20

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

<div align="center">

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

</div>

**A. Surrender of Leases:**

<div align="center">21</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by

22

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation / . so that each Drilling Party receives its pro rata share of such contribution. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F.** Preferential Right to Purchase:

X    (Optional; Check if applicable.)

From and after the payment of the Farmout Consideration payable unto the parties' Farmout Agreement, dated July 1, 2001, should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase

23

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

ARTICLE IX.

INTERNAL REVENUE CODE ELECTION

~~If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.~~

ARTICLE X.

CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Fifty Thousand and No/100_____ Dollars ($ _50,000.00_____) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations **ARTICLE XI.**

FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

24

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

<div align="center">

**ARTICLE XII.**

**NOTICES**

</div>

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

<div align="center">

**ARTICLE XIII.**

**TERM OF AGREEMENT**

</div>

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: ~~So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.~~

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of __90__ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____90_____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of ~~180~~ / 90 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

<div align="center">25</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ARTICLE XIV.

COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ____Texas_____ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

ARTICLE XV.

MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

26

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

C. Counterparts:

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

D. Severability:

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

<div align="center">

**ARTICLE XVI.**

**OTHER PROVISIONS**

</div>

A.    Well Proposal Requirements and Order of Preference of Operations:

  1.  (a)  **Requirements of Vertical Well Proposal**: A proposal for a vertical well operation shall include the following:

    (1)  the estimated commencement date;

    (2)  the proposed depth;

    (3)  the objective formation or formations to be penetrated or tested:

    (4)  the Authorized Depth, the surface and bottomhole locations, proposed directional operations; and

    (5)  the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, or abandoning the well, itemization of all tangible and intangible costs. Operator's estimate of Completion costs should be included as an informational item.

      (b)  **Order of Preference of Operations - Vertical Well**: The term "Authorized Depth" is the objective depth authorized in the AFE for vertical wells. Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a vertical well has been drilled to the Authorized Depth, and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in order enumerated hereafter:

    (1)  a proposal to do additional logging, coring or testing;

    (2)  a proposal to attempt to Complete the well at the Authorized Depth in the manner set forth in the Operator's

    AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

    (3)  a proposal to attempt to Complete the well at the Authorized Depth in a manner different than as set forth in the Operator's AFE for Completion:

    (4)  a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Depth, with priority given to objectives in ascending order up the hole;

    (5)  a proposal to drill the well to a depth below the Authorized Depth, with priority given to objectives in descending order;

    (6)  a proposal to Sidetrack the well to a new target objective for a vertical or deviated hole, but not a horizontal well or lateral drain hole, with the priority given first in ascending order to targets above the Authorized Depth, and then in descending order to targets below the Authorized Depth;

    (7)  a proposal to Sidetrack to a horizontal well or lateral drain hole, with priority given to a lateral drain hole at the Authorized Depth, and then to objectives in ascending order above the Authorized Depth, and then to objectives in descending order below the Authorized Depth; and

    (8)  plugging and abandoning the well.

  2.  (a)  **Requirements of Horizontal Well Proposal**:  A proposal for a horizontal well operation shall include the following:

    (1)  the estimated commencement date;

    (2)  the proposed depth;

    (3)  the objective formation or formations to be penetrated or tested;

    (4)  the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and

    (5)  the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well.  Operator's estimate of Completion costs should be included as an informational item.

<div align="center">

27

</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

(b)  Order of Preference of Operations – Horizontal Well:  The term "Authorized Objective" is the agreed upon length of the lateral drain hole for the horizontal well(s) as authorized in the AFE.  Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a horizontal well has been drilled to the Authorized Objective and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter:

(1)  a proposal to do additional logging, coring or testing;

(2)  a proposal to attempt to Complete the well at the Authorized Objective in the manner set forth in the Operator's AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

(3)  a proposal to attempt to Complete the well at the Authorized Objective in a manner different than as set forth in the Operator's AFE for Completion;

(4)  a proposal to extend the length of the lateral drain hole for specified number of feet in the direction it is drilling, with a priority given to the shortest additional length proposed by any of the participating parties;

(5)  a proposal to drill a new lateral drain hole in a different direction at the Authorized Objective;

(6)  a proposal to drill a new later drain hole at a different depth, with priority given in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective;

(7)  a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Objective with priority given to the objectives in ascending order up the hole;

(8)  a proposal to Deepen the well below the Authorized Objective;

(9)  a proposal to Sidetrack the well to a new target objective, with priority given first in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective; and

(10)  plugging and abandoning the well.

In drilling a horizontal well, the Operator shall have the right at its sole discretion to 1) cease drilling at any time, for any reason, after it has drilled the objective formation and has drilled laterally for a distance which is at least equal to fifty percent (50%) of the length of the total horizontal displacement (displacement from true vertical) proposed in the AFE or 2)  continue drilling laterally at any time, for any reason, beyond the total horizontal displacement proposed in the AFE, so long as such lateral does not exceed 25% more than that proposed in the AFE; if in such event the well be deemed to be at its "Authorized Objective" as that term is used in this Agreement.

B.    Gathering Lines/Facilities:

Notwithstanding anything herein to the contrary, any flow line necessary for the gathering of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement and an election to participate in such operation shall include participation in these associated facilities.  Facility includes, but is not limited to, any battery, separator, compressor, gathering system facility, production storage facility or water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation.

C.    Plugging and Abandoning:

It is understood and agreed that where the terms "plugging and abandoning" or "plugged and abandoned" are used in this agreement such terms shall be deemed to include all costs associated with plugging and abandoning a well including, but not limited to, any costs of remediating contamination and/or surface restoration, to the extent that such remediation and/or surface restoration is required by the lease(s), applicable laws or regulation or by prevailing oil field practices.

D.    Commencement of Operations:

Notwithstanding anything in Article VI.B. to the contrary, Operator's election to commence operations prior to or during the Notice Period (forty-eight (48) hours if applicable), will not alter or extend the Notice Period in which a party is required to make an election to participate in the proposed operation, or constitute an election by that party not to participate in the cost of the proposed operation.

E.    Headings:

The descriptive headings used in this Operating Agreement are for convenience only and will not be deemed to affect the meaning of this Operating Agreement.

F.    Memorandum of Operating Agreement:

Contemporaneously with the execution of this Agreement, the parties have executed a Memorandum of Operating Agreement substantially in the same form as Exhibit "G" attached hereto, for the purpose of giving notice to the third parties of the existence of this Agreement and of the mortgage lien and security interest created by each party as debtor, to all other parties, as secured parties.  Such Memorandum of Operating Agreement shall be recorded by Operator in any county in which the Contract Area is located and/or with the Secretary of State.

28

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

G.  Construction:

Each party has had the opportunity to contribute to the drafting of this agreement and/or opportunity to have it reviewed by its legal counsel; therefore, the parties agree that in the event of a dispute over the meaning or application of this agreement, it shall be construed as if drafted equally by the parties and no presumption shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this agreement.

H. INTEGRATION:

In the event the Pennsylvania Department of Environmental Protection ("DEP"), Federal, State or other governmental body having jurisdiction orders the integration of interests within a spacing unit, any resulting increase or decrease in the working interest of the parties shall be realized on a proportionate basis.

I. CONFIDENTIALITY:

Except as otherwise provided herein, during the term of this agreement no party shall divulge to any third party any geophysical data acquired, obtained or developed by the parties hereto involving the Contract Area subsequent to the effective date of this agreement, or any drilling information relative to any well or wells drilled as a result hereof, other than depth and information customarily publicized, without first obtaining the written consent of the other parties to release any such information, which consent shall not be unreasonably withheld; provided, however, that (1) such consent shall not be necessary for any party to divulge such information to a party who is the record owner of an interest in such a well, but only if such party to whom the information is to be disclosed agrees, in writing, to be subject to this provision prior to disclosure, and (2) access to such data shall be made available to a party's parent company or its subsidiaries, agents, employees and contractors engaged in the performance of any work hereunder. All such information and data shall be treated as strictly confidential. Nothing contained herein shall be deemed to prevent disclosure of any such information or data if such disclosure is required by applicable laws or rules and regulations of any administrative or governmental agency or entity.

After the expiration of this agreement all information, data and/or materials acquired jointly pursuant to this agreement shall be independently owned by each party who participated in such Geoscience operation and such participating party shall have the right to separately sell, trade or otherwise dispose of such data without the obligation to share any remuneration received with the other participating parties.

J.  PROSPECT AREA:

i.  Shall mean the unique Contract Area covered by the JOA for each Initial Prospect Well and all related Subsequent Prospect Wells.  For each Initial Prospect Well the corresponding Prospect Area shall be a contiguous area in size and configuration as determined by the Operator in consultation with Non-Operator in order to accommodate anticipated wells, wellbore paths and wellbore lengths located within the anticipated production unit established by the Operator as permitted by the underlying oil and gas leases, as may be amended, or allowed/required by Federal, State or other governmental body having jurisdiction, or other means, (the "Drilling Unit") but in no event shall the Drilling Unit exceed 1,280 acres without the mutual consent of the Parties.  The Prospect Area shall not include any portion of any other Prospect Area in effect at the time of the Initial Prospect Well proposal without the mutual consent of the Parties, except as otherwise provided for herein.  For purposes of this Agreement, the Prospect Area, Contract Area, Drilling Unit and Prospect JOA Contract Area shall have the same meaning and be considered one and the same.

ii.  (A)  It is recognized by the Parties that it may be prudent and/or necessary to expand or reduce the size of an existing Prospect Area, or include within an existing Prospect Area acreage which was not initially included in such existing Prospect Area ("Outside Acreage") and/or acreage from an existing and adjoining Prospect Area.   In the event an existing Prospect Area is expanded or reduced in size, the working interests of the Parties in proposed new wells, wells previously proposed and drilled and all wells drilled subsequent thereto within the modified Prospect Area shall not change unless agreed to by the Parties or proportionately reduced by a participating third party working interest owner in the Prospect Area.  For purposes of the Parties maintaining their same working interest throughout the Prospect Area, any Outside Acreage included by the Parties shall be owned in proportions of the Parties' initial working interest in the Prospect Area being expanded and all Parties shall be obligated to pay their share of acquisition costs to acquire such Outside Acreage.  The modified Prospect Area(s) and associated Unit boundary(ies) shall be revised to reflect the change in Prospect Area. New Memorandums of Operating Agreement and modified Declarations of Pooled Units shall be prepared and filed of record, if necessary.  No Outside Acreage that would constitute more than 20% of the Prospect Area and be necessary to drill longer or additional horizontal lateral  shall be included in the Prospect Area and/or Drilling Unit without Non-Operators consent.

(B)  If, while drilling a horizontal well, it becomes necessary to accommodate a well bore path which may extend outside of an existing Prospect Area, Operator shall have the right at its sole discretion to reconfigure such Prospect Area in such a way as to encompass acreage necessary for such horizontal well and the corresponding Unit and shall provide notice to Non-operator of the revised Prospect Area and corresponding working interests.  The working interests of the Parties in resulting Prospect Area shall remain unchanged as a result of such reconfiguration.  Should it be necessary to equalize any additional Prospect Area acreage to accommodate such reconfiguration as it relates to existing working interests, then assignments of interests necessary to equalize shall be made, and the assignee shall reimburse assignor for actual acquisition costs associated therewith.

K.  UNDERLINE  INITIAL PROSPECT WELL:

Shall mean the initial well drilled on the Prospect Area.

L.  GATHERING LINES / FACILITIES:

Notwithstanding anything herein to the contrary, any gas gathering line necessary for the gathering or transportation of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be proposed in accordance with the method prescribed for under Article VI.B.-Operations of

Appx0208

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

this Agreement. Facility includes, but is not limited to, any battery, separator, compressor stations, gathering system or production storage facility.

M. **MEDIA/NEWS RELEASES:**

No party hereto shall, at any time, issue to the press or other media any news release, concerning the Contract Area (also referred to herein as "Prospect Area"), without the prior approval of all the other parties hereto, which approval shall not be unreasonably withheld. Any request for approval hereunder shall be responded to within 24 hours if receipt of such request and any failure to timely respond shall be deemed to be an approval. When all of the parties have reviewed such material and all parties have approved the issuance of the material, the party desiring such release shall have the principal responsibility for its issuance. The only other exception to the foregoing shall be that in the event of any emergency involving extensive property damage, operations failure, loss of human life or other clear emergency, the party designated as Operator hereunder is authorized to furnish such minimum, strictly factual information as shall be necessary to satisfy the legitimate public interest on the part of the press and duly constituted authorities, if time does not permit obtaining prior approval by the other parties. Said Operator shall thereupon promptly advise parties of the information so furnished. Notwithstanding the foregoing, either party may issue a media or news release required by applicable laws, rules or regulations, including those of applicable stock exchanges.

N. **CONFLICTING PROVISIONS:**

In the event of a conflict between the provisions of this Article XVI and any other provisions of this agreement, the provisions of this Article XVI shall control and prevail.

O. **DEFAULTS AND REMEDIES:**

Except as expressly provided herein, nothing in this Operating Agreement entitles any person or party other than the Operator and Non-Operator to any claim, cause of action, remedy, or right of any kind.

P. **AFE OVERRUNS**

In the event expenditure against an AFE exceeds, or in Operator's reasonable judgment, are likely to exceed, twenty percent (20%) or more of the total AFE prior to finishing the approved operations, the Operator, shall promptly furnish to Non-Operator a supplemental AFE and a summary description as to the purpose and/or cause of the overrun. Upon receipt of a supplemental AFE, Non-Operator may call for partner's meeting by notifying the Operator with full details of the purpose of the meeting, including a time, place and agenda that meet the Operator's reasonable business schedule and do not interfere unreasonably with the Operator's ongoing operations under this Agreement.

IN WITNESS WHEREOF, this agreement shall be effective as of October 18, 2010.

Chesapeake Appalachia, L.L.C., who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications have been made, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes.

ATTEST OR WITNESS:                              CHESAPEAKE APPALACHIA, L.L.C.,
                                                          OPERATOR

_____          By _____

_____             _Henry J. Hood_____
                                                          Type or print name

                                                          Title _Senior Vice President – Land and Legal &
                                                          General Counsel_____

                                                          Date _____

                                                          Tax ID or S.S. No. ___20-3774650_____

ATTEST OR WITNESS:                              EPSILON ENERGY USA, INC.,
                                                          NON-OPERATORS

_____          By _____

_____             _Zoran Arandjelovic_____
                                                          Type or print name

                                                          Title _President & CEO_____

                                                          Date _____

                                                          Tax ID or S.S. No. _____

Signature Page to that certain Operating Agreement dated October 18, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Baltzley South Unit.

30

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ATTEST OR WITNESS:            STATOIL USA ONSHORE PROPERTIES INC.,
                                            NON-OPERATORS

_____

By _____

_____      __ M. K. Williams _____

                                       Type or print name

                                       Title __ Land Manager – Onshore Gas USA & Mexico __

                                       Date _____

                                       Tax ID or S.S. No. ____ FEIN 26-3666667 _____

Signature Page to that certain Operating Agreement dated October 18, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Baltzley South Unit.

31

Appx0210

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of <u>OKLAHOMA</u>　　　)
　　　　　　　　　　　　　　　) ss.
County of <u>OKLAHOMA</u>　　)

This instrument was acknowledged before me on

<u>June 2, 2011</u>　　by Henry J. Hood, Senior Vice President – Land and Legal & General Counsel of Chesapeake Appalachia, L.L.C., a limited liability company.

(Seal, if any)

Title (and Rank) <u>Land Tech</u>

My commission expires: <u>01/08/12</u>

Acknowledgment in representative capacity:

~~State of~~ PROVINCE OF ONTARIO　)
　　　　　　　　　　　　　　　　　) ss.
~~County of~~ CITY OF VAUGHAN　　　)

This instrument was acknowledged before me on

<u>June 23, 2011</u> by Zoran Arandjelovic as President of Epsilon Energy USA, Inc.

(Seal, if any)

Title (and Rank) <u>NOTARY PUBLIC</u>

My commission expires: <u>N/A</u>

Acknowledgment in representative capacity:

State of _____　)
　　　　　　　　　　　　　) ss.
County of _____　)

This instrument was acknowledged before me on

_____ by M.K. Williams as Land Manager – Onshore Gas USA & Mexico of Statoil USA Onshore Properties Inc.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

32

Appx0211

Exhibit "A-1"
Attached to and made a part of the Operating Agreement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Operator, Epsilon Energy USA, Inc., as Non-Operator, and
Statoil USA Onshore Properties Inc., as Non-Operator
**Baltzley South Unit**
**Rush Township**
**Susquehanna County, Pennsylvania**

**CHESAPEAKE APPALACHIA, L.L.C. / STATOIL USA ONSHORE PROPERTIES INC. LEASES CONTRIBUTED**

| | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| | Stephen J and Patricia J Molnar | Southwestern Energy Production Company | 5/17/2007 | 200707104 | 176.00-1-014.00 | 24.000000 | 24.000000 |
| | Thomas W and Fred Patton | Southwestern Energy Production Company | 6/4/2007 | 200707470 | 177.00-1-035.00 | 32.600000 | 26.441533 |
| | Stephen M Hunsinger | Southwestern Energy Production Company | 3/30/2007 | 200707089 | 177.00-1-038.00 | 25.000000 | 5.980025 |
| | | | | | | **Total:** | **56.421558** |

**EPSILON ENERGY USA INC./ CHESAPEAKE APPALACHIA, L.L.C. / STATOIL USA ONSHORE PROPERTIES INC. LEASES CONTRIBUTED**

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-297606-000 | Kenneth B and Janice Pittman | Epsilon Energy USA, Inc. | 10/26/2007 | 200800766 | 176.00-1-009.00 | 40.930000 | 11.424797 |
| 1-297569-000 | Charles M and Regina M Pierson | Epsilon Energy USA, Inc. | 3/2/2007 | 200704244 | 176.00-1-011.00 | 12.309100 | 12.309100 |
| 1-297572-000 | David Evan Baltzley | Epsilon Energy USA, Inc. | 11/7/2007 | 200800774 | 176.00-1-012.00 | 107.600000 | 85.856803 |
| 1-297585-000 | Roland D Jenner | Epsilon Energy USA, Inc. | 8/21/2007 | 200711597 | 176.00-1-046.00 | 23.280000 | 15.533203 |
| 1-297558-000 | Harold C and Gloria Craige | Cabot Oil & Gas Corporation | 3/26/2007 | 200704460 | 177.00-1-028.01 | 139.350000 | 13.940146 |
| | | | | | | **Total:** | **139.064049** |

**Third Party Interests (Not Subject to Operating Agreement)**

| | LESSEE | | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| | Howard E and Barbara Riner | Talisman Energy USA Inc. | 9/4/2009 | 200917056 | 176.00-1-005.00 | 51.000000 | 1.198781 |
| | Larry L. Delong | Talisman Energy USA Inc. | 9/19/2009 | 201002645 | 176.00-1-013.00 | 12.000000 | 12.000000 |
| | David Wipple | Talisman Energy USA Inc. | | | 176.00-1-015.00 | 104.348100 | 76.618907 |
| | Carmine Tagliaferro | Talisman Energy USA Inc. | 10/16/2009 | 201010847 | 177.00-1-033.00 | 20.690000 | 20.690000 |
| | Joseph and Donna Grillo | Cabot Oil & Gas Corporation | 5/17/2008 | 200809257 | 177.00-1-031.00 | 10.000000 | 10.000000 |
| | Joseph and Donna Grillo | Cabot Oil & Gas Corporation | 5/17/2008 | 200809257 | 177.00-1-032.00 | 10.010000 | 10.010000 |
| | | | | | | **Total:** | **130.517688** |

| Total Leasehold Subject to Operating Agreement: | 195.485607 |
|---|---|
| **Total Acres in Unit:** | **326.003295** |
| **Total Acres in Contract Area:** | **326.003295** |

END OF EXHIBIT "A-1"

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT
DATED OCTOBER 18, 2010
BY AND BETWEEN CHESAPEAKE APPALACHIA, L.L.C., OPERATOR,
EPSILON ENERGY USA, INC., AS NON-OPERATOR, AND STATOIL USA ONSHORE PROPERTIES
INC., AS NON-OPERATOR

**1.     DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT**

THOSE CERTAIN LEASES AND/OR INTERESTS LOCATED WITHIN THE CONTRACT AREA AS FURTHER DESCRIBED ON EXHIBIT "A-1" (LEASE LISTING) AND AS SHOWN ON THE PLAT OF THE CONTRACT AREA ATTACHED AS EXHIBIT "A-2" HEREOF.

**2.     RESTRICTIONS, IF ANY, AS TO DEPTHS, FORMATIONS AND SUBSTANCES**

None

**3.     PARTIES TO AGREEMENT WITH ADDRESS AND TELEPHONE NUMBER FOR NOTICE PURPOSES**

Chesapeake Appalachia, L.L.C.
6100 N. Western Avenue
P. O. Box 18496
Oklahoma City, Oklahoma
Attention: Serena Branch, Land Manager
Telephone:     (405) 935-7952
Facsimile:      (405) 849-7952

Epsilon Energy USA, Inc.
3343 State Route 3004
Meshoppen, PA  18630
Attention:  Zoran Arandjelovic -- President
Telephone:     (570) 869–2000 ext. 103
Facsimile:      (570) 869–4444

Statoil USA Onshore Properties Inc.
2103 CityWest Boulevard, Suite 800
Houston, TX  77042
Attention: Mike Williams, Land Manager
Telephone:     (713) 918 – 8200
Facsimile:      (713) 918 – 8290

**4.     PERCENTAGES OR FRACTIONAL INTERESTS OF PARTIES TO THIS AGREEMENT**

BALTZLEY SOUTH UNIT

| PARTIES | WORKING INTEREST CARRIED TO COMPLETION | WORKING INTEREST AFTER COMPLETION |
|---|---|---|
| Chesapeake Appalachia, L.L.C.* | 40.475906% | 26.079083% |
| Statoil USA Onshore Properties, Inc.* | 19.488398% | 12.556595% |
| Epsilon Energy USA, Inc.** | 0.000000% | 21.328626% |
| Third Party Interests** | 40.035696% | 40.035696% |
|  | 100.000000% | 100.000000% |

**5.     OIL AND GAS LEASES AND/OR OIL AND GAS INTEREST SUBJECT TO THIS AGREEMENT**

The oil and gas lease or oil and gas interest, or portions thereof, included in the Contract Area and described on Exhibit A-1 attached hereto.

**6.     BURDENS ON PRODUCTION**

Lease Royalty                                    15.694070%***

**7.     PLAT OF CONTRACT AREA**

See attached preliminary Exhibit A-2 which will be substituted with the final unit plat after the initial well is drilled.

Appx0213

*The working interests of the Parties above are to be determined in accordance with the terms and conditions of that certain Development Agreement ("DA") by and between the Parties dated November 10, 2008.
It is understood by the Parties hereto that in the event additional interest is acquired in the Contract Area and all Parties with a right under the DA do not elect and pay for their proportionate share of said interest, the interests above shall be adjusted to reflect actual interest owned by the Parties in the Contract Area.  An interest adjustment shall also occur in the event of participation from unleased mineral interests and/or third parites.

**See Exhbit A-1 for third party information.

***Lease burdens reflected are estimates and subject to change upon verification of royalty provisions of non-operated leasehold.

EXHIBIT "A-2"

Attached to and made a part of the Operating Agreement dated October 18, 2010, by and between
Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------------|
| 1 | 176.00-1-005.00 |
| 2 | 176.00-1-009.00 |
| 3 | 176.00-1-011.00 |
| 4 | 176.00-1-012.00 |
| 5 | 176.00-1-013.00 |
| 6 | 176.00-1-014.00 |
| 7 | 176.00-1-015.00 |
| 8 | 176.00-1-046.00 |
| 9 | 177.00-1-028.01 |
| 10 | 177.00-1-031.00 |
| 11 | 177.00-1-032.00 |
| 12 | 177.00-1-033.00 |
| 13 | 177.00-1-035.00 |
| 14 | 177.00-1-038.00 |

EPS/CHK/STO - 139.064049 AC
CHK/STO - 56.421558 AC
Talisman - 110.507688 AC
Cabot - 20.010000 AC
Contract Area - 326.003295 AC

5/20/2011

CONTRACT AREA

Baltzley South Common Pad
Susquehanna Co., PA
1 inch = 1,000 feet

Chesapeake
ENERGY

Appx0215

**Exhibit "B"**

**[THIS LEASE IS SUBJECT TO STATE RECORDING LAWS AND MODIFICATIONS TO REFLECT THE TYPE OF INTEREST CONVEYED.]**

## FOR THE PURPOSES OF THE COMMONWEALTH OF PENNSYLVANIA

**PAID-UP**

**OIL & GAS LEASE**          Lease No. _____

8/08 - PA

This Lease made this _____ day of _____, 2008, by and between:

_____

_____

hereinafter collectively called "Lessor"                    hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the Township of _____, in the County of _____, in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number: _____

and is bounded formerly or currently as follows:

On the North by lands of _____;

On the East by lands of _____;

On the South by lands of _____;

On the West by lands of _____;

including lands acquired from _____, by virtue of deed dated _____, and recorded in _____ Book _____, at Page _____, and described for the purposes of this agreement as containing a total of _____ Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of five (5) years from 12:00 A.M. _____ (effective date) to 11:59 P.M. _____ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL:  To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance.  **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B)  ROYALTY:  To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1.  OIL:  To deliver to the credit of Lessor, free of cost, a Royalty of the equal fifteen percent (15%) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2.  GAS:  To pay Lessor an amount equal to fifteen percent (15%) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.  Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C)  DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D)  SHUT-IN:  In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect.  During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E)  DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F)  MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address.  Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch.  Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G)  CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require.  Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H)  TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I)  LIENS:  Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J)  CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations.  Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold.  Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K)  PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.  Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.  Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit.  Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold.  In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent.  Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent.  Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date.  The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title.  Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease.  There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions.  If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.  Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION.  In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages

caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.


IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.


Witness _____          _____ (Seal)


Witness _____          _____ (Seal)


Witness _____          _____ (Seal)


Witness _____          _____ (Seal)



## ACKNOWLEDGMENT

STATE OF _____ )
                                          ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that _____ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                          ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of _____, a corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

COPYRIGHT 1985 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

# EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement between Chesapeake Appalachia, L. L. C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. dated October 18, 2010.

# ACCOUNTING PROCEDURE

## JOINT OPERATIONS

### I.  GENERAL PROVISIONS

**1.    Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.    Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.    Advances and Payments by Non-Operators**

A.    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within thirty (30) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.    Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____Bank One of Oklahoma, N.A._____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.    Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

Appx0219

COPAS 2005 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.  **Audits**

A.  A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.  The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

6.  **Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

1.  **Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

2.  **Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

3.  **Labor**

A.  (1)  Salaries and wages of Operator's field employees or consultants directly employed on the Joint Property in the conduct of Joint Operations.

(2)  Salaries of First level Supervisors in the field.

(3)  Salaries and wages of **on-site** Technical Employees or consultants directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)  Salaries and wages of **off-site** Technical Employees or consultants either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.  Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.  Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

4.  **Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

Appx0220

COPYRIGHT © 2005 by MORE
Recommended by the Council
of Petroleum Accountants
Societies



5.     **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.     **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.    If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.    If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.    In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.     **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III. The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.     **Equipment and Facilities Furnished By Operator**

A.    Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed **ten percent (10%)** per annum. Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.    In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, **less 20%**. For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.     **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.    **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, **except no charge for services of operator's legal staff or fees of outside attorneys performing services other than title examination** shall be made unless previously agreed to by the parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.    **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

Appx0221

EXHIBIT "C" ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

12.    **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties unless insurance coverage is already secured individually outside the Joint Operations in accordance with Exhibit D of that the Operating Agreement **to which this is attached** dated December 16, 2010.

2009. In the event Joint Operations are conducted in a state in which Operator may set as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at

its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

13.    **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

14.    **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

15.    **Other Expenditures**

Other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

1.    **Overhead - Drilling and Producing Operations**

    i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

        ( X ) Fixed Rate Basis, Paragraph IA, or
        (     ) Percentage Basis, Paragraph IB

        Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

    ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

        ( x ) shall be covered by the overhead rates, or
        (     ) shall not be covered by the overhead rates.

    iii.    The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

        ( X ) shall be covered by the overhead rates **except that the salaries, wages and Personal Expenses of those positions set forth on Exhibit C-1 employed directly in the operation of the Joint Property shall not be covered by the overhead rates and shall be chargeable as direct labor to the extent such services are supported by detailed timesheets and further provided the services shall not include managerial supervision or administratve services associated with such operations.**

        (     ) shall not be covered by the overhead rates.

    A.    Overhead - Fixed Rate Basis

        (1)    Operator shall charge the Joint Account at the following rates per well per month:

            Drillg  Well Rate    $ 13,000 (Prorated for less than a full month)

            Producing Well Rate $____1,300_____

        (2)    Application of Overhead - Fixed Rate Basis shall be as follows:

            (a)    Drilling Well Rate

                (1)    Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations

-4-

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

for fifteen (15) or more consecutive calendar days.

(2)   Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)   Producing Well Rates

(1)   An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)   Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)   An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)   All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)   The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached by the percent increase or decrease published by COPAS

**2.    Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $____25,000.00____:

A.   ___3.0___ % of first $100,000 or total cost if less, plus

B.   ___2.0___ % of costs in excess of $100,000 but less than $1,000,000, plus

C.   ___1.0___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3.    Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.   ___3.0___ % of total costs through $100,000; plus

B.   ___2.0___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.   ___1.0___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4.    Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

Appx0223

COPYRIGHT 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



### IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.    Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2.    Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

(1)    Tubular Goods Other than Line Pipe

(a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c)    Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d)    Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)    Line Pipe

(a)    Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b)    Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch thick and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus the percentage recommended by COPAS, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c)    Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d)    Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)    Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)    Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(1) and (2).

Appx0224

COPAS 2005 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

B. Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1) Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2) Material used on and moved from the Joint Property

(a) At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b) At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3) Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C. Other Used Material

(1) Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2) Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a) Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b) Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3) Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D. Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E. Pricing Conditions

(1) Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2) Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

(3) **Operator will pass along to Non-Operator a proportionate share of all bulk savings Operator receives from its vendors.**

Appx0225

COPAS 1962 - ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



3.    **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies, strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished as Non-Operators of the proposed charge prior to billing Non-Operators for such Material.    Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of its share of such Material suitable for use and acceptable to Operator.

4.    **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.    In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

<center>V. INVENTORIES</center>

The Operator shall maintain detailed records of Controllable Material.

1.    **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.    **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of   a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.    **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.    In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.    **Expense of Conducting Inventories**

A.    The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.    The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

Appx0226

# EXHIBIT C-1

Attached to and made a part of ___ that certain Operating Agreement dated October 18, 2010, by and between Chesapeake Appalachia , L.L.C., as Operator, Epsilon Energy USA, Inc., as Non-Operator and Statoil USA Onshore Properties Inc., as Non-Operator

## TECHNICAL EMPLOYEES EXCLUDED FROM OVERHEAD RATES

| TITLE | CATEGORY |
|---|---|
| ASSOCIATE GEOLOGIST | Technical Labor |
| ASSOCIATE GEOPHYSICIST | Technical Labor |
| GEOLOGIST | Technical Labor |
| GEOPHYSICIST | Technical Labor |
| SR GEOLOGIST | Technical Labor |
| SR GEOPHYSICIST | Technical Labor |
| ASSET MANAGER | Technical Labor |
| ASSOCIATE ASSET MANAGER | Technical Labor |
| DRILLING ENGINEER I | Technical Labor |
| DRILLING ENGINEER II | Technical Labor |
| FIELD ENGINEER | Technical Labor |
| SR DRILLING ENGINEER | Technical Labor |
| SR ASSET MANAGER | Technical Labor |

EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated October 18, 2010  between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator

**Insurance Provisions**

I.    As to all operations hereunder, Operator shall at all times while operations are conducted by it for the Joint Account, carry or cause to be carried, pay for, and charge to the Joint Account the following minimum insurance:

> Worker's Compensation, including Employer's Liability Insurance with limits of not less than $1,000,000, covering the employees of Operator engaged in operations hereunder and in compliance with all applicable state and federal laws.

II.    In addition, as to all operations hereunder, except as provided in Paragraph III below, each party shall carry for its own interest the following types and limits of insurance, or insurance which will provide coverage for a party's interest to the extent required below:

> (a)    Automobile Insurance including non-owned and hired vehicles, coverage with combined single limit per occurrence of not less that $1,000,000 for bodily injury and property damage.

> (b)    General Liability Insurance with a combined single limit per occurrence of not less than $1,000,000 for bodily injury and property damage. Such policy shall be endorsed to provide Blanket Contractual Liability covering obligations assumed herein.

> (c)    Excess Umbrella Liability Insurance with a combined limit per occurrence coverage of not less than $25,000,000.

> (d)    Operator's Extra Expense policy with limits of $25,000,000 per occurrence covering all losses or damages resulting from loss of well control, explosions, fire, cratering, including expenses of clean-up containment, seepage, pollution or contamination.

The premiums for all such insurance to be carried in Paragraph II shall be paid solely by each party.

To the extent of the liabilities assumed by each party herein, all of the above insurance, to the extent carried by a party as provided in Paragraph III below, shall be endorsed to provide that each party's insurers waive their right of subrogation (equitable or by assignment, express or implied, loan receipt or otherwise) against the other party. Each party's insurance coverage shall be primary over any insurance coverage maintained by the other party. Each party hereto may acquire at its own expense, any additional insurance to protect itself. Each such policy shall provide for underwriters waiver of subrogation in favor of each party to the extent of those liabilities assumed by each party herein.

III.    With regard to the aforementioned, Operator shall have the right, but not the obligation, to require satisfactory evidence of adequate insurance or self-insurance. Operator shall not provide this coverage for the benefit of the Joint Account. In the event that any party fails to provide evidence of insurance or evidence of ability to self insure as required herein ("failing party"), the other Party may, at its sole discretion, provide such insurance for and at the direct expense of the failing party. A party is under no obligation to provide such insurance for the party so failing to provide satisfactory evidence of its own insurance or evidence of ability to self insure and nothing contained herein shall be construed to alter the obligations of any party hereunder. Notwithstanding any of the foregoing, each party shall be allowed to self-insure for its interests.

EXHIBIT "E"

Attached to and made a part of that certain Operating Agreement dated October 18, 2010 between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator.

### Gas Balancing Agreement

I. DEFINITIONS:

For the purposes of this Gas Balancing Agreement ("GBA") the following terms shall be defined as follows:

(a)  "Affiliate" shall have the meaning ascribed to such term in the Operating Agreement.

(b)  The "Allowable" is the maximum rate of Gas production from each Gas Well permitted from time to time by the regulatory authority having jurisdiction.

(c)  "Balance" is the condition occurring when a party has utilized, sold or disposed of a Quantity of Gas equal to the same percentage of the cumulative Gas production as such party's Percentage Ownership during the period of such cumulative Gas production.

(d)  "Deliverability" shall mean the maximum sustainable daily Gas withdrawal from a Gas Well which may be accomplished without detriment to ultimate recovery of reserves as determined by Operator acting in good faith and taking into account relevant operational factors including, but not limited to, pipeline capacity and pressure and the maximum producing capability of the Gas Well based on data reported to the appropriate governmental agency having jurisdiction.

(e)  "Gas" shall mean all gaseous hydrocarbons produced from each Gas Well but shall not include liquid hydrocarbons.

(f)  "Gas Well" shall mean each well subject to the Operating Agreement that produces gas.  If a single Gas Well is completed in two or more reservoirs, such Gas Well will be considered a separate Gas Well with respect to, but only as to, each reservoir from which the Gas production is not commingled in the well bore.

(g)  "MMBtu" shall mean one million British thermal units.

(h)  "Operating Agreement" means the operating agreement between the Parties to which this GBA is attached.

(i)  "Operator" means the Party designated as operator under the Operating Agreement.

(j)  "Overproduced" is the condition occurring when a party has utilized, disposed of or sold a greater Quantity of Gas from a particular Gas Well at any given time (individually or through its gas purchaser) than if such party were in Balance.

(k)  "parties" means the legal entities that are signatory to the Operating Agreement, or their successors and assigns.  Parties shall be referred to individually as a party.

(l)  "Percentage Ownership" is the percentage interest of each party in each Gas Well as set forth in or determined in accordance with the provisions of the Operating Agreement, as such interest may change from time to time.

(m)  "Percentage of Proceeds Sale" means a sale of Gas processed in a gas processing plant the price for which is computed as a percentage of the proceeds from the resale of residue gas and natural gas liquids attributable to such Gas.

(n)    "Quantity" shall mean the number of units of Gas expressed in MMBtus.

(o)    "Underproduced" is the condition occurring when a party has utilized, disposed of or sold a lesser Quantity of Gas from a particular Well at any given time (individually or through its gas purchaser) than if such party were in Balance.

## II. APPLICATION OF THIS AGREEMENT

The provisions of this GBA shall be separately applicable to each Gas Well to the end that Gas production from one Gas Well may not be utilized for the purposes of balancing underproduction of Gas from any other Gas Well.

## III. OVERPRODUCTION

### A.    Right to Take All Gas Produced

Subject to the other provisions herein, during any period when any party hereto is not marketing or otherwise disposing of or utilizing its Percentage Ownership of the Allowable or Deliverability, as applicable, of Gas from any Gas Well, the other parties shall be entitled--but shall not have the obligation--to take, in addition to their own Percentage Ownership of Gas, that portion of such other party's Percentage Ownership of Gas which said party is not marketing, utilizing  or otherwise disposing of, and shall be entitled to take such Gas production and deliver same to its or their purchasers in accordance with the provisions herein. Each such taking party shall have the right to take its pro rata portion of each such non-taking party's share, said pro rata portion being based on the ratio of its Percentage Ownership to the Percentage Ownership of all parties in the same balancing status (either Overproduced or Underproduced) who elect to take such non-taking party's share of gas; provided, however, an Underproduced party desiring to take a non-taking party's share of Gas shall take precedence over an Overproduced party which wishes to take such non-taking party's Gas, and an Overproduced party shall be entitled to take a non-taking party's share of Gas only to the extent that an Underproduced party has elected not to take said Gas.  The Gas of a party not taking its production shall be allocated to a taking party hereunder prior to calculation of percentage entitlement to make up Gas from an Overproduced party under Article IV, below.

Notwithstanding the foregoing, all parties shall share in and own the liquid hydrocarbons recovered from Gas by primary separation equipment in accordance with their respective Percentage Ownership, which liquid hydrocarbon ownership shall be unaffected by this GBA.  One or more parties may arrange to have their Gas processed in a gas processing plant for the recovery of liquefiable hydrocarbons. Nothing in this GBA shall afford a basis for balancing any liquefiable hydrocarbons recovered from a Gas processing plant.   Each party taking Gas shall own all of the Gas delivered to its purchaser.

### B.    Limitation on Overproduced Party's Right to Take Gas

Notwithstanding the provisions of Article III.A., above, if during any time and from time to time an Overproduced party shall have taken more than one hundred percent (100%) of such party's Percentage Ownership share of the estimated ultimate recoverable reserves for a Gas Well as determined by Operator acting in good faith, said Overproduced party shall not, after receipt of written notice of said fact from Operator, be entitled to take, sell or otherwise dispose of Gas from such Gas Well until such time as said party is no longer Overproduced; provided, however, said Overproduced party may take Gas from such Gas Well without restriction if and for so long as the other parties are not taking Gas from such Gas Well their full share of the Gas or as otherwise authorized by all of the Underproduced parties.  Also, no Overproduced party shall at any time be entitled to take, sell or otherwise dispose of more than 300% of its Percentage Ownership of the Allowable from a Gas Well or, if there is no Allowable established, of the Deliverability of a Gas Well.

2

C.    Credit For Gas in Storage

Each party who markets less than its Percentage Ownership of the Gas produced shall be credited with Gas in storage equal to its Percentage Ownership share of the Gas produced, less the Gas actually marketed and taken by said party, and less such Party's Percentage Ownership share of the Gas, vented, used or lost in lease operations.

## IV. RIGHT OF UNDERPRODUCED PARTY TO MAKE UP PRODUCTION

Any Underproduced party may commence making up its underproduction provided it has given written notice to the Operator not later than the fifth day of the month preceding the month in which it wishes to commence making up its underproduction, or within such other time as Operator may from time to time reasonably establish.

In addition to its Percentage Ownership and its rights to a non-taking party's Gas under Article III, above, each Underproduced party will be entitled to take up to an additional twenty-five percent (25%) of the monthly Quantity of each Overproduced party's Percentage Ownership in Gas produced during any month; provided, however, nothing in this Article IV shall reduce the right of any Overproduced party to take a Quantity of Gas available for sale during any month less than seventy-five percent (75%) of its Percentage Ownership in Gas produced in said month.

If at any time more than one Underproduced party is taking a Quantity of Gas in excess of its Percentage Ownership in Gas production in order to balance its Gas production account ("Makeup"), then each such Underproduced party shall be entitled to take such Makeup in proportion that its Percentage Ownership bears to the total Percentage Ownership of all Underproduced parties desiring to take Makeup from the Well. Any portion of the Makeup to which an Underproduced party is entitled and which is not taken by such Underproduced party may be taken by any other Underproduced party in the proportion that its Percentage Ownership bears to the total Percentage Ownership of all Underproduced parties desiring to take such untaken portion of Makeup.

## V. MONTHLY DATA AND STATEMENTS TO BE PROVIDED

The Operator will establish and maintain a current Gas account which shows the Gas balance which exists for all the parties and will furnish each of these parties a monthly statement showing the total Quantity of Gas sold and taken in kind and the current and cumulative over and under account of each party within ninety (90) days following the end of each applicable month. Operator shall not incur any liability to any party for errors in the data provided by each party or third parties or for other matters pertaining to gas balancing statements (e.g., transporter's allocation of Gas). Each party shall be responsible for promptly providing written notification to Operator of any error(s) or inaccuracy(ies) contained in any gas balancing statement which it receives.

## VI. PAYMENT OF ROYALTIES AND PRODUCTION TAXES

At all times while Gas is produced from a Well, each party hereto will make, or cause to be made, settlement with respective royalty owners to whom each is accountable in accordance with the actual volumes of Gas taken by such party. Upon written request from any party, any other party shall provide on a monthly basis, any additional information which such requesting party may require in order to comply with its obligation to pay royalty pursuant to the terms hereof including, without limitation, name, address, decimal interest, tax identification and, to the extent it has same, title opinions and abstracts of ownership. The term "royalty owner" includes owners of royalty, overriding royalties, production payments and similar interests. Each party agrees to indemnify and hold harmless each other party from any and all claims asserted by its royalty owners and its Gas Purchasers for which said indemnifying party is responsible. Each party producing and/or delivering Gas to its purchaser shall pay, or cause to be paid, any and all production, severance and other similar taxes due on such Gas in accordance with the actual volumes of Gas taken by such party.

DB1/64243914.1

VII.  CASH SETTLEMENTS

A.    Events Occasioning Cash Settlements

A cash settlement of any imbalance of Gas production: (i) shall be made when production from a Gas Well permanently ceases or the Operating Agreement otherwise terminates (each being referred to herein as "Termination"); and (ii) shall be made by an Overproduced party at the request and option of any Underproduced party or parties upon the sale, transfer, assignment, mortgage or other disposition to an unaffiliated entity (herein individually or collectively referred to as a "Transfer"), by an Overproduced party of all or any portion of its Percentage Ownership in any Gas Well unless (x) the Transfer documentation clearly provides that the assignee has expressly assumed the gas balance position of, and the liability for gas imbalances from, the assignor, (y) the assignee is not a known credit risk and the assignor has provided to the other parties evidence of the creditworthiness of assignee prior to the date that the applicable Transfer becomes effective taking into account the potential liability associated with the applicable gas imbalance.  (A cash settlement pursuant to clause (ii) above may hereinafter be referred to as an "Optional Cash Settlement".)  The parties acknowledge that a cash settlement may be made on more than one occasion pursuant to the terms of this GBA.

B.    Notification of Proposed Transfer By Overproduced Party

When an Overproduced party elects to Transfer all or a portion of its Percentage Ownership (except to an Affiliate, or where the liability for prior period gas imbalances is assumed by an assignee), it shall give notice to all other parties to the Operating Agreement of its intended Transfer and the anticipated closing date.  Each Underproduced party shall have fifteen (15) days from the receipt of such notice in which to elect to receive a cash settlement from the transferring party for the transferring party's share of overproduction allocable to the Underproduced party.  Such election shall be made in writing and sent to the transferring party and Operator.  An Underproduced party's election not to request a cash settlement at the time of Transfer by an Overproduced party shall not, subject to the provisions of Article VII.E, below, preclude said Underproduced party from sharing in cash settlement at Termination or from requesting a cash settlement upon subsequent Transfer by an Overproduced party.

C.    Quantity of Gas

Within one hundred twenty (120) days after Termination, Operator shall provide a statement captioned "Final Quantity Statement" showing on a party-by-party basis the net unrecouped underproduction, the overproduction and the months and years in which such underproduction and overproduction occurred.  Quantities of Gas for which settlement is due shall be determined by accruing the monthly overproduction and underproduction in the order of accrual of said overproduction and underproduction; i.e. makeup Quantities taken by an Underproduced party shall be applied against the oldest overproduction and underproduction then outstanding.  In the event an Optional Cash Settlement is requested, Operator shall provide to the parties, within fifteen business days, an Interim Quantity Statement through the end of the last quarter for which Operator has production data, which shall contain similar information as would be contained within a Final Quantity Statement.

D.    Pricing

1.    For Overproduction Sold

The amount to be paid by an Overproduced party to an Underproduced party for such Underproduced party's Gas upon cash settlement shall, where the Overproduced party has sold the Gas to an unaffiliated third party, be based upon the price received by the Overproduced party at the time such overproduction occurred (the "price received") shall be the gross proceeds received, less the following:

4

(a)  production and/or severance taxes attributable to said Gas production paid by the Overproduced party;

(b)  royalties, if any, paid by the Overproduced party to an Underproduced party's royalty owner(s) to the extent said payments amounted to a discharge of said Underproduced party's royalty obligation;

(c)  any other payments made by the Overproduced party to obligees of the Underproduced party to the extent said payments by the Overproduced party were required by law and/or amounted to discharge of the obligations of the Underproduced party; and

(d)  all reasonable costs and expenses incurred to third parties in connection with the sale of said Gas; e.g., gathering, transportation, compression, storage, marketing and similar fees.

In the event sales by the Overproduced party were made to an Affiliate and the price paid by such Affiliate was less than the prevailing market price in the area of the Well at the time of the sale, then the price received shall be deemed to be the WAHA Index price for the applicable month of overproduction, calculated from a pricing bulletin published at the time such overproduction occurred, less those items set forth in a-d above (the "Adjusted WAHA Index Price").  Any Underproduced party that is entitled to payment with respect to the applicable cash settlement may, based upon competent evidence, object that sales by the Overproduced party to an Affiliate were at a price less than the prevailing market price in the area of the Well at the time of the sale, in which case the Adjusted WAHA Index Price shall be used to price such sales in accordance with the prior sentence.

2.  <u>For Overproduction Taken or Utilized and Not Sold</u>

If there is no actual sale to establish the amount received by the Overproduced party because the Overproduced party took such Gas for its own purposes instead of selling it, the amount to be paid by an Overproduced party to an Underproduced party for such Underproduced party's Gas upon cash settlement shall be based upon the Adjusted WAHA Index Price.

3.  <u>Proceeds for Liquefiable Hydrocarbons Not Included</u>

The parties agree that the terms "price received by an Overproduced party" and "weighted average price received" shall not include any compensation received by a party for liquid hydrocarbons derived from processing its Gas in a Gas processing plant, unless the overproduction for which the Overproduced party is accounting was sold under a Percentage of Proceeds Sale.
.

E.  <u>Calculation, Collection and Distribution of Payments</u>

1.  <u>For Cash Settlements at Termination</u>

In the event of a cash settlement at Termination, within ten (10) days after receipt of the Final Quantity Statement from the Operator, each Overproduced party shall furnish to the Operator and the other parties a statement showing the price received for its overproduction on a monthly basis.  Within ten (10) days after receipt of such pricing information from all parties, Operator shall submit to each party a statement showing the calculations and the total amount to be paid by each Overproduced party and to be received by each Underproduced party. Cash settlement shall be calculated on the "FIFO" accounting method.

Within twenty (20) days after receipt of said statement from Operator by an Overproduced party, the Overproduced party shall pay all amounts due and owing as reflected on such statement to the Underproduced parties.  In the event that all sums due and owing are not paid by an Overproduced party to the applicable Underproduced parties

5

within the time periods set forth in this provision, interest shall accumulate on such unpaid amounts as provided herein. The amount to be received by each Underproduced party shall be determined by apportioning the total amount to be received by all Underproduced parties from all Overproduced parties among all Underproduced parties in proportion to the total sum to be received by each Underproduced party as a percent of the total sum to be received by all Underproduced parties. The amount to be paid by each Overproduced party to each Underproduced party shall be determined by apportioning the total amount to by paid by all Overproduced parties to each such Underproduced party among all Overproduced parties in proportion to the total sum to be paid by each such Overproduced party to all Underproduced parties as a percent of the total sum to be paid by all Overproduced parties to all Underproduced parties.

2.   <u>Optional Cash Settlement Pursuant to Article VII.A.(ii) from an Overproduced party Who Seeks to Transfer an Interest</u>

In the event of a request for an Optional Cash Settlement by an Underproduced party pursuant to Article VII.A.(ii) from an Overproduced party who wishes to Transfer all or a portion of its Percentage Ownership, within twenty (20) working days after receipt of Operator's Interim Quantity Statement, the Overproduced party from whom cash settlement is sought shall provide to Operator a statement showing the price received for its overproduction on a monthly basis. Within ten (10) working days after receipt of such pricing information, Operator shall: (a) calculate the total amount due and owing by the Overproduced party and the total amount to be received by each Underproduced party requesting cash settlement based on the "FIFO" accounting method; and (b) provide the Overproduced party and each such Underproduced party with a statement showing the calculations and the total sum to be paid to said Underproduced party. The Overproduced party shall pay to each such Underproduced party the total amount due and owing as reflected in said statement within twenty (20) working days after receipt of said statement. In the event that all sums due and owing are not paid by an Overproduced party to the applicable Underproduced parties within the time periods set forth in this provision, interest shall accumulate on such unpaid amounts as provided herein.

The parties acknowledge that production and sales data may not be available for a brief period immediately preceding the closing date and prior to the effective date of the Transfer, and the transferring Overproduced party agrees to cash settle for any Gas produced during said period promptly after closing. In the event that said transferring Overproduced party for any reason fails to make all cash settlement payments required under this GBA, the transferee shall be obligated to make said payments.

3.   <u>Procedures Applicable to All Cash Settlements</u>

For purposes of all price calculations the overproduction of each Overproduced party shall be apportioned to each Underproduced party in proportion to each Underproduced party's underproduction as a percent of the sum of the underproduction of all Underproduced parties. Overproduced volumes shall be matched to Underproduced volumes based on the order in which the overproduction and underproduction arose. The parties recognize that the months of overproduction by an Overproduced party may not coincide with the months of underproduction by an Underproduced party.

4.   <u>Amount Subject to Refund May Be Withheld.</u>

In the event that any portion of the price actually received by an Overproduced party shall be subject to possible refund pursuant to rules and regulations issued by the Federal Energy Regulatory Commission ("FERC"), any state, administrative agency or successor governmental authority having jurisdiction, or any court order, the amount which may be ultimately required to be refunded by FERC or any other entity may be withheld without interest by the Overproduced party until such time as a final determination is made with respect thereto or until the party to whom payment is to be made provides a bond or other security to indemnify the party obligated to make such payments in form satisfactory to the latter.

DB1/64243914.1

F.    Operator's Liability

Except as otherwise provided herein, Operator is obligated to administer the provisions of this GBA, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

VIII.  OPERATING EXPENSES

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using Gas or whether the sales and use of each are in proportion to their Percentage Ownership.

IX.  DELIVERABILITY TESTS

Nothing herein shall be construed to deny any party the right from time to time to produce and take or deliver to the purchaser its full share of the Gas production to meet the deliverability test required by its purchaser.  Also, nothing herein shall:  (a) require the Operator to produce a Gas Well in excess of its deliverability or the applicable maximum allowable rate where such rate is established by regulatory authority having jurisdiction from time to time; or (b) prevent an Operator from operating the Gas Well in order to conduct such tests as may be required by any applicable regulatory authority from time to time.

X.  NOMINATIONS

For each party wishing to sell, utilize or dispose of Gas from a Gas Well subject to this GBA, Operator shall provide each party an initial nomination by well/delivery point(s) six working days prior to the beginning of each month.   Operator shall provide each party a revised nomination by well/delivery point as necessary during the month to reflect any change in production.  Allocation of gas production in any month in which the total nominations vary from the total production shall be by the Operator according to such procedures as Operator from time to time may reasonably establish.  Each non-operator party agrees to indemnify Operator for any charges or penalties incurred because of over or underdeliveries as compared to its nominations, except where such charges or penalties are solely attributable to action taken by Operator in total disregard of such nominations.

XI.  TERM

This GBA shall remain in full force and effect for so long as the Operating Agreement is in effect and thereafter until the gas balance accounts are settled in full.

XII.  SUCCESSORS AND ASSIGNS

The terms, covenants and conditions of this GBA shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.  The parties hereto agree to give notice of the existence of this GBA to any successor in interest and to make any transfer of any interest subject to the Operating Agreement, or any part thereof, expressly subject to the terms of this GBA.

XIII.  AUDITS

Any Underproduced party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced party's accounts and records relating to such payment. The party conducting such audit shall bear its costs of the audit.

XIV.  MISCELLANEOUS

7

A.    No assignment shall relieve the assignor from any obligation to the other parties with respect to any overproduction taken by assignor to such assignment.

B.    Any amount remaining unpaid under the GBA more than thirty (30) days after it is due shall bear interest (commencing the day after said payment was due) at the rate set forth in the Accounting Procedure (Exhibit C to the Operating Agreement).

C .   Unless the context otherwise clearly indicates, words used in the singular include the plural, and the plural includes the singular.

D.    Each party agrees to maintain the necessary records and documents to enable the gas balancing and cash settlements contemplated hereby to be made.

E.    If any party hereto fails to timely provide to Operator the data required hereby to enable gas balancing statements and cash settlements to be promptly made, Operator, or any other party, without prejudice to other remedies, is authorized to audit the records of the non-providing party and such audit shall be at the expense of the audited party.

F.    To the extent permitted by law, this GBA shall be in lieu of and take precedence over any law, statute, rule or regulation requiring Gas balancing, revenue sharing or marketing of Gas.

G.    In the event that any party is in default of any payment required by this GBA or fails to provide information required under this GBA, Operator is authorized--but not required--upon thirty (30) days notification to said defaulting party, without prejudice to any other remedies it may have, to curtail said party's Gas production from any and all Gas Wells subject to this GBA and such gas may be taken by the other parties in accordance with III.B. above.

H.    In the event of a conflict between the terms of this GBA and the Operating Agreement, the terms of this GBA shall govern except where the conflict is between Article VI of this GBA and the Operating Agreement, in which event the Operating Agreement shall govern.

I.    Nothing in this GBA shall be construed as precluding cash balancing at any time as may be agreed by the parties.

J.    Nothing contained in this GBA shall require an Overproduced Party to pay to an Underproduced Party a sum which would be violative of any law, rule or regulation.

DB1/64243914.1

Appx0236

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated October 18, 2010 between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator

## Equal Employment Opportunity

During the performance of this agreement, the Operator shall be bound by and comply with all terms and provisions of Section 202 of Executive Order 11246 of September 24, 1965, all of which are incorporated herein by references to the same extent as if fully set out herein, and shall be bound by and comply with the rules, regulations and relevant orders adopted pursuant to such Executive Order.

Operator assures Non-Operator that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that he does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom or otherwise. It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965. Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor, dated May 21, 1968, and the provisions of the equal opportunity clause enumerated in contracts between the United States of America and Non-Operator.

**RECORDING SUPPLEMENT TO**
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between Chesapeake Appalachia, L.L.C., hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A-1" and Exhibit "A-2" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A-1" and Exhibit "A-2";

WHEREAS, the parties hereto have executed an Operating Agreement dated October 18, 2010 (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, ~~which Agreement in its entirety is incorporated herein for reference,~~ and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

   A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

   B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

   C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

   D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

   E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

   F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

   G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

      This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

   H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

   I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

   J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

   K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

   A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

   B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the

Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C.  To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.  If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E.  If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F.  The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G.  Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder and under the Operating Agreement. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H.  The above described security may be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4.  This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5.  This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6.  Notwithstanding anything herein to the contrary, in the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7.  This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8.  Other Provisions:

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1   Chesapeake Appalachia, L.L.C., who has prepared and circulated this form for execution, represents and warrants
that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model
2   Form Recording Supplemental to Operating Agreement and Financing Statement, as published in computerized forms by
Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertions
3   and that are clearly recognizable as changes in Articles ————, have been made to the form.

4

5   ATTEST OR WITNESS:               CHESAPEAKE APPALACHIA, L.L.C.,
                                       OPERATOR

6

7   _____

8   _____   By _____

                                      Henry J. Hood
9                               Type or print name

10                       Title _Senior Vice President – Land and Legal &
                          General Counsel

11                       Date _____

12                       Tax ID or S.S. No. __20-3774650_____

13

14   ATTEST OR WITNESS:               EPSILON ENERGY USA, INC., NON-OPERATOR

15

16                       _____

17   _____   By _____

18   _____         Zoran Arandjelovic
                               Type or print name

19                       Title _President & CEO_____

20                       Date _____

21                       Tax ID or S.S. No._____

22

23   ATTEST OR WITNESS:               STATOIL USA ONSHORE PROPERTIES INC.,
                                   NON-OPERATOR

24

25                       _____

26   _____   By _____

27   _____         M. K. Williams
                                 Type or print name

28                       Title _Land Manager – Onshore Gas, Marcellus Asset

29                       Date _____

30                       Tax ID or S.S. No. ___FEIN 26-3666667_____

31
32

33

34

35

36

37   Signature Page to that certain Recording Supplement to Operating Agreement and Financing Statement dated October 18, 2010, between Chesapeake
Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Baltzley South Unit.

1

Appx0240

**ACKNOWLEDGMENT**

**OPERATOR:**

STATE OF <u>OKLAHOMA</u>         )

                                    ) SS:

COUNTY OF <u>OKLAHOMA</u>         )

On this, the 2nd day of June , 20 11 , before me Jessica S. Meek the undersigned officer, personally appeared, <u>Henry J. Hood</u>, who acknowledged himself to be the <u>Senior Vice President - Land and Legal & General Counsel</u> of <u>Chesapeake Appalachia L.L.C.</u>, a corporation, and that he as such <u>Senior Vice President - Land and Legal & General Counsel</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Senior Vice President – Land and Legal & General Counsel</u>.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: 01-08-12

Signature/Notary Public: _____

Name/Notary Public (print): Jessica S. Meek

*[Notary seal: JESSICA S. MEEK, NOTARY, # 08000292, EXP. 01/08/12, PUBLIC, STATE OF OKLAHOMA]*

**ACKNOWLEDGMENT**

**NON-OPERATORS:**

PROVINCE OF ONTARIO

~~STATE OF~~ _____ )

CITY OF VAUGHAN                     ) SS:

~~COUNTY OF~~ _____ )

                     Joseph Feldman

On this, the 23rd day of June , 20 11 , before me _____ , the undersigned officer, personally appeared, <u>Zoran Arandjelovic</u>, who acknowledged himself to be the <u>President</u> of <u>Epsilon Energy USA, INC.</u>, a corporation, and that he as such <u>Executive Chairman, President and C.E.O.</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Executive Chairman, President and C.E.O.</u>.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: n/a

Signature/Notary Public: _____

Name/Notary Public (print): Joseph Feldman

STATE OF _____ )

                                    ) SS:

COUNTY OF _____ )

On this, the _____ day of _____, 20___, before me _____ , the undersigned officer, personally appeared, <u>M.K. Williams</u>, who acknowledged himself to be the <u>Land Manager – Onshore Gas, Marcellus Asset</u> of <u>Statoil USA Onshore Properties Inc.</u>, a corporation, and that he as such <u>Land Manager – Onshore Gas, Marcellus Asset</u> of <u>Statoil USA Onshore Properties Inc.</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Land Manager – Onshore Gas, Marcellus Asset</u>.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____

Signature/Notary Public: _____

Name/Notary Public (print): _____

2

Appx0241

Exhibit "A-1"

Attached to and made a part of the Recording Supplement to Operating Agreement and Financing Statement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Operator, and Epsilon Energy USA, Inc., as Non-Operator, and Statoil USA Onshore Properties Inc., as Non-Operator

**Baltzley South Unit**
**Rush Township**
**Susquehanna County, Pennsylvania**

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| | Stephen J and Patricia J Molnar | Southwestern Energy Production Company | 5/17/2007 | 200707104 | 176.00-1-014.00 | 24.000000 | 24.000000 |
| | Thomas W and Fred Patton | Southwestern Energy Production Company | 6/4/2007 | 200707470 | 177.00-1-035.00 | 32.600000 | 26.441533 |
| | Stephen M Hunsinger | Southwestern Energy Production Company | 3/30/2007 | 200707089 | 177.00-1-038.00 | 25.000000 | 5.980025 |
| 1-297606-000 | Kenneth B and Janice Pittman | Epsilon Energy USA, Inc. | 10/26/2007 | 200800766 | 176.00-1-009.00 | 40.930000 | 11.424797 |
| 1-297569-000 | Charles M and Regina M Pierson | Epsilon Energy USA, Inc. | 3/2/2007 | 200704244 | 176.00-1-011.00 | 12.309100 | 12.309100 |
| 1-297572-000 | David Evan Baltzley | Epsilon Energy USA, Inc. | 11/7/2007 | 200800774 | 176.00-1-012.00 | 107.600000 | 85.856803 |
| 1-297585-000 | Roland D Jenner | Epsilon Energy USA, Inc. | 8/21/2007 | 200711597 | 176.00-1-046.00 | 23.280000 | 15.533203 |
| 1-297558-000 | Harold C and Gloria Craige | Cabot Oil & Gas Corporation | 3/26/2007 | 200704460 | 177.00-1-028.01 | 139.350000 | 13.940146 |
| | Howard E and Barbara Riner | Talisman Energy USA Inc. | 9/4/2009 | 200917066 | 176.00-1-005.00 | 51.000000 | 1.198781 |
| | Larry L Delong | Talisman Energy USA Inc. | 9/19/2009 | 201002645 | 176.00-1-013.00 | 12.000000 | 12.000000 |
| | David Wipple | Talisman Energy USA Inc. | 10/16/2009 | 201010647 | 176.00-1-015.00 | 104.348100 | 76.618907 |
| | Carmine Tagliaferro | Talisman Energy USA Inc. | | 200809257 | 177.00-1-033.00 | 20.690000 | 20.690000 |
| | Joseph and Donna Grillo | Cabot Oil & Gas Corporation | 5/17/2008 | 200809257 | 177.00-1-031.00 | 10.000000 | 10.000000 |
| | Joseph and Donna Grillo | Cabot Oil & Gas Corporation | 5/17/2008 | 200809257 | 177.00-1-032.00 | 10.010000 | 10.010000 |

END OF EXHIBIT "A-1"

Attached to and made a part of the Recording Supplement to Operating Agreement and Financing Statement dated October 18, 2010, by and between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------|
| 1 | 176.00-1-005.00 |
| 2 | 176.00-1-009.00 |
| 3 | 176.00-1-011.00 |
| 4 | 176.00-1-012.00 |
| 5 | 176.00-1-013.00 |
| 6 | 176.00-1-014.00 |
| 7 | 176.00-1-015.00 |
| 8 | 176.00-1-046.00 |
| 9 | 177.00-1-028.01 |
| 10 | 177.00-1-031.00 |
| 11 | 177.00-1-032.00 |
| 12 | 177.00-1-033.00 |
| 13 | 177.00-1-035.00 |
| 14 | 177.00-1-038.00 |

Contract Area

5/20/2011

**CONTRACT AREA**

**Baltzley South Common Pad**
**Susquehanna Co., PA**
1 inch = 1,000 feet

Chesapeake
ENERGY

Appx0243

# EXHIBIT 3

## DECLARATION AND NOTICE OF POOLED UNIT

### CRAIGE UNIT

This Declaration and Notice of Pooled Unit is executed to be effective as of May 23, 2011, by the undersigned parties, who collectively own the leasehold estates created under those certain oil and gas leases and any renewals, extensions, ratifications and amendments thereof which are more particularly described on Exhibit "A" attached hereto and incorporated herein by reference for all purposes (the "Leases"), or who collectively own an interest in the oil and gas estate in the lands described in the Leases, and who join in the execution hereof to evidence their consent to the pooling, unitization and combination of the leases and oil and gas estates herein described.

### R E C I T A L S

WHEREAS, each of the Leases authorizes the lessee thereunder to pool, unitize or combine all or a portion of the lands covered thereby with other land and leases, to form a pooled unit for the exploration, development and production of oil, gas and associated and constituent hydrocarbons from the lands covered by the Leases; and

WHEREAS, the pooling, unitization and combination of the Leases and oil and gas estates to the extent necessary to form the hereinafter described pooled unit are necessary and advisable in the judgment of the undersigned to efficiently and effectively develop the oil and gas rights within such unit.

WHEREAS, Chesapeake Appalachia, L.L.C. is the Operator of the gas well(s) in the pooled unit and executes this document on behalf of itself and as agent for all interest owners in the leases to the extent that they do not separately join in the execution hereof.

NOW, THEREFORE, in order to establish and provide proper notice of the creation of the hereinafter described pool or unit, the undersigned hereby declare as follows:

1.    Declaration of Unit:  In accordance with the provisions of the Leases, the undersigned do hereby declare, pool, unitize and combine the Leases, including all renewals, extensions, ratifications and amendments thereof, and the lands covered thereby and the oil and gas estates therein, to the extent necessary to form and create a pooled unit as described below.  Production from the unit shall be allocated among all of the Leases and tracts within the unit in the proportion that the number of surface acres of each lease and tract included within the unit bears to the total number of surface acres in the unit, as described in Exhibit "A".

2.    Unit Name.  The pooled unit created hereby shall be known as the "**Craige Unit**" ("the Unit").

3.    Description of Unit:  The Unit shall consist of **633.640237 acres**, more or less, being all or a portion of the Leases listed on Exhibit "A" INSOFAR AND ONLY INSOFAR as the Leases fall within the boundary more particularly described and depicted on Exhibit "B", which is attached hereto and incorporated herein by reference for all purposes. This Declaration and Notice of Pooled Unit covers all production from the lands described on Exhibit "A" and Exhibit "B" which is produced from any well drilled within the Unit.  To the extent of any inconsistency between the information contained on Exhibit "A" and that depicted on Exhibit "B", Exhibit "A" shall supersede and control.

4.    Effect of Pooled Unit.  The effect of this Declaration and Notice of Pooled Unit shall be that operations and/or production (or the equivalent as in the case of shut-in payments) anywhere within the Unit shall be deemed to be operations and/or production on each separate tract sufficient to extend and maintain each included lease in the Unit.

5.    Right to Amend.  The undersigned hereby expressly reserve the right, from time to time, to amend this Declaration and Notice of Pooled Unit, and the respective terms and provisions hereof, and to change the size and area of, and interests covered by the Unit, including without limitation, the power (i) to change, reduce, enlarge or extend the size or configuration of the Unit; (ii) to include in the Unit additional lands and oil and gas leases, or interests in the lands described therein, covering interests in the Unit, which are secured or obtained subsequent to the date hereof, or prior to the date hereof and not included and described herein; (iii) to include in the Unit full or undivided interests in the Unit which are not otherwise included herein by the respective owner of such full or undivided interests; and (iv) to change the allocation of oil and gas production attributable to the various lands, leases and owners thereof to conform with (i) – (iii) above.

6.    Dissolution of Unit:  The Unit formed hereby may be dissolved by Chesapeake Appalachia, L.L.C., acting as the Operator of the Unit, with the consent of the undersigned, at any time by filing an appropriate instrument of record in Susquehanna County, Pennsylvania, after any failure to establish unit production or after cessation of operations upon the Unit.

7.    Binding upon Assigns and Successors:  This instrument shall bind, inure to the benefit of, and be exercised by heirs, assigns, and successors in interest of all parties.

8.    Counterparts.  This document may be executed in one or more counterparts, each of which will be deemed to be an original for all purposes and all of which, when taken together, will be deemed to constitute one and the same document as if all signatures were included therein.  The failure of one or more of the signatory parties listed below to execute this instrument or a counterpart thereof shall not in any manner affect the validity of same as to the parties who do execute this instrument.

9.    Effective Date:  This Unit shall remain in force from the effective date listed hereinabove and for as long as oil and gas are being produced from the Unit, or so long as the Leases are maintained in force and effect by payment or tender of shut-in royalties, or by other means, in accordance with the terms and provisions of the Leases.

EXECUTED by the undersigned parties on the respective dates of acknowledgment hereof, to be effective for all purposes as of the date first above written.

Appx0246

**Chesapeake Appalachia, L.L.C.**
an Oklahoma limited liability company

By:_____
    Henry J. Hood, Senior Vice President –
    Land and Legal & General Counsel

**Statoil USA Onshore Properties Inc.**

By:_____
    M.K. Williams, Land Manager – Onshore Gas

**Epsilon Energy USA, Inc.**

By:_____
    Zoran Arandjelovic, President and CEO

**Chief Exploration & Development LLC**

By:_____
    Glynne Mildren- Sr. Vice President- Land

**Enerplus Resources (USA) Corporation**

By:_____
    Roxanne Forst- Manger of Lands USA

**Radler 2000 Limited Partnership**

By:_____
    Michael G. Radler- President of Tug Hill, Inc.,
    the general partner of Radler 2000 Limited
    Partnership

**MKR Holdings, L.L.C.**

By:_____
    Henry J. Hood, Senior Vice President –
    Land and Legal & General Counsel

**Unconventionals Natural Gas, LLC**

By:_____

**Southwestern Energy Production Company**

By:_____

Signature Pages to that certain Declaration and Notice of Pooled Unit made effective May 23, 2011 between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties, Inc. et al covering the Craige Unit.

**CORPORATE ACKNOWLEDGMENT**

STATE OF OKLAHOMA )
                   ) SS:
COUNTY OF OKLAHOMA)

On this, the _____ day of May, 20 11, before me Jessica S. Mirth the undersigned officer, personally appeared Henry J. Hood, Who acknowledged himself to be the Senior Vice President – Land and Legal & General Counsel of Chesapeake Appalachia, L.L.C., an Oklahoma limited liability company, and that he as such Senior Vice President – Land and Legal & General Counsel, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Senior Vice President – Land and Legal & General Counsel.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: 01/08/12
Signature/Notary Public: _____
Name/Notary Public (print): Jessica S. Mirth

**CORPORATE ACKNOWLEDGMENT**

STATE OF TEXAS )
                 ) SS:
COUNTY OF HARRIS )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared M.K. Williams, who acknowledged himself to be the Land Manager – Onshore Gas of Statoil USA Onshore Properties Inc., a corporation, and that he as such Land Manager – Onshore Gas, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as Land Manager – Onshore Gas.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

**CORPORATE ACKNOWLEDGMENT**

STATE OF TEXAS )
                 ) SS:
COUNTY OF HARRIS )

On this, the 24th day of May, 20 11, before me Aerayna Flores the undersigned officer, personally appeared Zoran Arandjelovic, who acknowledged himself to be the President and CEO of Epsilon Energy USA, Inc., a corporation, and that he as such President and CEO, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as President and CEO.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

AERAYNA FLORES
Notary Public, State of Texas
My Commission Expires
August 02, 2012

My Commission Expires: August 2, 2012
Signature/Notary Public: Aerayna Flores
Name/Notary Public (print): Aerayna Flores

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____ )
                 ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared Glynne Mildren, who acknowledged himself to be the Sr. Vice President-Land of Chief Exploration & Development LLC, and that he as such Sr. Vice President-Land, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as Sr. Vice President-Land.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

- 4 -

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                  ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared <u>Roxanne Forst</u>, who acknowledged herself to be the <u>Manager of Lands USA</u> of <u>Enerplus Resources (USA) Corporation</u>, and that she as such <u>Manager of Lands USA</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by herself as <u>Manager of Lands USA</u>.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                           My Commission Expires: _____
                           Signature/Notary Public: _____
                           Name/Notary Public (print): _____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                  ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared <u>Michael G. Radler</u>, who acknowledged himself to be the <u>President of Tug Hill, Inc., the general partner of Radler 2000 Limited Partnership</u> of <u>Radler 2000 Limited Partnership</u>, and that he as such <u>President of Tug Hill, Inc., the general partner of Radler 2000 Limited Partnership</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the limited partnership by himself as <u>President of Tug Hill, Inc., the general partner of Radler 2000 Limited Partnership</u>.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                           My Commission Expires: _____
                           Signature/Notary Public: _____
                           Name/Notary Public (print): _____

## CORPORATE ACKNOWLEDGMENT

STATE OF OKLAHOMA )
                    ) SS:
COUNTY OF OKLAHOMA   )

On this, the _____ day of _MAY_, 20_11_, before me _Jessica S. Meek_ the undersigned officer, personally appeared <u>Henry J. Hood</u> who acknowledged himself to be the <u>Senior Vice President – Land and Legal & General Counsel</u> of <u>MKR Holdings, L.L.C.</u>, and that he as such <u>Senior Vice President – Land and Legal & General Counsel</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the limited liability company by himself as <u>Senior Vice President – Land and Legal & General Counsel</u>.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*[Notary seal: JESSICA S. MEEK NOTARY, # 08000292, EXP. 01/08/12, PUBLIC, STATE OF OKLAHOMA]*

                           My Commission Expires: _01/08/12_
                           Signature/Notary Public: _[signature]_
                           Name/Notary Public (print): _Jessica S. Meek_

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                  ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of <u>Unconventionals Natural Gas, LLC</u>, a corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as _____.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                           My Commission Expires: _____
                           Signature/Notary Public: _____
                           Name/Notary Public (print): _____

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____ )

COUNTY OF _____ ) ) SS:

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of Southwestern Energy Production Company., a corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as _____.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____

Signature/Notary Public: _____

Name/Notary Public (print): _____

- 6 -

Exhibit "A"

Attached to and made a part of that Declaration and Notice of Pooled Unit made effective May 23, 2011, by and between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc., et al

Craige Unit

Rush and Auburn Township

Susquehanna County, Pennsylvania

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-236480-000 | John Koromlan | Chesapeake Appalachia LLC | 12/1/2006 | 201009225 | 196.00-2-003.00 | 131.4000 | 4.167941 |
| 1-301805-000 | Rushboro Ventures, LP | Chesapeake Appalachia LLC | 3/25/2010 | 201014458 | 196.00-2-004.01 | 107.0000 | 72.089227 |
| | Thomas J. and Donna G. Malandri | Southwestern Energy Production Company | 12/3/2007 | 200800070 | 196.00-2-008.02 | 39.1600 | 39.160000 |
| 1-297547-000 | John Bowen, Stanley Bowen, and Joseph Bowen | Chesapeake Appalachia LLC | 10/30/2007 | 200800144 | 177.00-1-021.00 | 126.0000 | 1.489444 |
| 1-297554-000 | Donald R. Hardic and Lawerence Hardic | Chesapeake Appalachia LLC | 3/14/2007 | 200711599 | 177.00-1-022.00 | 170.9000 | 15.517888 |
| 1-297549-000 | Anthony P. Litwin, Jr. | Chesapeake Appalachia LLC | 4/6/2007 | 200705059 | 177.00-1-025.00 | 218.1500 | 197.542985 |
| 1-297546-000 | Frederick P. Litwin | Chesapeake Appalachia LLC | 4/16/2007 | 200705060 | 177.00-1-025.01 | 235.9000 | 134.213731 |
| 1-297595-000 | Raymond and Christine K. Poulsen | Chesapeake Appalachia LLC | 6/6/2007 | 200708073 | 177.00-1-026.00 | 56.0000 | 14.144376 |
| 1-297558-000 | Harold and Gloria Craige | Chesapeake Appalachia LLC | 3/26/2007 | 200704460 | 177.00-1-028.01 | 139.3500 | 66.525937 |
| 1-297558-000 | Harold and Gloria Craige | Chesapeake Appalachia LLC | 3/26/2007 | 200704460 | 177.00-1-044.00 | 23.3700 | 19.858708 |
| 1-297683-000 | Wayne A. and Cynthia L. Rogers | Chesapeake Appalachia LLC | 2/25/2008 | 200807357 | 196.00-1-002.01 | 2.4100 | 2.410000 |
| 1-297670-000 | Robert Gerald and Gloria Rogers and Angela Bush | Chesapeake Appalachia LLC | 2/29/2008 | 200807356 | 196.00-2-052.00 | 4.5000 | 4.500000 |
| 1-297673-000 | Dawn Y. Childress | Chesapeake Appalachia LLC | 2/27/2008 | 200807355 | 196.00-1-002.00 | 4.1300 | 4.130000 |
| 1-283511-000 | Debbie L. Polovitch | The Keeton Group, LLC | 8/3/2006 | 200700453 | 196.00-2-007.00 | 57.890000 | 57.890000 |

| | Total Acres in Unit: | 633.640237 |
|---|---|---|

END OF EXHIBIT "A"

Exhibit "B"

Attached to and made a part of that Declaration and Notice of Pooled Unit made effective May 23, 2011, by and between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------|
| 1 | 177.00-1-021.00 |
| 2 | 177.00-1-022.00 |
| 3 | 177.00-1-025.00 |
| 4 | 177.00-1-025.01 |
| 5 | 177.00-1-026.00 |
| 6 | 177.00-1-028.01 |
| 7 | 177.00-1-044.00 |
| 8 | 196.00-1-002.00 |
| 9 | 196.00-1-002.01 |
| 10 | 196.00-2-003.00 |
| 11 | 196.00-2-004.01 |
| 12 | 196.00-2-007.00 |
| 13 | 196.00-2-008.02 |
| 14 | 196.00-2-052.00 |

Unit Area - 633.640237 AC

5/13/2011

Chesapeake
ENERGY

EXHIBIT "B"

Craige Unit
Susquehanna Co., PA
1 inch = 1,250 feet

Interior tracts highlighted in red hatch are NOT part of the declared unit and are excluded from the calculation determining allocation of production.

Appx0252

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

__December__    16, __2010__ ,
<small>year</small>

OPERATOR    __Chesapeake Appalachia, L.L.C.__

CONTRACT AREA    __Craige Unit__
__Auburn and Rush Townships__

COUNTY OR PARISH OF   Susquehanna          STATE OF   Pennsylvania

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED
FORM.

A.A.P.L. NO. 610 – 1989

## TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 1 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | 1. Failure of Title | 3 |
| | 2. Loss by Non-Payment or Erroneous Payment of Amount Due | 3 |
| | 3. Other Losses | 3 |
| | 4. Curing Title | 3 |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | ~~11~~ |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

i

## TABLE OF CONTENTS

    D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ................................................... 15
    E. WAIVER OF RIGHTS TO PARTITION: ...................................................................... 15
    F. PREFERRENTIAL RIGHT TO PURCHASE: .................................................................. 15
IX.   INTERNAL REVENUE CODE ELECTION ....................................................................... 15
X.    CLAIMS AND LAWSUITS ......................................................................................... 15
XI.   FORCE MAJEURE .................................................................................................. 16
XII.  NOTICES ............................................................................................................. 16
XIII. TERM OF AGREEMENT ........................................................................................... 16
XIV. COMPLIANCE WITH LAWS AND REGULATIONS ........................................................... 16
    A. LAWS, REGULATIONS AND ORDERS: ..................................................................... 16
    B. GOVERNING LAW: ............................................................................................. 16
    C. REGULATORY AGENCIES: ................................................................................... 16
XV.  MISCELLANEOUS ................................................................................................. 17
    A. EXECUTION: ..................................................................................................... 17
    B. SUCCESSORS AND ASSIGNS: ................................................................................ 17
    C. COUNTERPARTS: ............................................................................................... 17
    D. SEVERABILITY .................................................................................................. 17
XVI. OTHER PROVISIONS .............................................................................................. 17

Appx0255

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

## OPERATING AGREEMENT

THIS AGREEMENT, entered into by and between ___Chesapeake Appalachia, L.L.C.___,

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes

hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

## WITNESSETH:

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land

identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil

and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

## ARTICLE I.

## DEFINITIONS

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A.    The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of an

AFE for the drilling of a vertical or horizontal well must be prepared in compliance with Article XVI hereof, incurred in conducting and

estimating the costs to be operation hereunder.

B.    The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and

Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production

testing conducted in such operation.

C.    The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be

developed and operated for Oil and Gas purposes under this agreement.  Such lands, Oil and Gas Leases and Oil and Gas

Interests are described in Exhibit "A."

D.    The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest

Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the

lesser.

E.    The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the

cost of any operation conducted under the provisions of this agreement.

F.    The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal

body having authority.  If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as

established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties. **The Drilling Unit for a**

**horizontal well shall be determined by the Operator in consultation with Non-Operator, and conform with**
**any restrictions in the agreement or conveyances creating the Oil and Gas Interests to be included in the Drilling Unit and**

**applicable laws and be formed in such size and shape as needed to maximize the recovery of oil and gas through the use of multiple**

**laterals.**

G.    The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be

located.

**G.1    The term "Force Majeure"  shall mean anything act or occurrence beyond a party's control that delays  or prohibits**
**performance of any operation contemplated hereunder, including but not limited to the building of surface location, the drilling**
**completion or operating of a well, laying pipeline  or other physical operation. Force Majeure events include but are not limited to**
**Acts of God, inclement weather, governmental action or intervention, changes in existing laws or enforcement of existing laws and**
**permitting delays.**

H.    The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I.    The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as

provided in Article VI.B.2.

J.    The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a

proposed operation.

K.    The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous

hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is

specifically stated.

L.    The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts

2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of land lying within the Contract Area which are owned by parties to this agreement.

M.  The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N.  The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O.  The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P.  The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q.  The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R.  The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

### ARTICLE II.

### EXHIBITS

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__x__  A.  Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

(6) Burdens on production. (7) Plat of Contract Area

__x__  B.  Exhibit "B," Form of Lease.

__x__  C.  Exhibit "C," Accounting Procedure.

__x__  D.  Exhibit "D," Insurance.

__x__  E.  Exhibit "E," Gas Balancing Agreement.

__x__  F.  Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

__x__  G.  Exhibit "G," **Recording Supplement to Operating Agreement and Financing Statement.**

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

### ARTICLE III.

### INTERESTS OF PARTIES

**A.  Oil and Gas Interests:**

If any party owns / an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B.  Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their

3

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens **shall** be payable by Operator, and Operator shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area, **provided Non-Operator elects to market its Oil and Gas with Operator under Operator's standard marketing letter agreement if Non-Operator elects to take its Gas in kind and separately market, then it shall bear and pay its proportionate share of all royalties and Operator shall have no obligation to distribute such burdens on behalf of Non-Operator.**
. If any party has contributed hereto any Lease or

Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefore.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

ARTICLE IV.

TITLES

**A. Title Examination:**

**Completed on the Drillsite tract and on all tracts in the well bore path in the Drilling Unit**          **unless otherwise agreed upon by the parties.**

Title examination shall be / ~~made on the Drillsite of any proposed well~~ prior to commencement of drilling operations / ~~and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well.~~ The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator

4

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid **title agents and** attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party/ Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such / each party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to  attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received

5

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

6

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

<div align="center">

**ARTICLE V.**

**OPERATOR**

</div>

**A. Designation and Responsibilities of Operator:**

      Chesapeake Appalachia, L.L.C.                    shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

      1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

      Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a **Non-Operator. A change of a corporate name or structure of Operator or transfer of all of Operator's interest (including operatorship)/ to any single  Failure of Operator to provide proof, reasonably satisfactory to Non-Operator(s), of the proposed entity's financial subsidiary, parent or successor corporation shall not be the basis for removal of Operator. / capability to conduct operations shall entitle Non-Operator(s) to prevent said transfer.**

      2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

      3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall

<div align="center">7</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

C. Employees and Contractors:

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

D. Rights and Duties of Operator:

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment, **in conducting operations hereunder** but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the

8

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise / ~~Non-Operators~~ **Consenting Party** of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to / ~~Non-Operators~~ **Consenting Party all** such reports, test results and notices regarding the progress of operations on the well including, but not limited to, daily drilling reports, completion reports, and well logs. **Consenting Party will provide Operator a distribution list of data to be sent, in the form of a well requirement sheet**

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith. **This provision is made expressly subject to Article XVI.P, below.**

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

### ARTICLE VI.
### DRILLING AND DEVELOPMENT

**Operations in the Contract Area:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

    2. Operations by Less Than All Parties:

                                  **to Rework, Sidetrack, Deepen, Recomplete or Plug Back**

    (a) Determination of Participation. If any party to whom such notice / is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period.

Appx0264

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1  If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties
2  of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the
3  period provided in Article VI.B.1., subject to the same extension right as provided therein.

4        (b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be
   borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding
5  paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and
6  encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results
7  in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore
8  the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that
   participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate
9  shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not
10 increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,
11 Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in
12 paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the
   well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the
13 expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking,
14 Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the
15 provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the
   Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-
16 Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,
17

18 Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-
   Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect
19 to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or
20 market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes,
   royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production
21 from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

22       (i) __200__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment
23 beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and
24 piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first
25 production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other
   provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that
             proposed well or operation
26 interest which would have been chargeable to such Non-Consenting Party had it participated in the / well from the beginning
27 of the operations; and

28       (ii) __400 *__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening,
   Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C.,
29 and 400%_* of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections),
30 which would have been chargeable to such Non-Consenting Party if it had participated therein. **If the well to be drilled is the initial well**
   **in the Drilling Unit, the penalties in this subparagraph (ii) shall be 600/600% in lieu of 400//400%.**
31

32       Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone
   described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable
33 substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each
34 Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a
35 shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-
   Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the
36 cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-
37 Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions

11

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____400_____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have

12

been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-

13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) ~~thirty (30)~~ / days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required **Except as provided for in Article XVI.A, the** shall be deemed not to have voted. / ~~The~~ proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

**For (1) all horizontal wells in the Marcellus Shale formation and (2) all other horizontal wells with respect to which Non-Operator does not elect Option No. 2 all**

☒ Option No. 1: / All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.

**For (1) all vertical wells and (2) all horizontal wells not in the Marcellus Shale formation with respect to which Non-Operator elects Option No. 2 contemporaneously with Non-Operator making its initial election to participate in a proposed drilling operations, all          if applicable Operator shall revise the AFE to reflect Non-Operator's election.**

14

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

☒ Option No. 2: ~~All~~ / necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. / When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to **or to perform another operation described in Article XVI.A.,** participate in a Completion attempt whether or not Operator recommends attempting to Complete the well; / **the costs of the operation** together with Operator's AFE for ~~Completion costs~~ / if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE.  Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6.  Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE.   Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party _not_ to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals.  If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made.  Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

D. Other Operations:

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of_____ _Fifty Thousand & No/100_____ Dollars ($_**50,000.00**_____ ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties.  If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of ___Fifty Thousand & No/100_____ Dollars ($_**50,000.00**_____ ).  Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under

15

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least _____ 50 _____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. <u>Abandonment of Dry Holes:</u> Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. <u>Abandonment of Wells That Have Produced:</u> Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of

16

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing ___50___% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☒ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall / ~~take~~ may in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

## EXPENDITURES AND LIABILITY OF PARTIES

### A. Liability of Parties:

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

### B. Liens and Security Interests:

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform

18

Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefore by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

C. Advances:

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.

Appx0273

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may

20

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

<div align="center">

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

</div>

**A. Surrender of Leases:**

<div align="center">21</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by

22

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation / . so that each Drilling Party receives its pro rata share of such contribution. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

F. Preferential Right to Purchase:

X   (Optional; Check if applicable.)

From and after the payment of the Farmout Consideration payable unto the parties' Farmout Agreement, dated July 1, 2001, should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase

23

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

<div style="text-align:center">~~ARTICLE IX.~~</div>

<div style="text-align:center">~~INTERNAL REVENUE CODE ELECTION~~</div>

~~If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.~~

<div style="text-align:center">ARTICLE X.</div>

<div style="text-align:center">CLAIMS AND LAWSUITS</div>

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Fifty Thousand and No/100_____ Dollars ($ _50,000.00_____ ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations **ARTICLE XI.**

<div style="text-align:center">FORCE MAJEURE</div>

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

<div style="text-align:center">24</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

<div align="center">

**ARTICLE XII.**

**NOTICES**

</div>

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

<div align="center">

**ARTICLE XIII.**

**TERM OF AGREEMENT**

</div>

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ Option No. 1: ~~So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.~~

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of ___90___ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____90_____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of ~~180~~ 90 / days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

<div align="center">25</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

<div align="center">

**ARTICLE XIV.**

**COMPLIANCE WITH LAWS AND REGULATIONS**

</div>

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ____Texas_____ shall govern.

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence.    Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

<div align="center">

**ARTICLE XV.**

**MISCELLANEOUS**

</div>

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations.    In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination.    In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest.    In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

<div align="center">

26

</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

<div align="center">

**ARTICLE XVI.**

**OTHER PROVISIONS**

</div>

A.   Well Proposal Requirements and Order of Preference of Operations:

   1.   (a) Requirements of Vertical Well Proposal: A proposal for a vertical well operation shall include the following:

      (1) the estimated commencement date;

      (2) the proposed depth;

      (3) the objective formation or formations to be penetrated or tested:

      (4) the Authorized Depth, the surface and bottomhole locations, proposed directional operations; and

      (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, or abandoning the well, itemization of all tangible and intangible costs. Operator's estimate of Completion costs should be included as an informational item.

      (b) Order of Preference of Operations - Vertical Well: The term "Authorized Depth" is the objective depth authorized in the AFE for vertical wells. Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a vertical well has been drilled to the Authorized Depth, and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in order enumerated hereafter:

      (1) a proposal to do additional logging, coring or testing;

      (2) a proposal to attempt to Complete the well at the Authorized Depth in the manner set forth in the Operator's AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

      (3) a proposal to attempt to Complete the well at the Authorized Depth in a manner different than as set forth in the Operator's AFE for Completion;

      (4) a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Depth, with priority given to objectives in ascending order up the hole;

      (5) a proposal to drill the well to a depth below the Authorized Depth, with priority given to objectives in descending order;

      (6) a proposal to Sidetrack the well to a new target objective for a vertical or deviated hole, but not a horizontal well or lateral drain hole, with the priority given first in ascending order to targets above the Authorized Depth, and then in descending order to targets below the Authorized Depth;

      (7) a proposal to Sidetrack to a horizontal well or lateral drain hole, with priority given to a lateral drain hole at the Authorized Depth, and then to objectives in ascending order above the Authorized Depth, and then to objectives in descending order below the Authorized Depth; and

      (8) plugging and abandoning the well.

   2.   (a)   Requirements of Horizontal Well Proposal: A proposal for a horizontal well operation shall include the following:

      (1) the estimated commencement date;

      (2) the proposed depth;

      (3) the objective formation or formations to be penetrated or tested;

      (4) the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and

      (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well. Operator's estimate of Completion costs should be included as an informational item.

<div align="center">27</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

(b) Order of Preference of Operations – Horizontal Well:  The term "Authorized Objective" is the agreed upon length of the lateral drain hole for the horizontal well(s) as authorized in the AFE.  Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a horizontal well has been drilled to the Authorized Objective and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter:

(1) a proposal to do additional logging, coring or testing:

(2) a proposal to attempt to Complete the well at the Authorized Objective in the manner set forth in the Operator's AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

(3) a proposal to attempt to Complete the well at the Authorized Objective in a manner different than as set forth in the Operator's AFE for Completion;

(4) a proposal to extend the length of the lateral drain hole for specified number of feet in the direction it is drilling, with a priority given to the shortest additional length proposed by any of the participating parties;

(5) a proposal to drill a new lateral drain hole in a different direction at the Authorized Objective;

(6) a proposal to drill a new later drain hole at a different depth, with priority given in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective;

(7) a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Objective with priority given to the objectives in ascending order up the hole;

(8) a proposal to Deepen the well below the Authorized Objective;

(9) a proposal to Sidetrack the well to a new target objective, with priority given first in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective; and

(10) plugging and abandoning the well.

In drilling a horizontal well, the Operator shall have the right at its sole discretion to 1) cease drilling at any time, for any reason, after it has drilled the objective formation and has drilled laterally for a distance which is at least equal to fifty percent (50%) of the length of the total horizontal displacement (displacement from true vertical) proposed in the AFE or 2)  continue drilling laterally at any time, for any reason, beyond the total horizontal displacement proposed in the AFE, so long as such lateral does not exceed 25% more than that proposed in the AFE; if in such event the well be deemed to be at its "Authorized Objective" as that term is used in this Agreement.

B.    Gathering Lines/Facilities:

Notwithstanding anything herein to the contrary, any flow line necessary for the gathering of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement and an election to participate in such operation shall include participation in these associated facilities.  Facility includes, but is not limited to, any battery, separator, compressor, gathering system facility, production storage facility or water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation.

C.    Plugging and Abandoning:

It is understood and agreed that where the terms "plugging and abandoning" or "plugged and abandoned" are used in this agreement such terms shall be deemed to include all costs associated with plugging and abandoning a well including, but not limited to, any costs of remediating contamination and/or surface restoration, to the extent that such remediation and/or surface restoration is required by the lease(s), applicable laws or regulation or by prevailing oil field practices.

D.    Commencement of Operations:

Notwithstanding anything in Article VI.B. to the contrary, Operator's election to commence operations prior to or during the Notice Period (forty-eight (48) hours if applicable), will not alter or extend the Notice Period in which a party is required to make an election to participate in the proposed operation, or constitute an election by that party not to participate in the cost of the proposed operation.

E.    Headings:

The descriptive headings used in this Operating Agreement are for convenience only and will not be deemed to affect the meaning of this Operating Agreement.

F.    Memorandum of Operating Agreement:

Contemporaneously with the execution of this Agreement, the parties have executed a Memorandum of Operating Agreement substantially in the same form as Exhibit "G" attached hereto, for the purpose of giving notice to the third parties of the existence of this Agreement and of the mortgage lien and security interest created by each party as debtor, to all other parties, as secured parties.  Such Memorandum of Operating Agreement shall be recorded by Operator in any county in which the Contract Area is located and/or with the Secretary of State.

28

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

G.   Construction:

Each party has had the opportunity to contribute to the drafting of this agreement and/or opportunity to have it reviewed by its legal counsel; therefore, the parties agree that in the event of a dispute over the meaning or application of this agreement, it shall be construed as if drafted equally by the parties and no presumption shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this agreement.

H. INTEGRATION:

In the event the Pennsylvania Department of Environmental Protection ("DEP"), Federal, State or other governmental body having jurisdiction orders the integration of interests within a spacing unit, any resulting increase or decrease in the working interest of the parties shall be realized on a proportionate basis.

I. CONFIDENTIALITY:

Except as otherwise provided herein, during the term of this agreement no party shall divulge to any third party any geophysical data acquired, obtained or developed by the parties hereto involving the Contract Area subsequent to the effective date of this agreement, or any drilling information relative to any well or wells drilled as a result hereof, other than depth and information customarily publicized, without first obtaining the written consent of the other parties to release any such information, which consent shall not be unreasonably withheld; provided, however, that (1) such consent shall not be necessary for any party to divulge such information to a party who is the record owner of an interest in such a well, but only if such party to whom the information is to be disclosed agrees, in writing, to be subject to this provision prior to disclosure, and (2) access to such data shall be made available to a party's parent company or its subsidiaries, agents, employees and contractors engaged in the performance of any work hereunder. All such information and data shall be treated as strictly confidential. Nothing contained herein shall be deemed to prevent disclosure of any such information or data if such disclosure is required by applicable laws or rules and regulations of any administrative or governmental agency or entity.

After the expiration of this agreement all information, data and/or materials acquired jointly pursuant to this agreement shall be independently owned by each party who participated in such Geoscience operation and such participating party shall have the right to separately sell, trade or otherwise dispose of such data without the obligation to share any remuneration received with the other participating parties.

J. PROSPECT AREA:

i. Shall mean the unique Contract Area covered by the JOA for each Initial Prospect Well and all related Subsequent Prospect Wells. For each Initial Prospect Well the corresponding Prospect Area shall be a contiguous area in size and configuration as determined by the Operator in consultation with Non-Operator in order to accommodate anticipated wells, wellbore paths and wellbore lengths located within the anticipated production unit established by the Operator as permitted by the underlying oil and gas leases, as may be amended, or allowed/required by Federal, State or other governmental body having jurisdiction, or other means, (the "Drilling Unit") but in no event shall the Drilling Unit exceed 1,280 acres without the mutual consent of the Parties. The Prospect Area shall not include any portion of any other Prospect Area in effect at the time of the Initial Prospect Well proposal without the mutual consent of the Parties, except as otherwise provided for herein. For purposes of this Agreement, the Prospect Area, Contract Area, Drilling Unit and Prospect JOA Contract Area shall have the same meaning and be considered one and the same.

ii. (A) It is recognized by the Parties that it may be prudent and/or necessary to expand or reduce the size of an existing Prospect Area, or include within an existing Prospect Area acreage which was not initially included in such existing Prospect Area ("Outside Acreage") and/or acreage from an existing and adjoining Prospect Area.    In the event an existing Prospect Area is expanded or reduced in size, the working interests of the Parties in proposed new wells, wells previously proposed and drilled and all wells drilled subsequent thereto within the modified Prospect Area shall not change unless agreed to by the Parties or proportionately reduced by a participating third party working interest owner in the Prospect Area. For purposes of the Parties maintaining their same working interest throughout the Prospect Area, any Outside Acreage included by the Parties shall be owned in proportions of the Parties' initial working interest in the Prospect Area being expanded and all Parties shall be obligated to pay their share of acquisition costs to acquire such Outside Acreage. The modified Prospect Area(s) and associated Unit boundary(ies) shall be revised to reflect the change in Prospect Area. New Memorandums of Operating Agreement and modified Declarations of Pooled Units shall be prepared and filed of record, if necessary. No Outside Acreage that would constitute more than 20% of the Prospect Area and be necessary to drill longer or additional horizontal lateral shall be included in the Prospect Area and/or Drilling Unit without Non-Operators consent.

(B) If, while drilling a horizontal well, it becomes necessary to accommodate a well bore path which may extend outside of an existing Prospect Area, Operator shall have the right at its sole discretion to reconfigure such Prospect Area in such a way as to encompass acreage necessary for such horizontal well and the corresponding Unit and shall provide notice to Non-operator of the revised Prospect Area and corresponding working interests. The working interests of the Parties in resulting Prospect Area shall remain unchanged as a result of such reconfiguration. Should it be necessary to equalize any additional Prospect Area acreage to accommodate such reconfiguration as it relates to existing working interests, then assignments of interests necessary to equalize shall be made, and the assignee shall reimburse assignor for actual acquisition costs associated therewith.

K. INITIAL PROSPECT WELL:

Shall mean the initial well drilled on the Prospect Area.

L. GATHERING LINES / FACILITIES:

Notwithstanding anything herein to the contrary, any gas gathering line necessary for the gathering or transportation of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be proposed in accordance with the method prescribed for under Article VI.B.-Operations of

29

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

this Agreement. Facility includes, but is not limited to, any battery, separator, compressor stations, gathering system or production storage facility.

**M. MEDIA/NEWS RELEASES:**

No party hereto shall, at any time, issue to the press or other media any news release, concerning the Contract Area (also referred to herein as "Prospect Area"), without the prior approval of all the other parties hereto, which approval shall not be unreasonably withheld. Any request for approval hereunder shall be responded to within 24 hours if receipt of such request and any failure to timely respond shall be deemed to be an approval. When all of the parties have reviewed such material and all parties have approved the issuance of the material, the party desiring such release shall have the principal responsibility for its issuance. The only other exception to the foregoing shall be that in the event of any emergency involving extensive property damage, operations failure, loss of human life or other clear emergency, the party designated as Operator hereunder is authorized to furnish such minimum, strictly factual information as shall be necessary to satisfy the legitimate public interest on the part of the press and duly constituted authorities, if time does not permit obtaining prior approval by the other parties. Said Operator shall thereupon promptly advise parties of the information so furnished. Notwithstanding the foregoing, either party may issue a media or news release required by applicable laws, rules or regulations, including those of applicable stock exchanges.

**N. CONFLICTING PROVISIONS:**

In the event of a conflict between the provisions of this Article XVI and any other provisions of this agreement, the provisions of this Article XVI shall control and prevail.

**O. DEFAULTS AND REMEDIES:**

Except as expressly provided herein, nothing in this Operating Agreement entitles any person or party other than the Operator and Non-Operator to any claim, cause of action, remedy, or right of any kind.

**P.     AFE OVERRUNS**

In the event expenditure against an AFE exceeds, or in Operator's reasonable judgment, are likely to exceed, twenty percent (20%) or more of the total AFE prior to finishing the approved operations, the Operator, shall promptly furnish to Non-Operator a supplemental AFE and a summary description as to the purpose and/or cause of the overrun. Upon receipt of a supplemental AFE, Non-Operator may call for partner's meeting by notifying the Operator with full details of the purpose of the meeting, including a time, place and agenda that meet the Operator's reasonable business schedule and do not interfere unreasonably with the Operator's ongoing operations under this Agreement.

IN WITNESS WHEREOF, this agreement shall be effective as of December 16, 2010.

Henry Hood, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications have been made, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes.

ATTEST OR WITNESS:

CHESAPEAKE APPALACHIA, L.L.C.,
OPERATOR

By _____

_____

_____     Henry J. Hood
Type or print name

Title _Senior Vice President – Land and Legal & General Counsel

Date _____

Tax ID or S.S. No. ___20-3774650

ATTEST OR WITNESS:

EPSILON ENERGY USA, INC.,
NON-OPERATORS

By _____

_____     Zoran Arandjelovic
Type or print name

Title _Executive Chairman, President and CEO

Date _6 | 8 | 11

Tax ID or S.S. No. _20-2620866

Signature Page to that certain Operating Agreement dated December 16, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Craige Unit.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ATTEST OR WITNESS:

STATOIL USA ONSHORE PROPERTIES INC.,
NON-OPERATORS

_____

By _____

_____

_____    ___M. K. Williams_____
Type or print name

Title __Land Manager – Onshore Gas USA & Mexico__

Date _____

Tax ID or S.S. No. ___FEIN 26-3666667_____

ATTEST OR WITNESS:

MKR HOLDINGS, L.L.C., NON-OPERATOR

_____

By _____

_____

_____    ___Henry J. Hood_____
Type or print name

Title __Senior Vice President – Land and Legal &
General Counsel_____

Date _____

Tax ID or S.S. No. _____

ATTEST OR WITNESS:

CHIEF EXPLORATION & DEVELOPMENT L.L.C

_____

By _____

_____

_____
Type or print name

Title _____

Date _____

Tax ID or S.S. No. _____

ATTEST OR WITNESS:

ENERPLUS RESOURCES (USA) CORPORATION

_____

By _____

_____

_____
Type or print name

Title _____

Date _____

Tax ID or S.S. No. _____

Signature Page to that certain Operating Agreement dated December 16, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Craige Unit.

31

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

ATTEST OR WITNESS:                                **RADLER 2000 LIMITED PARTNERSHIP**

_____

_____   By _____

_____

                                          Type or print name

                                          Title _____

                                          Date _____

                                          Tax ID or S.S. No. _____

ATTEST OR WITNESS:                                **UNCONVENTIONALS NATURAL GAS, LLC**

_____

_____   By _____

_____

                                          Type or print name

                                          Title _____

                                          Date _____

                                          Tax ID or S.S. No. _____

Signature Page to that certain Operating Agreement dated December 16, 2010, between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Craige Unit.

32

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

# ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of <u>OKLAHOMA</u>          )
                                  ) ss.
County of <u>OKLAHOMA</u>         )

This instrument was acknowledged before me on

<u>May 18, 2011</u>          by Henry J. Hood, Senior Vice President – Land and Legal & General Counsel of Chesapeake Appalachia, L.L.C., a limited liability company.

(Seal, if any)

[Notary seal: JESSICA S. MEEK, NOTARY, # 08000292, EXP. 01/08/12, PUBLIC, STATE OF OKLAHOMA]

Title (and Rank) <u>Land Tech</u>

My commission expires: <u>01/08/12</u>

Acknowledgment in representative capacity:

State of <u>TEXAS</u>          )
                             ) ss.
County of <u>HARRIS</u>       )

This instrument was acknowledged before me on

<u>June 8, 2011</u>          by Zoran Arandjelovic as ~~Executive Chairman,~~ President ~~and CEO~~ of Epsilon Energy USA, Inc.

(Seal, if any)

Title (and Rank) <u>Staff Accountant</u>

My commission expires: <u>8/2/12</u>

Acknowledgment in representative capacity:

State of _____          )
                                  ) ss.
County of _____         )

This instrument was acknowledged before me on

_____          by M.K. Williams as Land Manager – Onshore Gas USA & Mexico of Statoil USA Onshore Properties Inc.

(Seal, if any)          _____

                       Title (and Rank) _____

                       My commission expires: _____

33

Appx0287

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Acknowledgment in representative capacity:

State of <u>Oklahoma</u>          )
                                 ) ss.
County of <u>Oklahoma</u>        )

    This instrument was acknowledged before me on

May 16, 2011 _____ by Henry J. Hood, Senior Vice President – Land and Legal & General Counsel of MKR Holdings, L.L.C.

(Seal, if any)

Title (and Rank) Land Tech

My commission expires: 01/08/12

Acknowledgment in representative capacity:

State of _____ )
                        ) ss.
County of _____ )

    This instrument was acknowledged before me on

_____ by _____ as _____ of Chief Oil & Gas LLC.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

Acknowledgment in representative capacity:

State of _____ )
                        ) ss.
County of _____ )

    This instrument was acknowledged before me on

_____ by _____ as _____ of Enerplus Resources (USA) Corporation.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

Acknowledgment in representative capacity:

State of _____ )
                        ) ss.
County of _____ )

    This instrument was acknowledged before me on

_____ by _____ as _____ of Radler 2000 Limited Partnership.

(Seal, if any)

Title (and Rank) _____

My commission expires: _____

34

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1    Acknowledgment in representative capacity:

2    State of _____ )

3    County of _____ ) ss.
                           )

4        This instrument was acknowledged before me on

5    _____ by _____ as _____ of Unconventionals Natural Gas, LLC

6    (Seal, if any)                        _____

7                                 Title (and Rank) _____

8                                 My commission expires: _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

34

35

36

37

35

EXHIBIT "A"

**ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT
DATED December 16, 2010
BY AND BETWEEN CHESAPEAKE APPALACHIA, L.L.C., OPERATOR,
EPSILON ENERGY USA, INC., as NON-OPERATOR, AND STATOIL USA ONSHORE PROPERTIES
INC., et al, as NON-OPERATORS**

1.   **DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT**

THOSE CERTAIN LEASES AND/OR INTERESTS LOCATED WITHIN THE CONTRACT AREA AS
FURTHER DESCRIBED ON EXHIBIT "A-1" (LEASE LISTING) AND AS SHOWN ON THE PLAT
OF THE CONTRACT AREA ATTACHED AS EXHIBIT "A-2" HEREOF.

2.   **RESTRICTIONS, IF ANY, AS TO DEPTHS, FORMATIONS AND SUBSTANCES**

None.

3.   **PARTIES TO AGREEMENT WITH ADDRESS AND TELEPHONE NUMBER FOR NOTICE
PURPOSES**

| | |
|---|---|
| Chesapeake Appalachia, L.L.C.<br>6100 N. Western Avenue<br>Oklahoma City, OK 73118 | MKR Holdings, LLC<br>6100 N. Western Avenue<br>Oklahoma City, OK 73118 |
| Epsilon Energy USA, Inc.<br>~~3343 State Route 3004~~<br>~~Meshoppen, PA 18630~~ *[handwritten: 10,700 NORTH FREEWAY, STE.930 HOUSTON, TX 77037]* | Statoil USA Onshore Properties Inc.<br>2103 CityWest Boulevard, Suite 800<br>Houston, Texas 77042 |
| Radler 2000 Limited Partnership<br>3131 West 7th Street, Suite 400<br>Ft. Worth, TX 76107 | Chief Exploration & Development LLC<br>5956 Sherry Lane, Suite 1500<br>Dallas, TX 75225 |
| Enerplus Resources (USA) Corporation<br>950 17th Street, Suite 2200<br>Denver, CO 80202 | Unconventionals Natural Gas, LLC<br>17800 Davenport Rd, Suite 101<br>Dallas, TX 75252 |

4.   **PERCENTAGES OR FRACTIONAL INTERESTS OF PARTIES TO THIS AGREEMENT**

**CRAIGE UNIT**

| PARTIES | WORKING INTEREST<br>CARRIED TO<br>COMPLETION | WORKING INTEREST<br>AFTER COMPLETION |
|---|---|---|
| Chesapeake Appalachia, L.L.C.*, **** | 61.949820% | 37.430795% |
| MKR Holdings, LLC** | 3.334676% | 3.334676% |
| Statoil USA Onshore Properties, Inc.*,**** | 29.530768% | 17.725311% |
| Epsilon Energy USA, Inc.** | 0.000000% | 36.324482% |
| Chief Exploration & Development LLC** | 2.903453% | 2.730780% |
| Enerplus Resources (USA) Corporation** | 1.555421% | 1.462918% |
| Radler 2000 Limited Partnership** | 0.725863% | 0.682695% |
| Unconventionals Natural Gas, LLC** | 0.000000% | 0.308343% |
| | 100.000000% | 100.000000% |

5.   **OIL AND GAS LEASES AND/OR OIL AND GAS INTEREST SUBJECT TO THIS
AGREEMENT**

The oil and gas lease or oil and gas interest, or portions thereof, included in the Contract Area and
described on Exhibit A-1 attached hereto.

6.   **BURDENS ON PRODUCTION**

Lease Royalty                                        18.031232%***

7. **PLAT OF CONTRACT AREA**
See attached preliminary Exhibit A-2 which will be substituted with the final unit plat after the initial well is drilled.

*The working interests of the Parties above are to be determined in accordance with the terms and conditions of that certain Development Agreement ("DA") by and between the Parties dated November 10, 2008.
It is understood by the Parties hereto that in the event additional interest is acquired in the Contract Area and all Parties with a right under the DA do not elect and pay for their proportionate share of said interest, the interests above shall be adjusted to reflect actual interest owned by the Parties in the Contract Area.   An interest adjustment shall also occur in the event of participation from unleased mineral interests and/or third parites.

**See Exhbit A-1 for third party information.

***Lease burdens reflected are estimates and subject to change upon verification of royalty provisions of non-operated leasehold.

****Inclusive of Southwestern Energy Production Company ("Southwestern") trade acreage.   In the event Southwestern elects to participate with its leasehold, each participant's interest will be proportionately revised to reflect Southwestern's participation.

"Exhibit "A-1"
Attached to and made a part of the Operating Agreement dated December 16, 2010, by and between Chesapeake Appalachia, L.L.C., Operator, Epsilon Energy USA, Inc., as Non-Operator, and Statoil USA Onshore
Properties Inc., et al, as Non-Operator
Craige Unit
Rush and Auburn Townships
Susquehanna County, Pennsylvania

CHESAPEAKE APPALACHIA, L.L.C. / STATOIL USA ONSHORE PROPERTIES INC. LEASES CONTRIBUTED

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX PARCEL/TERM | TITLE ACRES | NET ACRES CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-236480-000 | John Koromlan | Chesapeake Appalachia LLC | 12/1/2009 | 201009225 | 196.00-2-003.00 | 131.400000 | 4.187941 |
| 1-301805-000 | Rushboro Ventures, LP | Chesapeake Appalachia LLC | 3/25/2010 | 201014458 | 196.00-2-004.01 | 107.000000 | 72.089227 |
| | Thomas J. and Donna G. Malandin | Southwestern Energy Production Company | 12/3/2007 | 200800070 | 196.00-2-008.02 | 39.160000 | 39.160000 |

Total: 115.417168

EPSILON ENERGY USA INC / CHESAPEAKE APPALACHIA, L.L.C. / STATOIL USA ONSHORE PROPERTIES INC. LEASES CONTRIBUTED

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX PARCEL/TERM | TITLE ACRES | NET ACRES CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-297547-000 | John Bowen, Stanley Bowen, and Joseph Bowen | Epsilon Energy USA, Inc. | 10/30/2007 | 200800144 | 177.00-1-021.00 | 126.000000 | 1.489444 |
| 1-297554-000 | Donald R. Hardic and Lawrence Hardic | Epsilon Energy USA, Inc. | 3/14/2007 | 200711599 | 177.00-1-022.00 | 170.900000 | 15.517888 |
| 1-297549-000 | Anthony P. Litwin, Jr. | Epsilon Energy USA, Inc. | 4/6/2007 | 200705059 | 177.00-1-025.00 | 218.150000 | 197.542985 |
| 1-297546-000 | Frederick P. Litwin | Epsilon Energy USA, Inc. | 4/15/2007 | 200705060 | 177.00-1-025.01 | 235.900000 | 134.213731 |
| 1-297595-000 | Raymond and Christine K. Poulsen | Epsilon Energy USA, Inc. | 6/6/2007 | 200708073 | 177.00-1-026.00 | 56.000000 | 14.144378 |
| 1-297555-000 | Harold and Gloria Craige | Epsilon Energy USA, Inc. | 3/26/2007 | 200704460 | 177.00-1-028.01 | 139.350000 | 66.525937 |
| 1-297556-000 | Harold and Gloria Craige | Epsilon Energy USA, Inc. | 3/26/2007 | 200704460 | 177.00-1-044.00 | 23.370000 | 19.858708 |
| 1-297683-000 | Wayne A. and Cynthia L. Rogers | Epsilon Energy USA, Inc. | 2/25/2008 | 200807357 | 196.00-1-002.01 | 2.410000 | 2.410000 |
| 1-297870-000 | Robert Gerald and Gloria Rogers and Angela Bush | Epsilon Energy USA, Inc. | 2/29/2008 | 200807356 | 196.00-2-052.00 | 4.500000 | 4.500000 |
| 1-297873-000 | Dawn Y Childress | Epsilon Energy USA, Inc. | 2/27/2008 | 200807355 | 196.00-1-002.00 | 4.130000 | 4.130000 |

Total: 460.333069

Third Party Interests (Subject to Operating Agreement)

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX PARCEL/TERM | TITLE ACRES | NET ACRES CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-283511-000 | Debbie L. Polovitch | The Keeton Group, LLC | 8/3/2006 | 200700453 | 196.00-2-007.00 | 57.890000 | 57.890000 |

Total: 57.890000

| | |
|---|---|
| Total Leasehold Subject to Operating Agreement: | 633.640237 |
| Total Acres in Unit: | 633.640237 |
| Total Acres in Contract Area: | 633.640237 |

END OF EXHIBIT "A-1"

**EXHIBIT "A-2"**

Attached to and made a part of the Operating Agreement dated December 16, 2010, by and between
Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------|
| 1 | 177.00-1-021.00 |
| 2 | 177.00-1-022.00 |
| 3 | 177.00-1-025.00 |
| 4 | 177.00-1-025.01 |
| 5 | 177.00-1-026.00 |
| 6 | 177.00-1-028.01 |
| 7 | 177.00-1-044.00 |
| 8 | 196.00-1-002.00 |
| 9 | 196.00-1-002.01 |
| 10 | 196.00-2-003.00 |
| 11 | 196.00-2-004.01 |
| 12 | 196.00-2-007.00 |
| 13 | 196.00-2-008.02 |
| 14 | 196.00-2-052.00 |

EPS/CHK/STO - 460.333069 AC

CHK/STO - 115.417168 AC

MKR - 57.890000 AC

Contract Area - 633.640237 AC

5/13/2011

**CONTRACT AREA**

Chesapeake
ENERGY

**Craige Common Pad**
**Susquehanna Co., PA**
1 inch = 1,250 feet

Appx0293

## EXHIBIT "A-3"

Attached to and made a part of that certain Operating Agreement dated December 16, 2010, by and between Chesapeake Appalachia, L.L.C., as Operator, Epsilon Energy USA, Inc. as Non-Operator, and Statoil USA Onshore Properties Inc., et al, as Non-Operators

### Craige 1H Wellbore Summary

|  | Before Payout WI | After Payout WI |
|---|---|---|
| Chesapeake Appalachia, L.L.C. | 61.949820% | 37.430795% |
| MKR Holdings, L.L.C. | 3.334676% | 3.334676% |
| Statoil USA Onshore Properties Inc. | 29.530768% | 17.725311% |
| Epsilon Energy USA, Inc. | 0.000000% | 36.324482% |
| Chief Exploration & Development LLC | 2.903453% | 2.730780% |
| Enerplus Resources (USA) Corporation | 1.555421% | 1.462918% |
| Radler 2000 Limited Partnership | 0.725863% | 0.682695% |
| Unconventionals Natuaral Gas, LLC | 0.000000% | 0.308343% |
| **Total** | 100.00% | 100.00% |

It is understood by the parties hereto that in the event of unleased mineral interests and/or third party owning an interest in the Contract Area, the interest reflected above shall be proportionately reduced to actual interest owned by the parties in the Contract Area and/or working interest ownership in a well drilled hereunder.

1

### Exhibit "B"

**[THIS LEASE IS SUBJECT TO STATE RECORDING LAWS AND MODIFICATIONS TO REFLECT THE TYPE OF INTEREST CONVEYED.]**

## FOR THE PURPOSES OF THE COMMONWEALTH OF PENNSYLVANIA

### PAID-UP

### OIL & GAS LEASE

Lease No. _____

8/08 - PA

　　This Lease made this _____ day of _____, 2008, by and between:

_____

_____

hereinafter collectively called "Lessor"　　　　　　　hereinafter called "Lessee".

　　WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

　　LEASING CLAUSE.　Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

　　DESCRIPTION.　The Leasehold is located in the Township of _____, in the County of _____, in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number:_____

and is bounded formerly or currently as follows:
　　　　On the North by lands of _____;
　　　　On the East by lands of _____;
　　　　On the South by lands of _____;
　　　　On the West by lands of _____;

including lands acquired from _____, by virtue of deed dated _____, and recorded in _____ Book _____, at Page _____, and described for the purposes of this agreement as containing a total of _____ Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

　　LEASE TERM.　This Lease shall remain in force for a primary term of five (5) years from 12:00 A.M. _____(effective date) to 11:59 P.M._____ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

　　If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

　　EXTENSION OF PRIMARY TERM.　Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

　　NO AUTOMATIC TERMINATION OR FORFEITURE.

　　(A) CONSTRUCTION OF LEASE:　The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

　　(B) LIMITATION OF FORFEITURE:　This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

　　PAYMENTS TO LESSOR.　In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL:  To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance.  **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

    1.  OIL:  To deliver to the credit of Lessor, free of cost, a Royalty of the equal fifteen percent (15%) part of all oil and any constituents thereof produced and marketed from the Leasehold.

    2.  GAS:  To pay Lessor an amount equal to fifteen percent (15%) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.  Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C)  DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D)  SHUT-IN:  In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or Lessee surrenders the Lease) and this Lease shall remain in full force and effect.  During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E)  DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F)  MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G)  CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require.  Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H)  TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I)  LIENS:  Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J)  CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations.  Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold.  Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K)  PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.  Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.  Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit.  Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold.  In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent.  Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent.  Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date.  The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title.  Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease.  There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions.  If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.  Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION.  In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages

caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE. Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY. This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders. If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law. If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

## ACKNOWLEDGMENT

STATE OF _____ )
                                                                    ) SS:
COUNTY OF _____ )

On this, the \_\_\_\_\_ day of _____, 20\_\_\_\_, before me _____, the undersigned officer, personally appeared _____, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that _____ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                                                    ) SS:
COUNTY OF _____ )

On this, the _____ day of _____, 20\_\_\_\_, before me _____, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of _____, a corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



# EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement between Chesapeake Appalachia, L. L. C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. dated December 16, 2010.

## ACCOUNTING PROCEDURE

## JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1.**     **Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.**     **Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.**     **Advances and Payments by Non-Operators**

A.     Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within thirty (30) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.     Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____ Bank One of Oklahoma, N.A. _____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.**     **Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

Appx0298



COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

**5.    Audits**

A.    A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.    The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6.    Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II. DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.    Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2.    Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3.    Labor**

A.    (1)    Salaries and wages of Operator's field employees or consultants directly employed on the Joint Property in the conduct of Joint Operations.

(2)    Salaries of First level Supervisors in the field.

(3)    Salaries and wages of **on-site** Technical Employees or consultants directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)    Salaries and wages of **off-site** Technical Employees or consultants either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.    Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

**4.    Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

Appx0299

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



5.  **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.    Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations.  The accumulation of surplus stocks shall be avoided.

6.  **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.  If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.  If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties.  No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.  In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges.  The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.  **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.    The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates.  The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.  **Equipment and Facilities Furnished By Operator**

A.  Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation.  Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed **ten percent (10%)** per annum.  Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, **less 20%.**  For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.  **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct.  Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.  **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, **except no charge for services of operator's legal staff or fees of outside attorneys performing services other than title exaimation** shall be made unless previously agreed to by the parties.  All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.  **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties.  If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

Appx0300

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



**12.    Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties unless insurance coverage is already secured individually outside the Joint Operations in accordance with Exhibit D of that the Operating Agreement **to which this is attached** dated December 16, 2010.

**2009.** In the event Joint Operations are conducted in a state in which Operator may set as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at

its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.    Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.    Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.    Other Expenditures**

Other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

### III. OVERHEAD

**1.    Overhead - Drilling and Producing Operations**

i.    As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph IA, or
(    ) Percentage Basis, Paragraph IB

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii.    The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

( x ) shall be covered by the overhead rates, or
(    ) shall not be covered by the overhead rates.

iii.    The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

( X ) shall be covered by the overhead rates **except that the salaries, wages and Personal Expenses of those positions set forth on Exhibit C-1 employed directly in the operation of the Joint Property shall not be covered by the overhead rates and shall be chargeable as direct labor to the extent such services are supported by detailed timesheets and further provided the services shall not include managerial supervision or administratve services associated with such operations.**

(    ) shall not be covered by the overhead rates.

A.    Overhead - Fixed Rate Basis

(1)    Operator shall charge the Joint Account at the following rates per well per month:

Drillg Well Rate    $ 13,000 (Prorated for less than a full month)

Producing Well Rate $_____1,300_____

(2)    Application of Overhead - Fixed Rate Basis shall be as follows:

(a)    Drilling Well Rate

(1)    Charges for drilling wells shall begin on the date the well is spudded and terminate on the date the drilling rig, completion rig, or other units used in completion of the well is released, whichever is later, except that no charge shall be made during suspension of drilling or completion operations

Appx0301

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

COPAS

for fifteen (15) or more consecutive calendar days.

(2) Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)  Producing Well Rates

(1) An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2) Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3) An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5) All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached by the percent increase or decrease published by COPAS

2.    **Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $_____25,000.00_____ :

A.    ___3.0___ % of first $100,000 or total cost if less, plus

B.    ___2.0___ % of costs in excess of $100,000 but less than $1,000,000, plus

C.    ___1.0___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

3.    **Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.    ___3.0___ % of total costs through $100,000; plus

B.    ___2.0___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.    ___1.0___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

4.    **Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

Appx0302

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



### IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.    Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2.    Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

    (1)    Tubular Goods Other than Line Pipe

        (a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

        (b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

        (c)    Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

        (d)    Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

    (2)    Line Pipe

        (a)    Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

        (b)    Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch thick and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus the percentage recommended by COPAS, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

        (c)    Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

        (d)    Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

    (3)    Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

    (4)    Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



B.   Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)   Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)   Material used on and moved from the Joint Property

(a)   At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)   At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)   Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

C.   Other Used Material

(1)   Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2)   Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)   Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight.   Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)   Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)   Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

D.   Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

E.   Pricing Conditions

(1)   Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)   Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

(3)   **Operator will pass along to Non-Operator a proportionate share of all bulk savings Operator receives from its vendors.**

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



3.   **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies. strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished as Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of its share of such Material suitable for use and acceptable to Operator.

4.   **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished. In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

1.   **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

2.   **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

3.   **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory. In cases involving a change of Operator, all Parties shall be governed by such inventory.

4.   **Expense of Conducting Inventories**

A.   The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.   The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

Appx0305

## EXHIBIT C-1

Attached to and made a part of ___ that certain Operating Agreement dated December 16, 2010, by and between Chesapeake Appalachia , L.L.C., as Operator, Epsilon Energy USA, Inc., as Non-Operator and Statoil USA Onshore Properties Inc., as Non-Operator

### TECHNICAL EMPLOYEES EXCLUDED FROM OVERHEAD RATES

| TITLE | CATEGORY |
|-------|----------|
| ASSOCIATE GEOLOGIST | Technical Labor |
| ASSOCIATE GEOPHYSICIST | Technical Labor |
| GEOLOGIST | Technical Labor |
| GEOPHYSICIST | Technical Labor |
| SR GEOLOGIST | Technical Labor |
| SR GEOPHYSICIST | Technical Labor |
| ASSET MANAGER | Technical Labor |
| ASSOCIATE ASSET MANAGER | Technical Labor |
| DRILLING ENGINEER I | Technical Labor |
| DRILLING ENGINEER II | Technical Labor |
| FIELD ENGINEER | Technical Labor |
| SR DRILLING ENGINEER | Technical Labor |
| SR ASSET MANAGER | Technical Labor |

EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated December 16, 2010  between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator

**Insurance Provisions**

I.  As to all operations hereunder, Operator shall at all times while operations are conducted by it for the Joint Account, carry or cause to be carried, pay for, and charge to the Joint Account the following minimum insurance:

> Worker's Compensation, including Employer's Liability Insurance with limits of not less than $1,000,000, covering the employees of Operator engaged in operations hereunder and in compliance with all applicable state and federal laws.

II.  In addition, as to all operations hereunder, except as provided in Paragraph III below, each party shall carry for its own interest the following types and limits of insurance, or insurance which will provide coverage for a party's interest to the extent required below:

> (a)  Automobile Insurance including non-owned and hired vehicles, coverage with combined single limit per occurrence of not less that $1,000,000 for bodily injury and property damage.

> (b)  General Liability Insurance with a combined single limit per occurrence of not less than $1,000,000 for bodily injury and property damage. Such policy shall be endorsed to provide Blanket Contractual Liability covering obligations assumed herein.

> (c)  Excess Umbrella Liability Insurance with a combined limit per occurrence coverage of not less than $25,000,000.

> (d)  Operator's Extra Expense policy with limits of $25,000,000 per occurrence covering all losses or damages resulting from loss of well control, explosions, fire, cratering, including expenses of clean-up containment, seepage, pollution or contamination.

The premiums for all such insurance to be carried in Paragraph II shall be paid solely by each party.

To the extent of the liabilities assumed by each party herein, all of the above insurance, to the extent carried by a party as provided in Paragraph III below, shall be endorsed to provide that each party's insurers waive their right of subrogation (equitable or by assignment, express or implied, loan receipt or otherwise) against the other party. Each party's insurance coverage shall be primary over any insurance coverage maintained by the other party. Each party hereto may acquire at its own expense, any additional insurance to protect itself. Each such policy shall provide for underwriters waiver of subrogation in favor of each party to the extent of those liabilities assumed by each party herein.

III.  With regard to the aforementioned, Operator shall have the right, but not the obligation, to require satisfactory evidence of adequate insurance or self-insurance. Operator shall not provide this coverage for the benefit of the Joint Account. In the event that any party fails to provide evidence of insurance or evidence of ability to self insure as required herein ("failing party"), the other Party may, at its sole discretion, provide such insurance for and at the direct expense of the failing party. A party is under no obligation to provide such insurance for the party so failing to provide satisfactory evidence of its own insurance or evidence of ability to self insure and nothing contained herein shall be construed to alter the obligations of any party hereunder. Notwithstanding any of the foregoing, each party shall be allowed to self-insure for its interests.

Exhibit "E"

Attached to and made a part of that certain Operating Agreement dated December 16, 2010 between Chesapeake Appalachia, L. L. C., Operator, and Statoil USA Onshore Properties Inc., Non-Operator

## GAS BALANCING AGREEMENT

1. DEFINITIONS

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the price under such agreement equals or exceeds the Published Reference Price, less any applicable transportation or gathering charges.

1.02 "Balancing Area" shall mean all of the acreage and depth subject to the Operating Agreement.

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of Gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoir dupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an Operating Agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage of decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13 "Published Reference Price" shall mean the Index price published for the applicable geographic area on the transporting pipeline in the first of the production month's edition of *McGraw-Hill's Inside FERC's Gas Market Report* ("*Inside FERC* Index"). In the event that the *Inside FERC* Index ceases to be published, the Parties will attempt in good faith to agree on a replacement reference price reflective of the same market reflected by the *Inside FERC* Index.

1.14 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.15 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.16 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

2. BALANCING AREA

2.1 All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in MMBtu.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

3. RIGHT OF PARTIES TO TAKE GAS

3.1      Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the meter station relating to delivery at least thirty (30) days in advance so that the Operator, acting with reasonable diligence, can meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2      Each Party is required to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights or to maintain oil production.

3.3      When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4      All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5      Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Parties, considering the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6      In the event that the Operator determines that a Party has failed to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, or to preserve correlative rights, the Operator shall notify such Party that it has failed to take its Full Share of Current Production, along with the applicable reason(s), as originally stated in Section 3.2, that it is required to take its Full Share of Current Production. If the notified Party does not begin taking its Full Share of Current Production effective the second business day following notification from the Operator, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and will render to such Party, on a current basis, the full proceeds of the sale equal to Operator's received price less actual marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the Parties under the particular circumstances, but in no event for the period in excess of one year. Notwithstanding the provisions of Section 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

## 4.      IN-KIND BALANCING

Effective the first day of any calendar month following at least thirty (30) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying thirty percent (30%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty percent (50%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

## 5.      STATEMENT OF GAS BALANCES

5.1      The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within thirty (30) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the current, total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the current month and cumulative Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No. 24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparations of the statements required hereunder.

5.2      If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business

2

hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

6.    PAYMENTS ON PRODUCTION
    6.1    Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.
    6.2    Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.
    6.3    In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

7.    CASH SETTLEMENTS
    The Parties recognize that the disposition of Gas from the Balancing Area may differ from the volumes produced. The Parties shall strive to monitor and adjust said volumes in an effort to minimize differences on an ongoing basis. On or before March 31st of each calendar year, the Parties shall settle such difference, measured in MMBtu, through a cash payment from the Overproduced Party for the previous calendar year to the Underproduced Party for such previous calendar year. The amount of such cash payment shall be calculated on a monthly basis using the Published Reference Price less actual deductions for marketing, gathering and fuel paid by the Overproduced Party for that month.

8.    OPERATING COSTS
    Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

9.    LIQUIDS
    The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

10.    AUDIT RIGHTS
    Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Sections 5 and 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 10 shall be in addition to those provided for in Section 5.2 of this Agreement.

11.    MISCELLANEOUS
    11.1    As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, in each case, with respect to the subject matter of this Agreement, the provisions of this Agreement shall govern.
    11.2    Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.
    11.3    Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performances of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party (other than Operator) to pay any amounts owed pursuant to the terms hereof.
    11.4    This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefits of and be binding upon the Parties hereto, and their respective successors and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any

3

Appx0310

transfer any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

11.5     Unless the context clearly indicates otherwise, words used in singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

11.6     This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

11.7     In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service based on the quantity of Gas taken for its account (the cumulative method) in accordance with such regulations, insofar as same relate to sales method tax computations.

12.     ASSIGNMENT AND RIGHTS UPON ASSIGNMENT

12.1     Subject to the provisions of Section 12.2, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced Party or an Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment or other act of transfer accordingly and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

12.2     The provisions of this Section 12 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

4

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated December 16, 2010 between Chesapeake Appalachia, L. L. C., Operator, and Epsilon Energy USA, Inc., Non-Operator and Statoil USA Onshore Properties Inc., Non-Operator

## Equal Employment Opportunity

During the performance of this agreement, the Operator shall be bound by and comply with all terms and provisions of Section 202 of Executive Order 11246 of September 24, 1965, all of which are incorporated herein by references to the same extent as if fully set out herein, and shall be bound by and comply with the rules, regulations and relevant orders adopted pursuant to such Executive Order.

Operator assures Non-Operator that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that he does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom or otherwise. It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965. Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor, dated May 21, 1968, and the provisions of the equal opportunity clause enumerated in contracts between the United States of America and Non-Operator.

**RECORDING SUPPLEMENT TO**
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between Chesapeake Appalachia, L.L.C., hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A-1" and Exhibit "A-2" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A-1" and Exhibit "A-2";

WHEREAS, the parties hereto have executed an Operating Agreement dated December 16, 2010 (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas;

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, ~~which Agreement in its entirety is incorporated herein for reference~~, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

    A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

    B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

    C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

    D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

    E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

    F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production hereafter created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

    G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

    This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

    H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

    I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

    J. Each party's interest under this agreement and the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

    K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

    A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

    B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the

Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C.   To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.   If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E.   If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F.   The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G.   Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder and under the Operating Agreement. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H.   The above described security may be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4.   This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5.   This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6.   Notwithstanding anything herein to the contrary, in the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7.   This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8.   Other Provisions:

1  Serena Branch, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model
2  Form Recording Supplemental to Operating Agreement and Financing Statement, as published in computerized forms by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertions
3  and that are clearly recognizable as changes in Articles _____, have been made to the form.

4  **ATTEST OR WITNESS:**                      **CHESAPEAKE APPALACHIA, L.L.C.,**
5                                                        **OPERATOR**

7  _____          By _____

8  _____            ___Henry J. Hood_____
                                       Type or print name

9                                      Title __Senior Vice President – Land and Legal &
10                                     General Counsel_____

11                                     Date _____

12                                     Tax ID or S.S. No. ___20-3774650_____

13  **ATTEST OR WITNESS:**          **EPSILON ENERGY USA, INC., NON-OPERATOR**

15                                     _____

16  _____          By _____

17  _____            ___Zoran Arandjelovic_____
                                       Type or print name

18                                     Title __Executive Chairman, President and CEO

19                                     Date ___6|8|11_____

20                                     Tax ID or S.S. No. 20-2620866_____

21  **ATTEST OR WITNESS:**          **STATOIL USA ONSHORE PROPERTIES INC.,**
22                                                   **NON-OPERATOR**

24                                     _____
25  _____          By _____

     _____            ___M.K. Williams_____
26                                     Type or print name

27                                     Title ___Land Manager – Onshore Gas USA & Mexico

28                                     Date _____

29                                     Tax ID or S.S. No. ___FEIN 26-3666667_____

30  **ATTEST OR WITNESS:**          **MKR HOLDINGS, L.L.C., NON-OPERATOR**

33                                     By _____
     _____

     _____            ___Henry J. Hood_____
34                                     Type or print name

35                                     Title __Senior Vice President – Land and Legal &
                                       General Counsel_____

36                                     Date _____

37                                     Tax ID or S.S. No._____

Signature Page to that certain Recording Supplement to Operating Agreement and Financing Statement dated December 16, 2010 between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Craige Unit.

ATTEST OR WITNESS:

CHIEF EXPLORATION & DEVELOPMENT L.L.C.

By _____

_____

_____

Type or print name

Title _____

Date _____

Tax ID or S.S. No._____

ATTEST OR WITNESS:

ENERPLUS RESOURCES (USA) CORPORATION

By _____

_____

_____

Type or print name

Title _____

Date _____

Tax ID or S.S. No._____

ATTEST OR WITNESS:

RADLER 2000 LIMITED PARTNERSHIP

By _____

_____

_____

Type or print name

Title _____

Date _____

Tax ID or S.S. No._____

ATTEST OR WITNESS:

UNCONVENTIONALS NATURAL GAS L.L.C

By _____

_____

_____

Type or print name

Title _____

Date _____

Tax ID or S.S. No._____

Signature Page to that certain Recording Supplement to Operating Agreement and Financing Statement dated December 16, 2010 between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc. covering the Craige Unit.

**ACKNOWLEDGMENT**

**OPERATOR:**

STATE OF <u>OKLAHOMA</u>          )

                                                      ) SS:

COUNTY OF <u>OKLAHOMA</u>          )

On this, the 18th day of May, 20 11, before me Jessica S. Meek the undersigned officer, personally appeared, <u>Henry J. Hood</u>, who acknowledged himself to be the <u>Senior Vice President - Land and Legal & General Counsel</u> of <u>Chesapeake Appalachia L.L.C.</u>, a corporation, and that he as such <u>Senior Vice President - Land and Legal & General Counsel</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Senior Vice President – Land and Legal & General Counsel</u>.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*[Notary seal: JESSICA S. MEEK, NOTARY, # 08000292, EXP. 01/08/12, PUBLIC, STATE OF OKLAHOMA]*

My Commission Expires: 01/08/12
Signature/Notary Public: _____
Name/Notary Public (print): Jessica S. Meek

**ACKNOWLEDGMENT**

**NON-OPERATORS:**

STATE OF <u>TEXAS</u>          )

                                                      ) SS:

COUNTY OF <u>HARRIS</u>          )

On this, the 8th day of June, 20 11, before me Aeraynа Flores the undersigned officer, personally appeared, <u>Zoran Arandjelovic</u>, who acknowledged himself to be the ~~Executive Chairman, President and CEO~~ of <u>Epsilon Energy USA Inc</u>, and that he as such ~~Executive Chairman, President and CEO,~~ being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as ~~Executive Chairman, President and CEO~~.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*[Notary seal: AERAYNA FLORES, Notary Public, State of Texas, My Commission Expires August 02, 2012]*

My Commission Expires: August 2, 2012
Signature/Notary Public: Aerayna Flores
Name/Notary Public (print): Aerayna Flores

STATE OF _____)

                                                      ) SS:

COUNTY OF _____)

On this, the _____ day of _____, 20___, before me _____, the undersigned officer, personally appeared, <u>M.K. Williams</u>, who acknowledged himself to be the <u>Land Manager – Onshore Gas USA & Mexico</u> of <u>Statoil USA Onshore Properties Inc.</u>, a corporation, and that he as such <u>Land Manager – Onshore Gas USA & Mexico</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Land Manager – Onshore Gas USA & Mexico</u>.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____
Signature/Notary Public: _____
Name/Notary Public (print): _____

STATE OF <u>OKLAHOMA</u>          )

                                                      ) SS:

COUNTY OF <u>OKLAHOMA</u>          )

On this, the 18th day of May, 20 11, before me Jessica S. Meek the undersigned officer, personally appeared, <u>Henry J. Hood</u>, who acknowledged himself to be the <u>Senior Vice President - Land and Legal & General Counsel</u> of <u>MKR Holdings, L.L.C.</u>, a corporation, and that he as such <u>Senior Vice President - Land and Legal & General Counsel</u>, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as <u>Senior Vice President – Land and Legal & General Counsel</u>.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

*[Notary seal: JESSICA S. MEEK, NOTARY, # 08000292, EXP. 01/08/12, STATE OF OKLAHOMA, PUBLIC]*

My Commission Expires: 01/08/12
Signature/Notary Public: _____
Name/Notary Public (print): Jessica S. Meek

STATE OF _____)

                   ) SS:

COUNTY OF _____)

On this, the _____day of _____, 20___, before me _____, the undersigned officer, personally appeared, _____, who acknowledged himself to be the _____ of Chief Exploration & Development, LLC, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as .

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                     My Commission Expires: _____
                     Signature/Notary Public: _____
                     Name/Notary Public (print): _____

STATE OF _____)

                   ) SS:

COUNTY OF _____)

On this, the _____day of _____, 20___, before me _____, the undersigned officer, personally appeared, _____, who acknowledged himself to be the _____ of Enerplus Resources (USA) Corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as .

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                     My Commission Expires: _____
                     Signature/Notary Public: _____
                     Name/Notary Public (print): _____

STATE OF _____)

                   ) SS:

COUNTY OF _____)

On this, the _____day of _____, 20___, before me _____, the undersigned officer, personally appeared, _____, who acknowledged himself to be the _____ of Radler 2000 Limited Partnership, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as .

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                     My Commission Expires: _____
                     Signature/Notary Public: _____
                     Name/Notary Public (print): _____

STATE OF _____)

                   ) SS:

COUNTY OF _____)

On this, the _____day of _____, 20___, before me _____, the undersigned officer, personally appeared, _____, who acknowledged himself to be the _____ of Unconventionals Natural Gas LLC, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as .

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                     My Commission Expires: _____
                     Signature/Notary Public: _____
                     Name/Notary Public (print): _____

Exhibit "A-1"

Attached to and made a part of the Recording Supplement to Operating Agreement and Financing Statement dated December 16, 2010, by and between Chesapeake Appalachia, L.L.C., Operator, Epsilon Energy USA, Inc., as Non-Operator, and Statoil USA Onshore Properties Inc., et al, as Non-Operator

**Craige Unit**

**Rush and Auburn Townships**

**Susquehanna County, Pennsylvania**

| CHK LEASE ID | LESSOR | LESSEE | LEASE DATE | INSTRUMENT NUMBER | TAX ID NUMBER | TITLE ACRES | NET ACRES IN CONTRACT AREA |
|---|---|---|---|---|---|---|---|
| 1-236480-000 | John Koromlan | Chesapeake Appalachia LLC | 12/1/2006 | 201009225 | 196.00-2-003.00 | 131.4000 | 4.167941 |
| 1-301805-000 | Rushboro Ventures, LP | Chesapeake Appalachia LLC | 3/25/2010 | 201014458 | 196.00-2-004.01 | 107.0000 | 72.089227 |
| | Thomas J. and Donna G. Malandri | Southwestern Energy Production Company | 12/3/2007 | 200800070 | 196.00-2-008.02 | 39.1600 | 39.160000 |
| 1-297547-000 | John Bowen, Stanley Bowen, and Joseph Bowen | Chesapeake Appalachia LLC | 10/30/2007 | 200800144 | 177.00-1-021.00 | 126.0000 | 1.489444 |
| 1-297554-000 | Donald R. Hardic and Lawerence Hardic | Chesapeake Appalachia LLC | 3/14/2007 | 200711599 | 177.00-1-022.00 | 170.9000 | 15.517888 |
| 1-297549-000 | Anthony P. Litwin, Jr. | Chesapeake Appalachia LLC | 4/6/2007 | 200705059 | 177.00-1-025.00 | 218.1500 | 197.542985 |
| 1-297546-000 | Frederick P. Litwin | Chesapeake Appalachia LLC | 4/16/2007 | 200705060 | 177.00-1-025.01 | 235.9000 | 134.213731 |
| 1-297595-000 | Raymond and Christine K. Poulsen | Chesapeake Appalachia LLC | 6/6/2007 | 200708073 | 177.00-1-026.00 | 56.0000 | 14.144376 |
| 1-297558-000 | Harold and Gloria Craige | Chesapeake Appalachia LLC | 3/26/2007 | 200704460 | 177.00-1-028.01 | 139.3500 | 66.525937 |
| 1-297558-000 | Harold and Gloria Craige | Chesapeake Appalachia LLC | 3/26/2007 | 200704460 | 177.00-1-044.00 | 23.7000 | 19.858708 |
| 1-297683-000 | Wayne A. and Cynthia L. Rogers | Chesapeake Appalachia LLC | 2/25/2008 | 200807357 | 196.00-1-002.01 | 2.4100 | 2.410000 |
| 1-297670-000 | Robert Gerald and Gloria Rogers and Angela Bush | Chesapeake Appalachia LLC | 2/29/2008 | 200807356 | 196.00-2-052.00 | 4.5000 | 4.500000 |
| 1-297673-000 | Dawn Y Childress | Chesapeake Appalachia LLC | 2/27/2008 | 200807355 | 196.00-1-002.00 | 4.1300 | 4.130000 |
| 1-283511-000 | Debbie L. Polovitch | The Keeton Group, LLC | 8/3/2006 | 200700453 | 196.00-2-007.00 | 57.890000 | 57.890000 |

END OF EXHIBIT "A-1"

Exhibit "A-2"

Attached to and made a part of the Recording Supplement to Operating Agreement and Financing Statement dated December 16, 2010, by and between Chesapeake Appalachia, L.L.C., Epsilon Energy USA, Inc., and Statoil USA Onshore Properties Inc.



| NUMBER | TAX ID |
|--------|--------|
| 1 | 177.00-1-021.00 |
| 2 | 177.00-1-022.00 |
| 3 | 177.00-1-025.00 |
| 4 | 177.00-1-025.01 |
| 5 | 177.00-1-026.00 |
| 6 | 177.00-1-028.01 |
| 7 | 177.00-1-044.00 |
| 8 | 196.00-1-002.00 |
| 9 | 196.00-1-002.01 |
| 10 | 196.00-2-003.00 |
| 11 | 196.00-2-004.01 |
| 12 | 196.00-2-007.00 |
| 13 | 196.00-2-008.02 |
| 14 | 196.00-2-052.00 |

Contract Area

5/13/2011

CONTRACT AREA

Craige Common Pad
Susquehanna Co., PA
1 inch = 1,250 feet

Chesapeake ENERGY

Appx0320

# EXHIBIT 4

# FARMOUT AGREEMENT

THIS FARMOUT AGREEMENT (the "Agreement") is made effective February 1, 2010, by and between EPSILON ENERGY USA, INC., an Ohio corporation, located at 3343 State Road 3004, Meshoppen, PA  18630 ("Epsilon"), and CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company, located at 6100 North Western Avenue, Oklahoma City, OK 73118 ("Chesapeake").   Chesapeake and Epsilon may be collectively referred to herein as the "Parties" and individually as a "Party."  Chesapeake and Epsilon agree as follows:

1.    Conveyed Interests.

    1.1    Property Subject to Farmout.    Subject to the terms and conditions of this Agreement, Epsilon agrees to farmout and convey and Chesapeake agrees to acquire and accept an undivided fifty percent (50%) interest (the "Conveyed Interest") in all of the Properties for the Farmout Consideration as defined hereinafter.  The term "Property" (or within context "Properties") means, with respect to certain oil and gas interests and properties located in Susquehanna, Bradford and Wyoming Counties, Pennsylvania, all of the following:

        1.1.1    Real Property Interests.  All of Epsilon's right, title and interest in and to all oil, gas and mineral leases, operating rights, working interests, net revenue interests, mineral interests, royalty interests, surface fee interests, payments out of production and other similar agreements and rights, whether producing or non-producing and any other oil, gas or other leasehold or mineral rights of any type including, without limitation, those described in Exhibit "A" attached hereto and made a part hereof, any working interests and net revenue interests in the mineral interests, leasehold interests, oil and gas interests and any rights to acquire any of the foregoing interests, by contract, pooling order or otherwise (the "Real Property Interests");

        1.1.2    Wells.  All tangible personal property, equipment, inventory, spare parts, fixtures and improvements, including, without limitation, all oil and gas wells, injection wells, salt water disposal facilities, well heads, casing, tubing, pumps, motors, gauges, valves, heaters, treaters, gathering lines, flow lines, gas lines, gas processing and compression facilities, water lines, vessels, tanks, boilers, separators, fixtures, platforms, machinery, tools, treating equipment, compressors and other equipment, pipelines, power lines, telephone and communication lines, transportation and communication facilities, and other appurtenances situated upon the lands covered by the Real Property Interests or any land or lands pooled or unitized therewith or used or obtained in connection with the production, treating, storing, transportation or marketing of oil, gas and other hydrocarbons or minerals therefrom (the "Wells"), the Wells are comprised of eight (8) existing wells ('Existing Wells") listed on Exhibit "A", and all wells subsequently drilled on the Properties ("Future Wells");

1.1.3    Pipelines.  All of Epsilon's pipeline facilities servicing the Wells or the Real Property Interests (the "Pipelines"), including, without limitation, the pipelines, and associated taps described on Exhibit "A," and all leases, deeds, easements, road grants, licenses, permits, right-of-way agreements or other interests in property relating thereto;

1.1.4    Meters.  All meters, pressure control devices and other appurtenant equipment, rights and privileges used in connection with the Wells or the Pipelines including, without limitation, the meters identified in Exhibit "A" and all associated easements, rights-of-way, or other interests in property and facilities;

1.1.5    Compressor Stations.  All compressors and compression stations used in connection with the Pipelines or the Wells including, without limitation, identified in Exhibit "A", and all software, spare parts, tools, and equipment related to the operation or maintenance of the compression stations;

1.1.6    Rights in Production.  All presently existing unitization, pooling and/or communitization agreements, declarations or designations and statutorily, judicially or administratively created drilling, spacing and/or production units, whether recorded or unrecorded, insofar as the same are attributable or allocated to the Real Property Interests, and all of Epsilon's interest in and to the properties covered or units created thereby which are attributable to the Real Property Interests;

1.1.7    Contracts.  All presently existing and valid oil, casinghead gas and gas sales agreements, operating agreements, farmout and farmin agreements, pooling agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements, partnership and joint venture agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Real Property Interests, Wells or any interests pooled or unitized therewith including, without limitation, those contracts and agreements described on Exhibit "A" (collectively, the "Contracts");

1.1.8    Hydrocarbons.  All oil, condensate, gas, casinghead gas and other liquid or gaseous hydrocarbons ("Hydrocarbons") in, on, under or produced from the Real Property Interests or any interests pooled or unitized therewith from and after the Effective Time (as hereinafter defined) except the Hydrocarbons produced from the Existing Wells from the Effective Time until earned by Buyer pursuant to Section 6,4 below;

1.1.9    Easements.  All easements, permits, licenses, servitudes, rights of way and all other rights and appurtenances situated on or used in connection with the Real Property Interests, Wells or any interests pooled or unitized

therewith including, without limitation, those easements and rights of way described on Exhibit "A" (collectively, the "Easements");

1.1.10  <u>Imbalances</u>.  All rights and benefits arising from or in connection with any gas production, pipeline, storage, processing or other imbalance attributable to Hydrocarbons produced from the Real Property Interests as of the Effective Time;

1.1.11  <u>Claims</u>.  To the extent the same are assignable or transferable, and further to the extent the same are related to the Properties, all of Epsilon's interests in and to: (i) all orders, contracts, title opinions and documents, abstracts of title, leases, deeds, division of interest statements, participation agreements, and all other agreements and instruments, easements, rights-of-way, licenses, authorizations, permits and similar rights and interests, subject to the rights of third parties; and (ii) subject to all expenses, liabilities, third party claims and taxes, asserted and unasserted, known and unknown, all claims, rights and causes of action including, without limitation, causes of action for breach of warranty, against third parties, asserted and unasserted, known and unknown, but only to the extent such claims, rights and causes of action are attributable to the Properties after the Effective Time, and where necessary to give effect to the assignment of such rights, claims and causes of action, Epsilon grants to Chesapeake the right to be subrogated to such rights, claims and causes of action;

1.1.12  <u>Files, Records and Data</u>.  Copies of all files, records and data (including electronic data) including but not limited to geophysical and seismic data (to the extent assignable), lease files, land files, wells files, division order files, abstracts, title files, engineering and/or production files, maps, accounting records, and other information in the possession of Epsilon or copies thereof specifically related to the Wells and Real Property Interests, and all rights relating thereto; and

1.1.13  <u>Other Rights</u>.  All other rights and interests in, to or under or derived from the Properties, the lands covered thereby or pooled, unitized or directly used or held for use in connection therewith.

1.2  <u>Excluded Properties</u>.  The term "Excluded Properties" includes, and the Properties do not include, and there is hereby expressly excepted and excluded from the Properties and reserved to Epsilon as a part of the Excluded Properties:

1.2.1  all audit rights and other rights and choses in action, arising, occurring or existing in favor of Epsilon prior to the Effective Time or arising out of the operation of or production from the Properties prior to the Effective Time (including, but not limited to, any and all contract rights, claims, receivables, revenues, recoupment rights, recovery rights, accounting adjustments, mispayments, erroneous payments or other claims of any

nature in favor of Epsilon and relating and accruing to any time period prior to the Effective Time);

1.2.2   any accounts receivable or payable accruing before the Effective Time;

1.2.3   all corporate, partnership, financial, tax, and legal records and files of Epsilon;

1.2.4   all claims for refunds of costs, taxes or expenses borne by Epsilon or Epsilon's predecessor in title attributable to all periods prior to the Effective Time;

1.2.5   all deposits, cash, checks, funds and accounts receivable or received attributable to Epsilon's interests in the Properties with respect to any period of time prior to the Effective Time;

1.2.6   all documents and instruments of Epsilon that may be protected by an attorney-client privilege (except that if requested by Chesapeake, Epsilon will provide to Chesapeake copies of title related documents pertaining to the Real Property Interests);

1.2.7   all rights, title and interest in Epsilon's property and offices located at 3343 State Road 3004, Meshoppen, PA18630;

1.2.8   Epsilon's 3D seismic survey license, which may not be transferred; however Chesapeake shall have the right to purchase a second license pursuant to the terms and conditions set forth in that certain Letter Agreement dated August 5, 2009 by and between Epsilon and Geophysical Pursuit, Inc. with no additional consideration to Epsilon for such license; and

1.2.9   production revenue from the Existing Wells from the Effective Time until earned by Chesapeake pursuant to Section 6.4 below.

Chesapeake shall not be responsible for, and Epsilon expressly retains, all liabilities related to the Excluded Properties, whether such liabilities arise before or after the Effective Time.  It is understood that certain of the Excluded Properties may not be embraced by the term Properties.  The fact that certain properties, rights and interests have been expressly excluded is not intended to suggest that had they not been excluded they would have constituted Properties and shall not be used to interpret the meaning of any word or phrase used in describing the Properties.

2.    Farmout Consideration.  At the Closing, and upon the terms and subject to the conditions of this Agreement:  (a) Epsilon agrees to farmout and convey to  Chesapeake the Conveyed Interests; and (b) Chesapeake agrees to acquire and  accept the Conveyed Interests on the terms set forth herein.  The aggregate consideration for the farmout of the Conveyed Interests is ONE HUNDRED MILLION DOLLARS ($100,000,000.00), as adjusted as provided herein (the

"Farmout Consideration"). The Farmout Consideration will be made as follows: (a) FIVE MILLION DOLLARS ($5,000,000.00) (the "Cash Payment") will be payable in immediately available funds at Closing; and (b) the remainder of the Farmout Consideration will be made in accordance with Section 6.

3.    Representations, Warranties and Covenants of Epsilon; Disclaimers. Epsilon represents and warrants to Chesapeake as of the date hereof and the Closing, as follows:

3.1    Authority. Epsilon is duly organized, validly existing and in good standing under the laws of Ohio, and has all the requisite power and authority to enter into, deliver and perform this Agreement and carry out the transactions contemplated under this Agreement.

3.2    Valid Agreement. This Agreement constitutes the legal, valid and binding agreement of Epsilon. At the Closing, all instruments required hereunder to be executed and delivered by Epsilon shall be duly executed and delivered to Chesapeake and shall constitute legal, valid and binding obligations of Epsilon. The execution and delivery by Epsilon of this Agreement, the consummation of the transactions set forth herein and the performance by Epsilon of its obligations hereunder have been duly and validly authorized by all necessary action on the part of such Epsilon and except for (i) requirements (if any) that there be obtained consents to assignment (or waivers of preferential rights to purchase) from third parties, and (ii) approvals ("Routine Governmental Approvals") required to be obtained from governmental entities, which are lessors under the Real Property Interests (or who administer such Real Property Interests on behalf of such lessors) which are customarily obtained post-closing, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not and will not conflict with, violate or constitute a breach or default under any of the following:

3.2.1    Partnership agreements, contracts, mortgages, leases, licenses or other instruments to which Epsilon is a party or by which Epsilon or the Property is bound.;

3.2.2    Governmental franchise, license, permit or authorization or any judgment or order by a judicial or governmental body to which Epsilon or the Property is bound; or

3.2.3    Law, statute, decree, rule or regulation of any jurisdiction in the United States or Canada to which Epsilon or the Property is subject.

3.3    Authorization. This Agreement has been duly authorized, executed and delivered by Epsilon. All instruments required to be delivered by Epsilon under this Agreement shall be duly authorized, executed and delivered by Epsilon. This Agreement and all documents executed by Epsilon in connection with this Agreement shall constitute legal, valid and binding obligations of Epsilon, enforceable against Epsilon in accordance with their terms, subject to the effects

of bankruptcy, insolvency, reorganization, moratorium and similar laws from time to time in effect, as well as general principles of equity.

3.4    <u>Real Property Interests</u>.  As of the Closing Date, to Epsilon's best knowledge without independent investigation (i) the Real Property Interests and Easements described on Exhibit A are in full force and effect and are valid and subsisting documents covering the entire estates which they purport to cover, (ii) all royalties, rentals and other payments due under the Real Property Interests described on Exhibit A have been fully, properly and timely paid, (iii) all deductions from oil and gas proceeds have been deducted in compliance with all of the terms and conditions of the applicable Leases, other contracts and applicable law, (iv) there are no deferred bonus payments due from and after the Closing Date under the terms of any of the Real Property Interests described on Exhibit A included in the Properties, (v) the Real Property Interests are free and clear of all liens and encumbrances, except for that certain lien arising from the Stanton v. Larue claim, being Susquehanna County Court of Common Pleas, 2008-20008-MLF.

3.5    <u>Taxes</u>.  All taxes and assessments relative to the Properties have been timely paid when due and are not in arrears.

3.6    <u>Prepayments and Wellhead Imbalances</u>.  Epsilon is not obligated, by virtue of a production payment, prepayment arrangement under any contract for the sale of hydrocarbons and containing a "take or pay", advance payment or similar provision, gas balancing agreement or any other arrangement to deliver Hydrocarbons produced from the Properties at any time after the Effective Time without then or thereafter receiving full payment therefor.  For the avoidance of doubt, there are no gas imbalances or pipeline imbalances affecting the Properties.

3.7    <u>Operations</u>.  Epsilon has and is operating the Properties in accordance with industry standards and in compliance with the provisions and requirements of all applicable laws and permits in connection with the Properties.

3.8    <u>Environmental and Safety Matters</u>.  Epsilon represents that (i) the Properties and the ownership and operation thereof are in compliance with all applicable environmental laws and with all the terms of and conditions of all environmental permits, and all prior instances of non-compliance have been fully and finally resolved to the satisfaction of all governmental authorities with jurisdiction over such matters, to the extent such authorities were involved; (ii) there are no civil, criminal or administrative actions, lawsuits, demands, litigation, claims or hearings relating to an alleged breach of applicable environmental laws on or with respect to the Properties, and Epsilon has not received any notice of any third persons environmental or health or safety claim, demand, filing, investigation, administrative proceeding, action, suit or other legal proceeding relating to the Properties or notice of any alleged violation or non-compliance with any applicable environmental law or of non-compliance with the terms or conditions of any environmental permits, arising from, based upon, associated with or related

to the Properties or the ownership or operation of any thereof; (iii) during the period of ownership of the Properties by Epsilon no pollutant, waste, contaminant or hazardous or toxic material, substance, chemical or waste identified, defined or regulated as such under any environmental law is present or has been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or escaped on, in, from, under or in connection with the Properties or the ownership or operation of any thereof.

3.9     <u>Brokers</u>.  Epsilon has incurred no obligation or liability, contingent or otherwise, for brokers' or finders' fees with respect for this transaction for which Chesapeake shall have any obligation or liability.

3.10    <u>Suits and Claims</u>.  No suit, action, claim, or other proceeding is now pending or, to Epsilon's knowledge, threatened before any court or governmental agency which might result in the impairment or loss of any of Epsilon's title to the Properties and Epsilon shall promptly notify Chesapeake of any such proceeding which arises or is threatened prior to the Closing Date.

3.11    <u>Contracts, Consents and Preferential Rights</u>.  Schedule "3.11" attached hereto and made a part hereof accurately describes:

3.11.1  All joint venture and area of mutual interest agreements of which any terms remain executory and affect any Property (excluding joint operating agreements and oil, gas and mineral leases);

3.11.2  All gas purchase contracts, oil purchase contracts, gathering contracts, transportation contracts, marketing contracts, disposal or injection contracts and all other contracts affecting any Property which are not, by the terms thereof, subject to termination upon thirty (30) days or less notice;

3.11.3  All governmental approvals and third party contractual consents required in order to consummate the transactions contemplated by this Agreement, other than Routine Governmental Approvals required in connection with transfers of U.S. federal, state and Indian leases; and

3.11.4  All agreements pursuant to which third parties have preferential rights or similar rights to acquire any portion of the Conveyed Interest in the Properties upon the transfer of the Conveyed Interest in the Properties by Epsilon to Chesapeake as contemplated by this Agreement.

3.12    <u>Disclaimers</u>.  THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN THIS SECTION    AND THE SPECIAL WARRANTY OF TITLE IN THE ASSIGNMENT TO BE DELIVERED AT CLOSING (COLLECTIVELY "SELLER'S WARRANTIES") ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE.

SELLER EXPRESSLY DISCLAIMS ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES.

4.    Representations, Warranties, and Covenants of Chesapeake.  Chesapeake represents and warrants to Epsilon as of the date hereof and will represent and warrant at the Closing, as follows:

4.1    Authority.  Chesapeake is a limited liability company duly organized and in good standing under the laws of the State of Oklahoma, is duly qualified and in good standing to carry on its business in the State of Pennsylvania, and has all the requisite power and authority to enter into and perform this Agreement and carry out the transactions contemplated under this Agreement.

4.2    Valid Agreement.    This Agreement constitutes the legal, valid and binding Agreement of Chesapeake.  At the Closing, all instruments required hereunder to be executed and delivered by Chesapeake shall be duly executed and delivered to Epsilon and shall constitute legal, valid and binding obligations of Chesapeake.  Chesapeake's execution and delivery of this Agreement, the consummation of the transactions set forth herein and Chesapeake's performance of its obligations hereunder have been duly and validly authorized by all requisite company action on the part of Chesapeake and will not conflict with or result in any violation of any provision of any:

4.2.1    contract, mortgage, lease, license or other instrument to which Chesapeake is a party or by which Chesapeake is bound;

4.2.2    Governmental franchise, license, permit or authorization or any judgment or order of judicial or governmental body applicable to Chesapeake; or

4.2.3    Law, statute, decree, rule or regulation of any jurisdiction in the United States to which Chesapeake is subject.

4.3    Governmental Approvals.    Chesapeake shall obtain all required local, state, federal governmental and agency permissions, approvals, permits, bonds and consents, as may be required to assume Epsilon's obligations and responsibilities attributable to the Conveyed Interest in the Properties.

4.4    Independent Evaluation.    Chesapeake is an experienced and knowledgeable investor in the oil and gas business.  Chesapeake has been advised by and subject to the representations and warranties of Epsilon set forth in Section 3, has relied solely on its own expertise and legal, tax, title, reservoir engineering, environmental and other professional counsel concerning this transaction, the Properties, the value thereof and title thereto.  Subject to the representations and warranties of Epsilon set forth in Section 3, Chesapeake is acquiring the Conveyed Interest, AS IS, WHERE IS, and, subject to certain participation rights of Statoil USA Onshore Properties Inc. ("STO") Chesapeake is acquiring the Conveyed Interest for its own account, and not for resale.

4.5   <u>Brokers</u>.  Chesapeake has incurred no obligation or liability, contingent or otherwise, for brokers' or finders' fees with respect to this transaction for which Epsilon shall have any obligation or liability.

4.6   <u>Suits and Claims</u>.  There are no pending suits, actions, or other proceedings in which Chesapeake is a party (or, to Chesapeake's knowledge, which have been threatened to be instituted against Chesapeake) which affect the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

5.   <u>Title and Environmental Matters</u>.

5.1   <u>Definitions</u>.

5.1.1   "Marketable Title" means, as of the Effective Time, clear, unencumbered, uncontested, record title to a Property in Epsilon that (a) is evidenced by instruments filed of record in accordance with the conveyance and recording laws of the applicable jurisdiction; (b) unless such Real Property Interest is held by production, such Real Property Interest has a remaining term of not less than described on Exhibit "A"; and (c) subject to Permitted Encumbrances, is free and clear of all reversionary interests, contractual burdens, claims and other liens.

5.1.2   "Title Defect" means, as of the Effective Time and the date of each Assignment, and other than or subject to Permitted Encumbrances, any matter that would cause the title to the Conveyed Interest in the Properties to fail to qualify as "Marketable Title".

Notwithstanding any other provision in this Agreement to the contrary, the following matters ("Permitted Encumbrances") shall not constitute a Title Defect, a breach of any covenant, representation or warranty of Epsilon or a failure to satisfy a condition to Chesapeake's obligation to close and shall not be asserted as such:

(a)   Liens in the normal course of business customarily found in joint operating agreements, and taxes, assessments or mechanics and materialmens liens, provided all amounts due and payable by Epsilon thereunder have been paid and Epsilon is not in default thereunder or are not yet due;

(b)   preferential rights and consents with respect to which, prior to Closing, (i) waivers or consents are obtained from the appropriate parties, or (ii) the appropriate time period for asserting such rights has expired without an exercise of such rights;

(c)   easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations or the like; and easements for streets, alleys, highways, pipelines, telephone lines,

power lines, railways and other easements and rights-of-way, on, over or in respect of any of the Properties to the extent such matters do not materially interfere with operations on the Properties;

(d)     rights reserved to or vested in any governmental authority to control or regulate any of the Properties in any manner, and all applicable laws, rules and orders of governmental authority; and

(e)     any title or environmental defect affecting the Wells, Pipeline and associated equipment that would result in a reduction in the Farmout Consideration of five thousand dollars ($5,000.00) or less.

5.1.3   "Environmental Defect" means a presently existing condition on a Property requiring remedial action or a violation of applicable environmental laws that relates to a Property.

5.2     <u>Examination of Files and Records</u>.  Epsilon shall make available to Chesapeake all of Epsilon's files and information relating to the Properties, including, without limitation, Epsilon's land, lease, Contracts, easement and title files (collectively "Data").  Upon reasonable advanced notice from Chesapeake, all such Data shall be made available at Epsilon's office during normal working hours.  Epsilon will also permit Chesapeake to examine and copy such Data at Chesapeake's expense.

5.3     <u>Notice of Title or Environmental Defect</u>.  Chesapeake will review title to the Properties and conduct title and environmental due diligence after Closing at Chesapeake's sole cost and expense and notify Epsilon in writing of any Title or Environmental Defect Chesapeake discovers as soon as reasonably practicable after such discovery, but in no event later than April 1, 2010 (the "Defect Notice Date").  Chesapeake's notice of claimed Title and Environmental Defects shall include for each claimed defect, a defect value, based on the Allocated Value of the affected item of Property.  On the Defect Notice Date, Chesapeake shall provide Epsilon with copies of each due diligence report, including environmental due diligence reports, that results in a Title or Environmental Defect claim.  Any notice provided hereunder shall include a description of the Title or Environmental Defect, the portion of the lease or other part of the Properties affected by the Title or Environmental Defect, and the amount by which Chesapeake believes the value of the Conveyed Interest in the Properties has been reduced because of the Title or Environmental Defect.  Chesapeake will be deemed to have conclusively waived any Title or Environmental Defect about which it fails to notify Epsilon in writing prior to or on the Defect Notice Date.

5.4     <u>Procedure</u>.  If Chesapeake timely notifies Epsilon of a Title or Environmental Defect, Epsilon shall have ten (10) days from receipt of Chesapeake's notice to elect to either: (i) dispute whether such matter is a Title or Environmental Defect, or (ii) acknowledge the Title or Environmental Defect.  In the event that Epsilon disputes the legitimacy of a Title or Environmental Defect, Chesapeake and

Epsilon will negotiate in good faith to resolve such dispute. In the event the Parties are unable to resolve the dispute, Chesapeake will have the option to waive such Title or Environmental Defect. If Chesapeake does not waive the Title or Environmental Defect, the Parties shall handle such dispute in accordance with the arbitration provisions set forth in Section 5.6. In the event Epsilon acknowledges a Title or Environmental Defect, to the extent cure of such Title or Environmental Defect is economically feasible, Epsilon will use commercially reasonable efforts to cure the Title or Environmental Defect. If Epsilon is unable to cure a Title or Environmental Defect, the Promote Cap will be reduced by the amount of the Title or Environmental Defect (the "Defect Amount"). If Epsilon cures same to the reasonable satisfaction of Chesapeake, the Farmout Consideration will not be reduced as to the Property affected by such cured Title or Environmental Defect. If the Parties disagree on whether a Title or Environmental Defect has been cured, Epsilon will have the right to retain that portion of the Property subject to such Title or Environmental Defect and the Promote Cap will be reduced by the Allocated Value attributable to such Title or Environmental Defect. Epsilon will have three (3) months following the Defect Notice Date to attempt to cure the Title or Environmental Defect. Any disputes between the Parties regarding Title or Environmental Defects or cures thereof will be handled in accordance with Section 5.6. Notwithstanding the foregoing, in the event the Allocated Value of all of Chesapeake's claimed Title and Environmental Defects is greater than twenty million dollars ($20,000,000.00), then and in that event Epsilon, in its sole discretion, shall have the option to (i) cure some or all of such Defects and accept an adjustment to the Farmout Consideration for those Defects not cured; (ii) handle in accordance with Section 5.6; or (iii) terminate this Agreement in its entirety. In addition, in the event the Allocated Value of all of Chesapeake's claimed Title and Environmental Defects is greater than twenty million dollars ($20,000,000.00), Chesapeake will have the option, in Chesapeake's sole discretion, to terminate this Agreement in its entirety. Upon any such termination, Epsilon shall repay to Chesapeake all Farmout Consideration previously paid by Chesapeake and Chesapeake shall reconvey to Epsilon any Properties previously conveyed to Chesapeake.

5.5     Title and Environmental Adjustments.  Upon delivery of a notice of a Title Defect or Environmental Defect, Chesapeake and Epsilon will in good faith negotiate the validity of the claim and the amount of any adjustment to the Farmout Consideration using the following criteria:

5.5.1   All adjustments to the Farmout Consideration based on Title Defects or Environmental Defects will be based on the Allocated Values attributable to the affected Conveyed Interest as set forth on Exhibit "A" attached hereto.

5.5.2   If the requested adjustment is based on Epsilon owning a Net Revenue Interest for an Existing Well which is less than that shown in Exhibit "A," then a downward adjustment shall be calculated by multiplying the Allocated Value set forth for such Existing Well on Exhibit "A" by a

fraction the numerator of which is an amount equal to the Net Revenue Interest shown on Exhibit "A" for such Existing Well less the decimal share to which Epsilon would be entitled as a result of its ownership interest in such Existing Well which is unaffected by such Title Defect, and the denominator of which is the Net Revenue Interest shown for such Existing Well on Exhibit "A."

5.5.3    If a Title Defect is based on Epsilon owning a Working Interest in a Well that is larger than the Working Interest shown on Exhibit "A," without a comparable increase in the Net Revenue Interest then the downward adjustment is calculated by determining the effective Net Revenue Interest that results from such larger Working Interest, if both such enlarged Working Interest and the Net Revenue Interest were reduced proportionately until the Working Interest was as shown on Exhibit "A", and then calculating the adjustment based on the deemed reduction in Net Revenue Interest in the manner set forth in Section 5.5.2.

5.5.4    If the adjustment is based on the relevant Property being burdened by a royalty, overriding royalty and/or other non-expense bearing interest that in the aggregate is greater than the net revenue burden represented on Exhibit "A" for a Lease, then the downward adjustment shall be calculated by multiplying the Allocated Value set forth for such Conveyed Interest on Exhibit "A" by a fraction, the numerator of which is an amount equal to the Net Revenue Interest shown on Exhibit "A" for such Lease less the Net Revenue Interest for such Lease to which Epsilon is actually entitled taking such burden into account, and the denominator of which is the Net Revenue Interest shown for such Lease on Exhibit "A".

5.5.5    If the adjustment is based on a variance in the Net Mineral Acres for a Real Property Interest, there shall be a downward adjustment equal to the amount determined by multiplying the Allocated Value for such Real Property Interest listed on Exhibit "A" by a fraction (A) the numerator of which is an amount equal to the number of Net Mineral Acres for such Real Property Interest shown on Exhibit "A" less the total Net Mineral Acres actually determined to exist for such Real Property Interest and (B) the denominator of which is the number of Net Mineral Acres shown for such Real Property Interest on Exhibit "A".

5.5.6    If the adjustment is based on a lien, claim, encumbrance or other monetary charge upon a Property that is liquidated in amount, then the adjustment is the amount necessary to remove such lien, claim, encumbrance or other monetary charge from the affected Property or the Allocated Value of the affected Property.

5.5.7    If the adjustment is based on a liability to remediate or otherwise cure an Environmental Defect related to a Property that is liquidated in amount, then the adjustment is the amount necessary to remediate or otherwise

cure such Environmental Defect in a manner reasonably consistent with common industry practices.

5.5.8    If the adjustment is based on an obligation, burden or liability upon a Property (based on an Environmental Defect or otherwise) or a defect in any of the Pipeline, meters, compressor stations, fee surface ownership, Easement or other properties not constituting Wells or Real Property Interests for which the economic detriment is not liquidated but can be estimated with reasonable certainty, then, subject to the other provisions hereof, the adjustment is the amount reasonably necessary to compensate Chesapeake for the adverse economic effect on the affected Property; provided, however, that such adjustment with respect to a Title Defect shall not exceed the Allocated Value of the affected Property.

5.5.9    The Farmout Consideration will be decreased by the amount of such Title Defects and Environmental Defects.

5.5.10   As used in this Agreement, the following terms will have the following meanings: (a) "Allocated Value" means, with respect to any Property, a portion of the Farmout Consideration attributable to such Property as more particularly described in Exhibit "A;" (b) "Net Mineral Acre" means, as computed separately with respect to each Real Property Interest, (i) the number of gross acres in the lands covered by such Real Property Interest, multiplied by (ii) the interest in oil, gas and other minerals covered by such Real Property Interest in such lands, multiplied by (ii) Epsilon's undivided interest in such Real Property Interest, provided that if items (ii) and/or (iii) vary as to different areas of such lands covered by such Real Property Interest, a separate calculation shall be done for each such area; (c) "Net Revenue Interest" (or "NRI") means the decimal interest in and to all production of the Hydrocarbons produced and saved or sold from the Properties after giving effect to all valid lessors' royalties, overriding royalties and/or other non-expense bearing burdens against production; and (d) "Working Interest" ("WI") means the decimal interest in the full and entire leasehold estate in any Property and all rights and obligations of every kind and character pertinent thereto or arising therefrom, without regard to any valid lessor royalties, overriding royalties and/or other burdens against production insofar as said interest in said leasehold is burdened with the obligation to bear and pay the cost of exploration, development and operation.

5.6    Disputes.  If there is a dispute between Epsilon and Chesapeake involving Title or Environmental Defects, the cure of a Title or Environmental Defect or the value attributable to a Title or Environmental Defect or the adjustment to the Farmout Consideration with respect thereto or any other matter under this Article 5, Epsilon and Chesapeake will submit the dispute to arbitration after the Defect Notice Date provided in this Section.  Title dispute matters to be arbitrated shall be submitted to a lawyer in the energy industry in the State where the affected

Property is located with experience in oil and gas title issues selected by Epsilon and Chesapeake (such title attorney hereinafter, a "Consultant"). The cost of each Consultant shall be paid fifty percent (50%) by Epsilon and fifty percent (50%) by Chesapeake. Epsilon and Chesapeake shall each present to the Consultant, with a simultaneous copy to the other Party, a single written statement of its position on the defect, benefit or dispute in question, together with a copy of this Agreement and any supporting material that such party desires to furnish, not later than ten (10) days after appointment of the Consultant. In making the determination, the Consultant shall be bound by the terms of this Agreement and, without any additional or supplemental submittals by either Party, may consider available legal and industry matters as in their opinion are necessary or appropriate to make a proper determination.. By the twentieth (20th) day following the submission of the matter to the Consultant, applying the principles set forth in this Section 5, the Consultant shall make a determination of the matter submitted. The decision of the Consultant shall be in writing and conclusive and binding on Epsilon and Chesapeake and shall be enforceable against the Parties in any court of competent jurisdiction. **The Consultant shall act as an expert for the limited purpose of determining the specific dispute presented to the Consultant and shall not act as an arbitrator.**

5.7     <u>Certain Other Adjustments</u>.

    5.7.1     If, after the date of this Agreement but prior to conveyance thereof to Chesapeake, any portion of the Properties is destroyed or taken as a result of a casualty (a "Casualty Loss"), Chesapeake will nevertheless be required to close and such Casualty Loss shall be treated as a Farmout Consideration adjustment equal to the lesser of (i) the Allocated Value of the Conveyed Interest affected by such Casualty Loss or (ii) the amount of such Casualty Loss attributable to the Conveyed Interest. Epsilon shall not voluntarily compromise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Chesapeake. Epsilon shall be entitled to retain 100% of any insurance proceeds or awards attributable to such Casualty Loss.

    5.7.2     The Farmout Consideration shall be increased by the following (without duplication): (a) the value of all merchantable allowable oil or other liquid Hydrocarbons in storage owned by Epsilon above the pipeline connection at the Effective Time and not previously sold by Epsilon, that is credited to the Conveyed Interests, such value to be the current market price or the price paid, less taxes and gravity adjustments deducted by the purchaser of such oil or other liquid hydrocarbons; (b) the amount of all expenditures paid in connection with the ownership, operation and maintenance of the Conveyed Interests (including rentals, overhead, royalties and other charges and expenses billed under applicable operating agreements) which are paid by or on behalf of Epsilon and attributable to the period on or after the Effective Time; and (c) any other amount agreed upon by Chesapeake and Epsilon.

5.7.3    The Farmout Consideration shall be decreased by the following (without duplication): (a) the amount of any proceeds received by Epsilon from the sale of hydrocarbons, produced from and after the Effective Time, from the Conveyed Interests (net of royalties and other burdens and production, severance and similar taxes and assessments measured by or payable out of production; provided, that on oil the amount shall be the amount paid by the purchaser to Epsilon); (b) the amount equal to all unpaid ad valorem, property, production, severance and similar Taxes (excluding franchise, margin, income or similar taxes) and assessments based upon or measured by the ownership of the Conveyed Interests or the production of oil, gas or other minerals therefrom or the receipt of proceeds attributable thereto, which accrue to or are chargeable against the Conveyed Interests in accordance with GAAP prior to the Effective Time, which amount shall, to the extent not actually assessed or known, be computed based upon such taxes and assessments for the immediately preceding calendar year, or, if such taxes or assessments are assessed on other than a calendar year basis, for the tax period last ended; (c) the amount of any deferred bonus payments or lease rental payments due during the remaining life of the Leases to preserve the Leases throughout their remaining primary term; and (d) any other amount agreed upon by Chesapeake and Epsilon.

6.    <u>Development Costs</u>.  The remaining balance of the Farmout Consideration will be paid by Chesapeake paying Epsilon's share of certain costs in connection with the development of the Properties including, without limitation, post Effective Date costs in connection with the Existing Wells ("Development Costs") up to the aggregate amount of $95,000,000 (the "Promote Cap"), as adjusted as provided herein, and in addition by Chesapeake incurring and paying development costs for its own account in the amount of One Hundred Million Dollars ($100,000,000) ("Chesapeake's Development Costs") which amount the Parties agree will be incurred and paid as follows:

6.1    Development Costs may be paid in the form of:

(i)    The payment of Epsilon's share of all drilling and completion costs associated with drilling wells from and after the Effective Time ("Operating Development Costs"); and

(ii)    (a) The payment of Epsilon's share of expansion of the existing gas gathering system, land acquisitions, and other items required for the successful operations on the Properties, or (b) by conveying to Epsilon an undivided fifty percent (50%) interest in acreage owned by Chesapeake that is adjacent to (or in another mutually agreeable location in the proximity of) the Properties.  The inclusion of such acreage and the value of such acreage shall be mutually agreed upon between the Parties at the time of the conveyance of an interest in such acreage to Epsilon, and shall be referred to herein as the "Acreage Development Costs".

6.2     Chesapeake agrees to be responsible for and pay or cause to be paid on a current and timely basis one hundred percent (100%) of Epsilon's working interest share of all Development Costs (the "Promoted Costs") not exceeding the Promote Cap. Chesapeake shall pay or cause to be paid the Promoted Costs in addition to Chesapeake's (or its affiliate's) working interest share of Development Costs.

6.3     Chesapeake shall pay or cause to be paid all Promoted Costs in the same manner as payment of Chesapeake's Development Costs. Each Party shall maintain an accurate record of the Promoted Costs paid by Chesapeake from time to time, and shall provide the other Party with access to such records upon request by such other Party. Chesapeake shall be entitled to any reimbursements, credits or other adjustments for any Promoted Costs paid by Chesapeake, provided that any amounts so reimbursed to Chesapeake shall be deducted from the calculation of the Promoted Costs paid by Chesapeake for purposes of this Agreement. In the event Epsilon or any affiliate of Epsilon receives any refund in respect of Promoted Costs paid by Chesapeake, Epsilon shall request that such refund be paid directly to Chesapeake. Any dispute with regard to Promoted Costs may be referred by either Party to a Consultant for resolution in accordance with Section 5.6.

6.4     On the Closing Date, Chesapeake shall receive the contractual rights to the Conveyed Interests. Upon payment of Fifty Million Dollars ($50,000,000.00) of Chesapeake's Development Costs and Promoted Costs in the amount of Forty-Five Million Dollars ($45,000.000.00) of the Promote Cap, within five (5) business days after notice of such payment by Chesapeake, Epsilon shall execute and deliver to Chesapeake an assignment in substantially the form attached hereto as Exhibit "C" (the "Assignment"), such Assignment representing and conveying full title to 50% of the Conveyed Interest. Upon payment of 100% of Chesapeake's Development Costs and of the Promoted Costs in the amount equal to 100% of the Promote Cap, within five (5) business days after receipt of notice of such payment from Chesapeake, Epsilon shall execute and deliver to Chesapeake another Assignment representing and conveying full title to the remaining 50% of the Conveyed Interest. Each Assignment will be effective as of February 1, 2010. Notwithstanding anything contained herein or in the Assignment to the contrary (including the stated Effective Time), with respect to the Existing Wells, Epsilon will retain the revenue associated with the Conveyed Interests from and after the Effective Time until the first day of the month following the date that Chesapeake expends or causes to be expended a total of fifty million dollars ($50,000,000.00) ($25,000,000.00 associated with the Development Costs, plus $25,000,000.00 for Chesapeake's Development Costs). From and after the first day of the calendar month after such date, Chesapeake shall be entitled to the revenues attributable to the Conveyed Interests from all Wells (Existing Wells and Future Wells).

6.5     The amounts expended in accordance with this Section 6 shall be allocated as set forth in the table below:

| Activity | % Allocation |
|---|---|
| Operating Development Costs to be used for drilling and completion of additional wells | Not less than 75% of the Promote Cap. |
| Acreage Development Costs to be used for acquisition of additional acreage and expansion of the existing gathering system | Not more than 25% of the Promote Cap. |

6.6     Notwithstanding anything contained in this Agreement to the contrary, Chesapeake's obligation to pay Promoted Costs shall terminate on the earlier of the date on which the aggregate Promoted Costs paid by Chesapeake equals the Promote Cap or August 1, 2012. Should the Development Costs paid through August 1, 2012 not exceed fifty million dollars ($50,000,000.00), then Chesapeake shall be entitled to an assignment of ninety percent (90%) of the Conveyed Interest otherwise due from Epsilon hereunder.  For the avoidance of doubt, if Development Costs of twenty-five million dollars ($25,000,000) are paid during such period, then Chesapeake would be due an assignment of eleven and one-quarter percent (11.25%) working interest in the Properties ($25mm/$100mm x 50% x 90%).  Should the Development Costs paid through August 1, 2012 exceed fifty million dollars ($50,000,000), but not exceed the Promote Cap, then Chesapeake shall be entitled to an assignment of ninety-five percent (95%) of the Conveyed Interest otherwise due, but that remains unearned hereunder.  For the avoidance of doubt, if eighty million dollars ($80,000,000) of Development Costs are expended during such period, then Chesapeake will have already earned an assignment of 50% of the Conveyed Interest (being 25% working interest in the Properties), plus Chesapeake shall be due an assignment of an additional fourteen and one-quarter percent (14.25%) working interest in the Properties (($80mm - $50mm)/100mm x 50% x 95%).  Notwithstanding anything contained herein to the contrary, the Parties agree that in the event that the aggregate Development Costs paid through August 1, 2012 are less than twenty-five million dollars ($25,000,000.00) then Chesapeake shall forfeit all rights to acquire any of the Conveyed Interests.

7.    Effective Time and Closing.   The closing of the transactions contemplated by this Agreement (the "Closing") will occur on February 3, 2010 (the "Closing Date"), effective as of February 1, 2010 at 7:00 a.m. (the "Effective Time").  The Closing shall be held at Chesapeake's offices or such other place as the Parties shall mutually agree.  Epsilon shall provide Chesapeake with wiring instructions designating the account to which the Closing funds are to be delivered.  At the Closing, the following shall occur:

7.1     Epsilon shall deliver the following to Chesapeake, executed and acknowledged where appropriate:

7.1.1     A Memorandum of this Agreement in the form set forth at Schedule "7.1.1" hereto for recording in the counties where the Properties are located;

7.1.2    A Joint Operating Agreement covering the Properties in the form attached at Schedule "7.1.2" hereto wherein Chesapeake is designated the Operator of the Properties, and which the Parties agree shall govern all operations on the Properties from and after the Closing Date (the "JOA");

7.1.3    An executed statement as described in Treasury Regulation 1.1445-2(b)(2), certifying that Epsilon is not a foreign person within the meaning of the Internal Revenue Code;

7.1.4    Releases of all liens (other than the Permitted Encumbrances) insofar as they cover the Conveyed Interest in the Properties;

7.1.5    Copies of the Data; and

7.1.6    All necessary and required forms and documents for the transfer of the right to operate the Existing Wells from Epsilon to Chesapeake.

7.2    Chesapeake shall deliver the following to Epsilon:

7.2.1    The Cash Payment by wire transfer pursuant to wire instructions provided to Chesapeake by Epsilon;

7.2.2    A Joint Operating Agreement covering the Properties in the form attached at Schedule 7.1.2 hereto;

7.2.3    Proper evidence of Chesapeake's authority to operate wells in the state of Pennsylvania, including but not limited to any required licenses and bonds;

7.2.4    Evidence of the insurance for the joint account as required by the JOA and the attachments thereto; and

7.2.5    To the extent required by applicable laws or regulations, any necessary and required forms and documents for the acceptance of the transfer of operations for the Existing Wells from Epsilon to Chesapeake.

7.3    The final Farmout Consideration does not include any sales taxes or other taxes in connection with the sale of property pursuant to this Agreement.  Chesapeake shall be liable for any applicable conveyance, transfer and recording fees, and real estate transfer, stamps or taxes imposed on any transfer of Property pursuant to this Agreement, including but not limited to recording fees for any assignment given by Epsilon to Chesapeake pursuant to this Agreement, and the Memorandum of this Agreement provided for in Section 7.1.1, above.

8.    <u>Conditions Precedent to Closing</u>.

8.1    <u>Conditions Precedent to the Obligations of Chesapeake</u>.    The obligations of Chesapeake to consummate the transactions contemplated by this Agreement are subject to each of the following conditions being met or waived by Chesapeake:

8.1.1    <u>Representations True and Correct</u>.    Each and every representation of Epsilon under this Agreement shall be true and accurate in all material respects as of the date when made and, for the purposes of serving as a condition to close, shall be true and accurate in all material respects at and as of such time of Closing as if it had been made again at and as of the Closing.

8.1.2    <u>Compliance with Covenants and Agreements</u>.    Epsilon shall have performed and complied in all material respects with (or compliance therewith shall have been waived by Chesapeake) each and every covenant and agreement required by this Agreement to be performed or complied with by Epsilon prior to or at the Closing.

8.1.3    <u>Litigation</u>.    No suit, action or other proceedings shall, on the Closing Date, be pending or to Epsilon's knowledge threatened before any court or governmental agency seeking to restrain, prohibit, or obtain material damages or other material relief in connection with the consummation of the transactions contemplated by this Agreement.

If any such condition on the obligations of Chesapeake under this Agreement is not met as of the Closing Date and the Closing does not occur on or before the Closing Date as a result of such condition not having been met and Chesapeake is not in material breach of its representations or obligations hereunder, this Agreement may, at the option of Chesapeake, be terminated.    If such a termination by Chesapeake occurs, the Parties shall have no further obligations to one another hereunder.

8.2    <u>Conditions Precedent to the Obligations of Epsilon</u>.    The obligations of Epsilon to consummate the transactions contemplated by this Agreement are subject to the each of the following conditions being met or waived by Epsilon:

8.2.1    <u>Representations True and Correct</u>.    Each and every representation of Chesapeake under this Agreement shall be true and accurate in all material respects as of the date when made and for the purposes of serving as a condition to close, and shall be true and accurate in all material respects at and as of such time of Closing as if it had been made again as of the Closing.

8.2.2    <u>Compliance With Covenants and Agreements</u>.    Chesapeake shall have performed and complied in all material respects with (or compliance therewith shall have been waived by Epsilon) each and every covenant

and agreement required by this Agreement to be performed or complied with by Chesapeake prior to or at the Closing.

8.2.3 <u>Litigation</u>. No suit, action or other proceedings shall, on the date of Closing, be pending or to Chesapeake's knowledge threatened before any court or governmental agency seeking to restrain, prohibit, or obtain material damages or other material relief in connection with the consummation of the transactions contemplated by this Agreement.

If any such condition on the obligations of Epsilon under this Agreement is not met as of the Closing Date and the Closing does not occur on or before the Closing Date as a result of such condition not having been met and Epsilon is not in material breach of its representations or obligations hereunder, this Agreement may, at the option of Epsilon, be terminated, in which case the Parties shall have no further obligations to one another hereunder.

9. <u>Post-Closing Adjustments and Final Settlement</u>. Not more than five (5) months after the Closing, or sooner as defined below, Chesapeake shall prepare and deliver to Epsilon, in accordance with this Agreement, a statement (the "Final Settlement Statement") setting forth each adjustment and showing or including: (i) the calculation of such adjustments; (ii) whether each such adjustment relates to the cure of a Title or Environmental Defect; (iii) all curative materials and documents relating to the cure of Title or Environmental Defects; and (iv) any other agreed upon adjustments. As soon as practicable, but not later than twenty (20) days after receipt of the Final Settlement Statement, Epsilon shall deliver to Chesapeake a written report containing any changes which Epsilon proposes be made to the Final Settlement Statement including, without limitation, any title curative which Chesapeake disputes. The Parties shall agree on the Final Settlement Statement no later than 180 days after Closing. The date upon which such agreement is reached or upon which the Final Farmout Consideration is established shall be called the "Final Settlement Date". The Final Settlement Statement shall include adjustments to the Promote Cap.

10. <u>Indemnification</u>.

10.1 <u>By Epsilon</u>. Except as specifically provided herein, Epsilon agrees to indemnify and hold Chesapeake, its affiliates, and each of their officers, directors, employees and agents harmless from all claims, losses, costs, liabilities and expenses arising out of or resulting from (i) any misrepresentation or breach of any warranty, covenant or agreement of Epsilon contained in this Agreement; (ii) Epsilon's ownership or operation of the Properties prior to the Closing Date; (iii) any and all actions, claims or other proceedings with respect to matters attributable to any period prior to the Closing Date; and (iv) Epsilon's ownership or operation of the Excluded Properties, whether prior to or after the Closing Date. **THE FOREGOING INDEMNIFICATIONS SHALL APPLY WHETHER OR NOT SUCH DUTIES, OBLIGATIONS OR LIABILITIES, OR SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, LIABILITIES, DAMAGES, LOSSES, COSTS OR EXPENSES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE,**

**CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE, BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF ANY INDEMNIFIED PARTY, OR (ii) STRICT LIABILITY. THE PARTIES AGREE THAT THE FOREGOING COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.**

10.2    <u>By Chesapeake</u>.  Except as specifically provided herein, Chesapeake agrees to indemnify and hold Epsilon, its affiliates and each of their partners, officers, directors, employees and agents harmless from all claims, losses, costs, liabilities and expenses arising out of or resulting from any misrepresentation or breach of any warranty, covenant or agreement of Chesapeake contained in this Agreement. **THE FOREGOING INDEMNIFICATIONS SHALL APPLY WHETHER OR NOT SUCH DUTIES, OBLIGATIONS OR LIABILITIES, OR SUCH CLAIMS, ACTIONS, CAUSES OF ACTION, LIABILITIES, DAMAGES, LOSSES, COSTS OR EXPENSES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE, BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF ANY INDEMNIFIED PARTY, OR (ii) STRICT LIABILITY. THE PARTIES AGREE THAT THE FOREGOING COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.**

10.3    <u>Exclusive Remedy</u>.  If the Closing occurs the sole and exclusive remedy of Chesapeake and Epsilon, for any and all (a) claims relating to any representations, warranties, covenants and agreements that are contained in this Agreement or in any certificate delivered at Closing, and (b) other claims pursuant to or in connection with this Agreement and the transactions contemplated hereby shall be the rights to indemnification from such claims that is expressly provided in this Section 10.

11.    <u>Operation of the Properties; Standstill</u>.

11.1    Chesapeake shall be the operator with respect to all drilling and production activities in connection with the Properties during the term of this Agreement in accordance with and subject to the provisions of the JOA.  After the date of this Agreement, Epsilon will not grant a lien or security interest in any of the Conveyed Interest to any party, and Epsilon will not enter into any agreement affecting any of the Conveyed Interest without the prior written consent of Chesapeake.  The Parties agree that notwithstanding anything contained herein to the contrary, in the event Chesapeake fails to expend a total of $190,000,000 (50% for Development Costs and 50% for Chesapeake's Development Costs such total costs being divided between Operating Development Costs and Acreage Development Costs in accordance with the provisions of Section 6.5) on or before August 1, 2012, Epsilon shall no longer be required to support Chesapeake as the operator of the Properties.  Chesapeake's proposed development shall utilize two

rigs to drill eighteen (18) wells in the first year.  Thereafter, Chesapeake plans to drill twelve (12) wells every six (6) months until the Promote Cap is fully exhausted.

11.2    Chesapeake agrees that it shall not use the gathering system constructed for the Properties for gas produced from outside acreage, unless the Parties agree to the payment of a reasonable fee to the joint account.  The amount of such fee shall be agreed upon by the Parties prior to the transportation of any outside gas through the gathering system.

12.    <u>Tax Matters</u>.  The Parties intend and expect that the transactions contemplated by this Agreement will be treated, for purposes of federal income taxation and for purposes of certain state income tax laws that incorporate or follow federal income tax principles, as resulting in (a) the creation of a partnership (the "Tax Partnership") in which Chesapeake and Epsilon are treated as partners, with the Tax Partnership being treated for Tax purposes as holding the Properties and engaging in all activities of the Parties with respect to the Properties, (b) a contribution by Epsilon of all of the Properties to the Tax Partnership; (c) a contribution of the Five Million Dollar ($5,000,000) Cash Payment and a commitment to fund the costs as provided for in Section 6 of this Agreement to the Tax Partnership by Chesapeake in exchange for an interest therein, (d) a distribution to Epsilon of the Five Million Dollar ($5,000,000) Cash Payment and, specifically, as a reimbursement of Epsilon's preformation expenditures with respect to the Properties within the meaning of Treasury Regulations Section 1.707-4(d) to the extent applicable, and (e) the realization by the Tax Partnership of all items of income or gain and the incurrence by the Tax Partnership of all items of costs or expenses attributable to the Properties' operation or the disposition of the Properties, notwithstanding that such items are realized, paid or incurred by the Parties individually, all as set forth in the Tax Partnership Agreement attached as Exhibit "B" to this Agreement.

13.    <u>Securities Matters</u>. In the event any or all of the Conveyed Interests, Cash Payment or payment of Development Costs or the consideration received in exchange therefor are deemed "securities" within the meaning of the Securities act of 1933 or any other state securities laws, then, each Party to this Agreement hereby represents and warrants to all other parties to this Agreement that: (a) the Party is acquiring its Real Property Interests for the Party's own account as an investment and without an intent to distribute the same or any part thereof (subject to the rights of STO with respect to Chesapeake); and (b) the Party acknowledges that there has not been a registration under the Securities Act of 1933 or any state securities laws with respect to any part of the transactions contemplated hereby.

14.    <u>Miscellaneous</u>.

14.1    <u>Further Assurances</u>.  The Parties agree to execute any documents, whether before or after the Closing, to aid the other Party in fulfilling the purpose of this Agreement.

14.2    <u>Entire Agreement</u>.  This Agreement together with the Exhibits and Schedules attached hereto and the Assignment and other documents to be delivered pursuant to the terms hereof, shall constitute the complete agreement between the Parties

hereto and shall supersede all prior agreements, whether written or oral, and any representations or conversations with respect to the Properties (including the Letter of Intent dated January 17, 2010 by and between the Parties pertaining to the Properties and the transactions covered by this Agreement).

14.3   <u>Notices</u>.  All communications required or permitted under this Agreement shall be in writing and may be sent by facsimile or electronic mail (email).  Such communication shall be deemed made when actually received, or if mailed by registered or certified mail, postage prepaid, addressed as set forth below, shall be deemed made three days after such mailing.  Faxes or emails will be deemed to be received when reflected in the fax confirmation sheet or email.  Either party may, by written notice to the other, change the address for mailing such notices.  Notwithstanding the foregoing, Notices with respect to Section  may be submitted via e-mail.  Such Notices will be deemed to have been made when the e-mail is sent.

| | |
|---|---|
| Notices to Epsilon: | Epsilon Energy USA, Inc. |
| | c/o Epsilon Energy LTD |
| | 150 Jardin Dr., Suite #9 |
| | Concord, Ontario  L4K 3P9 |
| | CANADA |
| | Attn:  Zoran Arandjelovic |
| | Telephone:  (570) 869-2000 |
| | Facsimile:  (905) 669-8220 |
| | Email:  zoran@epsilonenergyltd.com |
| With copy to: | Loomis, Ewert, Parsely, Davis & Gotting, P.C. |
| | 124 West Allegan Street, Suite 700 |
| | Attn:  Michael H. Rhodes |
| | Telephone: (517) 482-2400 |
| | Facsimile: (517) 853-8619 |
| | Email:  mhrhodes@loomislaw.com |
| Notices to Chesapeake: | Chesapeake Appalachia, L.L.C. |
| | 6100 North Western Avenue |
| | Oklahoma City, Oklahoma 73118 |
| | Attn:  Douglas J. Jacobson |
| | Telephone: 405-935-9233 |
| | Facsimile: 405-879-9546 |
| | Email:  doug.jacobson@chk.com |
| With copy to: | Commercial Law Group, P.C. |
| | 5520 North Francis Avenue |
| | Oklahoma City, Oklahoma 73118-6040 |
| | Attn:  Ray Lees |
| | Telephone:  405-254-5725 |
| | Facsimile:  405-232-5553 |
| | Email:  rlees@clgroup.org |

14.4   <u>Binding Effect</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, and their successors and assigns. No assignment of this Agreement by either Party shall be made without the prior, written consent of the other Party, which consent shall not be unreasonably withheld.

14.5   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, which taken together shall constitute one instrument and each of which shall be considered legally enforceable.

14.6   <u>Law Applicable; Venue</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVNIA WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAWS RULES THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION, EXCEPT TO THE EXTENT THAT IT IS MANDATORY THAT THE LAW OF ANOTHER JURISDICTION, WHEREIN OR ADJACENT TO WHICH THE PROPERTIES ARE LOCATED, SHALL APPLY. EXCEPT FOR DISPUTES THAT ARE EXPRESSLY SUBJECT TO ARBITRATION UNDER THIS AGREEMENT: (i) THE PARTIES CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE COURTS OF THE COMMONWEALTH OF PENNSYLVANIA FOR ANY ACTION ARISING OUT OF THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS, (ii) ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS SHALL BE EXCLUSIVELY LITIGATED IN COURTS HAVING SITES IN THE COMMONWEALTH OF PENNSYLVANIA (iii) EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

14.7   <u>Survival</u>. Except for the special warranty of title which is incorporated in the Assignment, all indemnities, representations, and warranties contained in this Agreement shall survive the Closing for a period of twenty-four (24) months after the Effective Time at which time all such indemnities, representations, and warranties shall expire other than as to claims made concerning same written notice of which has been provided prior to the expiration of such twenty-four (24) month period.

14.8   <u>Headings</u>. The headings of the articles and sections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms and provisions of this Agreement.

14.9   <u>Timing</u>. Time is of the essence in this Agreement.

Appx0345

14.10  <u>Expenses; No Special Damages</u>.  All fees, costs and expenses incurred by the Parties in negotiating this Agreement and in consummating the transactions contemplated by this Agreement shall be paid by the Party that incurred such fees, costs and expenses.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY NEITHER PARTY SHALL HAVE ANY OBLIGATIONS WITH RESPECT TO THIS AGREEMENT, OR OTHERWISE IN CONNECTION HEREWITH, FOR ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES; PROVIDED, HOWEVER, THAT THIS WAIVER SHALL NOT AFFECT OR RELEASE ANY CLAIMS OF THIRD PARTIES FOR WHICH A PARTY IS OBLIGATED TO INDEMNIFY THE OTHER HEREUNDER.

14.11  <u>Amendment and Waiver</u>.  This Agreement may be altered, amended or waived only by a written agreement executed by Chesapeake and Epsilon.  No waiver of any provision of this Agreement shall be construed as a continuing waiver of the provision.

14.12  <u>Announcements</u>.  No Party shall announce or otherwise publicize the existence of this Agreement, its terms and conditions or the transactions contemplated hereby without first providing the other Parties the opportunity to review the proposed announcement and obtaining the other Party's prior, written consent to such proposed announcement, which consent shall not be unreasonably withheld.

14.13  <u>Parties in Interest</u>.  This Agreement is binding upon and shall inure to the benefit of the Parties and, except where prohibited, their successors, representatives or assigns.  The Parties acknowledge that Chesapeake and STO are parties to that certain Development Agreement dated November 24, 2008 pursuant to the terms of which STO has the right to participate with Chesapeake in the acquisition of the Conveyed Interests to the extent of a thirty-two and one-half percent (32.5%) of the Conveyed Interests.  The Parties acknowledge and agree that in the event STO exercises its election to acquire its proportionate share of the Conveyed Interests "Chesapeake" as used herein will be deemed to mean Chesapeake and STO in their respective proportionate shares and STO will be subject to all of the terms and conditions of this Agreement to the same extent as if STO had been an original party hereto.

14.14  <u>Third-Party Beneficiaries</u>.  Unless expressly stated to the contrary, no third party is intended to have any rights, benefits or remedies under this Agreement.

14.15  <u>Severance</u>.  If any provision of this Agreement is found to be illegal or unenforceable, the other terms of this Agreement shall remain in effect and this Agreement shall be construed as if the illegal or unenforceable provision had not been included.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed below by their duly authorized representatives.

**Epsilon:**

EPSILON ENERGY USA, INC., an Ohio corporation

By:_____
Name: ZORAN ARANDJELOVIC
Title PRESIDENT

**Chesapeake:**

CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company

By: Douglas J. Jock
Douglas J. Jacobson
Executive Vice President – Acquisitions and Divestitures

FARMOUT AGREEMENT

26

## EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

### EXISTING WELLS

| Well Name | API Number | State | County | Township | Working Interest | Net Revenue Interest | Conveyed Working Interest | Conveyed Net Revenue Interest | Allocated Value |
|---|---|---|---|---|---|---|---|---|---|
| B. Poulsen #1H | 37-115-20058 | Pennsylvania | Susquehanna | Auburn | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $1,966,754 |
| B. Poulsen #2H | 37-115-20044-01 | Pennsylvania | Susquehanna | Auburn | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $1,490,863 |
| Hardic #2H | 37-115-20066 | Pennsylvania | Susquehanna | Rush | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $2,802,440 |
| Larue #1H | 37-115-20022 | Pennsylvania | Susquehanna | Rush | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $2,047,715 |
| Larue #2H | 37-115-20027 | Pennsylvania | Susquehanna | Rush | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $4,111,878 |
| Larue #1A | 37-115-20009 | Pennsylvania | Susquehanna | Rush | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $162,789 |
| Larue #1B | 37-115-20038 | Pennsylvania | Susquehanna | Rush | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $234,228 |
| Pierson #1 | 37-115-20037 | Pennsylvania | Susquehanna | Rush | 1.0000 | 0.8750 | 0.5000 | 0.4375 | $633,333 |
| **Total:** | | | | | | | | | $13,450,000 |

### CONDUCTOR WELLS

| Well Name | State | County | Township | Working Interest | Net Revenue Interest |
|---|---|---|---|---|---|
| MJ Barlow #1H | Pennsylvania | Susquehanna | Rush | 1.000 | 0.875 |
| MJ Barlow #2H | Pennsylvania | Susquehanna | Rush | 1.000 | 0.875 |
| Bowen #1H | Pennsylvania | Susquehanna | Rush | 1.000 | 0.875 |

### PIPELINES, TAP AND COMPRESSOR STATION

| | Working Interest | Conveyed Working Interest | Allocated Value |
|---|---|---|---|
| Highway 706 pipeline (comprised of +/- 20 miles of existing pipeline servicing the above wells), Tap on Tennessee Gas Pipeline and Compressor Station located in Susquehanna County, PA as depicted on the included map | 1.000 | 0.500 | $4,550,000 |

### LEASEHOLD

| | Net Acres | Conveyed Net Acres | Allocated Value |
|---|---|---|---|
| Epsilon Highway 706 leasehold (see included lease schedule) | 11,449.52 | 5,724.76 | $82,000,000 |

### TOTAL ALLOCATED VALUE:

| | Allocated Value |
|---|---|
| | $100,000,000 |

EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## REAL PROPERTY INTERESTS

### Leases

| Epsilon Lease Number | Lessor | Lessee | Instrument Number | Tax Parcel Number | Lease Date | Lease Expiration Date | Extension Cost Per Acre | Extension Term | Lease Royalty | State | County | Township | Gross Acres | Net Acres | Conveyed Net Acres | WI | NRI | Allocated Value Per Acre | Total Allocated Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WLS15708 | DENNIS & VICTORIA LARUE | EPSILON ENERGY USA, INC. | 200704243 | 139.00-2,018.00,000 158.00-1,004.00,000 | 3/3/2007 | 3/2/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH JESSUP | 689.00 | 689.00 | 344.50 | 1.000 | 0.875 | $14,581 | $5,023,102 |
| WLS18157 | RONALD & BRENDA DECKER | EPSILON ENERGY USA, INC. | 200800774 | 158.00-1,011.00,000 157.00-1,103.00,000 158.00-2,023.00,000 | 11/7/2007 | 11/6/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH JESSUP | 496.10 | 496.10 | 248.05 | 1.000 | 0.875 | $14,581 | $3,616,779 |
| WLS15548 | RICHARD A & ANN L GARY | EPSILON ENERGY USA, INC. | 200703391 | 138.00-1,020.01,000 139.00-1,002.00,000 | 2/16/2007 | 2/15/2012 | $ 35.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 479.94 | 479.94 | 239.97 | 1.000 | 0.875 | $14,581 | $3,498,966 |
| WLS18159 | WARD & LINDA DECKER | EPSILON ENERGY USA, INC. | 200800773 | 158.00-1,011.00,000 158.00-2,018.00,000 | 11/7/2007 | 11/6/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH JESSUP | 363.50 | 363.50 | 181.75 | 1.000 | 0.875 | $14,581 | $2,650,050 |
| WLS19027 | MILDRED BENNETT | EPSILON ENERGY USA, INC. | 200805855 | 156.00-1,002.00,000 156.00-1,073.00,000 156.00-1,072.00,000 156.00-1,016.00,000 | 1/14/2008 | 1/13/2013 | $ 400.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 309.95 | 309.95 | 154.98 | 1.000 | 0.875 | $14,581 | $2,259,667 |
| WLS16140 | LARRY R LARUE | EPSILON ENERGY USA, INC. | 200705783 | 178.00-1,003.00,000 159.00-2,001.00,000 159.00-1,055.01,000 159.00-1,057.00,000 159.00-1,059.00,000 159.00-1,061.00,000 159.00-1,018.00,000 | 4/25/2007 | 4/24/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH JESSUP | 288.45 | 288.45 | 144.23 | 1.000 | 0.875 | $14,581 | $2,102,923 |
| WLS16185 | JAMES W & DAWN ROBERTSON | EPSILON ENERGY USA, INC. | 200705027 | 261.00-1,005.00,000 261.00-1,038.00,000 | 5/1/2007 | 4/30/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | LENOX | 243.00 | 243.00 | 121.50 | 1.000 | 0.875 | $12,151 | $1,476,311 |
| WLS16321 | DAVID JENNER & PATRICIA RINKER | EPSILON ENERGY USA, INC. | 200708070 | 158.00-1,012.00,000 | 5/14/2007 | 5/13/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 238.00 | 238.00 | 119.00 | 1.000 | 0.875 | $14,581 | $1,735,121 |
| EPS18416 | FREDERICK P LITWIN | CABOT OIL & GAS CORPORATION | 200705060 | 177-1-25.01 | 4/16/2007 | 4/15/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH AUBURN | 235.90 | 235.90 | 117.95 | 1.000 | 0.875 | $14,581 | $1,719,811 |
| WLS18059 | JOHN T BOWEN, ET AL | EPSILON ENERGY USA, INC. | 200800144 | 177.00-1,021.00,000 178.00-1,012.00,000 | 10/30/2007 | 10/29/2012 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 234.00 | 234.00 | 117.00 | 1.000 | 0.875 | $14,581 | $1,705,959 |
| WLS18771 | GARGES, LINFORD & R JEANETTE | EPSILON ENERGY USA, INC. | 200802995 | 137.00-2,018.00,000 137.00-2,021.00,000 | 12/18/2007 | 12/17/2012 | $ 200.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 220.00 | 220.00 | 110.00 | 1.000 | 0.875 | $14,581 | $1,603,893 |
| EPS18417 | ANTHONY P LITWIN JR | CABOT OIL & GAS CORPORATION | 200705059 | 177-1-25 | 4/6/2007 | 4/5/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 218.15 | 218.15 | 109.08 | 1.000 | 0.875 | $14,581 | $1,590,406 |
| EPS18413 | PINE HOLLOW HUNTING CLUB | CABOT OIL & GAS CORPORATION | 200707885 | 175-1-4 | 6/12/2007 | 6/11/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 215.00 | 215.00 | 107.50 | 1.000 | 0.875 | $14,581 | $1,567,441 |
| WLS15628 | PAUL G & LINDA E MONTALBANO | EPSILON ENERGY USA, INC. | 200704245 | 156.00-1,045.00,000 194.03-1,027.00,000 | 2/23/2007 | 2/22/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH AUBURN | 182.25 | 182.25 | 91.13 | 1.000 | 0.875 | $14,581 | $1,328,680 |
| EPS18395 | LLOYD & V KUNKLE, JEFF BECHTEL | CABOT OIL & GAS CORPORATION | 200703493 | 177-1-40 177-1-9 | 3/8/2007 | 3/7/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 171.77 | 171.77 | 85.89 | 1.000 | 0.875 | $14,581 | $1,252,276 |
| WLS16051 | TERRANCE K & DARLENE LEIDY | EPSILON ENERGY USA, INC. | 200705020 | 156.00-1,082.00,000 156.00-1,079.00,000 156.00-1,069.00,000 | 4/9/2007 | 4/8/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 170.24 | 170.24 | 85.12 | 1.000 | 0.875 | $14,581 | $1,241,122 |
| WLS17114 | DONALD HARDIC & LAWRENCE HARDIC | EPSILON ENERGY USA, INC. | 200711599 | 177.00-1,022.00,000 | 8/21/2007 | 8/20/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 170.19 | 170.19 | 85.10 | 1.000 | 0.875 | $14,581 | $1,240,757 |
| WLS17911 | WILLIAM DAHM | EPSILON ENERGY USA, INC. | 200800146 | 176.00-1,035.00,000 | 10/20/2007 | 10/19/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 168.47 | 168.47 | 84.24 | 1.000 | 0.875 | $14,581 | $1,228,218 |
| EPS18400 | RONALD B & LOU ANN KIEFER | CABOT OIL & GAS CORPORATION | 200708871 | 158-2-16 158-2-16.01 | 6/28/2007 | 6/27/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 167.75 | 167.75 | 83.88 | 1.000 | 0.875 | $14,581 | $1,222,969 |
| WLS17112 | STANLEY A & JILL M BENNETT | EPSILON ENERGY USA, INC. | 200711598 | 157.00-1,069.00,000 156.00-1,086.00,000 137.00-2,002.00,000 | 8/18/2007 | 8/17/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 165.85 | 165.85 | 82.93 | 1.000 | 0.875 | $14,581 | $1,209,117 |
| EPS18388 | HAROLD & GLORIA CRAIGE | CABOT OIL & GAS CORPORATION | 200704460 | 177-1-28.01 | 3/26/2007 | 3/25/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 162.72 | 162.72 | 81.36 | 1.000 | 0.875 | $14,581 | $1,186,298 |
| WLS15709 | ROBERT E & BETTY J BOYANOWSKI | EPSILON ENERGY USA, INC. | 200704246 | 156.00-1,057.00,000 157.00-1,064.00,000 157.00-1,065.00,000 157.00-1,067.00,000 176.00-1,036.00,000 | 3/2/2007 | 3/1/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 161.71 | 161.71 | 80.86 | 1.000 | 0.875 | $14,581 | $1,178,934 |
| WLS16528 | BLANCHE O. POULSEN | EPSILON ENERGY USA, INC. | 200709898 | 196.00-2,011.00,000 | 6/6/2007 | 6/5/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 160.86 | 160.86 | 80.43 | 1.000 | 0.875 | $14,581 | $1,172,738 |
| WLS16049 | LARRY & KEVIN HOLGATE (TIC) | EPSILON ENERGY USA, INC. | 200711601 | 222.00-3,020.02,000 | 4/12/2007 | 4/11/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | LENOX | 157.10 | 157.10 | 78.55 | 1.000 | 0.875 | $12,151 | $954,438 |
| WLS16469 | WILLIAM FASSLER | EPSILON ENERGY USA, INC. | 200708068 | 120.00-2,001.00,000 | 5/29/2007 | 4/30/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 154.25 | 154.25 | 77.13 | 1.000 | 0.875 | $14,581 | $1,124,548 |
| WLS15851 | CHARLES & LAURAN MANCUSO | EPSILON ENERGY USA, INC. | 200705022 | 195.00-1,006.01,000 | 5/1/2007 | 4/30/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 153.21 | 153.21 | 76.61 | 1.000 | 0.875 | $14,581 | $1,116,966 |
| EPS18387 | ALAN B & YVONNE M PALMER | CABOT OIL & GAS CORPORATION | 200706038 | 175-1-2 | 5/7/2007 | 5/6/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 142.00 | 142.00 | 71.00 | 1.000 | 0.875 | $14,581 | $1,035,347 |
| WLS18058 | MATTHEW J & HELEN M BARLOW | EPSILON ENERGY USA, INC. | 200800765 | 196.00-1,004.00,000 | 11/1/2007 | 10/31/2012 | $ 200.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH AUBURN | 141.20 | 141.20 | 70.60 | 1.000 | 0.875 | $14,581 | $1,029,408 |
| WLS19219 | IRA D THOMAS | EPSILON ENERGY USA, INC. | 200805853 | 021.04-1,007.01,000 | 1/22/2008 | 1/21/2013 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | APOLACON | 133.36 | 133.36 | 66.68 | 1.000 | 0.875 | $12,151 | $810,209 |
| WLS15773 | BETHAL I DODGE, ET AL | EPSILON ENERGY USA, INC. | 200705781 | 176.00-1,034.00,000 | 3/14/2007 | 3/13/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 130.00 | 130.00 | 65.00 | 1.000 | 0.875 | $14,581 | $947,755 |

Appx0349

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## REAL PROPERTY INTERESTS

### *Leases*

| Epsilon Lease Number | Lessor | Lessee | Instrument Number | Tax Parcel Number | Lease Date | Lease Expiration Date | Extension Cost Per Acre | Extension Term | Lease Royalty | State | County | Township | Gross Acres | Net Acres | Conveyed Net Acres | WI | NRI | Allocated Value Per Acre | Total Allocated Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WLS15849 | MARLENE M PECK | EPSILON ENERGY USA, INC. | 200704239 | 226.00-2,029.00,000 245.00-3,003.00,000 | 3/20/2007 | 3/19/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | CLIFFORD | 120.87 | 120.87 | 60.44 | 1.000 | 0.875 | $2,430 | $146,866 |
| WLS15711 | CHARLES M & REGINA M PIERSON | EPSILON ENERGY USA, INC. | 200704244 | 175.00-1,031.00,000 176.00-1,011.00,000 177.00-1,034.00,000 177.00-1,037.00,000 | 3/2/2007 | 3/1/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 118.31 | 118.31 | 59.16 | 1.000 | 0.875 | $14,581 | $862,530 |
| WLS17058 | MARVIN P. & WAYNE J. FRANCE | EPSILON ENERGY USA, INC. | 200709892 | 176.00-1,041.00,000 | 8/6/2007 | 8/5/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 109.30 | 109.30 | 54.65 | 1.000 | 0.875 | $14,581 | $796,843 |
| WLS18357 | ELAINE H & JOHN W HELVIG | EPSILON ENERGY USA, INC. | 200801944 | 174.00-1,016.00,000 174.00-1,017.00,000 | 11/17/2007 | 11/16/2012 | $ 225.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 108.90 | 108.90 | 54.45 | 1.000 | 0.875 | $14,581 | $793,927 |
| WLS16369 | DAVID E BALTZLEY | EPSILON ENERGY USA, INC. | 200708064 | 176.00-1,012.00,000 | 5/16/2007 | 5/15/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 107.60 | 107.60 | 53.80 | 1.000 | 0.875 | $14,581 | $784,450 |
| WLS17433 | ANTE & MIRJANA VIDAIC, ET AL | EPSILON ENERGY USA, INC. | 200712836 | 176.00-1,037.00,000 | 7/14/2007 | 7/13/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 107.40 | 107.40 | 53.70 | 1.000 | 0.875 | $14,581 | $782,992 |
| WLS15853 | DAVID E & LYNDA ROSE JUSER | EPSILON ENERGY USA, INC. | 200704241 | 176.00-1,038.00,000 | 3/21/2007 | 3/20/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 106.00 | 106.00 | 53.00 | 1.000 | 0.875 | $14,581 | $772,785 |
| WLS15771 | RANDY PIERSON | EPSILON ENERGY USA, INC. | 200704242 | 177.00-1,018.00,000 | 3/14/2007 | 3/13/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 105.00 | 105.00 | 52.50 | 1.000 | 0.875 | $14,581 | $765,495 |
| EPS18451 | NANCY WIKER & SUE KIPAR | EPSILON ENERGY USA, INC. | 200813515 | 125.00-1,009.00,000 | 3/1/2008 | 2/28/2013 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | BRIDGEWATER | 102.70 | 102.70 | 51.35 | 1.000 | 0.875 | $14,581 | $748,727 |
| WLS16315 | JONATHAN B ELLSWORTH | EPSILON ENERGY USA, INC. | 200708067 | 253.00-1,015.00,000 | 5/11/2007 | 5/10/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 100.40 | 100.40 | 50.20 | 1.000 | 0.875 | $14,581 | $731,950 |
| EPS18405 | JOHN & KIM D CANCELLIERE | CABOT OIL & GAS CORPORATION | 200710114 | 174-1-18 | 8/3/2007 | 8/2/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 92.89 | 92.89 | 46.45 | 1.000 | 0.875 | $14,581 | $677,207 |
| WLS16001 | DOBROSIELSKI, EDWARD J & MARYANNA | EPSILON ENERGY USA, INC. | 200705034 | 196.00-2,001.00,000 217.00-2,034.00,000 | 4/11/2007 | 4/10/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN SPRINGVILLE | 90.00 | 90.00 | 45.00 | 1.000 | 0.875 | $14,581 | $656,138 |
| WLS16089 | JAMES E JUSER | EPSILON ENERGY USA, INC. | 200705024 | 098.00-1,020.00,000 | 4/17/2007 | 4/16/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | MIDDLETOWN | 90.00 | 90.00 | 45.00 | 1.000 | 0.875 | $14,581 | $656,138 |
| WLS16262 | ALBERT J JR & CAROL A EFFINGER | EPSILON ENERGY USA, INC. | 200708066 | 138.00-1,038.00,000 138.00-1,047.00,000 138.00-1,040.02,000 | 4/25/2007 | 4/24/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 85.20 | 85.20 | 42.60 | 1.000 | 0.875 | $14,581 | $621,144 |
| WLS15552 | RAY M & KATHLEEN L ELLINGER | EPSILON ENERGY USA, INC. | 200703395 | 176.00-1,006.00,000 | 2/21/2007 | 2/20/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 84.29 | 84.29 | 42.15 | 1.000 | 0.875 | $14,581 | $614,510 |
| EPS18383 | RICHARD W & KAREN L SCHULZE | CABOT OIL & GAS CORPORATION | 200708615 200707233 | 174-1-21.02 174-1-21.01 | 6/2/2007 | 6/1/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH STEVENS | 83.82 | 83.82 | 41.91 | 1.000 | 0.875 | $14,581 | $611,083 |
| WLS18154 | ROLAND & RANDEL D JENNER | EPSILON ENERGY USA, INC. | 200801945 | 176.00-1,017.01,000 176.00-1,046.00,000 | 11/2/2007 | 11/1/2012 | $ 200.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 83.62 | 83.62 | 41.81 | 1.000 | 0.875 | $14,581 | $609,625 |
| EPS18418 | GARRY & NANCY BROZONIS JOHNSON | CABOT OIL & GAS CORPORATION | 200706082 | 175-1-70 175-1-63 | 4/27/2007 | 4/26/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 82.00 | 82.00 | 41.00 | 1.000 | 0.875 | $14,581 | $597,815 |
| WLS17676 | MICHAEL F & LINDA R ERAT | EPSILON ENERGY USA, INC. | 200800147 | 178.00-1,040.00,000 177.00-1,012.00,000 | 9/29/2007 | 9/28/2012 | $ 110.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 76.58 | 76.58 | 38.29 | 1.000 | 0.875 | $14,581 | $558,301 |
| WLS15998 | BRIAN & JANET FALLON | EPSILON ENERGY USA, INC. | 200705023 | 224.00-1,038.00,000 | 4/6/2007 | 4/5/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | LENOX | 73.54 | 73.54 | 36.77 | 1.000 | 0.875 | $12,151 | $446,781 |
| WLS16771 | PAUL A. & MARIANN K. JONES | EPSILON ENERGY USA, INC. | 200709894 | 157.00-1,042.00,000 | 7/17/2007 | 7/16/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 67.70 | 67.70 | 33.85 | 1.000 | 0.875 | $14,581 | $493,562 |
| WLS16137 | RICHARD HENDRICKS | EPSILON ENERGY USA, INC. | 200705030 | 156.00-1,058.00,000 | 4/16/2007 | 4/15/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 64.00 | 64.00 | 32.00 | 1.000 | 0.875 | $14,581 | $466,587 |
| WLS18156 | JAMES & JAMES A GRIFFITHS | EPSILON ENERGY USA, INC. | 200801942 | 178.00-1,021.00,000 | 11/3/2007 | 11/2/2012 | $ 200.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 60.50 | 60.50 | 30.25 | 1.000 | 0.875 | $14,581 | $441,071 |
| WLS16139 | LAWRENCE P LARUE | EPSILON ENERGY USA, INC. | 200705029 | 159.00-1,058.00,000 | 4/25/2007 | 4/24/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 58.00 | 58.00 | 29.00 | 1.000 | 0.875 | $14,581 | $422,845 |
| WLS16735 | ROBERT A. JOHNSON, JR | EPSILON ENERGY USA, INC. | 200709893 | 159.00-1,047.02,000 159.00-1,016.00,000 | 6/15/2007 | 6/14/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 57.67 | 57.67 | 28.84 | 1.000 | 0.875 | $14,581 | $420,439 |
| WLS17436 | COLIN R & DIANA L BURRIDGE | EPSILON ENERGY USA, INC. | 200800145 | 157.00-1,027.00,000 157.00-1,043.00,000 | 9/19/2007 | 9/18/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 56.13 | 56.13 | 28.07 | 1.000 | 0.875 | $14,581 | $409,212 |
| WLS16468 | RAYMOND & CHRISTINE K. POULSEN | EPSILON ENERGY USA, INC. | 200708073 | 177.00-1,026.00,000 | 6/6/2007 | 6/5/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 56.00 | 56.00 | 28.00 | 1.000 | 0.875 | $14,581 | $408,264 |
| WLS18829 | WILLIAM & SHAWN MCNEICE | EPSILON ENERGY USA, INC. | 200802015 | 216.00-1,036.00,000 216.00-1,041.00,000 161.00-1,008.00,000 | 12/21/2007 | 12/20/2012 | $ 225.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN BRIDGEWATER | 54.47 | 54.47 | 27.24 | 1.000 | 0.875 | $14,580 | $397,109 |
| WLS15850 | DAVID C JENNER | EPSILON ENERGY USA, INC. | 200704240 | 157.00-1,105.00,000 157.00-1,049.01,000 | 3/21/2007 | 3/20/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 54.23 | 54.23 | 27.12 | 1.000 | 0.875 | $14,581 | $395,360 |
| WLS16317 | MICHAEL E & LINDA M STANTON | EPSILON ENERGY USA, INC. | 200708076 | 156.00-1,077.00,000 | 5/8/2007 | 5/7/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 53.77 | 53.77 | 26.89 | 1.000 | 0.875 | $14,581 | $392,006 |
| WLS16318 | SMITH, RAYMOND LEE & DEBRA L | EPSILON ENERGY USA, INC. | 200708075 | 141.00-1,057.00,000 124.19-1,002.00,000 | 4/28/2007 | 4/27/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | BRIDGEWATER JESSUP | 52.89 | 52.89 | 26.45 | 1.000 | 0.875 | $14,581 | $385,591 |
| WLS17331 | LYNDON D LARUE ET AL | EPSILON ENERGY USA, INC. | 200712838 | 178.00-1,041.00,000 | 9/8/2007 | 9/7/2012 | $ 110.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 52.75 | 52.75 | 26.38 | 1.000 | 0.875 | $14,581 | $384,570 |
| WLS18354 | VARLEY & HILDEGARD BUCKLEY | EPSILON ENERGY USA, INC. | 200801938 | 178.00-1,033.00,000 | 11/17/2007 | 11/16/2012 | $ 235.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 52.50 | 52.50 | 26.25 | 1.000 | 0.875 | $14,581 | $382,747 |

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## REAL PROPERTY INTERESTS

### *Leases*

| Epsilon Lease Number | Lessor | Lessee | Instrument Number | Tax Parcel Number | Lease Date | Lease Expiration Date | Extension Cost Per Acre | Extension Term | Lease Royalty | State | County | Township | Gross Acres | Net Acres | Conveyed Net Acres | WI | NRI | Allocated Value Per Acre | Total Allocated Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EPS18386 | LOUISE W & NATALIE J HAWLEY | CABOT OIL & GAS CORPORATION | 200606042 | 142.04-1.001.01.000 142.02-1.016.01.000 142.02-1.026.00.000 142.02-1.018.00.000 142.02-1.020.01.000 142.04-1.001.00.000 142.02-1.016.00.000 142.02-1.018.01.000 124.17-1.038.00.000 158.00-1.017.00.000 | 2/11/2006 | 2/10/2011 | $ 25.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | BRIDGEWATER JESSUP | 52.00 | 52.00 | 26.00 | 1.000 | 0.875 | $14,581 | $379,102 |
| WLS17330 | LYNDON D & ROBEN D LARUE | EPSILON ENERGY USA, INC. | 200712837 | 178.00-1.041.01.000 | 9/8/2007 | 9/7/2012 | $ 110.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 50.09 | 50.09 | 25.05 | 1.000 | 0.875 | $14,581 | $365,177 |
| WLS18244 | CHARLES & NANCY DAVIS JR | EPSILON ENERGY USA, INC. | 200801940 | 120.00-2.004.00.000 | 11/7/2007 | 11/6/2012 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 46.91 | 46.91 | 23.46 | 1.000 | 0.875 | $14,581 | $341,994 |
| EPS18391 | JEFFREY S BECHTEL | CABOT OIL & GAS CORPORATION | 200703475 | 177-1-11 | 3/10/2007 | 3/9/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 46.26 | 46.26 | 23.13 | 1.000 | 0.875 | $14,581 | $337,255 |
| EPS18384 | STEWART BIALER & SUSAN BEGASSE | CABOT OIL & GAS CORPORATION | 200706182 | 175-1-53 175-1-8 | 5/14/2007 | 5/13/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 44.94 | 44.94 | 22.47 | 1.000 | 0.875 | $14,581 | $327,632 |
| WLS16048 | EUGENE R & ELIZABETH J HAUBER | EPSILON ENERGY USA, INC. | 200705021 | 234.00-1.031.02.000 | 4/12/2007 | 4/11/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 44.30 | 44.30 | 22.15 | 1.000 | 0.875 | $14,581 | $322,966 |
| WLS15775 | KEVIN B & ANGELA M VALVANO | EPSILON ENERGY USA, INC. | 200704236 | 235.00-2.012.00.000 | 2/28/2007 | 2/27/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | SPRINGVILLE | 42.00 | 42.00 | 21.00 | 1.000 | 0.875 | $14,581 | $306,198 |
| WLS16319 | KENNETH B & JANICE PITTMAN | EPSILON ENERGY USA, INC. | 200708072 | 176.00-1.009.00.000 | 5/7/2007 | 5/6/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 40.93 | 40.93 | 20.47 | 1.000 | 0.875 | $14,581 | $298,397 |
| WLS15553 | RODNEY & TRACY STONE | EPSILON ENERGY USA, INC. | 200703396 | 177.00-1.016.01.000 | 2/22/2007 | 2/21/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 40.00 | 40.00 | 20.00 | 1.000 | 0.875 | $14,581 | $291,617 |
| WLS16564 | PETER VAN HOESEN | EPSILON ENERGY USA, INC. | 200708078 | 177.00-1.034.01.000 | 6/9/2007 | 9/8/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 40.00 | 40.00 | 20.00 | 1.000 | 0.875 | $14,581 | $291,617 |
| WLS17036 | JOYCE R. WARNER | EPSILON ENERGY USA, INC. | 200709902 | 120.00-2.002.00.000 | 7/9/2007 | 7/8/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 153.99 | 38.50 | 19.25 | 1.000 | 0.875 | $14,581 | $280,663 |
| WLS17031 | MILDRED NEMCEK | EPSILON ENERGY USA, INC. | 200709896 | 12.00-2.002.00.000 | 7/9/2007 | 7/8/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 153.99 | 38.50 | 19.25 | 1.000 | 0.875 | $14,581 | $280,663 |
| WLS17032 | GAIL D. FERENCIK | EPSILON ENERGY USA, INC. | 200709891 | 120.00-2.002.00.000 | 7/9/2007 | 7/8/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 153.99 | 38.50 | 19.25 | 1.000 | 0.875 | $14,581 | $280,663 |
| WLS17060 | KATHY C. KOVACH | EPSILON ENERGY USA, INC. | 200709895 | 120.00-2.002.00.000 | 7/9/2007 | 7/8/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 153.99 | 38.50 | 19.25 | 1.000 | 0.875 | $14,581 | $280,663 |
| WLS18774 | ROBERT IPPOLITO | EPSILON ENERGY USA, INC. | 200802997 | 176.00-1.016.05.000 | 12/19/2007 | 12/18/2012 | $ 225.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 38.27 | 38.27 | 19.14 | 1.000 | 0.875 | $14,581 | $279,005 |
| EPS18389 | PETER BROZONIS JR | CABOT OIL & GAS CORPORATION | 200706517 | 175-1-61.00 | 4/30/2007 | 4/29/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 37.60 | 37.60 | 18.80 | 1.000 | 0.875 | $14,581 | $274,120 |
| WLS16600 | ERRICK & CATHLEEN NOLDY | EPSILON ENERGY USA, INC. | 200705025 | 195.00-2.016.01.000 | 4/10/2007 | 4/9/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 36.58 | 36.58 | 18.29 | 1.000 | 0.875 | $14,581 | $266,684 |
| WLS10285 | VINCENT & JERILYNN SCAVAZZO | EPSILON ENERGY USA, INC. | 200805705 | 44-091-00-017-000-000 44.091-0-018-000-000 | 1/24/2008 | 1/23/2018 | $ - | N/A | 0.125 | PA | BRADFORD | STEVENS | 35.00 | 35.00 | 17.50 | 1.000 | 0.875 | $14,581 | $255,165 |
| WLS19974 | JOHN A & REGINA M MCGAVIN | EPSILON ENERGY USA, INC. | 200817354 | 215.00-1.016.00.000 | 2/29/2008 | 2/28/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 34.29 | 34.29 | 17.15 | 1.000 | 0.875 | $14,581 | $249,989 |
| WLS16933 | CHARLES VULLO | EPSILON ENERGY USA, INC. | 200711600 | 195.00-1.015.00.000 | 7/26/2007 | 7/25/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 32.60 | 32.60 | 16.30 | 1.000 | 0.875 | $14,581 | $237,668 |
| EPS18399 | ANGELA VERY | EPSILON ENERGY USA, INC. | 200704448 | 177-1-29 | 3/22/2007 | 3/21/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 31.00 | 31.00 | 15.50 | 1.000 | 0.875 | $14,581 | $226,003 |
| WLS16566 | JOHN S. & MARYBETH SULLIVAN | EPSILON ENERGY USA, INC. | 200708077 | 176.00-1.016.03.000 | 6/12/2007 | 6/11/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 30.00 | 30.00 | 15.00 | 1.000 | 0.875 | $14,581 | $218,713 |
| WLS19029 | GARY BENNETT | EPSILON ENERGY USA, INC. | 200808554 | 156.00-1.002.01.000 156.00-1.075.00.000 156.00-1.084.00.000 | 1/14/2008 | 1/13/2013 | $ 400.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 25.52 | 25.52 | 12.76 | 1.000 | 0.875 | $14,581 | $186,052 |
| WLS19957 | LARRY LARUE | EPSILON ENERGY USA, INC. | 200807353 | 140.00-1.054.00.000 | 3/6/2008 | 3/5/2013 | $ 500.00 | N/A | 0.125 | PA | SUSQUEHANNA | JESSUP | 25.46 | 25.46 | 12.73 | 1.000 | 0.875 | $14,581 | $185,614 |
| WLS17913 | DENNIS H & LINDA M TALBERT | EPSILON ENERGY USA, INC. | 200800768 | 196.00-2.057.00.000 | 10/22/2007 | 10/21/2012 | $ 125.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 25.11 | 25.11 | 12.56 | 1.000 | 0.875 | $14,581 | $183,063 |
| WLS19284 | RAYMOND J & MATTIE S MAST | EPSILON ENERGY USA, INC. | 200805706 | 29-064.00-054-000-000 | 1/21/2008 | 1/20/2013 | $ 200.00 | 5YRS | 0.125 | PA | BRADFORD | PIKE | 25.00 | 25.00 | 12.50 | 1.000 | 0.875 | $14,581 | $182,261 |
| WLS16565 | ALBERT LUDWIG | EPSILON ENERGY USA, INC. | 200708071 | 196.00-2.030.00.000 | 6/14/2007 | 6/13/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 23.74 | 23.74 | 11.87 | 1.000 | 0.875 | $14,581 | $173,075 |
| EPS18398 | CHRISTOPHER & ANGIE STEPHENS | EPSILON ENERGY USA, INC. | 200706520 | 175-1-71 175-1-70.01 | 4/27/2007 | 4/26/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 65.00 | 23.00 | 11.50 | 1.000 | 0.875 | $14,581 | $167,680 |
| EPS18407 | DALE M WOLFINGER | CABOT OIL & GAS CORPORATION | 200709303 | 175-1-24 | 7/7/2007 | 7/6/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 22.80 | 22.80 | 11.40 | 1.000 | 0.875 | $14,581 | $166,222 |
| EPS18396 | ABRAHAM J PICKERING | CABOT OIL & GAS CORPORATION | 200706522 | 175-1-71 | 4/30/2007 | 4/29/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 65.00 | 21.00 | 10.50 | 1.000 | 0.875 | $14,581 | $153,099 |
| EPS18397 | ERIC P & PATRICIA A LYMAN | CABOT OIL & GAS CORPORATION | 200706521 | 175-1-71 | 4/27/2007 | 4/26/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 65.00 | 21.00 | 10.50 | 1.000 | 0.875 | $14,581 | $153,099 |
| WLS17059 | CHARLES J. & BRENDA VULLO | EPSILON ENERGY USA, INC. | 200709901 | 176.00-1.031.00.000 | 8/7/2007 | 8/6/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 20.64 | 20.64 | 10.32 | 1.000 | 0.875 | $14,581 | $150,474 |
| WLS16052 | ADA G GEHMAN | EPSILON ENERGY USA, INC. | 200705033 | 175.00-1.001.00.000 | 4/12/2007 | 4/11/2012 | $ 60.00 | 3YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 97.20 | 19.44 | 9.72 | 1.000 | 0.875 | $14,581 | $141,726 |
| WLS16053 | ERNEST GEHMAN | EPSILON ENERGY USA, INC. | 200705031 | 175.00-1.001.00.000 | 4/12/2007 | 4/11/2012 | $ 60.00 | 3YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 97.20 | 19.44 | 9.72 | 1.000 | 0.875 | $14,581 | $141,726 |
| WLS16054 | GRANT GEHMAN | EPSILON ENERGY USA, INC. | 200705026 | 175.00-1.001.00.000 | 3/30/2007 | 3/29/2012 | $ 60.00 | 3YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 97.20 | 19.44 | 9.72 | 1.000 | 0.875 | $14,581 | $141,726 |
| WLS16055 | WILLIAM H GEHMAN | EPSILON ENERGY USA, INC. | 200705028 | 175.00-1.001.00.000 | 4/4/2007 | 4/3/2012 | $ 60.00 | 3YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 97.20 | 19.44 | 9.72 | 1.000 | 0.875 | $14,581 | $141,726 |
| WLS16397 | KIMBERLY BOOZ | EPSILON ENERGY USA, INC. | 200708065 | 175.00-1.001.00.000 | 4/6/2007 | 4/5/2012 | $ 60.00 | 3YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 97.20 | 19.44 | 9.72 | 1.000 | 0.875 | $14,581 | $141,726 |
| WLS17914 | WILL TALBERT & DARCIA PACHUTA | EPSILON ENERGY USA, INC. | 200800769 | 196.00-2.008.03.000 | 10/23/2007 | 10/22/2012 | $ 125.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 19.19 | 19.19 | 9.60 | 1.000 | 0.875 | $14,581 | $139,903 |
| WLS18261 | HARRY M SUTTON | EPSILON ENERGY USA, INC. | 200801955 | 157.00-1.011.00.000 175.00-1.035.00.000 | 11/14/2007 | 11/13/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 19.00 | 19.00 | 9.50 | 1.000 | 0.875 | $14,581 | $138,518 |
| WLS18155 | RANDAL JENNER | EPSILON ENERGY USA, INC. | 200801946 | 176.00-1.018.00.000 | 11/2/2007 | 11/1/2012 | $ 200.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 18.82 | 18.82 | 9.41 | 1.000 | 0.875 | $14,581 | $137,206 |
| EPS18406 | ANTHONY S ZAMBITO | CABOT OIL & GAS CORPORATION | 200700100 | 174-1-2 | 5/22/2007 | 5/26/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 17.50 | 17.50 | 8.75 | 1.000 | 0.875 | $14,581 | $127,582 |
| EPS18411 | AMY E BURGESS | CABOT OIL & GAS CORPORATION | 200709299 | 174-1-21.03 | 7/15/2007 | 7/14/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 17.00 | 17.00 | 8.50 | 1.000 | 0.875 | $14,581 | $123,937 |
| WLS18359 | JASON D & MORGAN S JONES | EPSILON ENERGY USA, INC. | 200802999 | 157.001-078.00.000 157.00-1.095.00.000 | 11/12/2007 | 11/11/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 16.94 | 16.94 | 8.47 | 1.000 | 0.875 | $14,581 | $123,500 |
| WLS16733 | JOHN E. SNYDER | EPSILON ENERGY USA, INC. | 200709899 | 138.00-1.048.00.000 | 6/27/2007 | 6/26/2012 | $ 60.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 16.48 | 16.48 | 8.24 | 1.000 | 0.875 | $14,581 | $120,146 |

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## REAL PROPERTY INTERESTS

### *Leases*

| Epsilon Lease Number | Lessor | Lessee | Instrument Number | Tax Parcel Number | Lease Date | Lease Expiration Date | Extension Cost Per Acre | Extension Term | Lease Royalty | State | County | Township | Gross Acres | Net Acres | Conveyed Net Acres | WI | NRI | Allocated Value Per Acre | Total Allocated Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WLS16847 | WILLIAM & JEANNINE VANNORT | EPSILON ENERGY USA, INC. | 200709900 | 120.00-2,002.01.000 | 6/29/2007 | 6/28/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 16.01 | 16.01 | 8.01 | 1.000 | 0.875 | $14,581 | $116,720 |
| WLS17113 | DONALD & MARIE HARDIC | EPSILON ENERGY USA, INC. | 200711597 | 177.00-1,004.00.000 | 8/21/2007 | 8/20/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 16.00 | 16.00 | 8.00 | 1.000 | 0.875 | $14,581 | $116,647 |
| EPS18402 | RICHARD J & MARGARET BEDNARKSI | CABOT OIL & GAS CORPORATION | 200710625 | 175-1-11 | 8/14/2007 | 8/13/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 15.80 | 15.80 | 7.90 | 1.000 | 0.875 | $14,581 | $115,189 |
| WLS19635 | CHARLES & ANN NOLDY | EPSILON ENERGY USA, INC. | 200805851 | 195.00-2,016.02.000 195.00-2,021.00.000 | 2/7/2008 | 2/6/2013 | $ 500.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 15.52 | 15.52 | 7.76 | 1.000 | 0.875 | $14,581 | $113,147 |
| EPS18419 | JODI S CLARK | CABOT OIL & GAS CORPORATION | 200706171 | 175-1-43.01 | 5/3/2007 | 5/2/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 15.00 | 15.00 | 7.50 | 1.000 | 0.875 | $14,581 | $109,356 |
| WLS18906 | JOHN J JR & JEAN CAROL LINDNER | EPSILON ENERGY USA, INC. | 200803002 | 174.00-1,012.00.000 | 12/22/2007 | 12/21/2012 | $ 225.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 14.10 | 14.10 | 7.05 | 1.000 | 0.875 | $14,581 | $102,795 |
| WLS18773 | JUSTIN R LAWRENCE | EPSILON ENERGY USA, INC. | 200803000 | 216.00-1,021.00.000 216.00-1,021.02.000 | 12/21/2007 | 12/20/2012 | $ 225.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 14.00 | 14.00 | 7.00 | 1.000 | 0.875 | $14,581 | $102,066 |
| WLS17598 | WAYNE H & BELVA L VERY, TTEE | EPSILON ENERGY USA, INC. | 200712831 | 157.00-1,025.00.000 | 9/19/2007 | 9/18/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 13.57 | 13.57 | 6.79 | 1.000 | 0.875 | $14,581 | $98,931 |
| WLS18054 | ALLAN & BERNADETTE VILLENEUVE | EPSILON ENERGY USA, INC. | 200800771 | 177.00-1,006.00.000 | 10/29/2007 | 10/28/2012 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 13.07 | 13.07 | 6.54 | 1.000 | 0.875 | $14,581 | $95,286 |
| EPS18385 | FRANCES G BARBARO | CABOT OIL & GAS CORPORATION | 200706340 | 175-1-60 | 4/27/2007 | 4/26/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 12.32 | 12.32 | 6.16 | 1.000 | 0.875 | $14,581 | $89,818 |
| WLS18356 | WAYNE & LOIS P EDWARDS | EPSILON ENERGY USA, INC. | 200801941 | 156.00-1,045.03.000 | 11/16/2007 | 11/15/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 12.17 | 12.17 | 6.09 | 1.000 | 0.875 | $14,581 | $88,724 |
| WLS19026 | ROBERT E & CHERYL STEWART | EPSILON ENERGY USA, INC. | 200805856 | 215.00-1,044.00.000 | 1/15/2008 | 1/14/2013 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 12.06 | 12.06 | 6.03 | 1.000 | 0.875 | $14,581 | $87,923 |
| EPS18434 | HARRY J & BARBARA L WESTERN | EPSILON ENERGY USA, INC. | 200810149 | 177.00-1,039.00.000 | 3/10/2008 | 3/9/2013 | $ 500.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 12.00 | 12.00 | 6.00 | 1.000 | 0.875 | $14,581 | $87,485 |
| WLS18907 | ROBERT & BONNIE HAWK | EPSILON ENERGY USA, INC. | 200802996 | 174.00-1,011.00.000 | 1/2/2008 | 1/1/2013 | $ 225.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 11.70 | 11.70 | 5.85 | 1.000 | 0.875 | $14,581 | $85,298 |
| WLS19634 | JOHN W & CAROL M RICHARD | EPSILON ENERGY USA, INC. | 2008-1767 | 27-084.0-005-02-00-00 | 2/9/2008 | 2/8/2013 | $ 250.00 | 5YRS | 0.125 | PA | WYOMING | WASHINGTON | 11.57 | 11.57 | 5.79 | 1.000 | 0.875 | $14,581 | $84,350 |
| WLS18541 | RAYMOND & ALBERTA NEWHART | EPSILON ENERGY USA, INC. | 200801951 | 156.00-1,036.00.000 | 11/27/2007 | 11/26/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 11.35 | 11.35 | 5.68 | 1.000 | 0.875 | $14,581 | $82,746 |
| WLS18153 | THOMAS I & CYNTHIA L MOORE | EPSILON ENERGY USA, INC. | 200801949 | 157.00-1,030.00.000 157.00-1,092.00.000 | 10/31/2007 | 10/30/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 11.09 | 11.09 | 5.55 | 1.000 | 0.875 | $14,581 | $80,851 |
| WLS18050 | ROBERT A & CONNIE J BURRIDGE | EPSILON ENERGY USA, INC. | 200800766 | 177.00-1,042.00.000 | 10/26/2007 | 10/25/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 11.06 | 11.06 | 5.53 | 1.000 | 0.875 | $14,581 | $80,632 |
| WLS18256 | NEWHART STONE | EPSILON ENERGY USA, INC. | 200803003 | 215.00-1,003.00.000 | 11/14/2007 | 11/13/2012 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 11.00 | 11.00 | 5.50 | 1.000 | 0.875 | $14,581 | $80,195 |
| WLS18258 | STEPHEN III & BILLIE JO SHAFER | EPSILON ENERGY USA, INC. | 200801954 | 215.00-1,004.00.000 | 11/14/2007 | 11/13/2012 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 11.00 | 11.00 | 5.50 | 1.000 | 0.875 | $14,581 | $80,195 |
| EPS18392 | MICHAEL M & DARLENE J TIMEK | CABOT OIL & GAS CORPORATION | 200706339 | 175-1-23.01 | 4/26/2007 | 4/25/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 10.81 | 10.81 | 5.41 | 1.000 | 0.875 | $14,581 | $78,809 |
| EPS18390 | FRANK & LINDA M KAMARAUSKAS | CABOT OIL & GAS CORPORATION | 200707225 | 175-1-21 | 5/22/2007 | 5/24/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 10.47 | 10.47 | 5.24 | 1.000 | 0.875 | $14,581 | $76,331 |
| WLS16581 | ROBERT & DONNA L. FASSLER | EPSILON ENERGY USA, INC. | 200709890 | 120.00-1,017.00.000 | 6/26/2007 | 6/25/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | FOREST LAKE | 10.27 | 10.27 | 5.14 | 1.000 | 0.875 | $14,581 | $74,873 |
| WLS18263 | MICHAEL & KERRY DECKER | EPSILON ENERGY USA, INC. | 200800772 | 158.00-1,011.01.000 | 11/8/2007 | 11/7/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 10.00 | 10.00 | 5.00 | 1.000 | 0.875 | $14,581 | $72,904 |
| WLS18543 | SCOTT E DECKER | EPSILON ENERGY USA, INC. | 200802012 | 158.00-2,018.02.000 | 12/7/2007 | 12/6/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 10.00 | 10.00 | 5.00 | 1.000 | 0.875 | $14,581 | $72,904 |
| WLS19633 | DAVID A NEWHART | EPSILON ENERGY USA, INC. | 200807359 | 157.00-1,008.00.000 | 2/19/2008 | 2/18/2013 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 10.00 | 10.00 | 5.00 | 1.000 | 0.875 | $14,581 | $72,904 |
| EPS18393 | IRENE S LOPEZ | CABOT OIL & GAS CORPORATION | 200706174 | 174-1-5 | 5/11/2007 | 5/10/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 19.60 | 9.80 | 4.90 | 1.000 | 0.875 | $14,581 | $71,446 |
| EPS18394 | WILLIAM F MILLER | CABOT OIL & GAS CORPORATION | 200706173 | 174-1-5 | 5/11/2007 | 5/10/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 19.60 | 9.80 | 4.90 | 1.000 | 0.875 | $14,581 | $71,446 |
| WLS18535 | GERHARDT D PEDERSON | EPSILON ENERGY USA, INC. | 200801953 | 138.00-1,008.00.000 | 11/14/2007 | 11/13/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 9.80 | 9.80 | 4.90 | 1.000 | 0.875 | $14,581 | $71,446 |
| EPS18412 | FRANKLIN KAMARAUSKAS JR | CABOT OIL & GAS CORPORATION | 200707754 | 175-1-23 155-1-27 155-1-44 | 5/22/2007 | 5/21/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 8.82 | 8.82 | 4.41 | 1.000 | 0.875 | $14,581 | $64,302 |
| EPS18403 | MICHAEL A & DIANE R YANCHULIS | CABOT OIL & GAS CORPORATION | 200708121 | 174-1-9 | 6/3/2007 | 6/2/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 8.20 | 8.20 | 4.10 | 1.000 | 0.875 | $14,581 | $59,781 |
| WLS18242 | CHARLES B LITWINSKI | EPSILON ENERGY USA, INC. | 200801948 | 177.00-1,006.01.000 | 11/9/2007 | 11/8/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 8.13 | 8.13 | 4.07 | 1.000 | 0.875 | $14,581 | $59,271 |
| WLS17916 | DORA COBB | EPSILON ENERGY USA, INC. | 200800767 | 196.00-2,008.00.000 | 10/23/2007 | 10/22/2012 | $ 125.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 7.80 | 7.80 | 3.90 | 1.000 | 0.875 | $14,581 | $56,865 |
| WLS17332 | FRANCIS & PATRICIA FLYNN | EPSILON ENERGY USA, INC. | 200712834 | 157.00-1,077.00.000 | 9/10/2007 | 9/9/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 6.61 | 6.61 | 3.31 | 1.000 | 0.875 | $14,581 | $48,190 |
| EPS18448 | PAUL NEWHART JR | EPSILON ENERGY USA, INC. | 200813514 | 157.00-1,062.01.000 | 3/26/2008 | 3/25/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 5.95 | 5.95 | 2.98 | 1.000 | 0.875 | $14,581 | $43,378 |
| WLS18643 | JACK R HAGADORN | EPSILON ENERGY USA, INC. | 200801943 | 215.00-1,076.00.000 | 12/7/2007 | 12/6/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 5.86 | 5.86 | 2.93 | 1.000 | 0.875 | $14,581 | $42,722 |
| WLS18368 | PATRICIA & DAVID S FRANKS JR | EPSILON ENERGY USA, INC. | 200802994 | 158.00-1,005.00.000 158.00-1,005.01.000 | 11/28/2007 | 11/27/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 5.63 | 5.63 | 2.82 | 1.000 | 0.875 | $14,581 | $41,045 |
| EPS18481 | GEORGE H & NORMA L MCNEAL | EPSILON ENERGY USA, INC. | 200810150 | 157.00-1,062.00.000 | 3/31/2008 | 3/30/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 5.61 | 5.61 | 2.81 | 1.000 | 0.875 | $14,581 | $40,899 |
| WLS18257 | TIMOTHY D & SHERI NEWHART | EPSILON ENERGY USA, INC. | 200801952 | 196.00-2,048.01.000 | 11/14/2007 | 11/13/2012 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 5.47 | 5.47 | 2.74 | 1.000 | 0.875 | $14,581 | $39,879 |
| EPS18435 | HARRY J WESTERN | EPSILON ENERGY USA, INC. | 200810151 | 158.00-2,013.00.000 | 3/10/2008 | 3/9/2013 | $ 500.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 10.50 | 5.25 | 2.63 | 1.000 | 0.875 | $14,581 | $38,275 |
| EPS18436 | WILLIAM H REENSTRA | EPSILON ENERGY USA, INC. | 200810151 | 158.00-2,013.00.000 | 3/10/2008 | 3/9/2013 | $ 500.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 10.50 | 5.25 | 2.63 | 1.000 | 0.875 | $14,581 | $38,275 |
| WLS19218 | WAYNE & DOROTHY HIBBARD | EPSILON ENERGY USA, INC. | 200805852 | 157.00-1,068.00.000 | 1/22/2008 | 1/21/2013 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 4.79 | 4.79 | 2.40 | 1.000 | 0.875 | $14,581 | $34,921 |
| WLS16734 | DARREN & NANNETTE PETTYJOHN | EPSILON ENERGY USA, INC. | 200709897 | 139.00-1,002.01.000 | 7/2/2007 | 7/1/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 4.73 | 4.73 | 2.37 | 1.000 | 0.875 | $14,581 | $34,484 |
| WLS18643 | KELLY M BURRIDGE | EPSILON ENERGY USA, INC. | 200801939 | 158.00-2,015.00.000 | 12/7/2007 | 12/6/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 4.70 | 4.70 | 2.35 | 1.000 | 0.875 | $14,581 | $34,265 |
| WLS19972 | ROBERT GERALD & GLORIA ROGERS | EPSILON ENERGY USA, INC. | 200807356 | 196.00-2,052.00.000 | 2/29/2008 | 2/28/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 4.50 | 4.50 | 2.25 | 1.000 | 0.875 | $14,581 | $32,807 |
| WLS17912 | MARK WADDINGTON | EPSILON ENERGY USA, INC. | 200800775 | 156.00-1,042.00.000 | 10/20/2007 | 10/19/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 4.27 | 4.27 | 2.14 | 1.000 | 0.875 | $14,581 | $31,130 |
| WLS18542 | MICHAEL T MASTERS | EPSILON ENERGY USA, INC. | 200802004 | 158.00-1,006.00.000 | 12/7/2007 | 12/6/2012 | $ 250.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 4.22 | 4.22 | 2.11 | 1.000 | 0.875 | $14,581 | $30,766 |
| WLS19971 | DAWN Y CHILDRESS | EPSILON ENERGY USA, INC. | 200807355 | 196.00-1,002.00.000 | 2/27/2008 | 2/26/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 4.13 | 4.13 | 2.07 | 1.000 | 0.875 | $14,581 | $30,109 |
| EPS18409 | DALE & DEBORAH GROVER | CABOT OIL & GAS CORPORATION | 200708098 | 174-1-24 | 6/2/2007 | 6/1/2012 | $ 50.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 4.11 | 4.11 | 2.06 | 1.000 | 0.875 | $14,581 | $29,964 |
| WLS18259 | DANIEL & PATRICIA NEWHART | EPSILON ENERGY USA, INC. | 200801950 | 196.00-2,048.00.000 | 11/13/2012 | 11/12/2017 | $ 150.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 4.10 | 4.10 | 2.05 | 1.000 | 0.875 | $14,581 | $29,818 |
| WLS18544 | MICKI L HERMAN | EPSILON ENERGY USA, INC. | 200802013 | 177.00-1,005.00.000 | 12/5/2007 | 12/4/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 4.00 | 4.00 | 2.00 | 1.000 | 0.875 | $14,581 | $29,162 |
| WLS19923 | WILLIAM & ELAINE WASHER | EPSILON ENERGY USA, INC. | 200807358 | 196.00-2,008.01.000 | 2/26/2008 | 2/25/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 3.54 | 3.54 | 1.77 | 1.000 | 0.875 | $14,581 | $25,808 |
| WLS19476 | VERNON & CATHERINE L MAST | EPSILON ENERGY USA, INC. | 200805707 | 29-051.00-165.000 | 2/4/2008 | 2/3/2013 | $ 200.00 | 5YRS | 0.125 | PA | BRADFORD | PIKE | 3.31 | 3.31 | 1.66 | 1.000 | 0.875 | $14,581 | $24,131 |
| EPS18401 | ALDUS HALTEMAN | CABOT OIL & GAS CORPORATION | 200707877 | 175-1-5 | 6/14/2007 | 6/13/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 16.00 | 3.20 | 1.60 | 1.000 | 0.875 | $14,581 | $23,329 |

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## REAL PROPERTY INTERESTS

### *Leases*

| Epsilon Lease Number | Lessor | Lessee | Instrument Number | Tax Parcel Number | Lease Date | Lease Expiration Date | Extension Cost Per Acre | Extension Term | Lease Royalty | State | County | Township | Gross Acres | Net Acres | Conveyed Net Acres | WI | NRI | Allocated Value Per Acre | Total Allocated Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EPS18404 | SCOTT KRATZ | CABOT OIL & GAS CORPORATION | 200707876 | 175-1-5 | 6/14/2007 | 6/13/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 16.00 | 3.20 | 1.60 | 1.000 | 0.875 | $14,581 | $23,329 |
| EPS18408 | FLOYD KRATZ | CABOT OIL & GAS CORPORATION | 200707875 | 175-1-5 | 6/14/2007 | 6/13/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 16.00 | 3.20 | 1.60 | 1.000 | 0.875 | $14,581 | $23,329 |
| EPS18410 | ARLIN FREED | CABOT OIL & GAS CORPORATION | 200707874 | 175-1-5 | 6/14/2007 | 6/13/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 16.00 | 3.20 | 1.60 | 1.000 | 0.875 | $14,581 | $23,329 |
| EPS18414 | RONALD HALTEMAN | CABOT OIL & GAS CORPORATION | 200707878 | 175-1-5 | 6/14/2007 | 6/13/2012 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 16.00 | 3.20 | 1.60 | 1.000 | 0.875 | $14,581 | $23,329 |
| WLS18260 | DARLENE SHEFFLER | EPSILON ENERGY USA, INC. | 200802017 | 196.00-2,058.00,000 | 11/10/2007 | 11/9/2012 | $ 125.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 3.17 | 3.17 | 1.59 | 1.000 | 0.875 | $14,581 | $23,111 |
| WLS17333 | FLYNN'S STONE CASTLE | EPSILON ENERGY USA, INC. | 200712839 | 157.00-1,081.00,000 | 9/10/2007 | 9/9/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 3.05 | 3.05 | 1.53 | 1.000 | 0.875 | $14,581 | $22,255 |
| WLS18644 | DAWNNEY A TALBERT | EPSILON ENERGY USA, INC. | 200803005 | 196.00-2,055.00,000 | 12/10/2007 | 12/9/2012 | $ 125.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 2.73 | 2.73 | 1.37 | 1.000 | 0.875 | $14,581 | $19,903 |
| WLS19968 | FRANCIS D GAILER | EPSILON ENERGY USA, INC. | 200807352 | 196.00-2,054.00,000 | 3/3/2008 | 3/2/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | AUBURN | 2.55 | 2.55 | 1.28 | 1.000 | 0.875 | $14,581 | $18,591 |
| WLS19921 | WAYNE A & CYNTHIA L ROGERS | EPSILON ENERGY USA, INC. | 200704905 | 196.00-1,002.01,000 | 2/25/2008 | 2/24/2018 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 2.41 | 2.41 | 1.21 | 1.000 | 0.875 | $14,581 | $17,570 |
| WLS18546 | ELMER W JR & KAREN A RICHIE | EPSILON ENERGY USA, INC. | 200802016 | 157.00-1,102.00,000 | 12/5/2007 | 12/4/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 2.00 | 2.00 | 1.00 | 1.000 | 0.875 | $14,581 | $14,581 |
| WLS17334 | FRANCIS & PATRICIA FLYNN | EPSILON ENERGY USA, INC. | 200712835 | 138.00-1,043.00,000 | 9/10/2007 | 9/9/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 1.70 | 1.70 | 0.85 | 1.000 | 0.875 | $14,581 | $12,394 |
| WLS18052 | RICKY & ORLENE SHOEMAKER | EPSILON ENERGY USA, INC. | 200800770 | 177.00-1,003.00,000 | 10/27/2007 | 10/26/2017 | $ - | N/A | 0.125 | PA | SUSQUEHANNA | RUSH | 1.61 | 1.61 | 0.81 | 1.000 | 0.875 | $14,581 | $11,738 |
| WLS18540 | GRANT & HELEN WILBUR | EPSILON ENERGY USA, INC. | 200801957 | 158.00-2,002.00,000 158.00-2,003.00,000 | 11/2/2007 | 11/1/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | JESSUP | 1.60 | 1.60 | 0.80 | 1.000 | 0.875 | $14,581 | $11,665 |
| WLS17915 | ROBERT & DORA COBB | EPSILON ENERGY USA, INC. | 200800764 | 196.00-2,010.00,000 | 10/23/2007 | 10/22/2012 | $ 125.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | AUBURN | 1.56 | 1.56 | 0.78 | 1.000 | 0.875 | $14,581 | $11,373 |
| WLS18262 | SHARON A & JAMES D JONES | EPSILON ENERGY USA, INC. | 200801947 | 157.00-1,079.00,000 | 11/6/2007 | 11/5/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 1.44 | 1.44 | 0.72 | 1.000 | 0.875 | $14,581 | $10,498 |
| WLS18890 | DANIEL ALLEN | EPSILON ENERGY USA, INC. | 200802993 | 157.00-1,073.00,000 | 12/21/2007 | 12/20/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 1.34 | 1.34 | 0.67 | 1.000 | 0.875 | $14,581 | $9,769 |
| WLS17435 | DAVID C JENNER | EPSILON ENERGY USA, INC. | 200712832 | 157.00-1,026.00,000 | 9/19/2007 | 9/18/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 1.32 | 1.32 | 0.66 | 1.000 | 0.875 | $14,581 | $9,623 |
| WLS17434 | EARL & LORRAINE TIFFANY | EPSILON ENERGY USA, INC. | 200712833 | 157.00-1,025.01,000 | 9/18/2007 | 9/17/2012 | $ 100.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 1.11 | 1.11 | 0.56 | 1.000 | 0.875 | $14,581 | $8,092 |
| EPS18415 | JOEL THOMAS LEARN | CABOT OIL & GAS CORPORATION | 200709296 | 177-1-52 | 7/1/2007 | 6/30/2012 | $ 75.00 | 5YRS | 0.125 | PA | SUSQUEHANNA | RUSH | 0.50 | 0.50 | 0.25 | 1.000 | 0.875 | $14,581 | $3,645 |
| **TOTAL:** | | | | | | | | | | | | | 11,449.52 | 11,449.52 | 5,724.76 | | | | $82,000,000 |



# Exhibit A
# Real Property Interest
# Map of Leases

Legend
Epsilon Leasehold
State
County
District

Map Scale: 1 inch equals 4 miles
Projection: GCS NAD 1927
Date: 1/28/2010

Chesapeake ENERGY

Appx0354

**EXHIBIT "A"**

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

**REAL PROPERTY INTERESTS**

*Surface Fee Interests*

| Grantor | Grantee | Deed Date | Instrument Number | Description | State | County | Township | Surface Acres |
|---------|---------|-----------|-------------------|-------------|-------|--------|----------|---------------|
| Harold B. Oelschlager and Victoria J. Oelschlager, h&w | Epsilon Energy USA, Inc. | 7/9/2008 | 200815975 | 215.00-1,079.00,000 | PA | Susquehanna | Auburn | 1.0000 |
| Harold C. Craige and Gloria Craige, h&w | Epsilon Energy USA, Inc. | 9/17/2008 | 200815976 | 177.00-1,028.01,000 | PA | Susquehanna | Rush | 23.3700 |



# Exhibit A
# Wells, Pipelines, Taps
# and Compressor Stations

Appx0356

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## EASEMENTS

| Lease Code | Lessor | Lessee | ROW Date | Instrument Number | State | County | Township | Description |
|---|---|---|---|---|---|---|---|---|
| EPS18437 | REENSTRA, WILLIAM H | EPSILON ENERGY USA, INC. | 3/8/2008 | N/A | PA | SUSQUEHANNA | JESSUP | 158.00-2-13 |
| EPS18438 | WESTERN, HARRY | EPSILON ENERGY USA, INC. | 3/8/2008 | N/A | PA | SUSQUEHANNA | JESSUP | 158.00-2-13 |
| EPS18439 | WESTERN, HARRY J & BARBARA L | EPSILON ENERGY USA, INC. | 3/8/2008 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-39 |
| EPS18440 | POULSEN, RAYMOND & CHRISTINE | EPSILON ENERGY USA, INC. | 3/13/2008 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-26 |
| EPS18441 | ERAT, MICHAEL F & LINDA R | EPSILON ENERGY USA, INC. | 3/13/2008 | N/A | PA | SUSQUEHANNA | RUSH | 178.00-1-40 & 177.00-1-12 |
| EPS18452 | BARLOW, MATTHEW & HELEN | EPSILON ENERGY USA, INC. | 3/27/2008 | 200908941 | PA | SUSQUEHANNA | RUSH/AUBURN | 196.00-1-4 |
| EPS18453 | BRADBURY, DONALD C | EPSILON ENERGY USA, INC. | 3/31/2008 | N/A | PA | SUSQUEHANNA | AUBURN | 196.00-2-37 |
| EPS18454 | POSTEN, CARL R & DAWN | EPSILON ENERGY USA, INC. | 3/28/2008 | 200908948 | PA | SUSQUEHANNA | AUBURN | 196.00-2-13 |
| EPS18455 | LUECK, ALFRED | EPSILON ENERGY USA, INC. | 3/30/2008 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-26 |
| EPS18462 | OELSCHLAGER, HAROLD B. & VICTORIA J. | EPSILON ENERGY USA, INC. | 4/7/2008 | N/A | PA | SUSQUEHANNA | AUBURN | 215.00-1-79 |
| EPS18463 | SULLIVAN, JOHN S & MARYBETH | EPSILON ENERGY USA, INC. | 4/1/2008 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-16.03 |
| EPS18467 | FRANCE, MARVIN P & WAYNE J | EPSILON ENERGY USA, INC. | 4/25/2008 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-41 |
| EPS18468 | LARUE, LYNDON & ROBEN | EPSILON ENERGY USA, INC. | 4/30/2008 | N/A | PA | SUSQUEHANNA | RUSH | 178.00-1-41.01 |
| EPS18469 | BECHTEL, JEFFERY | EPSILON ENERGY USA, INC. | 4/28/2008 | 200819258 | PA | SUSQUEHANNA | RUSH | 177.00-1-11 |
| EPS18470 | KUNKLE, LLOYD & VERNA | EPSILON ENERGY USA, INC. | 4/28/2008 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-9 |
| EPS18471 | HARDIC, DONALD & LAWRENCE | EPSILON ENERGY USA, INC. | 4/30/2008 | 200819257 | PA | SUSQUEHANNA | RUSH | 177.00-1-22 |
| EPS18486 | IPPOLITO, ROBERT | EPSILON ENERGY USA, INC. | 4/19/2008 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-16.05 |
| EPS18492 | PIFCHO, CLARENCE & MONICA | EPSILON ENERGY USA, INC. | 6/2/2008 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-54 |
| EPS18493 | BOWEN, JOSEPH & ANN MARIE | EPSILON ENERGY USA, INC. | 5/30/2008 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-21 & 178.00-1-12 |
| EPS18498 | LEIDY, TERRANCE K & DARLENE | EPSILON ENERGY USA, INC. | 5/15/2008 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-82 & 156.00-1-79 |
| EPS18500 | BENNETT, STANLEY & JILL | EPSILON ENERGY USA, INC. | 6/24/2008 | N/A | PA | SUSQUEHANNA | RUSH | 157.00-1-69 |
| EPS18502 | KIPAR, PATRICK K | EPSILON ENERGY USA, INC. | 7/10/2008 | 200908952 | PA | SUSQUEHANNA | AUBURN | 215.00-1-12 |
| EPS18521 | KIEFER, RONALD B & LOU ANN | EPSILON ENERGY USA, INC. | 6/28/2007 | N/A | PA | SUSQUEHANNA | JESSUP | 158.00-2-16 |
| EPS18529 | LITWIN, ANTHONY P JR | EPSILON ENERGY USA, INC. | 12/10/2008 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-25 |
| EPS18533 | THE AUBURN TOWNSHIP SUPERVISORS | EPSILON ENERGY USA, INC. | 12/30/2008 | 200908943 | PA | SUSQUEHANNA | AUBURN | HIBBARD RD 318 SOUTH FROM STATE ROUTE 3004 A |
| EPS18534 | WHITE, JOHN & LOUISE | EPSILON ENERGY USA, INC. | 12/16/2008 | 200908949 | PA | SUSQUEHANNA | AUBURN | 215.00-1-19 |
| EPS18538 | BOWEN, JOHN T | EPSILON ENERGY USA, INC. | 10/6/2008 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-21 & 178.00-1-12 |
| EPS18539 | KARABIN, JOHN E & TINA L | EPSILON ENERGY USA, INC. | 2/16/2009 | N/A | PA | SUSQUEHANNA | AUBURN | 215.00-1-17 |
| EPS18540 | POULSEN, BLANCHE | EPSILON ENERGY USA, INC. | 2/26/2009 | N/A | PA | SUSQUEHANNA | AUBURN | 196.00-2-11 |
| EPS18570 | GARY, RICHARD A & ANN L | EPSILON ENERGY USA, INC. | 6/13/2009 | N/A | PA | SUSQUEHANNA | RUSH | 138.00-20.1; 139.00-1-2 |
| EPS18571 | CULVER, GERALD N & DELORES A ET AL | EPSILON ENERGY USA, INC. | 6/13/2009 | N/A | PA | SUSQUEHANNA | JESSUP/RUSH | 139.00-2-19 |
| EPS18572 | VANNORT, WILLIAM & JEANNIE | EPSILON ENERGY USA, INC. | 7/7/2009 | N/A | PA | SUSQUEHANNA | RUSH | 120.00-2-2.01 |
| EPS18574 | FASSLER, WILLIAM | EPSILON ENERGY USA, INC. | 7/19/2009 | N/A | PA | SUSQUEHANNA | JESSUP | 120.00-2-1 |
| EPS18575 | FASSLER, ROBERT J | EPSILON ENERGY USA, INC. | 7/16/2009 | N/A | PA | SUSQUEHANNA | JESSUP | 120.00-2-1 |
| EPS18576 | MCNEAL, GEORGE H. & NORMA L. | EPSILON ENERGY USA, INC. | 3/31/2008 | N/A | PA | SUSQUEHANNA | RUSH | 157.00-1-62 |
| EPS18577 | NEWHART, PAUL JR. | EPSILON ENERGY USA, INC. | 3/26/2008 | N/A | PA | SUSQUEHANNA | RUSH | 268.00-1-62.01 |
| EPS18578 | BROZONIS, ALLEN J | EPSILON ENERGY USA, INC. | 8/15/2009 | N/A | PA | SUSQUEHANNA | RUSH | 75.00-1-61 |
| EPS18579 | BURGESS, AMY E | EPSILON ENERGY USA, INC. | 8/10/2009 | N/A | PA | SUSQUEHANNA | RUSH | 174.00-1-21.03 |
| EPS18580 | BROZONIS, PETER JR | EPSILON ENERGY USA, INC. | 8/6/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-61 |
| EPS18581 | JOHNSON, GARRY & NANCY BROZONIS | EPSILON ENERGY USA, INC. | 8/10/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-63; 175.00-1-70 |
| EPS18582 | LYMAN, ERIC P & PATRICIA A | EPSILON ENERGY USA, INC. | 8/25/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-71 |

EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

**EASEMENTS**

| Lease Code | Lessor | Lessee | ROW Date | Instrument Number | State | County | Township | Description |
|---|---|---|---|---|---|---|---|---|
| EPS18583 | STEPHENS, ANGIE JEAN | EPSILON ENERGY USA, INC. | 8/25/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-71 |
| EPS18584 | PICKERING, ABRAHAM J | EPSILON ENERGY USA, INC. | 8/25/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-71 |
| EPS18595 | TROUTS, ROBERT D & MARGARET A | EPSILON ENERGY USA, INC. | 9/16/2009 | N/A | PA | SUSQUEHANNA | RUSH | 137.00-2-17 |
| EPS18596 | WALTERS, WILLIAM C & MARGARET ET AL | EPSILON ENERGY USA, INC. | 9/15/2009 | N/A | PA | SUSQUEHANNA | RUSH | 137.00-2-3 |
| WLS15624 | ELLINGER, RAY M & KATHLEEN L | EPSILON ENERGY USA, INC. | 2/21/2007 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-6 |
| WLS15625 | STONE, RODNEY & TRACY | EPSILON ENERGY USA, INC. | 2/19/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-16.01 |
| WLS15683 | MONTALBANO, PAUL G & LINDA E | EPSILON ENERGY USA, INC. | 2/23/2007 | N/A | PA | SUSQUEHANNA | RUSH/AUBURN | 156.00-1-45; 194.03-1-27 |
| WLS15710 | BOYANOWSKI, ROBERT E & BETTY J | EPSILON ENERGY USA, INC. | 3/2/2007 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-57; 157.00-1-64; 157.00-1-65; 157.00-1-67 & 176.00-1-36 |
| WLS15712 | PIERSON, CHARLES M & REGINA M | EPSILON ENERGY USA, INC. | 3/2/2007 | N/A | PA | SUSQUEHANNA | RUSH/AUBURN | 175.00-1-31; 176.00-1-11; 177.00-1-34 & 177.00-1-37 |
| WLS15772 | PIERSON, RANDY | EPSILON ENERGY USA, INC. | 3/15/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-18 |
| WLS15774 | DODGE, BETHEL I | EPSILON ENERGY USA, INC. | 3/18/2007 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-34 |
| WLS15852 | MANCUSO, CHARLES & LAURAN | EPSILON ENERGY USA, INC. | 5/1/2007 | N/A | PA | SUSQUEHANNA | LENOX | 195.00-1-6.01 |
| WLS15854 | JUSER, DAVID E & LYNDA ROSE | EPSILON ENERGY USA, INC. | 3/21/2007 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-38 |
| WLS15999 | FALLON, BRIAN & JANET | EPSILON ENERGY USA, INC. | 4/4/2007 | N/A | PA | SUSQUEHANNA | LENOX | 224.00-1-38 |
| WLS16090 | JUSER, JAMES E | EPSILON ENERGY USA, INC. | 4/17/2007 | N/A | PA | SUSQUEHANNA | MIDDLETOWN | 98.00-1-20 |
| WLS16138 | HENDRICKS, RICHARD SCOTT | EPSILON ENERGY USA, INC. | 4/16/2007 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-58 |
| WLS16186 | ROBERTSON, JAMES W & DAWN | EPSILON ENERGY USA, INC. | 5/1/2007 | N/A | PA | SUSQUEHANNA | LENOX | 261.00-1-5 & 261.00-1-38 |
| WLS16263 | EFFINGER, ALBERT J JR & CAROL ANN | EPSILON ENERGY USA, INC. | 4/25/2007 | N/A | PA | SUSQUEHANNA | RUSH | 138.00-1-38; 138.00-1-40.02 & 138.00-1-47 |
| WLS16316 | ELLSWORTH, JONATHAN B | EPSILON ENERGY USA, INC. | 5/11/2007 | N/A | PA | SUSQUEHANNA | RUSH | 253.00-1-15 |
| WLS16320 | PITTMAN, KENNETH & JANICE | EPSILON ENERGY USA, INC. | 5/7/2007 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-9 |
| WLS16330 | HALDEMAN, DAVID L | EPSILON ENERGY USA, INC. | 5/15/2007 | N/A | PA | SUSQUEHANNA | BROOKLYN | 203.00-1-7; 203.00-1-8 |
| WLS17437 | LARUE, DENNIS & VICTORIA | EPSILON ENERGY USA, INC. | 9/12/2007 | N/A | PA | SUSQUEHANNA | JESSUP/RUSH | 139.00-2-18 |
| WLS17734 | DOBROSIELSKI, EDWARD J & MARYANNA | EPSILON ENERGY USA, INC. | 10/17/2007 | N/A | PA | SUSQUEHANNA | AUBURN/SPRINGVILLE | 196.00-2-1 217.00-2-34 |
| WLS17735 | VERY, ANGELA | EPSILON ENERGY USA, INC. | 10/18/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-29 |
| WLS17736 | VAN HOESEN, PIETER D | EPSILON ENERGY USA, INC. | 10/15/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-34.01 |
| WLS17917 | JONES, PAUL & MARIANN | EPSILON ENERGY USA, INC. | 10/20/2007 | N/A | PA | SUSQUEHANNA | RUSH | 157.00-1-42 |
| WLS17918 | CRAIGE, HAROLD C | EPSILON ENERGY USA, INC. | 10/22/2007 | 200908946 | PA | SUSQUEHANNA | RUSH | 177.00-1,028.01,000 |
| WLS18051 | BURRIDGE, ROBERT A & CONNIE J | EPSILON ENERGY USA, INC. | 10/26/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-42 |
| WLS18053 | SHOEMAKER, RICKY & ORLENE | EPSILON ENERGY USA, INC. | 10/27/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-3 |
| WLS18055 | VILLENEUVE, ALLAN & BERNADETTE | EPSILON ENERGY USA, INC. | 10/29/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-6 |
| WLS18056 | HARDIC, DONALD R & MARIE J | EPSILON ENERGY USA, INC. | 10/25/2007 | 200819256 | PA | SUSQUEHANNA | RUSH | 177.00-1-4 |
| WLS18057 | KRUPINSKI, JUDY P | EPSILON ENERGY USA, INC. | 10/25/2007 | N/A | PA | SUSQUEHANNA | RUSH | 158.00-1-10 |
| WLS18060 | JENNER, DAVID & RINKER, PATRICIA | EPSILON ENERGY USA, INC. | 10/25/2007 | 200819255 | PA | SUSQUEHANNA | RUSH | 158.00-1-12 |
| WLS18061 | JENNER, DAVID C | EPSILON ENERGY USA, INC. | 10/25/2007 | N/A | PA | SUSQUEHANNA | RUSH | 157.00-1-105; 157.00-1-49.01 |
| WLS18158 | DECKER, RONALD G & BRENDA J | EPSILON ENERGY USA, INC. | 11/7/2007 | N/A | PA | SUSQUEHANNA | RUSH/JESSUP | 158.00-1-11 ; 158.00-2-23 157.00-1-13 |
| WLS18160 | DECKER, WARD & LINDA | EPSILON ENERGY USA, INC. | 11/7/2007 | N/A | PA | SUSQUEHANNA | RUSH/JESSUP | 158.00-1-11 158.00-2-18 |

Appx0358

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## EASEMENTS

| Lease Code | Lessor | Lessee | ROW Date | Instrument Number | State | County | Township | Description |
|---|---|---|---|---|---|---|---|---|
| WLS18243 | LATWINSKI, CHARLES B | EPSILON ENERGY USA, INC. | 11/9/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-6.01 |
| WLS18264 | DECKER, MICHAEL & KERRY | EPSILON ENERGY USA, INC. | 11/8/2007 | N/A | PA | SUSQUEHANNA | RUSH | 158.00-1-11.01 |
| WLS18545 | HERMAN, MICKI L | EPSILON ENERGY USA, INC. | 12/5/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-5 |
| WLS18891 | LITWIN, FREDERICK P | EPSILON ENERGY USA, INC. | 12/18/2007 | N/A | PA | SUSQUEHANNA | RUSH | 177.00-1-25.01 |
| WLS19028 | BENNETT, MILDRED | EPSILON ENERGY USA, INC. | 1/14/2008 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-2; 156.00-1-73; 156.00-1-72 & 156.00-1-16 |
| WLS19030 | BENNETT, GARY | EPSILON ENERGY USA, INC. | 1/14/2008 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-2.01; 156.00-1-75 & 156.00-1-84 |
| WLS19031 | LARUE, LARRY R | EPSILON ENERGY USA, INC. | 1/15/2008 | N/A | PA | SUSQUEHANNA | RUSH/JESSUP | 178.00-1-3; 159.00-2-1; 159.00-1-55.01; 159.00-1-57; 159.00-1-59; 159-1-61; 159.00-1-18 |
| WLS19286 | KIPAR, DAVID R & SUSAN I | EPSILON ENERGY USA, INC. | 1/29/2008 | 200908950 | PA | SUSQUEHANNA | AUBURN | 215.00-1-14 & 215.00-1-62 |
| WLS19287 | KIPAR, K PAUL & SUE | EPSILON ENERGY USA, INC. | 1/30/2008 | 200908951 | PA | SUSQUEHANNA | AUBURN | 215.00-1-62.01 & 215.00-1-62.02 |
| WLS19475 | LITWIN JR, ANTHONY P | EPSILON ENERGY USA, INC. | 12/10/2008 | 200908942 | PA | SUSQUEHANNA | RUSH | 177.00-1-25 |
| WLS19477 | TALBERT, DAWNNEY A | EPSILON ENERGY USA, INC. | 1/31/2008 | N/A | PA | SUSQUEHANNA | AUBURN | 196.00-2-55 |
| WLS19531 | LARUE, LAWRENCE P | EPSILON ENERGY USA, INC. | 2/9/2008 | N/A | PA | SUSQUEHANNA | JESSUP | 159.00-1-58 |
| WLS19534 | LARUE, LYNDON & ROBEN | EPSILON ENERGY USA, INC. | 2/12/2008 | N/A | PA | SUSQUEHANNA | RUSH | 178.00-1-41.01 |
| WLS19636 | RICHARD, JOHN W & CAROL M | EPSILON ENERGY USA, INC. | 2/9/2008 | N/A | PA | WYOMING | WASHINGTON | 27-084.0-005-02-00-00 |
| WLS19637 | NOLDY, CHARLES & ANN | EPSILON ENERGY USA, INC. | 2/7/2008 | N/A | PA | SUSQUEHANNA | AUBURN | 195.00-2-16.02 & 195.00-2-21 |
| WLS19919 | TALBERT, DENNIS H & LINDA M | EPSILON ENERGY USA, INC. | 2/26/2008 | N/A | PA | SUSQUEHANNA | RUSH | 196.00-2-57 |
| WLS19920 | ROSS, HARRY R & JUDY K | EPSILON ENERGY USA, INC. | 2/25/2008 | 200908947 | PA | SUSQUEHANNA | RUSH | 196.00-2-31 |
| WLS19922 | ROGERS, WAYNE A & CYNTHIA L | EPSILON ENERGY USA, INC. | 2/25/2008 | N/A | PA | SUSQUEHANNA | RUSH | 196.00-1-2.01 |
| WLS19924 | WASHER, WILLIAM & ELAINE | EPSILON ENERGY USA, INC. | 2/26/2008 | N/A | PA | SUSQUEHANNA | AUBURN | 196.00-2-8.01 |
| WLS19958 | LARUE, LARRY | EPSILON ENERGY USA, INC. | 3/6/2008 | N/A | PA | SUSQUEHANNA | JESSUP | 140.00-1-54 |
| WLS19967 | LUDWIG, ALBERT P | EPSILON ENERGY USA, INC. | 2/29/2008 | 200908944 | PA | SUSQUEHANNA | AUBURN | 196.00-2-30 |
| WLS19969 | GAILER, FRANCES D | EPSILON ENERGY USA, INC. | 3/3/2008 | N/A | PA | SUSQUEHANNA | AUBURN | 196.00-2-54 |
| WLS19971 | CHILDRESS, DAWN Y | EPSILON ENERGY USA, INC. | 2/27/2008 | N/A | PA | SUSQUEHANNA | RUSH | 196.00-1-2 |
| WLS19973 | ROGERS, ROBERT GERALD & GLORIA | EPSILON ENERGY USA, INC. | 2/29/2008 | N/A | PA | SUSQUEHANNA | RUSH | 196.00-2-52 |
| WLS19975 | MCGAVIN, JOHN A & REGINA M | EPSILON ENERGY USA, INC. | 2/29/2008 | 200908945 | PA | SUSQUEHANNA | AUBURN | 215.00-1-16 |
| EPS18573 | GARGES, LINFORD JR & JEANETTE J TTEES | EPSILON ENERGY USA, INC. | 7/16/2009 | N/A | PA | SUSQUEHANNA | RUSH | 137.00-2-18, 137.00-2-21 |
| EPS18600 | HALTEMAN, ALDUS ET ALS | EPSILON ENERGY USA, INC. | 11/7/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-5 |
| EPS18601 | LANDIS, GERALD D & SHIRLEY MAE | EPSILON ENERGY USA, INC. | 11/7/2009 | N/A | PA | SUSQUEHANNA | RUSH | 176.00-1-2 |
| EPS18603 | LEIDY, TERRANCE K & DARLENE | EPSILON ENERGY USA, INC. | 11/8/2009 | N/A | PA | SUSQUEHANNA | RUSH | 156.00-1-69 |
| EPS18604 | PINE HOLLOW HUNTING CLUB | EPSILON ENERGY USA, INC. | 11/10/2009 | N/A | PA | SUSQUEHANNA | RUSH | 175.00-1-4 |

# EXHIBIT "A"

Attached to and made a part of that certain Farmout Agreement by and among

Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## PERSONAL PROPERTY

| Location | Item Number | Equipment Description | Manufacturer | Serial Number | Operator | WI % |
|---|---|---|---|---|---|---|
| Tapsite | | | | | | |
| Auburn Township | 1 | Meter Skid with building, ESD valve, | Dresser | | Epsilon Energy USA | 100% |
| 536 Fannon Muldoon Rd | | 4" meter run and Senior Orifice Meter | Tyco | 37210 | Epsilon Energy USA | 100% |
| Meshoppen, PA 18630 | 2 | Positive shut-off drip | Pride of the Hills | 17425 | Epsilon Energy USA | 100% |
| | 3 | Filter Separator | AirTak | 09-015-C | Epsilon Energy USA | 100% |
| | 4 | 210 BBL Steel Tank | Westerman | 17791 | Epsilon Energy USA | 100% |
| | | | | | | |
| Compressor Site | | | | | | |
| Rush Township | 1-2 | Two Rental 1750 HP 3 stage Ariel natural gas | Natural Gas Compression | C-291 | Epsilon Energy USA | 100% |
| 1010 County Home Road | | compressors with Caterpillar Engines | | C-301 | | |
| Montrose PA 18801 | 3 | Glycol Dehydration Unit | Natco | | Epsilon Energy USA | 100% |
| | | Reboiler | | MM9M59601-01 | Epsilon Energy USA | 100% |
| | | Tower | | EL9K08801-02 | Epsilon Energy USA | 100% |
| | 4 | Filter Separator 1440 psi | AirTak | 09-014-C | Epsilon Energy USA | 100% |
| | 5 | Filter Separator 1440 psi | AirTak | 09-013-C | Epsilon Energy USA | 100% |
| | 6 | Inlet Filter Separator 500 psi | AirTak | 09-023-D | Epsilon Energy USA | 100% |
| | 7 | 210 BBL Steel Tank | Westerman | 17967 | Epsilon Energy USA | 100% |
| | 8 | 50 BBI Steel Tank | Westerman | 17843 | Epsilon Energy USA | 100% |
| | 9 | 50 BBI Steel Tank | Westerman | 17842 | Epsilon Energy USA | 100% |
| | 10 | 15RES Generator | Kohler | 2243804 | Epsilon Energy USA | 100% |
| | 11 | 4" Check Meter | R L Laughlin | 74164 | Epsilon Energy USA | 100% |
| | | | | | | |
| Compressor Site | 1 | 800' - 10" SDR-7 high density polyethylene pipe | Performance Pipe | NONE | Epsilon Energy USA | 100% |
| County Home Road | 2 | 29,000' - 8" SDR-7 high density polyethylene pipe | Performance Pipe | NONE | Epsilon Energy USA | 100% |
| Rush Township | 3 | 4" SDR 7.3 HDPE pipe; 2 rolls @ 500'/roll | | NONE | Epsilon Energy USA | 100% |
| | 4 | 2" SDR 7.3 HDPE pipe; 1 roll @ 500' plus 100' partial | | NONE | Epsilon Energy USA | 100% |
| | | | | | | |
| S&K Stone Yard | 1 | 1,580' - 18" double beveled conductor pipe | | NONE | Epsilon Energy USA | 100% |
| | 2 | 1,780' - 16", 0.25" wall double beveled conductor pipe | | NONE | Epsilon Energy USA | 100% |
| | 3 | 2,440' - 11 3/4" | | NONE | Epsilon Energy USA | 100% |
| | 4 | 80' - 9 5/8" | | NONE | Epsilon Energy USA | 100% |
| | 5 | 2,537' - 8 5/8" 24#/ft J-55 casing | | NONE | Epsilon Energy USA | 100% |
| | 6 | 3,920' - 7" 18#/ft casing | | NONE | Epsilon Energy USA | 100% |
| | 7 | 1,880' - 5 1/2", 20#/ft p-110 casing | | NONE | Epsilon Energy USA | 100% |
| | 8 | 43,860' - 4 1/2", 11.6#/ft p-110 casing | | NONE | Epsilon Energy USA | 100% |
| | 9 | 806' - 3 1/2", 9.3#/ft Hydril CS | | NONE | Epsilon Energy USA | 100% |
| | 10 | 140' - 18" rubber culverts | | NONE | Epsilon Energy USA | 100% |
| | 11 | 20' - 14" rubber culverts | | NONE | Epsilon Energy USA | 100% |
| | 12 | 7,168' - 2 3/8" 4.7#/ft T&C tubing | | NONE | Epsilon Energy USA | 100% |

**EXHIBIT "A"**

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.


## CONTRACTS

Natural Gas Compression/Rental Agreement dated 1/9/2008 by and between Natural
Gas Compression Systems, Inc. and Epsilon Energy USA, Inc.

Natural Gas Compression/Rental Agreement dated 8/7/2009 by and between Natural
Gas Compression Systems, Inc. and Epsilon Energy USA, Inc.

Facilities Agreement dated 7/15/2008 by and between Tennessee Gas Pipeline and
Epsilon Energy USA, Inc.

Master Geophysical Data-Use License Agreement dated 7/31/2009 by and between
Geophysical Pursuit, Inc. and Epsilon Energy USA, Inc.

System License Agreement dated 2/8/2009 by and between Tennessee Gas Pipeline
Company and Epsilon Energy USA, Inc.

Base Contract for Sale and Purchase of Natural Gas dated 6/15/2009 by and between
South Jersey Resources Group, LLC and Epsilon Energy USA, Inc.

Base Contract for Sale and Purchase of Natural Gas dated 4/23/2008 by and between
Integrys Energy and Epsilon Energy USA, Inc.

Guaranty dated 5/14/2008 by and between Tennessee Gas Pipeline Company and
Epsilon Energy USA, Inc.

Membership Agreement dated 9/19/2008 by and between Pennsylvania One Call
System, Inc. and Epsilon Energy USA, Inc.

Standard Service Agreement dated 9/18/2008 by and between Pennsylvania One Call
System, Inc. and Epsilon Energy USA, Inc.

Professional Services Agreement dated 8/8/2008 by and between Epsilon Energy USA,
Inc. and Science Applications International Corporation.

Consent to Partial Assignment dated 1/28/2010 from Stanley A. Bennett and Jill M.
Bennett to Epsilon Energy USA, Inc. for Epsilon Energy USA, Inc. lease number
WLS17112.

Consent to Partial Assignment dated 1/28/2010 from Larry R. Larue to Epsilon Energy
USA, Inc. for Epsilon Energy USA, Inc. lease number WLS16140.

Consent to Partial Assignment dated 1/28/2010 from Larry R. Larue to Epsilon Energy
USA, Inc. for Epsilon Energy USA, Inc. lease number WLS19957.

Consent to Partial Assignment dated 1/28/2010 from Lawrence R. Larue to Epsilon
Energy USA, Inc. for Epsilon Energy USA, Inc. lease number WLS16139.

**Exhibit "B"**

**Attached to and made a part of that certain Farmout Agreement by and between Chesapeake Appalachia, L.L.C. ("Chesapeake") and Epsilon Energy USA, Inc. ("Epsilon") (the "Agreement")**

## TAX PARTNERSHIP PROVISIONS
## OF THE
## CHESAPEAKE APPALACHIA, L.L.C. – EPSILON ENERGY USA, INC.
## TAX PARTNERSHIP

### TABLE OF CONTENTS

1. GENERAL PROVISIONS ................................................................. 3

    1.1 DESIGNATION OF DOCUMENTS. ....................................................... 3
    1.2 RELATIONSHIP OF THE PARTIES. ..................................................... 3
    1.3 PRIORITY OF PROVISIONS OF THIS EXHIBIT. ................................... 3
    1.4 SURVIVORSHIP. .............................................................................. 3

2. TAX REPORTING PARTNER AND TAX MATTERS PARTNER ................. 4

    2.1 TAX REPORTING PARTNER. ............................................................ 4

3. INCOME TAX COMPLIANCE AND CAPITAL ACCOUNTS ...................... 4

    3.1 TAX RETURNS. ............................................................................... 4
    3.2 FAIR MARKET VALUE CAPITAL ACCOUNTS. ................................... 4
    3.3 INFORMATION REQUESTS. ............................................................... 4
    3.4 BEST EFFORTS WITHOUT LIABILITY. ............................................... 4

4. TAX AND FMV CAPITAL ACCOUNT ELECTIONS. ............................... 5

    4.1 GENERAL ELECTIONS. ..................................................................... 5
    4.2 DEPLETION. ................................................................................... 5
    4.3 ELECTION OUT UNDER CODE §761(A). ............................................ 5
    4.4 CONSENT REQUIREMENTS FOR SUBSEQUENT TAX OR FMV CAPITAL ACCOUNT ELECTIONS. ........................................................................ 6

5. CAPITAL CONTRIBUTIONS AND FMV CAPITAL ACCOUNTS ................ 6

    5.1 CAPITAL CONTRIBUTIONS. .............................................................. 6
    5.2 FMV CAPITAL ACCOUNTS. ............................................................ 6

6. PARTNERSHIP ALLOCATIONS ......................................................... 7

    6.1 FMV CAPITAL ACCOUNT ALLOCATIONS. ....................................... 7
    6.2 TAX RETURN AND TAX BASIS CAPITAL ACCOUNT ALLOCATIONS. ..... 8

7. TERMINATION AND LIQUIDATING DISTRIBUTION ............................. 9

    7.1 TERMINATION OF THE PARTNERSHIP. ............................................... 9
    7.2 BALANCING OF FMV CAPITAL ACCOUNTS. ..................................... 9
    7.3 DEEMED SALE GAIN/LOSS CHARGE BACK. ..................................... 9
    7.4 NO DEFICIT RESTORATION OBLIGATION. .......................................... 9

7.5  DISTRIBUTION TO BALANCE CAPITAL ACCOUNTS. ..................................................... 9

7.6  FMV DETERMINATION. ......................................................................................... 10

7.7  FINAL DISTRIBUTION. ......................................................................................... 10

**8.    TRANSFERS, INDEMNIFICATION, AND CORRESPONDENCE ............... 10**

8.1  TRANSFER OF PARTNERSHIP INTERESTS. ................................................................ 10

8.2  CORRESPONDENCE. .............................................................................................. 10

**9.    ELECTIONS AND CHANGES TO ABOVE PROVISIONS ........................... 10**

9.1  OPERATOR NOT THE TRP. ..................................................................................... 10

9.2  SPECIAL TAX ELECTIONS. ..................................................................................... 10

9.3  CHANGE OF MAJORITY FOR OTHER TAX ELECTIONS. ............................................. 11

9.4  SPECIAL ALLOCATIONS. ....................................................................................... 11

---------------------------------

2

# TAX PARTNERSHIP PROVISIONS

## 1.    GENERAL PROVISIONS

1.1    DESIGNATION OF DOCUMENTS.  This exhibit is referred to in, and is part of, that Agreement identified above. The Agreement (including all exhibits thereto, other than this exhibit) shall be hereinafter referred to as the "Agreement;" and this exhibit is hereinafter referred to as the "Exhibit" or the "Tax Partnership Provisions" (the "TPPs"). Except as may be otherwise provided in this Exhibit, terms defined and used in the Agreement shall have the same meaning when used herein.

1.2    RELATIONSHIP OF THE PARTIES.  The parties to the Agreement shall be hereinafter referred to individually as a "Party" or collectively as the "Parties."  The Parties understand and agree that the arrangement and undertakings evidenced by the Agreement result in a partnership for purposes of Federal income taxation and certain State income tax laws which incorporate or follow Federal income tax principles as to tax partnerships. Such partnership for tax purposes is hereinafter referred to as the "Partnership."  For every other purpose of the Agreement the Parties understand and agree that their legal relationship to each other under applicable State law with respect to all property subject to the Agreement is one of tenants in common, or undivided interest owners, or lessee(s)-sublessee(s) and not a partnership; that the liabilities of the Parties shall be several and not joint or collective; and that, except as otherwise provide in the Agreement, each Party shall be responsible solely for its own obligations.

1.3    PRIORITY OF PROVISIONS OF THIS EXHIBIT.  If there is a conflict or inconsistency, whether direct or indirect, actual or apparent, between the terms and conditions of this Exhibit and the terms and conditions of the Agreement, or any other exhibit or any part thereof, the terms and conditions of this Exhibit shall govern and control.

1.4    SURVIVORSHIP.

1.4.1    Any termination of the Agreement shall not affect the continuing application of the TPPs for the termination and liquidation.

1.4.2    Any termination of the Agreement shall not affect the continuing application of the TPPs for the resolution of all matters regarding Federal and State income reporting.

1.4.3    These TPPs shall inure to the benefit of, and be binding upon, the Parties hereto and their successors and assigns.

1.4.4    The effective date of the Agreement shall be the effective date of these TPPs. The Partnership shall continue in full force and effect from, and after such date, until termination and liquidation.

3

## 2.    TAX REPORTING PARTNER AND TAX MATTERS PARTNER

2.1    TAX REPORTING PARTNER.  The Operator (or the Party listed in Section 9.1) as the Tax Reporting Partner ("TRP") is responsible for compliance with all tax reporting obligations of the Partnership.  In the event of any change in the TRP, the Party serving as TRP at the beginning of a given taxable year shall continue as TRP with respect to all matters concerning such year.  The TRP shall be the "tax matters partner," as defined in Code §6231(a) (the "TMP"), for any period during which the Partnership is subject to the TEFRA unified audit rules.  The TMP shall not agree to any extension of the statute of limitations for making assessments on behalf of the Partnership without first obtaining the written consent of all Parties.  The TMP shall not bind any other Party to a settlement agreement in tax audits without obtaining the written concurrence of any such Party.  Notwithstanding anything else in this agreement, the TRP shall make no tax filings or tax elections that would have an adverse effect on the other Party without the consent of such other Party.

## 3.    INCOME TAX COMPLIANCE AND CAPITAL ACCOUNTS

3.1    TAX RETURNS.  The TRP shall prepare and file all required Federal and State partnership income tax returns. Not less than sixty (60) days prior to the return due date (including extensions), the TRP shall submit to each Party for review a copy of the return as proposed.

3.2    FAIR MARKET VALUE CAPITAL ACCOUNTS.  The TRP shall establish and maintain for each Party fair market value ("FMV") capital accounts and tax basis capital accounts.  Upon request, the TRP shall submit to each Party along with a copy of any proposed partnership income tax return an accounting of such Party's FMV capital accounts as of the end of the return period.

3.3    INFORMATION REQUESTS.  In addition to any obligation under Section 3.2, each Party agrees to furnish to the TRP not later than ninety (90) days before the return due date (including extensions) such information relating to the operations conducted under the Agreement as may be required for the proper preparation of such returns.  Similarly, each Party agrees to furnish timely to the TRP, as requested, any information and data necessary for the preparation and/or filing of other required reports and notifications, and for the computation of the capital accounts. As provided in §6050K(c) of the Internal Revenue Code of 1986, as amended (the "Code"), a Party transferring its interest must notify the TRP to allow compliance with Code §6050K(a) (see also Section 8.1 hereof).

3.4    BEST EFFORTS WITHOUT LIABILITY.  The TRP and the other Party(ies) shall use its/their best efforts to comply with responsibilities outlined in this Section 3, and with respect to the Service as TMP as outlined Section 2.1, and in doing so shall incur no liability to any other Party.

4

**4.      TAX AND FMV CAPITAL ACCOUNT ELECTIONS**

4.1      GENERAL ELECTIONS.  For both income tax return and capital account purposes, the Partnership shall make any elections as specially noted in Section 9.2 hereof and the Partnership shall elect:

a)      to deduct when incurred intangible drilling and development costs ("IDC");

b)      to use the maximum allowable accelerated tax method and the shortest permissible tax life for depreciation;

c)      the accrual method of accounting; and

d)      to report income on a calendar year basis.

4.2      DEPLETION.  Solely for FMV capital account purposes, depletion shall be calculated by using simulated cost depletion within the meaning of Treas. Reg.§1.704-1(b)(2)(iv)(k)(2), unless the use of simulated percentage depletion is elected in Section 9.2 below.  The simulated cost depletion allowance shall be determined under the principles of Code §612 and be based on the FMV capital account basis of each Lease. Solely for purposes of this calculation, remaining reserves shall be determined consistently by the TRP.

4.3 ELECTION OUT UNDER CODE §761(a).

4.3.1   The Parties agree not to elect to be excluded from the application of Subchapter K of Chapter 1 of the Code; provided, however, the Parties agree to cooperate with each other in electing to be excluded from the application of Subchapter K of Chapter 1 of the Code if necessary to enable a Party to dispose of all or part of its interest in the leases or properties covered by the Agreement in connection with a "like kind" exchange under Code §1031. Any such election out of Subchapter K shall require the consent of both Parties.  The TRP shall notify all Parties of an intended election to be excluded from the application of Subchapter K of Chapter 1 of the Code not later than sixty (60) days prior to the filing date or the due date (including extensions) for the Federal partnership income tax return, whichever comes earlier.  Any Party that does not consent must provide the TRP with written objection within thirty (30) days of such notice.   Even after an effective election-out the TRP's rights and obligations, other than the relief from tax return filing obligations of the partnership, continue.

4.3.2   After an election-out, to avoid an unintended impairment of the election-out: The Parties will avoid, without prior coordination, any operational changes which would terminate the qualification for the election-out status; all Parties will monitor the continuing qualification of the Partnership for the election-out status and will notify the other Parties if, in their opinion, a change in operations will jeopardize the election-out; and, all Parties will use, unless

5

4.4    CONSENT REQUIREMENTS FOR SUBSEQUENT TAX OR FMV CAPITAL ACCOUNT ELECTIONS.  Unless stipulated differently in Section 9.3, future elections, in addition to or in amendment of those in this Exhibit, must be approved by the affirmative vote of two (2) or more Parties owning more than two-thirds of the working interest based upon post-payout ownership.

5.    CAPITAL CONTRIBUTIONS AND FMV CAPITAL ACCOUNTS

The provisions of this Section 5 and any other provisions of the TPPs relating to the maintenance of the capital accounts are intended to comply with Treas. Reg. §1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulations.

5.1    CAPITAL CONTRIBUTIONS.  The respective capital contributions of each Party to the Partnership shall be (a) each Party's interest in the oil and gas lease(s), including all associated lease and well equipment, committed to the Partnership, and (b) all amounts of money paid by each Party in connection with the acquisition, exploration, development, and operation of the lease(s), and all other costs characterized as contributions or expenses borne by such Party under the Agreement.  The contribution of the leases and any other properties committed to the Partnership shall be made by each Party's agreement to hold legal title to its interest in such leases or other property as nominee of the Partnership.  This Section 5.1 shall not relieve Epsilon from its obligation to assign legal title to Chesapeake pursuant to Section 6.4 of the Agreement.

5.2    FMV CAPITAL ACCOUNTS.  The FMV capital accounts shall be increased and decreased as follows:

5.2.1    The FMV capital account of a Party shall be increased by:

(i)    the amount of money and the FMV (as of the date of contribution) of any property contributed by such Party to the Partnership (net of liabilities assumed by the Partnership or to which the contributed property is subject);

(ii)    that Party's share of Partnership items of income or gain, allocated in accordance with Section 6.1 hereof; and

(iii)    that Party's share of any Code §705(a)(1)(B)item.

5.2.2    The FMV capital account of a Party shall be decreased by:

(i)    the amount of money and the FMV of property distributed to a Party (net of liabilities assumed by such Party or to which the property is subject);

(ii)    that Party's Section 6.1 allocated share of Partnership loss and deductions, or items thereof; and,

(iii)    that Party's share of any Code §705(a)(2)(B) item.

5.2.3    As provided in Treas. Reg. §1.704-1(b)(2)(iv)(e), upon distribution of Partnership property to a Party the capital accounts will be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent

6

in distributed property (not previously reflected in the capital accounts) would be allocated among the Parties if there were a disposition of such property at its FMV as of the time of distribution. Furthermore, if so agreed in Section 9.2 hereof, under the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(f), the FMV capital accounts shall be revalued at certain times to reflect value changes of the Partnership property.

## 6.    PARTNERSHIP ALLOCATIONS

6.1    FMV CAPITAL ACCOUNT ALLOCATIONS.  Each item of income, gain, loss, or deduction shall be allocated to each Party as follows:

6.1.1    Actual or deemed income from the sale, exchange, distribution or other disposition of production shall be allocated to the Party entitled to such production or the proceeds from the sale of such production.  The amount received from the sale of production and the amount of the FMV of production taken in kind by the Parties are deemed to be identical; accordingly, such items may be omitted from the adjustments made to the Parties' FMV capital accounts.

6.1.2    Exploration cost, IDC, operating and maintenance cost shall be allocated to each Party in accordance with its respective contribution to such cost.

6.1.3    Depreciation shall be allocated to each Party in accordance with its contribution to the cost of the underlying asset.

6.1.4    Simulated depletion shall be allocated to each Party in accordance with its FMV capital account adjusted basis in each oil and gas property of the Partnership, for this purpose Chesapeake's Five Million Dollar ($5,000,000) Cash Payment shall be treated as a FMV capital account adjusted basis in oil and gas property and Epsilon's Five Million Dollar ($5,000,000) cash distribution shall be treated as decrease in its FMV capital account adjusted basis in oil and gas property.

6.1.5    Loss (or simulated loss) upon the sale, exchange, distribution, abandonment or other disposition of depreciable or depletable property shall be allocated to the Parties in the ratio of their respective FMV capital account adjusted bases in the depreciable or depletable property.

6.1.6    Gain (or simulated gain) upon the sale, exchange, distribution, or other disposition of depreciable or depletable property shall be allocated to the Parties so that the FMV capital account balances of the Parties will most closely reflect their respective percentage or fractional interests as determined in the Agreement.

6.1.7    Costs or expenses of any other kind shall be allocated to each Party in accordance with its respective contribution to such costs or expense.

6.2    TAX RETURN AND TAX BASIS CAPITAL ACCOUNT ALLOCATIONS.

6.2.1    Unless otherwise expressly provided in this Section 6.2, the allocations of the Partnership's items of income, gain, loss, or deduction for tax return and tax basis capital account purposes shall follow the principles of the allocations under Section 6.1. However, the Partnership's gain or loss on the taxable disposition of a Partnership property in excess of the gain or loss under Section 6.1, if any, is allocated to the contributing Party to the extent of such Party's pre-contribution gain or loss.

6.2.2    The Parties recognize that under Code §613A(c)(7)(D) the depletion allowance is to be computed separately by each Party. For this purpose, each Party's share of the adjusted tax basis in each oil and gas property shall be equal to its contribution to the adjusted tax basis of such property, after giving effect to Chesapeake's Five Million Dollar ($5,000,000) Cash Payment and Epsilon's Five Million Dollar ($5,000,000) cash distribution.

6.2.3    Under Code §613A(c)(7)(D) gain or loss on the disposition of an oil and gas property is to be computed separately by each Party. According to Treas. Reg. §1.704-1(b)(4)(v), the amount realized shall be allocated as follows: (i) an amount that represents recovery of adjusted simulated depletion basis is allocated (without being credited to the capital accounts) to the Parties in the same proportion as the aggregate simulated depletion basis was allocated to such Parties under Section 5.2; and (ii) any remaining realization is allocated in accordance with Section 6.1.6.

6.2.4    Depreciation shall be allocated to each Party in accordance with its contribution to the adjusted tax basis of the depreciable asset.

6.2.5    In accordance with Treas. Reg. §1.1245-1(e), depreciation recapture shall be allocated, to the extent possible, among the Parties to reflect their prior sharing of the depreciation.

6.2.6    In accordance with the principles of Treas. Reg. §1.1254-5, any recapture of IDC is determined and reported by each Party separately. Similarly, any recapture of depletion shall be computed separately by each Party, in accordance with its depletion allowance computed pursuant to Section 6.2.2.

6.2.7    For Partnership properties with FMV capital account values different from their adjusted tax bases the Parties intend that the allocations described in this Section 6.2 constitute a "reasonable method" of allocating gain or loss under Treas. Reg. §1.704-3(a)(1).

6.2.8    If checked "Yes" in Section 9.2, below, each Party has the right to determine the market for its proportionate share of production. All items of income, deductions, and credits arising from such marketing of production shall be recognized by the Partnership and shall be allocated to the Party whose production is so marketed.

Appx0369

**7.     TERMINATION AND LIQUIDATING DISTRIBUTION**

7.1     TERMINATION OF THE PARTNERSHIP.

     7.1.1     Upon termination, as provided in Code §708(b)(1)(A), the business shall be wound-up and concluded, and the assets shall be distributed to the Parties as described below by the end of such calendar year (or, if later, within ninety (90) days after the date of such termination). The assets shall be valued and distributed to the Parties in the order provided in Sections 7.1.2, 7.5, and 7.7

     7.1.2     First, all cash representing unexpended contributions by any Party and any property in which no interest has been earned by any other Party under the Agreement shall be returned to the contributor.

7.2     BALANCING OF FMV CAPITAL ACCOUNTS. Second, the FMV capital accounts of the Parties shall be determined as described hereafter. The TRP shall take the actions specified under Sections 7.2 through 7.5 in order to cause the ratios of the Parties' FMV capital accounts to reflect as closely as possible their interests under the Agreement. The ratio of a Party's FMV capital account is represented by a fraction, the numerator of which is the Party's FMV capital account balance and the denominator of which is the sum of all Parties' FMV capital account balances. This is hereafter referred to as the "balancing of the FMV capital accounts" and, when completed, the FMV capital accounts of the Parties shall be referred to as "balanced."

7.3     DEEMED SALE GAIN/LOSS CHARGE BACK. The FMV of all Partnership properties shall be determined and the gain or loss for each property, which would have resulted if sold at such FMV, shall be allocated in accordance with Sections 6.1.5 and 6.1.6.

7.4     NO DEFICIT RESTORATION OBLIGATION. Notwithstanding anything to the contrary, upon a liquidation within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g), if any Party has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other FMV capital account adjustments for all years, including the year during which such liquidation occurs), such Party shall have no obligation to make any contribution so as to restore its FMV capital account to zero, and the negative balance of such Party's FMV capital account shall not be considered a debt owed by such Party to the other Party(ies), to the tax partnership, or to any other person for any purpose whatsoever, provided, however that in all events each Party shall be and remain obligated to bear and pay its applicable share of costs, expenses and charges pursuant to the applicable Joint Operating Agreement.

7.5     DISTRIBUTION TO BALANCE CAPITAL ACCOUNTS.

     7.5.1     If all Parties agree, any cash or an undivided interest in certain selected properties shall be distributed to one or more Parties as necessary for the purpose of balancing the FMV capital accounts.

7.5.2   Unless Section 7.5.1 applies, an undivided interest in each and every property shall be distributed to one or more Parties in accordance with the ratios of their FMV capital accounts.

7.6     FMV DETERMINATION.  If a property is to be valued for purposes of balancing the capital accounts and making distributions under this Section 7, the Parties must first attempt to agree on the FMV of the property; failing such an agreement, the TRP shall cause a nationally recognized independent engineering firm to prepare an appraisal of the FMV of such property.

7.7     FINAL DISTRIBUTION.  After the FMV capital accounts of the Parties have been adjusted pursuant to Sections 7.2 to 7.5, all remaining property and interests then held by the Partnership shall be distributed to the Parties in accordance with their positive FMV capital account balances.

## 8.     TRANSFERS, INDEMNIFICATION, AND CORRESPONDENCE

8.1     TRANSFER OF PARTNERSHIP INTERESTS.  Transfers of Partnership interests shall be governed by the Agreement.  A Party transferring its interest, or any part thereof, shall notify the TRP in writing within two weeks after such transfer.

8.2     CORRESPONDENCE.  All correspondence relating to the preparation and filing of the Partnership's income tax returns and capital accounts shall be sent to*:*

    a)     Chesapeake Appalachia, L.L.C.
           6100 N. Western Avenue
           Oklahoma City, OK  73118
           Phone: (405) 935-9372
           Fax: (405) 849-9372
           Attn: Greg Small, Tax Director

    b)     Epsilon Energy USA, Inc.

## 9.     ELECTIONS AND CHANGES TO ABOVE PROVISIONS

9.1     OPERATOR NOT THE TRP.  With respect to Section 2.1, (insert name of Party to be TRP instead of Operator, or indicate "N/A"):        N/A.

9.2     SPECIAL TAX ELECTIONS.  With respect to the Sections noted, the Parties agree as follows (if not applicable insert "N/A" or strike):

| With respect to Section 4.1,: | |
|---|---|
| a)   that the Partnership shall elect to account for dispositions of depreciable | **N/A** |

10

| | | |
|---|---|---|
| | assets under the general asset method to the extent permitted by Code §168(i)(4); | |
| b) | that the Partnership shall elect under Code §754 to adjust the basis of Partnership property, with the adjustments provided in Code §734 for a distribution of property and in Code §743 for a transfer of a partnership interest. In case of distribution of property the TRP shall adjust all tax basis capital accounts. In the case of a transfer of a partnership interest the acquiring party(ies) shall establish and maintain its (their) tax basis capital account(s); | √ |
| c) | that the Partnership shall elect under Code §6231 to be subject to the TEFRA rules. | **N/A** |

| | |
|---|---|
| With respect to Section 4.2, Depletion the Parties agree that the Partnership shall use simulated percentage depletion instead of simulated cost depletion. | **N/A** |
| With respect to Section 5.2.4, under the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(f) the Parties agree that the FMV capital accounts shall be revalued to reflect value changes of the Partnership property upon the occurrence of the events specified in (5)(i) through (iii) of said -1(b)(2)(iv)(f) regulations. | √ |
| With respect to Section 6.2.8, the income attributable to take-in-kind production will be reflected on the tax return. | **N/A** |

| | |
|---|---|
| With respect to Section 5.2.3 the FMV for the listed properties are determined as follows (mark as "N/A" if not applicable; use separate sheet if necessary) | |
| Property Description | **FMV** |
| Chesapeake hereby contributes the properties covered by the Agreement and more fully described in _____ by and between Chesapeake and Epsilon dated _____. | $X,XXX,XXX |
| Epsilon hereby contributes the properties covered by the Agreement and more fully described in _____ by and between Chesapeake and Epsilon dated _____. | $X,XXX,XXX |

9.3    CHANGE OF MAJORITY FOR OTHER TAX ELECTIONS.

| | |
|---|---|
| Instead of the Section 4.4 majority for other tax elections, a majority shall be considered if consisting of (specify or line out blanks) | **N/A** |

9.4    SPECIAL ALLOCATIONS.

9.4.1    Notwithstanding the provisions of Section 6, if any Party would be allocated an item of deduction or loss which would reduce its adjusted FMV capital account balance to below zero, the Party shall be allocated only the amount of such item which would reduce its adjusted FMV capital account balance to zero, and any remaining amount of such item shall be allocated to the other

11

Parties.  For purposes of this Section 9.4, a Party's "adjusted FMV capital account balance" shall be the same as the Party's FMV capital account balance, increased by the sum of (i) the amount, if any, which the Party is unconditionally obligated to contribute to the Partnership, and (ii) the amount, if any, which the Party is deemed to be obligated to contribute to the Partnership under Treasury Regulations under Code §704(b), and decreased by the adjustments, allocations and distributions described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), (5) and (6).

9.4.2    Notwithstanding the provisions of Section 6, if any Party unexpectedly receives any adjustments, allocations or distributions described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), (5) or (6), which reduces the Party's adjusted FMV capital account balance to below zero (a "Deficit Capital Account"), gross income shall be specially allocated to such Party in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the adjusted FMV capital account deficit of such Party as quickly as possible. This Section 9.4.2 is intended to constitute a "qualified income offset" provision under Treas. Reg. §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

<div align="center">THE END</div>

Appx0373

**EXHIBIT "C"**

**Attached to and made a part of that certain Farmout Agreement by and between Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.**

**ASSIGNMENT, BILL OF SALE AND CONVEYANCE**

COMMONWEALTH OF PENNSYLVANIA          )

                                                    )    §

COUNTY OF _____          )

       This Assignment, Bill of Sale and Conveyance (this "Assignment"), dated effective as of February 1, 2010 at 7:00 a.m. Central Standard Time (the "Effective Time"), is made by **Epsilon Energy USA, Inc., ,** an Ohio corporation with a notice address of 3343 State Road 3004, Meshoppen, PA 18630 ("Assignor") to **Chesapeake Appalachia, L.L.C.,** an Oklahoma limited liability company, with a notice address of P.O. Box 18496, Oklahoma City, Oklahoma 73154, ("Assignee").

       For and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby **GRANT, BARGAIN, SELL, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER** unto Assignee, subject to the terms and reservations hereof, an undivided _____ percent (__%) of Assignor's right, title and interest in and to those certain oil and gas interests located in _____ County, Pennsylvania, and described as follows (the "Properties"):

(1)    All of Assignor's right, title and interest in and to all oil, gas and mineral leases, operating rights, working interests, net revenue interests, mineral interests, royalty interests, surface fee interests, payments out of production and other similar agreements and rights, whether producing or non-producing and any other oil, gas or other leasehold or mineral rights of any type, including, without limitation those described in Exhibit "A" attached hereto and made a part hereof, any working interests and net revenue interests in the mineral interests, leasehold interests, oil and gas interests and any rights to acquire any of the foregoing interests, by contract, pooling order or otherwise (the "Real Property Interests");

(2)    All tangible personal property, equipment, inventory, spare parts, fixtures and improvements, including, without limitation, all oil and gas wells, injection wells, salt water disposal facilities, well heads, casing, tubing, pumps, motors, gauges, valves, heaters, treaters, gathering lines, flow lines, gas lines, gas processing and compression facilities, water lines, vessels, tanks, boilers, separators, fixtures, platforms, machinery, tools, treating equipment, compressors and other equipment, pipelines, power lines, telephone and communication lines, transportation and communication facilities, and other appurtenances situated upon the lands covered by the Real Property Interests or any land or lands pooled or unitized therewith or used or obtained in connection with the production, treating, storing, transportation or marketing of oil, gas and other hydrocarbons or minerals therefrom (the "Wells"), the Wells are comprised of eight (8) existing wells ('Existing Wells") listed on Exhibit "A-1", and all wells subsequently drilled on the Properties ("Future Wells");

(3)    All of Assignor's pipeline facilities servicing the Wells or the Real Property Interests (the "Pipelines"),  including without limitation, the pipelines, and associated taps described on Exhibit "A," and all leases, deeds, easements, road grants, licenses, permits, right-of-way agreements or other interests in property relating thereto;

(4)    All meters, pressure control devices and other appurtenant equipment, rights and privileges used in connection with the Wells or the Pipelines, including, without limitation, the meters identified in Exhibit "A" and all associated easements, rights-of-way, or other interests in property and facilities;

(5)    All compressors and compression stations used in connection with the Pipelines or the Wells, including, without limitation, those identified in Exhibit "A", and all software,

Appx0374

spare parts, tools, and equipment related to the operation or maintenance of the compression stations;

(6)     All presently existing unitization, pooling and/or communitization agreements, declarations or designations and statutorily, judicially or administratively created drilling, spacing and/or production units, whether recorded or unrecorded, insofar as the same are attributable or allocated to the Real Property Interests, and all of the Assignor's interest in and to the properties covered or units created thereby which are attributable to the Real Property Interests;

(7)     All presently existing and valid oil, casinghead gas and gas sales agreements, operating agreements, farmout and farmin agreements, pooling agreements, purchase agreements, exploration agreements, area of mutual interest agreements, exchange and processing contracts and agreements, partnership and joint venture agreements and any other contracts, agreements and instruments insofar as the above agreements cover, are attributable to or relate to the Real Property Interests, Wells or any interests pooled or unitized therewith including, without limitation, those contracts and agreements described on Exhibit "A" (collectively, the "Contracts");

(8)     All oil, condensate, gas, casinghead gas and other liquid or gaseous hydrocarbons ("Hydrocarbons") in, on, under or produced from the Real Property Interests or any interests pooled or unitized therewith from and after the Effective Time, except to the extent otherwise provided in that certain Farmout Agreement by and between Assignor and Assignee dated effective February 1, 2010 (the "Farmout Agreement");

(9)     All easements, permits, licenses, servitudes, rights of way and all other rights and appurtenances situated on or used in connection with the Real Property Interests, Wells or any interests pooled or unitized therewith including without limitation, those easements and rights of way described on Exhibit "A" (collectively, the "Easements");

(10)    All rights and benefits arising from or in connection with any gas production, pipeline, storage, processing or other imbalance attributable to Hydrocarbons produced from the Real Property Interests as of the Effective Time;

(11)    To the extent the same are assignable or transferable, and further to the extent the same are related to the Properties, all of the Assignor's interests in and to: (i) all orders, contracts, title opinions and documents, abstracts of title, leases, deeds, division of interest statements, participation agreements, and all other agreements and instruments, easements, rights-of-way, licenses, authorizations, permits and similar rights and interests, subject to the rights of third parties; and (ii) subject to all expenses, liabilities, third party claims and taxes, all claims, rights and causes of action including, without limitation, causes of action for breach of warranty, against third parties, asserted and unasserted, known and unknown, but only to the extent such claims, rights and causes of action are attributable to the Properties after the Effective Time, and where necessary to give effect to the assignment of such rights, claims and causes of action, the Assignor grants to the Assignee the right to be subrogated to such rights, claims and causes of action;

(12)    Copies of all files, records and data (including electronic data) including but not limited to geophysical and seismic data (to the extent assignable), lease files, land files, wells files, division order files, abstracts, title files, engineering and/or production files, maps, accounting records, and other information in the possession of the Assignor or copies thereof specifically related to the Wells and Real Property Interests, and all rights relating thereto; and

(13)    All other rights and interests in, to or under or derived from the Properties, the lands covered thereby or pooled, unitized or directly used or held for use in connection therewith.

It is the intent of Assignor to convey and this Assignment hereby conveys to Assignee, subject to any reservations and conditions herein contained, all of Assignor's right, title, and interest, from and after the Effective Time, in and to the Properties, regardless of the omission of any lease or leases, errors in description, any incorrect or misspelled names or any transcribed or incorrect recording references.

2

**TO HAVE AND TO HOLD** all and singular such Properties together with all rights, titles, interests, estates, remedies, powers and privileges thereunto appertaining unto Assignee and Assignee's successors and assigns forever; subject to the following matters:

(1)    All Lessors' royalties, overriding royalties and other burdens, reversionary interests and similar burdens as shown of record;

(2)    All easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations;

(3)    The terms and conditions of the Real Property Interests, Contracts, Easements and any other contracts, agreements and instruments affecting the Properties;

(4)    All rights reserved to or vested in any municipality or governmental, tribal, statutory or public authority to control or regulate any of the Properties in any manner, and all applicable laws, rules and orders of governmental and tribal authority.

Assignor does hereby bind itself, its heirs, successors and assigns, to warrant and forever defend all and singular title to the Properties unto Assignee, Assignee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by through or under Assignor, but not otherwise.  Assignor conveys the Properties free and clear of any outstanding mortgage, deed of trust, lien or encumbrance created by Assignor, but not otherwise.

Assignor also hereby grants and transfers to Assignee, its successors and assigns, to the extent so transferable, the benefit of, and the right to enforce, the covenants and warranties, if any, which Assignor is entitled to enforce with respect to Assignor's predecessors in title to the Properties.

Assignor retains liability and shall be responsible for, and shall defend, indemnify and hold Assignee harmless from, any and all costs, expenses, liabilities and claims arising, asserted or due prior to the Effective Time with respect to the Properties.  Assignee assumes liability and shall be responsible for, and shall defend, indemnify and hold Assignor harmless from, any and all costs, expenses, liabilities and claims arising, asserted or due after the Effective Time with respect to the Properties.  Assignee hereby assumes and shall be responsible for and comply with all duties and obligations, express or implied, arising on or after the Effective Time with respect to the Properties.

In addition to this Assignment, Assignor shall execute, acknowledge, and deliver to Assignee, in a timely manner and without further consideration, any documents or instruments that Assignee may reasonably require, including, without limitation, further assignments or conveyances required by any state or federal authority, deeds and consents to further evidence the assignment and conveyance of the Properties by Assignor to Assignee.

This Assignment is made pursuant and subject to the terms and conditions of the Farmout Agreement.  The Farmout Agreement and all of the terms and conditions thereof are hereby incorporated by reference for all purposes.

This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

This Assignment may be executed in multiple counterparts, each of which will be an original instrument, but all of which will constitute one assignment.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has executed this instrument on the date of the acknowledgment annexed hereto, but effective for all purposes as of the Effective Time.

**ASSIGNOR:**

**EPSILON ENEGY USA, INC.,** an Ohio corporation

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**CHESAPEAKE APPALACHIA, L.L.C.,** an Oklahoma limited liability company

By: _____
Name: _____
Title: _____

**ACKNOWLEDGMENT**

| | |
|---|---|
| STATE OF _____ | § |
| | § |
| COUNTY OF _____ | § |

The foregoing instrument was acknowledged before me this ___ day of _____, 2010, by (name), (title) of (corporate name), a (state of incorporation) company, as the act and deed and on behalf of such company.

_____
Notary Public in and for the State of _____

**ACKNOWLEDGMENT**

| | |
|---|---|
| STATE OF _____ | § |
| | § |
| COUNTY OF _____ | § |

The foregoing instrument was acknowledged before me this ___ day of _____, 2010, by (name), (title) of (corporate name), a (state of incorporation) company, as the act and deed and on behalf of such company.

_____
Notary Public in and for the State of _____

This instrument was prepared by:

_____
_____
_____

4

Appx0377

**SCHEDULE 3.11**

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

Natural Gas Compression/Rental Agreement dated 1/9/2008 by and between Natural
Gas Compression Systems, Inc. and Epsilon Energy USA, Inc.

Natural Gas Compression/Rental Agreement dated 8/7/2009 by and between Natural
Gas Compression Systems, Inc. and Epsilon Energy USA, Inc.

Facilities Agreement dated 7/15/2008 by and between Tennessee Gas Pipeline and
Epsilon Energy USA, Inc.

Master Geophysical Data-Use License Agreement dated 7/31/2009 by and between
Geophysical Pursuit, Inc. and Epsilon Energy USA, Inc.

System License Agreement dated 2/8/2009 by and between Tennessee Gas Pipeline
Company and Epsilon Energy USA, Inc.

Base Contract for Sale and Purchase of Natural Gas dated 6/15/2009 by and between
South Jersey Resources Group, LLC and Epsilon Energy USA, Inc.

Base Contract for Sale and Purchase of Natural Gas dated 4/23/2008 by and between
Integrys Energy and Epsilon Energy USA, Inc.

Guaranty dated 5/14/2008 by and between Tennessee Gas Pipeline Company and
Epsilon Energy USA, Inc.

Membership Agreement dated 9/19/2008 by and between Pennsylvania One Call
System, Inc. and Epsilon Energy USA, Inc.

Standard Service Agreement dated 9/18/2008 by and between Pennsylvania One Call
System, Inc. and Epsilon Energy USA, Inc.

Professional Services Agreement dated 8/8/2008 by and between Epsilon Energy USA,
Inc. and Science Applications International Corporation.

Consent to Partial Assignment dated 1/28/2010 from Stanley A. Bennett and Jill M.
Bennett to Epsilon Energy USA, Inc. for Epsilon Energy USA, Inc. lease number
WLS17112.

Consent to Partial Assignment dated 1/28/2010 from Larry R. Larue to Epsilon Energy
USA, Inc. for Epsilon Energy USA, Inc. lease number WLS16140.

Consent to Partial Assignment dated 1/28/2010 from Larry R. Larue to Epsilon Energy
USA, Inc. for Epsilon Energy USA, Inc. lease number WLS19957.

Consent to Partial Assignment dated 1/28/2010 from Lawrence R. Larue to Epsilon
Energy USA, Inc. for Epsilon Energy USA, Inc. lease number WLS16139.

# SCHEDULE 7.1.1

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

## <u>MEMORANDUM OF FARMOUT AGREEMENT</u>

THIS MEMORANDUM OF FARMOUT AGREEMENT is executed this ____ day of February, 2010, effective for all purposes as of February 1, 2010, among CHESAPEAKE APPALACHIA, L.L.C., an Oklahoma limited liability company ("Chesapeake") with an address of 6100 North Western, Oklahoma City, OK 73118, and EPSILON ENERGY USA, INC., an Ohio corporation ("Epsilon") with an address of 3343 State Road 3004, Meshoppen, Pennsylvania 18630. Chesapeake and Epsilon may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

W I T N E S S E T H:

Chesapeake and Epsilon entered into that certain Farmout Agreement dated _____ ___, 2010 (the "Agreement") pursuant to which Epsilon has agreed to farmout and convey to Chesapeake and Chesapeake has to acquire from Epsilon an undivided fifty percent (50%) interest in and to the "Properties" as defined on Schedule "1" attached hereto including, without limitation the items of Properties more particularly described on Exhibit "A" attached hereto.

The Agreement provides for the Properties to be conveyed to Chesapeake by Epsilon upon payment by Chesapeake of cash and certain Development Costs (as defined in the Agreement) for the wells to be drilled on the Properties within the time permitted by the Agreement.

The Agreement may be found at:

Chesapeake Appalachia, L.L.C.
6100 N. Western
Oklahoma City, Oklahoma 73154
Attn: Henry J. Hood
Senior Vice President – Land and Legal & General Counsel

The Parties agree that this instrument is executed to give notice of the Agreement and the rights and obligations of the Parties under the Agreement and except for such purpose all rights and obligations of Chesapeake and Epsilon under the Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Agreement.

[SIGNATURE PAGE FOLLOWS]

## SCHEDULE 7.1.1

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

IN WITNESS WHEREOF, Chesapeake and Epsilon have executed and acknowledged this
instrument effective as of the date first above written.

**CHESAPEAKE:**

**CHESAPEAKE APPALACHIA, L.L.C.**, an
Oklahoma limited liability company

By: _____
Name: _____
Title: _____

**EPSILON:**

**EPSILON ENERGY USA, INC.** an Ohio
corporation

By: _____
Name: _____
Title: _____

## SCHEDULE 7.1.1

Attached to and made a part of that certain Farmout Agreement by and among
Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C.

### <u>ACKNOWLEDGEMENTS</u>

STATE OF OKLAHOMA      §
                                       §

COUNTY OF OKLAHOMA     §

       The foregoing instrument was acknowledged before me this ____ day of _____, 20___, by _____, as _____ of Chesapeake Appalachia, L.L.C., an Oklahoma limited liability company, as the act and deed and on behalf of such limited liability company.

 

_____
Notary Public in and for the State of
Oklahoma

 

STATE OF _____ §
                                       §

COUNTY OF _____ §

       The foregoing instrument was acknowledged before me this ____ day of ____, 20___, by _____ as _____ of EPSILON ENERGY USA, INC., an Ohio corporation, as the act and deed and on behalf of such corporation.

 

_____
Notary Public in and for the State of
_____

# SCHEDULE 7.1.2

## A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

February    1,   **2010** ,
<span style="font-size:smaller">year</span>

OPERATOR    **Chesapeake Appalachia, L.L.C.**

CONTRACT AREA      **Unit**

**Township**

COUNTY OR PARISH OF   Susquehanna      STATE OF   Pennsylvania

COPYRIGHT 1989 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PETROLEUM
LANDMEN, 4100 FOSSIL CREEK BLVD.
FORT WORTH, TEXAS, 76137, APPROVED
FORM.

A.A.P.L. NO. 610 – 1989

## TABLE OF CONTENTS

Article                                                    Title                                                    Page
I.    **DEFINITIONS** ...................................................................................................1
II.   **EXHIBITS** ........................................................................................................1
III.  **INTERESTS OF PARTIES** ...........................................................................2
      A.  OIL AND GAS INTERESTS: ...................................................................2
      B.  INTERESTS OF PARTIES IN COSTS AND PRODUCTION: ..................2
      C.  SUBSEQUENTLY CREATED INTERESTS: .............................................2
IV.   **TITLES** .............................................................................................................2
      A.  TITLE EXAMINATION: ..........................................................................2
      B.  LOSS OR FAILURE OF TITLE: ...............................................................3
            1.  Failure of Title ...................................................................................3
            2.  Loss by Non-Payment or Erroneous Payment of Amount Due ...........3
            3.  Other Losses ......................................................................................3
            4.  Curing Title .......................................................................................3
V.    **OPERATOR** ....................................................................................................4
      A.  DESIGNATION AND RESPONSIBILITIES OF OPERATOR: ..................4
      B.  RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: .................4
            1.  Resignation or Removal of Operator ..................................................4
            2.  Selection of Successor Operator ........................................................4
            3.  Effect of Bankruptcy .........................................................................4
      C.  EMPLOYEES AND CONTRACTORS: .....................................................4
      D.  RIGHTS AND DUTIES OF OPERATOR: .................................................4
            1.  Competitive Rates and Use of Affiliates .............................................4
            2.  Discharge of Joint Account Obligations .............................................4
            3.  Protection from Liens .........................................................................4
            4.  Custody of Funds ...............................................................................5
            5.  Access to Contract Area and Records .................................................5
            6.  Filing and Furnishing Governmental Reports .....................................5
            7.  Drilling and Testing Operations .........................................................5
            8.  Cost Estimates ...................................................................................5
            9.  Insurance ...........................................................................................5
VI.   **DRILLING AND DEVELOPMENT** .................................................................5
      A.  INITIAL WELL: ......................................................................................5
      B.  SUBSEQUENT OPERATIONS: ...............................................................5
            1.  Proposed Operations ..........................................................................5
            2.  Operations by Less Than All Parties ..................................................6
            3.  Stand-By Costs ..................................................................................7
            4.  Deepening ..........................................................................................8
            5.  Sidetracking .......................................................................................8
            6.  Order of Preference of Operations .....................................................8
            7.  Conformity to Spacing Pattern ...........................................................9
            8.  Paying Wells ......................................................................................9
      C.  COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: ......9
            1.  Completion ........................................................................................9
            2.  Rework, Recomplete or Plug Back .....................................................9
      D.  OTHER OPERATIONS: ...........................................................................9
      E.  ABANDONMENT OF WELLS: ................................................................9
            1.  Abandonment of Dry Holes ...............................................................9
            2.  Abandonment of Wells That Have Produced .....................................10
            3.  Abandonment of Non-Consent Operations .........................................10
      F.  TERMINATION OF OPERATIONS: .........................................................10
      G.  TAKING PRODUCTION IN KIND: ..........................................................10
            (Option 1) Gas Balancing Agreement ....................................................10
            ~~(Option 2) No Gas Balancing Agreement~~ ...........................................11
VII.  **EXPENDITURES AND LIABILITY OF PARTIES** ..........................................11
      A.  LIABILITY OF PARTIES: ........................................................................11
      B.  LIENS AND SECURITY INTERESTS: ......................................................12
      C.  ADVANCES: ...........................................................................................12
      D.  DEFAULTS AND REMEDIES: ..................................................................12
            1.  Suspension of Rights ..........................................................................13
            2.  Suit for Damages ...............................................................................13
            3.  Deemed Non-Consent .........................................................................13
            4.  Advance Payment ...............................................................................13
            5.  Costs and Attorneys' Fees ..................................................................13
      E.  RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: ...13
      F.  TAXES: ...................................................................................................13
VIII. **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** ...............14
      A.  SURRENDER OF LEASES: ......................................................................14
      B.  RENEWAL OR EXTENSION OF LEASES: ...............................................14
      C.  ACREAGE OR CASH CONTRIBUTIONS: ................................................14

## TABLE OF CONTENTS

D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ........................................... 15
E. WAIVER OF RIGHTS TO PARTITION: .................................................................... 15
F. PREFERRENTIAL RIGHT TO PURCHASE: ............................................................. 15
IX. **INTERNAL REVENUE CODE ELECTION** ............................................................. 15
X. **CLAIMS AND LAWSUITS** ..................................................................................... 15
XI. **FORCE MAJEURE** ................................................................................................ 16
XII. **NOTICES** ............................................................................................................... 16
XIII. **TERM OF AGREEMENT** ...................................................................................... 16
XIV. **COMPLIANCE WITH LAWS AND REGULATIONS** ........................................... 16
A. LAWS, REGULATIONS AND ORDERS: ................................................................. 16
B. GOVERNING LAW: ............................................................................................... 16
C. REGULATORY AGENCIES: .................................................................................. 16
XV. **MISCELLANEOUS** ............................................................................................... 17
A. EXECUTION: ......................................................................................................... 17
B. SUCCESSORS AND ASSIGNS: ............................................................................ 17
C. COUNTERPARTS: ................................................................................................. 17
D. SEVERABILITY ..................................................................................................... 17
XVI. **OTHER PROVISIONS** ........................................................................................... 17

Appx0384

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

<div align="center">

**OPERATING AGREEMENT**

</div>

THIS AGREEMENT, entered into by and between ___Chesapeake Appalachia, L.L.C._____,

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes

hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

<div align="center">

**WITNESSETH:**

</div>

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land

identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil

and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

<div align="center">

**ARTICLE I.**

**DEFINITIONS**

</div>

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A.    The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of an

AFE for the drilling of a vertical or horizontal well must be prepared in compliance with Article XVI hereof, incurred in conducting and

estimating the costs to be operation hereunder.

B.    The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and

Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production

testing conducted in such operation.

C.    The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be

developed and operated for Oil and Gas purposes under this agreement.    Such lands, Oil and Gas Leases and Oil and Gas

Interests are described in Exhibit "A."

D.    The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest

Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the

lesser.

E.    The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the

cost of any operation conducted under the provisions of this agreement.

F.    The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal

body having authority.    If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as

established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties. **The Drilling Unit for a**

**horizontal well shall be determined by the Operator in consultation with Non-Operator, and conform with**

**any restrictions in the agreement or conveyances creating the Oil and Gas Interests to be included in the Drilling Unit and**

**applicable laws and be formed in such size and shape as needed to  maximize the recovery of oil and gas through the use of multiple**

**laterals.**

G.    The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be

located.

**G.1   The term "Force Majeure"  shall mean anything act or occurrence beyond a party's control that delays  or prohibits**

**performance of any operation contemplated hereunder, including but not limited to the building of surface location, the drilling**

**completion or operating of a well, laying pipeline  or other physical operation. Force Majeure events include but are not limited to**

**Acts of God, inclement weather, governmental action or intervention, changes in existing laws or enforcement of existing laws and**

**permitting delays.**

H.  The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

I.    The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as

provided in Article VI.B.2.

J.    The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a

proposed operation.

K.    The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous

hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is

specifically stated.

L.    The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts

<div align="center">

2

</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of land lying within the Contract Area which are owned by parties to this agreement.

M.    The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N.    The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O.    The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P.    The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore.  Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q.    The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R.    The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

<div align="center">

**ARTICLE II.**

**EXHIBITS**

</div>

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

    x    A.  Exhibit "A," shall include the following information:

    (1) Description of lands subject to this agreement,

    (2) Restrictions, if any, as to depths, formations, or substances,

    (3) Parties to agreement with addresses and telephone numbers for notice purposes,

    (4) Percentages or fractional interests of parties to this agreement,

    (5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,

    (6) Burdens on production. (7) Plat of Contract Area

    x    B.  Exhibit "B," Form of Lease.

    x    C.  Exhibit "C," Accounting Procedure.

    x    D.  Exhibit "D," Insurance.

    x    E.  Exhibit "E," Gas Balancing Agreement.

    x    F.  Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

    x    G.  Exhibit "G**," Recording Supplement to Operating Agreement and Financing Statement.**

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

<div align="center">

**ARTICLE III.**

**INTERESTS OF PARTIES**

</div>

**A.  Oil and Gas Interests:**

                **or acquires**

If any party owns / an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B.  Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their

<div align="center">3</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens **shall** be payable **by Operator, and Operator** shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area**, provided Non-Operator elects to market its Oil and Gas with Operator under Operator's standard marketing letter agreement if Non-Operator elects to take its Gas in kind and separately market, then it shall bear and pay its proportionate share of all royalties and Operator shall have no obligation to distribute such burdens on behalf of Non-Operator.** . If any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden.  However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefore.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest."  Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party.  If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**

**TITLES**

**A. Title Examination:**

**Completed on the Drillsite tract and on all tracts in the well bore path in the Drilling Unit          unless otherwise agreed upon by the parties.**

Title examination shall be ~~/ made on the Drillsite of any proposed well~~ prior to commencement of drilling operations / ~~and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well~~.  The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases.     Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator

4

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid **title agents and** attorneys for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Each party~~ Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by ~~such /~~ each party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to    attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

1. Underline{Failure of Title}: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received

5

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. <u>Loss by Non-Payment or Erroneous Payment of Amount Due</u>: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment.   Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. <u>Other Losses</u>: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A."  This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended.   There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. <u>Curing Title</u>: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

**ARTICLE V.**

6

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**OPERATOR**

**A. Designation and Responsibilities of Operator:**

    Chesapeake Appalachia, L.L.C.        shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement.  In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement.  Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party.  Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

    1.  Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators.  If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice.  For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

    Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a **Non-Operator.  A change of a corporate name or structure of Operator or transfer of all of Operator's interest (including operatorship)/ to any single   Failure of Operator to provide proof, reasonably satisfactory to Non-Operator(s), of the proposed entity's financial subsidiary, parent or successor corporation shall not be the basis for removal of Operator. / capability to conduct operations shall entitle Non-Operator(s) to prevent said transfer.**

    2.  Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected.  The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned.  The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator.  Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint **account.**

    3.  Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor.  If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor.  During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A."  In

7

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. <u>Competitive Rates and Use of Affiliates:</u> All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area.  If it so desires, Operator may employ its own tools and equipment, **in conducting operations hereunder** but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature.  All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in  the industry.

2. <u>Discharge of Joint Account Obligations:</u> Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the  Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. <u>Custody of Funds:</u> Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B.  Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided.  Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. <u>Access to Contract Area and Records:</u> Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto.  Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information.  Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

8

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder, including but not limited to the Initial Well:

(a) Operator will promptly advise / ~~Non-Operators~~ **Consenting Party** of the date on which the well is spudded, or the date on which drilling operations are commenced.

(b) Operator will send to / ~~Non-Operators~~ **Consenting Party all** such reports, test results and notices regarding the progress of operations on the well including, but not limited to, daily drilling reports, completion reports, and well logs. **Consenting Party will provide Operator a distribution list of data to be sent, in the form of a well requirement sheet**

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith. **This provision is made expressly subject to Article XVI.P, below.**

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**

**DRILLING AND DEVELOPMENT**

.

**Operations in the Contract Area:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance.   If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made.   Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2.  Operations by Less Than All Parties:

<p style="text-align:center">to Rework, Sidetrack, Deepen, Recomplete or Plug Back</p>

(a)  Determination of Participation.  If any party to whom such notice / is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work.   The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party.   Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed.   Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take.   Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal.  Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays).   The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties

<p style="text-align:center">10</p>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph.  Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties.  If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties.  If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties.  Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1.  Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate.  Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i)    200    % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that **proposed well or operation** interest which would have been chargeable to such Non-Consenting Party had it participated in the / ~~well~~ from the beginning of the operations; and

(ii)    400 *    % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and 400%_* of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated there**in.  If the well to be drilled is the initial well in the Drilling Unit, the penalties in this subparagraph (ii) shall be 600/600% in lieu of 400//400%.**

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a).  If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

11

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

(c) <u>Reworking, Recompleting or Plugging Back.</u> An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties ___400___% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) <u>Recoupment Matters.</u> During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. <u>Stand-By Costs:</u> When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise

12

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the

13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have ~~fifteen (15)~~ / thirty (30) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required **Except as provided for in Article XVI.A, the** shall be deemed not to have voted. / ~~The~~ proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

C. Completion of Wells; Reworking and Plugging Back:

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include: **For (1) all horizontal wells in the Marcellus Shale formation and (2) all other horizontal wells with respect to which Non-Operator does not elect Option No. 2 all**

☒ Option No. 1: / ~~All~~ necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.
**For (1) all vertical wells and (2) all horizontal wells not in the Marcellus Shale formation with respect to which Non-Operator elects Option No. 2 contemporaneously with Non-Operator making its initial election to participate in a proposed drilling operations, all                     if applicable Operator shall revise the AFE to reflect Non-Operator's election.**

☒ Option No. 2: ~~All~~ / necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. / When

14

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results

thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to **or to perform another operation described in Article XVI.A.,** participate in a Completion attempt whether or not Operator recommends attempting to Complete the well; / **the costs of the operation**

together with Operator's AFE for ~~Completion costs~~ / if not previously provided. The parties receiving such notice shall have

forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of

notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an

accompanying AFE.  Operator shall deliver any such Completion proposal, or any Completion proposal conflicting

with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the

procedures specified in Article VI.B.6.  Election to participate in a Completion attempt shall include consent to all

necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface

facilities but excluding any stimulation operation not contained on the Completion AFE.   Failure of any party

receiving such notice to reply within the period above fixed shall constitute an election by that party <u>not</u> to

participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of

conflicting Completion proposals.  If one or more, but less than all of the parties, elect to attempt a Completion, the

provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging

Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations

thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each

separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting

Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party

in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier

Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any

recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in

which the Completion attempt is made.  Election by a previous Non-Consenting party to participate in a subsequent

Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable

materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt,

insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a

Completion attempt.

2. <u>Rework, Recomplete or Plug Back:</u> No well shall be Reworked, Recompleted or Plugged Back except a well Reworked,

Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement.  Consent to the Reworking,

Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and

Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of _____

 **Fifty** Thousand & No/100_____ Dollars ($__**50,000.00**_____) except in connection with the

drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously

authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden

emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion

are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the

emergency to the other parties.  If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so

requesting an information copy thereof for any single project costing in excess of __**Fifty** Thousand & No/100_____ Dollars

($__**50,000.00**_____).  Any party who has not relinquished its interest in a well shall have the right to propose that

Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as

salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but

not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall

be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the

amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under

Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles).  Operator shall deliver such

15

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least _____50_____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

    1. <u>Abandonment of Dry Holes:</u> Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

    2. <u>Abandonment of Wells That Have Produced:</u> Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

        Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form

16

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

attached as Exhibit "B."  The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located.  The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees.  There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article.  Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.  Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. <u>Abandonment of Non-Consent Operations:</u> The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F.  Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing ____**50**____% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G.  Taking Production in Kind:**

☒ <u>**Option No. 1: Gas Balancing Agreement Attached**</u>

Each party ~~shall~~ / <sup>may</sup> take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost.  Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party.  Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party.  Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser.  Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

17

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

<center>EXPENDITURES AND LIABILITY OF PARTIES</center>

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform

<center>18</center>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefore by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month.

19

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received.  If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.  Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D.  Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable.  For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator.  Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1.  <u>Suspension of Rights:</u> Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement.  If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately.  The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2.  <u>Suit for Damages:</u> Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto.  Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3.  <u>Deemed Non-Consent:</u> The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default.  Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4.  <u>Advance Payment:</u> If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may

20

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

21

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto.  Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice.  If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender.  If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article.  The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage.  The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface.  If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit.  If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties.  If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease.  The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area.  Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease.  The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by

22

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

the expiring Lease or cover only a portion of its area or an interest therein.  Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation  /  . so that each Drilling Party receives its pro rata share of such contribution.  If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement.  Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area.  The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee.  No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F.** Preferential Right to Purchase:

**X**   **(Optional; Check if applicable.)**

**From and after the payment of the Farmout Consideration payable unto the parties' Farmout Agreement, dated February 1, 2001, should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase**

23

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

<center>~~ARTICLE IX.~~</center>

<center>~~INTERNAL REVENUE CODE ELECTION~~</center>

~~If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.~~

<center>**ARTICLE X.**</center>

<center>**CLAIMS AND LAWSUITS**</center>

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed    **Fifty Thousand and No/100**                     Dollars ($ **50,000.00**          ) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises.  If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations **ARTICLE XI.**

<center>**FORCE MAJEURE**</center>

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure.  The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

<center>24</center>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ARTICLE XII.**

**NOTICES**

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.

**ARTICLE XIII.**

**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ ~~Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.~~

☒ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of ___90___ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____90_____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of ~~180~~ / **90** days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

**ARTICLE XIV.**

**COMPLIANCE WITH LAWS AND REGULATIONS**

25

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ___Texas_____ shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence.  Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

<div align="center">

**ARTICLE XV.**

**MISCELLANEOUS**

</div>

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations.  In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination.  In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest.  In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

<div align="center">26</div>

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**ARTICLE XVI.**

**OTHER PROVISIONS**

**A.    Well Proposal Requirements and Order of Preference of Operations:**

1.   **(a)  Requirements of Vertical Well Proposal: A proposal for a vertical well operation shall include the following:**

**(1)  the estimated commencement date;**

**(2)  the proposed depth;**

**(3)  the objective formation or formations to be penetrated or tested:**

**(4)  the Authorized Depth, the surface and bottomhole locations, proposed directional operations; and**

**(5)  the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, or abandoning the well, itemization of all tangible and intangible costs. Operator's estimate of Completion costs should be included as an informational item.**

**(b)  Order of Preference of Operations - Vertical Well: The term "Authorized Depth" is the objective depth authorized in the AFE for vertical wells.  Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a vertical well has been drilled to the Authorized Depth, and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in order enumerated hereafter:**

**(1)  a proposal to do additional logging, coring or testing;**

**(2)  a proposal to attempt to Complete the well at the Authorized Depth in the manner set forth in the Operator's**

**AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);**

**(3)  a proposal to attempt to Complete the well at the Authorized Depth in a manner different than as set forth in the Operator's AFE for Completion;**

**(4)  a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Depth, with priority given to objectives in ascending order up the hole;**

**(5)  a proposal to drill the well to a depth below the Authorized Depth, with priority given to objectives in descending order;**

**(6)  a proposal to Sidetrack the well to a new target objective for a vertical or deviated hole, but not a horizontal well or lateral drain hole, with the priority given first in ascending order to targets above the Authorized Depth, and then in descending order to targets below the Authorized Depth;**

**(7)  a proposal to Sidetrack to a horizontal well or lateral drain hole, with priority given to a lateral drain hole at the Authorized Depth, and then to objectives in ascending order above the Authorized Depth, and then to objectives in descending order below the Authorized Depth; and**

**(8)  plugging and abandoning the well.**

2.   **(a)   Requirements of Horizontal Well Proposal:  A proposal for a horizontal well operation shall include the following:**

**(1)  the estimated commencement date;**

**(2)  the proposed depth;**

**(3)  the objective formation or formations to be penetrated or tested;**

**(4)  the Authorized Objective, the surface and bottomhole locations, proposed directional operations; and**

**(5)  the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well.  Operator's estimate of Completion costs should be included as an informational item.**

**(b)   Order of Preference of Operations – Horizontal Well:  The term "Authorized Objective" is the agreed upon length of the lateral drain hole for the horizontal well(s) as authorized in the AFE.  Notwithstanding anything contained herein to the contrary, in the event that competing proposals are received when a well authorized under the terms of this agreement as a horizontal well has been drilled to the Authorized Objective and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the**

27

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter:

(1) a proposal to do additional logging, coring or testing;

(2) a proposal to attempt to Complete the well at the Authorized Objective in the manner set forth in the Operator's AFE for Completion (i.e., in accordance with the casing, stimulation, and other Completion programs set forth in the AFE);

(3) a proposal to attempt to Complete the well at the Authorized Objective in a manner different than as set forth in the Operator's AFE for Completion;

(4) a proposal to extend the length of the lateral drain hole for specified number of feet in the direction it is drilling, with a priority given to the shortest additional length proposed by any of the participating parties;

(5) a proposal to drill a new lateral drain hole in a different direction at the Authorized Objective;

(6) a proposal to drill a new later drain hole at a different depth, with priority given in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective;

(7) a proposal to Plug Back and attempt to Complete the well at a depth shallower than the Authorized Objective with priority given to the objectives in ascending order up the hole;

(8) a proposal to Deepen the well below the Authorized Objective;

(9) a proposal to Sidetrack the well to a new target objective, with priority given first in ascending order to objectives above the Authorized Objective, and then in descending order to objectives below the Authorized Objective; and

(10) plugging and abandoning the well.

In drilling a horizontal well, the Operator shall have the right at its sole discretion to 1) cease drilling at any time, for any reason, after it has drilled the objective formation and has drilled laterally for a distance which is at least equal to fifty percent (50%) of the length of the total horizontal displacement (displacement from true vertical) proposed in the AFE or 2)  continue drilling laterally at any time, for any reason, beyond the total horizontal displacement proposed in the AFE, so long as such lateral does not exceed 25% more than that proposed in the AFE; if in such event the well be deemed to be at its "Authorized Objective" as that term is used in this Agreement.

B.    Gathering Lines/Facilities:

Notwithstanding anything herein to the contrary, any flow line necessary for the gathering of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement and an election to participate in such operation shall include participation in these associated facilities.  Facility includes, but is not limited to, any battery, separator, compressor, gathering system facility, production storage facility or water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation.

C.   Plugging and Abandoning:

It is understood and agreed that where the terms "plugging and abandoning" or "plugged and abandoned" are used in this agreement such terms shall be deemed to include all costs associated with plugging and abandoning a well including, but not limited to, any costs of remediating contamination and/or surface restoration, to the extent that such remediation and/or surface restoration is required by the lease(s), applicable laws or regulation or by prevailing oil field practices.

D.   Commencement of Operations:

Notwithstanding anything in Article VI.B. to the contrary, Operator's election to commence operations prior to or during the Notice Period (forty-eight (48) hours if applicable), will not alter or extend the Notice Period in which a party is required to make an election to participate in the proposed operation, or constitute an election by that party not to participate in the cost of the proposed operation.

E.   Headings:

The descriptive headings used in this Operating Agreement are for convenience only and will not be deemed to affect the meaning of this Operating Agreement.

F.   Memorandum of Operating Agreement:

Contemporaneously with the execution of this Agreement, the parties have executed a Memorandum of Operating Agreement substantially in the same form as Exhibit "G" attached hereto, for the purpose of giving notice to the third parties of the existence of this Agreement and of the mortgage lien and security interest created by each party as debtor, to all other parties, as secured parties.  Such Memorandum of Operating Agreement shall be recorded by Operator in any county in which the Contract Area is located and/or with the Secretary of State.

G.   Construction:

Each party has had the opportunity to contribute to the drafting of this agreement and/or opportunity to have it reviewed by its legal counsel; therefore, the parties agree that in the event of a dispute over the meaning or application of this agreement, it shall be construed as if drafted equally by the parties and no presumption shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this agreement.

28

**H. INTEGRATION:**

In the event the Pennsylvania Department of Environmental Protection ("DEP"), Federal, State or other governmental body having jurisdiction orders the integration of interests within a spacing unit, any resulting increase or decrease in the working interest of the parties shall be realized on a proportionate basis.

**I. CONFIDENTIALITY:**

Except as otherwise provided herein, during the term of this agreement no party shall divulge to any third party any geophysical data acquired, obtained or developed by the parties hereto involving the Contract Area subsequent to the effective date of this agreement, or any drilling information relative to any well or wells drilled as a result hereof, other than depth and information customarily publicized, without first obtaining the written consent of the other parties to release any such information, which consent shall not be unreasonably withheld; provided, however, that (1) such consent shall not be necessary for any party to divulge such information to a party who is the record owner of an interest in such a well, but only  if such party to whom the information is to be disclosed agrees, in writing, to be subject to this provision prior to disclosure, and (2) access to such data shall be made available to a party's parent company or its subsidiaries, agents, employees and contractors engaged in the performance of any work hereunder.  All such information and data shall be treated as strictly confidential.  Nothing contained herein shall be deemed to prevent disclosure of any such information or data if such disclosure is required by applicable laws or rules and regulations of any administrative or governmental agency or entity.

After the expiration of this agreement all information, data and/or materials acquired jointly pursuant to this agreement shall be independently owned by each party who participated in such Geoscience operation and such participating party shall have the right to separately sell, trade or otherwise dispose of such data without the obligation to share any remuneration received with the other participating parties.

**J. PROSPECT AREA:**

i. Shall mean the unique Contract Area covered by the JOA for each Initial Prospect Well and all related Subsequent Prospect Wells.  For each Initial Prospect Well the corresponding Prospect Area shall be a contiguous area in size and configuration as determined by the Operator in consultation with Non-Operator in order to accommodate anticipated wells, wellbore paths and wellbore lengths located within the anticipated production unit established by the Operator as permitted by the underlying oil and gas leases, as may be amended, or allowed/required by Federal, State or other governmental body having jurisdiction, or other means, (the "Drilling Unit") but in no event shall the Drilling Unit exceed 1,280 acres without the mutual consent of the Parties.  The Prospect Area shall not include any portion of any other Prospect Area in effect at the time of the Initial Prospect Well proposal without the mutual consent of the Parties, except as otherwise provided for herein.  For purposes of this Agreement, the Prospect Area, Contract Area, Drilling Unit and Prospect JOA Contract Area shall have the same meaning and be considered one and the same.

ii.  (A)  It is recognized by the Parties that it may be prudent and/or necessary to expand or reduce the size of an existing Prospect Area, or include within an existing Prospect Area acreage which was not initially included in such existing Prospect Area ("Outside Acreage") and/or acreage from an existing and adjoining Prospect Area.   In the event an existing Prospect Area is expanded or reduced in size, the working interests of the Parties in proposed new wells, wells previously proposed and drilled and all wells drilled subsequent thereto within the modified Prospect Area shall not change unless agreed to by the Parties or proportionately reduced by a participating third party working interest owner in the Prospect Area.  For purposes of the Parties maintaining their same working interest throughout the Prospect Area, any Outside Acreage included by the Parties shall be owned in proportions of the Parties' initial working interest in the Prospect Area being expanded and all Parties shall be obligated to pay their share of acquisition costs to acquire such Outside Acreage.  The modified Prospect Area(s) and associated Unit boundary(ies) shall be revised to reflect the change in Prospect Area. New Memorandums of Operating Agreement and modified Declarations of Pooled Units shall be prepared and filed of record, if necessary.  No Outside Acreage that would constitute more than 20%  of the Prospect Area and be necessary to drill longer or additional horizontal lateral  shall be included in the Prospect Area and/or Drilling Unit without Non-Operators consent.

(B)  If, while drilling a horizontal well, it becomes necessary to accommodate a well bore path which may extend outside of an existing Prospect Area, Operator shall have the right at its sole discretion to reconfigure such Prospect Area in such a way as to encompass acreage necessary for such horizontal well and the corresponding Unit and shall provide notice to Non-operator of the revised Prospect Area and corresponding working interests.  The working interests of the Parties in resulting Prospect Area shall remain unchanged as a result of such reconfiguration.  Should it be necessary to equalize any additional Prospect Area acreage to accommodate such reconfiguration as it relates to existing working interests, then assignments of interests necessary to equalize shall be made, and the assignee shall reimburse assignor for actual acquisition costs associated therewith.

**K.  <u>INITIAL PROSPECT WELL:</u>**

Shall mean the initial well drilled on the Prospect Area.

**L.  <u>GATHERING LINES / FACILITIES:</u>**

Notwithstanding anything herein to the contrary, any gas gathering line necessary for the gathering or transportation of gas from the Contract Area or any other facility necessary for the operation and development of the Contract Area shall be proposed in accordance with the method prescribed for under Article VI.B.-Operations of this Agreement.  Facility includes, but is not limited to, any battery, separator, compressor stations, gathering system or production storage facility.

**M.  <u>MEDIA/NEWS RELEASES:</u>**

No party hereto shall, at any time, issue to the press or other media any news release, concerning the Contract Area (also referred to herein as "Prospect Area"), without the prior approval of all the other parties hereto,

Appx0412

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

which approval shall not be unreasonably withheld.  Any request for approval hereunder shall be responded to within 24 hours if receipt of such request and any failure to timely respond shall be deemed to be an approval.  When all of the parties have reviewed such material and all parties have approved the issuance of the material, the party desiring such release shall have the principal responsibility for its issuance.  The only other exception to the foregoing shall be that in the event of any emergency involving extensive property damage, operations failure, loss of human life or other clear emergency, the party designated as Operator hereunder is authorized to furnish such minimum, strictly factual information as shall be necessary to satisfy the legitimate public interest on the part of the press and duly constituted authorities, if time does not permit obtaining prior approval by the other parties.  Said Operator shall thereupon promptly advise parties of the information so furnished. Notwithstanding the foregoing, either party may issue a media or news release required by applicable laws, rules or regulations, including those of applicable stock exchanges.

N.  **CONFLICTING PROVISIONS:**

    In the event of a conflict between the provisions of this Article XVI and any other provisions of this agreement, the provisions of this Article XVI shall control and prevail.

O.  **DEFAULTS AND REMEDIES:**

    Except as expressly provided herein, nothing in this Operating Agreement entitles any person or party other than the Operator and Non-Operator to any claim, cause of action, remedy, or right of any kind.

P.      **AFE OVERRUNS**

    In the event expenditure against an AFE exceeds, or in Operator's reasonable judgment, are likely to exceed, twenty percent (20%) or more of the total AFE prior to finishing the approved operations, the Operator, shall promptly furnish to Non-Operator a supplemental AFE and a summary description as to the purpose and/or cause of the overrun.  Upon receipt of a supplemental AFE, Non-Operator may call for partner's meeting by notifying the Operator with full details of the purpose of the meeting, including a time, place and agenda that meet the Operator's reasonable business schedule and do not interfere unreasonably with the Operator's ongoing operations under this Agreement.

    IN WITNESS WHEREOF, this agreement shall be effective as of February 1, 2010 .

Henry  Hood, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications have been made, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes.

**OPERATOR**

_____

By _____

   __Henry J. Hood_____
Type or print name

Title _Senior  Vice  President  –  Land  and  Legal  &
General Counsel

Date _____

Tax ID or S.S. No. ____20-3774650_____

**ATTEST OR WITNESS:**

    _____,

**NON-OPERATORS**

_____

By _____

_____
Type or print name

Title _____

Date _____

Tax ID or S.S. No. _____

30

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

1

2

3

4

5

6
7

8

9

10

11

12

13

14

15

16
17

18

19

20

21

22

23

24
25

26

27

28

29

30

31
32

33

34

35

36

37

31

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts.

The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of <u>OKLAHOMA</u>    )
                                        ) ss.
County of <u>OKLAHOMA</u>  )

    This instrument was acknowledged before me on

_____ by Henry J. Hood, Senior Vice President – Land and Legal & General Counsel of Chesapeake Appalachia, L.L.C., a limited liability company.

(Seal, if any)

                         _____

                         Title (and Rank) _____

                         My commission expires: _____

Acknowledgment in representative capacity:

State of _____ )
                                        ) ss.
County of _____ )

    This instrument was acknowledged before me on

_____ by _____.

(Seal, if any)

                         _____

                         Title (and Rank) _____

                         My commission expires: _____

Appx0415

**EXHIBIT "A"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN OPERATING AGREEMENT**
**DATED** Click here to enter text.**, 2010**
**BY AND BETWEEN CHESAPEAKE APPALACHIA, L.L.C., OPERATOR,**
**AND., _____NON-OPERATOR**

**1.     DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT**

THOSE CERTAIN LEASES AND/OR INTERESTS LOCATED WITHIN THE CONTRACT AREA AS FURTHER DESCRIBED ON EXHIBIT "A-1" (LEASE LISTING) AND AS SHOWN ON THE PLAT OF THE CONTRACT AREA ATTACHED AS EXHIBIT "A-2" HEREOF.

**2.     RESTRICTIONS, IF ANY, AS TO DEPTHS, FORMATIONS AND SUBSTANCES**

Click here to enter text.

**3.     PARTIES TO AGREEMENT WITH ADDRESS AND TELEPHONE NUMBER FOR NOTICE PURPOSES**

Chesapeake Appalachia, L.L.C.
6100 N. Western Avenue
P. O. Box 18496
Oklahoma City, Oklahoma
Attention:      Serena Branch, Land Manager, Northern District-Eastern Division
Telephone:    (405) 935-7952
Facsimile:     (405) 849-7952

[Non-Operator]
Attention:
Telephone:
Facsimile:

**4.     PERCENTAGES OR FRACTIONAL INTERESTS OF PARTIES TO THIS AGREEMENT**

| PARTIES | WORKING INTEREST |
|---|---|
| Chesapeake Appalachia, L.L.C. | Click here to enter text. |
| Non-Operator | U |
|  | 100.000000% |

**5.     OIL AND GAS LEASES AND/OR OIL AND GAS INTEREST SUBJECT TO THIS AGREEMENT**

The oil and gas lease or oil and gas interest, or portions thereof, included in the Contract Area and described on Exhibit A-1 attached hereto.

**6.     BURDENS ON PRODUCTION**

Lease Royalty

**7.     PLAT OF CONTRACT AREA**

See attached Exhibit A-2

**Exhibit "B"**
**[THIS LEASE IS SUBJECT TO STATE RECORDING LAWS AND MODIFICATIONS TO REFLECT THE TYPE OF INTEREST CONVEYED.]**

**FOR THE PURPOSES OF THE COMMONWEALTH OF PENNSYLVANIA**

**PAID-UP**

**OIL & GAS LEASE**          Lease No. _____

8/08 - PA

This Lease made this _____ day of _____, 2008, by and between:

_____
_____

hereinafter collectively called "Lessor"          hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the Township of _____, in the County of _____, in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number: _____

and is bounded formerly or currently as follows:

On the North by lands of _____;
On the East by lands of _____;
On the South by lands of _____;
On the West by lands of _____;

including lands acquired from _____, by virtue of deed dated _____, and recorded in _____ Book _____, at Page _____, and described for the purposes of this agreement as containing a total of _____ Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of five (5) years from 12:00 A.M. _____(effective date) to 11:59 P.M._____ (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary or secondary term of this oil and gas lease without additional compensation or performance by Lessee for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

EXTENSION OF PRIMARY TERM. Lessee has the option to extend the primary term of this Lease for one additional term of five (5) years from the expiration of the primary term of this Lease; said extension to be under the same terms and conditions as contained in this Lease. Lessee may exercise this option to extend this Lease if on or before the expiration date of the primary term of this Lease, Lessee pays or tenders to the Lessor or to the Lessor's credit an amount equal to the initial consideration given for the execution hereof. Exercise of this option is at Lessee's sole discretion and may be invoked by Lessee where no other alternative of the Lease Term clause extends this Lease beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL:  To pay Lessor as Delay Rental, after the first year, at the rate of five dollars ($5.00) per net acre per year payable in advance.  **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

    1.  OIL:  To deliver to the credit of Lessor, free of cost, a Royalty of the equal fifteen percent (15%) part of all oil and any constituents thereof produced and marketed from the Leasehold.

    2.  GAS:  To pay Lessor an amount equal to fifteen percent (15%) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee.  Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C)  DELAY IN MARKETING:  In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

 (D) SHUT-IN:  In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of twelve months, and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect.  During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation.  In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than twelve months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES:  Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any claimed improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT:  Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address.  Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch.  Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP:  Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require.  Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE:  If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS:  Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS:  Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked.  Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease.  Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations.  Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold.  Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, or seek additional consideration based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS:  If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING.  Lessee grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.  Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created.  Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit.  Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold.  In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES.  Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent.  Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent.  Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE.  Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage.  At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, and in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date.  The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS.  Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title.  Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT.  There is no implied covenant to drill, prevent drainage, further develop or market production within the primary term or any extension of term of this Lease.  There shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with said implied covenants.  Provisions herein, including, but not limited to the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS.  This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL.  If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions.  Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease.  Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions.  If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.  Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION.  In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages

caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association.  All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT.  The entire agreement between Lessor and Lessee is embodied herein.  No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

TITLE CURATIVE.  Lessor agrees to execute affidavits, ratifications, amendments, permits and other instruments as may be necessary to carry out the purpose of this lease.

SURRENDER.  Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS.  All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE.  All express or implied covenants of this Lease shall be subject to all applicable laws, rules, regulations and orders.  When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate, in whole or in part, because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable in damages for breach of any express or implied covenants of this Lease for failure to comply therewith, if compliance is prevented by, or failure is the result of any applicable laws, rules, regulations or orders or operation of force majeure.

SEVERABILITY.  This Lease is intended to comply with all applicable laws, rules, regulations, ordinances and governmental orders.  If any provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall survive and continue in full force and effect to the maximum extent allowed by law.  If a court of competent jurisdiction holds any provision of this Lease invalid, void, or unenforceable under applicable law, the court shall give the provision the greatest effect possible under the law and modify the provision so as to conform to applicable law if that can be done in a manner which does not frustrate the purpose of this Lease.

COUNTERPARTS.  This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

Witness _____    _____ (Seal)

## ACKNOWLEDGMENT

STATE OF _____ )

COUNTY OF _____ ) SS:

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that _____ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____

Signature/Notary Public: _____

Name/Notary Public (print): _____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )

COUNTY OF _____ ) SS:

On this, the _____ day of _____, 20____, before me _____, the undersigned officer, personally appeared _____, who acknowledged himself to be the _____ of _____, a corporation, and that he as such _____, being authorized to do so, executed foregoing instrument for the purpose therein contained by signing the name of the corporation by himself as _____.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____

Signature/Notary Public: _____

Name/Notary Public (print): _____

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



# EXHIBIT "C"

Attached to and made a part of that certain Operating Agreement between Chesapeake Appalachia, L. L. C. and Epsilon Energy USA, Inc ,. dated February 1, 2010.

# ACCOUNTING PROCEDURE

# JOINT OPERATIONS

### I. GENERAL PROVISIONS

**1.    Definitions**

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"Operator" shall mean the party designated to conduct the Joint Operations.

"Non-Operators" shall mean the Parties to this agreement other than the Operator.

"Parties" shall mean Operator and Non-Operators.

"First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of other employees and/or contract labor directly employed on the Joint Property in a field operating capacity.

"Technical Employees" shall mean those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

"Personal Expenses" shall mean travel and other reasonable reimbursable expenses of Operator's employees.

"Material" shall mean personal property, equipment or supplies acquired or held for use on the Joint Property.

"Controllable Material" shall mean Material which at the time is so classified in the Material Classification Manual as most recently recommended by the Council or Petroleum Accountants Societies.

**2.    Statement and Billings**

Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month. Such bills will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense except that items of Controllable Material and unusual charges and credits shall be separately identified and fully described in detail.

**3.    Advances and Payments by Non-Operators**

A.    Unless otherwise provided for in the agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay for the succeeding month's operation within thirty (30) days after receipt of the billing or by the first day of the month for which the advance is required, whichever is later. Operator shall adjust each monthly billing to reflect advances received from the Non-Operators.

B.    Each Non-Operator shall pay its proportion of all bills within thirty (30) days after receipt. If payment is not made within such time, the unpaid balance shall bear interest monthly at the prime rate in effect at _____Bank One of Oklahoma, N.A._____ on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

**4.    Adjustments**

Payment of any such bills shall not prejudice the right of any Non-Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment. No adjustment favorable to Operator shall be made unless it is made within the same prescribed period. The provisions of this paragraph shall not prevent adjustments resulting from a physical inventory of Controllable Material as provided for in Section V.

**COPYRIGHT © 1985 by the Council of Petroleum Accountants Societies.**

Appx0420

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



**5.      Audits**

A.    A Non-Operator, upon notice in writing to Operator and all other Non-Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

B.    The Operator shall reply in writing to an audit report within 180 days after receipt of such report.

**6.      Approval By Non-Operators**

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other sections of this Accounting Procedure and if the agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Operator shall notify all Non-Operators of the Operator's proposal, and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

## II.  DIRECT CHARGES

Operator shall charge the Joint Account with the following items:

**1.      Ecological and Environmental**

Costs incurred for the benefit of the Joint Property as a result of governmental or regulatory requirements to satisfy environmental considerations applicable to the Joint Operations. Such costs may include surveys of an ecological or archaeological nature and pollution control procedures as required by applicable laws and regulations.

**2.      Rentals and Royalties**

Lease rentals and royalties paid by Operator for the Joint Operations.

**3.      Labor**

A.    (1)   Salaries and wages of Operator's field employees or consultants directly employed on the Joint Property in the conduct of Joint Operations.

(2)   Salaries of First level Supervisors in the field.

(3)   Salaries and wages of **on-site** Technical Employees or consultants directly employed on the Joint Property if such charges are excluded from the overhead rates.

(4)   Salaries and wages of **off-site** Technical Employees or consultants either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates.

B.    Operator's cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 3A of this Section II. Such costs under this Paragraph 3B may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 3A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to Operator's costs chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

D.    Personal Expenses of those employees whose salaries and wages are chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II.

**4.      Employee Benefits**

Operator's current costs or established plans for employees' group life insurance, hospitalization, pension, retirement, stock purchase, thrift, bonus, and other benefit plans of a like nature, applicable to Operator's labor cost chargeable to the Joint Account under Paragraphs 3A and 3B of this Section II shall be Operator's actual cost not to exceed the percent most recently recommended by the Council of Petroleum Accountants Societies.

Appx0421

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies

 COPAS

5.      **Material**

Material purchased or furnished by Operator for use on the Joint Property as provided under Section IV.   Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use and is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

6.      **Transportation**

Transportation of employees and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest reliable supply store where like material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

B.   If surplus Material is moved to Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest reliable supply store where like material is normally available, or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties belonging to Operator, unless agreed to by the Parties.

C.   In the application of subparagraphs A and B above, the option to equalize or charge actual trucking cost is available when the actual charge is $400 or less excluding accessorial charges. The $400 will be adjusted to the amount most recently recommended by the Council of Petroleum Accountants Societies.

7.      **Services**

The cost of contract services, equipment and utilities provided by outside sources, except services excluded by Paragraph 10 of Section II and Paragraph i, ii, and iii, of Section III.   The cost of professional consultant services and contract services of technical personnel directly engaged on the Joint Property if such charges are excluded from the overhead rates. The cost of professional consultant services or contract services of technical personnel not directly engaged on the Joint Property shall not be charged to the Joint Account unless previously agreed to by the Parties.

8.      **Equipment and Facilities Furnished By Operator**

A.   Operator shall charge the Joint Account for use of Operator owned equipment and facilities at rates commensurate with costs of ownership and operation. Such rates shall include costs of maintenance, repairs, other operating expense, insurance, taxes, depreciation, and interest on gross investment less accumulated depreciation not to exceed **ten percent (10%)** per annum.   Such rates shall not exceed average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Paragraph 8A above, Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, **less 20%**.   For automotive equipment, Operator may elect to use rates published by the Petroleum Motor Transport Association.

9.      **Damages and Losses to Joint Property**

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, flood, storm, theft, accident, or other cause, except those resulting from Operator's gross negligence or willful misconduct. Operator shall furnish Non-Operator written notice of damages or losses incurred as soon as practicable after a report thereof has been received by Operator.

10.     **Legal Expense**

Expense of handling, investigating and settling litigation or claims, discharging of liens, payment of judgments and amounts paid for settlement of claims incurred in or resulting from operations under the agreement or necessary to protect or recover the Joint Property, **except no charge for services of operator's legal staff or fees of outside attorneys performing services other than title exaimation** shall be made unless previously agreed to by the parties. All other legal expense is considered to be covered by the overhead provisions of Section III unless otherwise agreed to by the Parties, except as provided in Section I, Paragraph 3.

11.     **Taxes**

All taxes of every kind and nature assessed or levied upon or in connection with the Joint Property, the operation thereof, or the production therefrom, and which taxes have been paid by the Operator for the benefit of the Parties. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the Joint Account shall be made and paid by the Parties hereto in accordance with the tax value generated by each party's working interest.

Appx0422

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



**12.** **Insurance**

Net premiums paid for insurance required to be carried for the Joint Operations for the protection of the Parties unless insurance coverage is already secured individually outside the Joint Operations in accordance with Exhibit D of that the Operating Agreement **to which this is attached** dated Click here to enter text.,

2009. In the event Joint Operations are conducted in a

state in which Operator may set as self-insurer for Worker's Compensation and/or Employers Liability under the respective state's laws, Operator may, at its election, include the risk under its self-insurance program and in that event, Operator shall include a charge at Operator's cost not to exceed manual rates.

**13.** **Abandonment and Reclamation**

Costs incurred for abandonment of the Joint Property, including costs required by governmental or other regulatory authority.

**14.** **Communications**

Cost of acquiring, leasing, installing, operating, repairing and maintaining communication systems, including radio and microwave facilities directly serving the Joint Property. In the event communication facilities/systems serving the Joint Property are Operator owned, charges to the Joint Account shall be made as provided in Paragraph 8 of this Section II.

**15.** **Other Expenditures**

Other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

**1.** **Overhead - Drilling and Producing Operations**

i. As compensation for administrative, supervision, office services and warehousing costs, Operator shall charge drilling and producing operations on either:

( X ) Fixed Rate Basis, Paragraph lA, or
(     ) Percentage Basis, Paragraph lB

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Paragraph 3A, Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in the above selected Paragraph of this Section III unless such cost and expense are agreed to by the Parties as a direct charge to the Joint Account.

ii. The salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

( x ) shall be covered by the overhead rates, or
(     ) shall not be covered by the overhead rates.

iii. The salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

( X ) shall be covered by the overhead rates **except that the salaries, wages and Personal Expenses of those positions set forth on Exhibit C-1 employed directly in the operation of the Joint Property shall not be covered by the overhead rates and shall be chargeable as direct labor to the extent such services are supported by detailed timesheets and further provided the services shall not include managerial supervision or administrative services associated with such operations.**

(     ) shall not be covered by the overhead rates.

A. Overhead - Fixed Rate Basis

(1) Operator shall charge the Joint Account at the following rates per well per month:

Drillg Well Rate      **$ 13.000**
(Prorated for less than a full month)

Producing Well Rate $      **1,300**

(2) Application of Overhead - Fixed Rate Basis shall be as follows:

(a) Drilling Well Rate

(1) Charges for drilling wells shall begin on the date the well is spudded and terminate on the date

Appx0423

the drilling rig, completion rig, or other units used in completion of the well is released, which is later, except that no charge shall be made during suspension of drilling or completion operations for fifteen (15) or more consecutive calendar days.

(2)  Charges for wells undergoing any type of workover or recompletion for a period of five (5) consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, commence through date of rig or other unit release, except that no charge shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(b)  Producing Well Rates

(1)  An active well either produced or injected into for any portion of the month shall be considered as a one-well charge for the entire month.

(2)  Each active completion in a multi-completed well in which production is not commingled down hole shall be considered as a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(3)  An inactive gas well shut in because of overproduction or failure of purchaser to take the production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(4)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when drilling well rate applies.

(5)  All other inactive wells (including but not limited to inactive wells covered by unit allowable, lease allowable, transferred allowable, etc.) shall not qualify for an overhead charge.

(3)  The well rates shall be adjusted as of the first day of April each year following the effective date of the agreement to which this Accounting Procedure is attached  by the percent increase or decrease published by COPAS

**2.    Overhead - Major Construction**

To compensate Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of $_____25,000.00___:

A.    __3.0___ % of first $100,000 or total cost if less, plus

B.    __2.0___ % of costs in excess of $100,000 but less than $1,000,000, plus

C.    __1.0___ % of costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately and the cost of drilling and workover wells and artificial lift equipment shall be excluded.

**3.    Catastrophe Overhead**

To compensate Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following rates:

A.    __3.0___ % of total costs through $100,000; plus

B.    __2.0___ % of total costs in excess of $100,000 but less than $1,000,000; plus

C.    __1.0___ % of total costs in excess of $1,000,000.

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

**4.    Amendment of Rates**

The overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto if, in practice, the rates are found to be insufficient or excessive.

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies


COPAS

### IV.    PRICING OF JOINT ACCOUNT MATERIAL PURCHASES, TRANSFERS AND DISPOSITIONS

Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for all Material movements affecting the Joint Property. Operator shall provide all Material for use on the Joint Property; however, at Operator's option, such Material may be supplied by the Non-Operator. Operator shall make timely disposition of idle and/or surplus Material, such disposal being made either through sale to Operator or Non-Operator, division in kind, or sale to outsiders. Operator may purchase, but shall be under no obligation to purchase, interest of Non-Operators in surplus condition A or B Material. The disposal of surplus Controllable Material not purchased by the Operator shall be agreed to by the Parties.

**1.    Purchases**

Material purchased shall be charged at the price paid by Operator after deduction of all discounts received. In case of Material found to be defective or returned to vendor for any other reasons, credit shall be passed to the Joint Account when adjustment has been received by the Operator.

**2.    Transfers and Dispositions**

Material furnished to the Joint Property and Material transferred from the Joint Property or disposed of by the Operator, unless otherwise agreed to by the Parties, shall be priced on the following basis exclusive of cash discounts:

A.    New Material (Condition A)

(1)    Tubular Goods Other than Line Pipe

(a)    Tubular goods, sized 2 3/8 inches OD and larger, except line pipe, shall be priced at Eastern mill published carload base prices effective as of date of movement plus transportation cost using the 80,000 pound carload weight basis to the railway receiving point nearest the Joint Property for which published rail rates for tubular goods exist. If the 80,000 pound rail rate is not offered, the 70,000 pound or 90,000 pound rail rate may be used. Freight charges for tubing will be calculated from Lorain, Ohio and casing from Youngstown, Ohio.

(b)    For grades which are special to one mill only, prices shall be computed at the mill base of that mill plus transportation cost from that mill to the railway receiving point nearest the Joint Property as provided above in Paragraph 2.A.(1)(a). For transportation cost from points other than Eastern mills, the 30,000 pound Oil Field Haulers Association interstate truck rate shall be used.

(c)    Special end finish tubular goods shall be priced at the lowest published out-of-stock price, f.o.b. Houston, Texas, plus transportation cost, using Oil Field Haulers Association interstate 30,000 pound truck rate, to the railway receiving point nearest the Joint Property.

(d)    Macaroni tubing (size less than 2 3/8 inch OD) shall be priced at the lowest published out-of-stock prices f.o.b. the supplier plus transportation costs, using the Oil Field Haulers Association interstate truck rate per weight of tubing transferred, to the railway receiving point nearest the Joint Property.

(2)    Line Pipe

(a)    Line pipe movements (except size 24 inch OD and larger with walls ¾ inch and over) 30,000 pounds or more shall be priced under provisions of tubular goods pricing in Paragraph A.(l)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(b)    Line Pipe movements (except size 24 inch OD) and larger with walls ¾ inch thick and over) less than 30,000 pounds shall be priced at Eastern mill published carload base prices effective as of date of shipment, plus the percentage recommended by COPAS, plus transportation costs based on freight rates as set forth under provisions of tubular goods pricing in Paragraph A.(1)(a) as provided above. Freight charges shall be calculated from Lorain, Ohio.

(c)    Line pipe 24 inch OD and over and ¾ inch wall and larger shall be priced f.o.b. the point of manufacture at current new published prices plus transportation cost to the railway receiving point nearest the Joint Property.

(d)    Line pipe, including fabricated line pipe, drive pipe and conduit not listed on published price lists shall be priced at quoted prices plus freight to the railway receiving point nearest the Joint Property or at prices agreed to by the Parties.

(3)    Other Material shall be priced at the current new price, in effect at date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property.

(4)    Unused new Material, except tubular goods, moved from the Joint Property shall be priced at the current new price, in effect on date of movement, as listed by a reliable supply store nearest the Joint Property, or point of manufacture, plus transportation costs, if applicable, to the railway receiving point nearest the Joint Property. Unused new tubulars will be priced as provided above in Paragraph 2.A.(l) and (2).

Appx0425

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



COPAS

**B.**    Good Used Material (Condition B)

Material in sound and serviceable condition and suitable for reuse without reconditioning:

(1)    Material moved to the Joint Property

At seventy-five percent (75%) of current new price, as determined by Paragraph A.

(2)    Material used on and moved from the Joint Property

(a)    At seventy-five percent (75%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as new Material or

(b)    At sixty-five percent (65%) of current new price, as determined by Paragraph A, if Material was originally charged to the Joint Account as used Material

(3)    Material not used on and moved from the Joint Property

At seventy-five percent (75%) of current new price as determined by Paragraph A.

The cost of reconditioning, if any, shall be absorbed by the transferring property.

**C.**    Other Used Material

(1)    Condition C

Material which is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at fifty percent (50%) of current new price as determined by Paragraph A. The cost of reconditioning shall be charged to the receiving property, provided Condition C value plus cost of reconditioning does not exceed Condition B value.

(2)    Condition D

Material, excluding junk, no longer suitable for its original purpose, but usable for some other purpose shall be priced on a basis commensurate with its use. Operator may dispose of Condition D Material under procedures normally used by Operator without prior approval of Non-Operators.

(a)    Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing or drill pipe utilized as line pipe shall be priced at used line pipe prices.

(b)    Casing, tubing or drill pipe used as higher pressure service lines than standard line pipe, e.g. power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non upset basis.

(3)    Condition E

Junk shall be priced at prevailing prices. Operator may dispose of Condition E Material under procedures normally utilized by Operator without prior approval of Non-Operators.

**D.**    Obsolete Material

Material which is serviceable and usable for its original function but condition and/or value of such Material is not equivalent to that which would justify a price as provided above may be specially priced as agreed to by the Parties. Such price should result in the Joint Account being charged with the value of the service rendered by such Material.

**E.**    Pricing Conditions

(1)    Loading or unloading costs may be charged to the Joint Account at the rate of twenty-five cents (25¢) per hundred weight on all tubular goods movements, in lieu of actual loading or unloading costs sustained at the stocking point. The above rate shall be adjusted as of the first day of April each year following January 1, 1985 by the same percentage increase or decrease used to adjust overhead rates in Section III, Paragraph 1.A.(3). Each year, the rate calculated shall be rounded to the nearest cent and shall be the rate in effect until the first day of April next year. Such rate shall be published each year by the Council of Petroleum Accountants Societies.

(2)    Material involving erection costs shall be charged at applicable percentage of the current knocked-down price of new Material.

**(3)**    **Operator will pass along to Non-Operator a proportionate share of all bulk savings Operator receives from its vendors.**

Appx0426

COPAS 1984 ONSHORE
Recommended by the Council
of Petroleum Accountants
Societies



**3.**    **Premium Prices**

Whenever Material is not readily obtainable at published or listed prices because of national emergencies. strikes or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property; provided notice in writing is furnished as Non-Operators of the proposed charge prior to billing Non-Operators for such Material. Each Non-Operator shall have the right, by so electing and notifying Operator within ten days after receiving notice from Operator, to furnish in kind all or part of its share of such Material suitable for use and acceptable to Operator.

**4.**    **Warranty of Material Furnished By Operator**

Operator does not warrant the Material furnished.    In case of defective Material, credit shall not be passed to the Joint Account until adjustment has been received by Operator from the manufacturers or their agents.

## V. INVENTORIES

The Operator shall maintain detailed records of Controllable Material.

**1.**    **Periodic Inventories, Notice and Representation**

At reasonable intervals, inventories shall be taken by Operator of the Joint Account Controllable Material. Written notice of intention to take inventory shall be given by Operator at least thirty (30) days before any inventory is to begin so that Non-Operators may be represented when any inventory is taken. Failure of Non-Operators to be represented at an inventory shall bind Non-Operators to accept the inventory taken by Operator.

**2.**    **Reconciliation and Adjustment of Inventories**

Adjustments to the Joint Account resulting from the reconciliation of  a physical inventory shall be made within six months following the taking of the inventory. Inventory adjustments shall be made by Operator to the Joint Account for overages and shortages, but, Operator shall be held accountable only for shortages due to lack of reasonable diligence.

**3.**    **Special Inventories**

Special inventories may be taken whenever there is any sale, change of interest, or change of Operator in the Joint Property. It shall be the duty of the party selling to notify all other Parties as quickly as possible after the transfer of interest takes place. In such cases, both the seller and the purchaser shall be governed by such inventory.   In cases involving a change of Operator, all Parties shall be governed by such inventory.

**4.**    **Expense of Conducting Inventories**

A.    The expense of conducting periodic inventories shall not be charged to the Joint Account unless agreed to by the Parties.

B.    The expense of conducting special inventories shall be charged to the Parties requesting such inventories, except inventories required due to change of Operator shall be charged to the Joint Account.

Appx0427

# EXHIBIT C-1

Attached to and made a part of ___ that certain Operating Agreement dated , by and between Chesapeake Appalachia , L.L.C., as Operator, and _____ , as Non-Operator

## TECHNICAL EMPLOYEES EXCLUDED FROM OVERHEAD RATES

| TITLE | CATEGORY |
|---|---|
| ASSOCIATE GEOLOGIST | Technical Labor |
| ASSOCIATE GEOPHYSICIST | Technical Labor |
| GEOLOGIST | Technical Labor |
| GEOPHYSICIST | Technical Labor |
| SR GEOLOGIST | Technical Labor |
| SR GEOPHYSICIST | Technical Labor |
| ASSET MANAGER | Technical Labor |
| ASSOCIATE ASSET MANAGER | Technical Labor |
| DRILLING ENGINEER I | Technical Labor |
| DRILLING ENGINEER II | Technical Labor |
| FIELD ENGINEER | Technical Labor |
| SR DRILLING ENGINEER | Technical Labor |
| SR ASSET MANAGER | Technical Labor |

EXHIBIT "D"

Attached to and made a part of that certain Operating Agreement dated ___, 20__ between
Chesapeake Appalachia, L. L. C., Operator, and _____, Non-Operator

**Insurance Provisions**

I.    As to all operations hereunder, Operator shall at all times while operations are conducted by it for the Joint Account, carry or cause to be carried, pay for, and charge to the Joint Account the following minimum insurance:

Worker's Compensation, including Employer's Liability Insurance with limits of not less than $1,000,000, covering the employees of Operator engaged in operations hereunder and in compliance with all applicable state and federal laws.

II.   In addition, as to all operations hereunder, except as provided in Paragraph III below, each party shall carry for its own interest the following types and limits of insurance, or insurance which will provide coverage for a party's interest to the extent required below:

(a)   Automobile Insurance including non-owned and hired vehicles, coverage with combined single limit per occurrence of not less that $1,000,000 for bodily injury and property damage.

(b)   General Liability Insurance with a combined single limit per occurrence of not less than $1,000,000 for bodily injury and property damage. Such policy shall be endorsed to provide Blanket Contractual Liability covering obligations assumed herein.

(c)   Excess Umbrella Liability Insurance with a combined limit per occurrence coverage of not less than $25,000,000.

(d)   Operator's Extra Expense policy with limits of $25,000,000 per occurrence covering all losses or damages resulting from loss of well control, explosions, fire, cratering, including expenses of clean-up containment, seepage, pollution or contamination.

The premiums for all such insurance to be carried in Paragraph II shall be paid solely by each party.

To the extent of the liabilities assumed by each party herein, all of the above insurance, to the extent carried by a party as provided in Paragraph III below, shall be endorsed to provide that each party's insurers waive their right of subrogation (equitable or by assignment, express or implied, loan receipt or otherwise) against the other party. Each party's insurance coverage shall be primary over any insurance coverage maintained by the other party. Each party hereto may acquire at its own expense, any additional insurance to protect itself. Each such policy shall provide for underwriters waiver of subrogation in favor of each party to the extent of those liabilities assumed by each party herein.

III.  With regard to the aforementioned, Operator shall have the right, but not the obligation, to require satisfactory evidence of adequate insurance or self-insurance. Operator shall not provide this coverage for the benefit of the Joint Account. In the event that any party fails to provide evidence of insurance or evidence of ability to self insure as required herein ("failing party"), the other Party may, at its sole discretion, provide such insurance for and at the direct expense of the failing party. A party is under no obligation to provide such insurance for the party so failing to provide satisfactory evidence of its own insurance or evidence of ability to self insure and nothing contained herein shall be construed to alter the obligations of any party hereunder. Notwithstanding any of the foregoing, each party shall be allowed to self-insure for its interests.

EXHIBIT "E"

Attached to and made a part of that certain Joint Operating Agreement dated _____ _____, 2009, by and between Chesapeake Exploration, L.L.C., as Operator, and _____, as Non-Operator.

## Gas Balancing Agreement

I. <u>DEFINITIONS</u>:

For the purposes of this Gas Balancing Agreement ("GBA") the following terms shall be defined as follows:

(a)    "Affiliate" shall have the meaning ascribed to such term in the Operating Agreement.

(b)    The "Allowable" is the maximum rate of Gas production from each Gas Well permitted from time to time by the regulatory authority having jurisdiction.

(c)    "Balance" is the condition occurring when a party has utilized, sold or disposed of a Quantity of Gas equal to the same percentage of the cumulative Gas production as such party's Percentage Ownership during the period of such cumulative Gas production.

(d)    "Deliverability" shall mean the maximum sustainable daily Gas withdrawal from a Gas Well which may be accomplished without detriment to ultimate recovery of reserves as determined by Operator acting in good faith and taking into account relevant operational factors including, but not limited to, pipeline capacity and pressure and the maximum producing capability of the Gas Well based on data reported to the appropriate governmental agency having jurisdiction.

(e)    "Gas" shall mean all gaseous hydrocarbons produced from each Gas Well but shall not include liquid hydrocarbons.

(f)    "Gas Well" shall mean each well subject to the Operating Agreement that produces gas.  If a single Gas Well is completed in two or more reservoirs, such Gas Well will be considered a separate Gas Well with respect to, but only as to, each reservoir from which the Gas production is not commingled in the well bore.

(g)    "MMBtu" shall mean one million British thermal units.

(h)    "Operating Agreement" means the operating agreement between the Parties to which this GBA is attached.

(i)    "Operator" means the Party designated as operator under the Operating Agreement.

(j)    "Overproduced" is the condition occurring when a party has utilized, disposed of or sold a greater Quantity of Gas from a particular Gas Well at any given time (individually or through its gas purchaser) than if such party were in Balance.

(k)    "parties" means the legal entities that are signatory to the Operating Agreement, or their successors and assigns.  Parties shall be referred to individually as a party.

(l)    "Percentage Ownership" is the percentage interest of each party in each Gas Well as set forth in or determined in accordance with the provisions of the Operating Agreement, as such interest may change from time to time.

(m)    "Percentage of Proceeds Sale" means a sale of Gas processed in a gas processing plant the price for which is computed as a percentage of the proceeds from the resale of residue gas and natural gas liquids attributable to such Gas.

(n)    "Quantity" shall mean the number of units of Gas expressed in MMBtus.

(o)    "Underproduced" is the condition occurring when a party has utilized, disposed of or sold a lesser Quantity of Gas from a particular Well at any given time (individually or through its gas purchaser) than if such party were in Balance.

## II.  APPLICATION OF THIS AGREEMENT

The provisions of this GBA shall be separately applicable to each Gas Well to the end that Gas production from one Gas Well may not be utilized for the purposes of balancing underproduction of Gas from any other Gas Well.

## III.  OVERPRODUCTION

### A.    Right to Take All Gas Produced

Subject to the other provisions herein, during any period when any party hereto is not marketing or otherwise disposing of or utilizing its Percentage Ownership of the Allowable or Deliverability, as applicable, of Gas from any Gas Well, the other parties shall be entitled--but shall not have the obligation--to take, in addition to their own Percentage Ownership of Gas, that portion of such other party's Percentage Ownership of Gas which said party is not marketing, utilizing  or otherwise disposing of, and shall be entitled to take such Gas production and deliver same to its or their purchasers in accordance with the provisions herein. Each such taking party shall have the right to take its pro rata portion of each such non-taking party's share, said pro rata portion being based on the ratio of its Percentage Ownership to the Percentage Ownership of all parties in the same balancing status (either Overproduced or Underproduced) who elect to take such non-taking party's share of gas; provided, however, an Underproduced party desiring to take a non-taking party's share of Gas shall take precedence over an Overproduced party which wishes to take such non-taking party's Gas, and an Overproduced party shall be entitled to take a non-taking party's share of Gas only to the extent that an Underproduced party has elected not to take said Gas.  The Gas of a party not taking its production shall be allocated to a taking party hereunder prior to calculation of percentage entitlement to make up Gas from an Overproduced party under Article IV, below.

Notwithstanding the foregoing, all parties shall share in and own the liquid hydrocarbons recovered from Gas by primary separation equipment in accordance with their respective Percentage Ownership, which liquid hydrocarbon ownership shall be unaffected by this GBA.  One or more parties may arrange to have their Gas processed in a gas processing plant for the recovery of liquefiable hydrocarbons. Nothing in this GBA shall afford a basis for balancing any liquefiable hydrocarbons recovered from a Gas processing plant.  Each party taking Gas shall own all of the Gas delivered to its purchaser.

### B.    Limitation on Overproduced Party's Right to Take Gas

Notwithstanding the provisions of Article III.A., above, if during any time and from time to time an Overproduced party shall have taken more than one hundred percent (100%) of such party's Percentage Ownership share of the estimated ultimate recoverable reserves for a Gas Well as determined by Operator acting in good faith, said Overproduced party shall not, after receipt of written notice of said fact from Operator, be entitled to take, sell or otherwise dispose of Gas from such Gas Well until such time as said party is no longer Overproduced; provided, however, said Overproduced party may take Gas from such Gas Well without restriction if and for so long as the other parties are not taking Gas from such Gas Well their full share of the Gas or as otherwise authorized by all of the Underproduced parties.  Also, no Overproduced party shall at any time be entitled to take, sell or otherwise dispose of more than 300% of its Percentage Ownership of the Allowable from a Gas Well or, if there is no Allowable established, of the Deliverability of a Gas Well.

2

C.    <u>Credit For Gas in Storage</u>

Each party who markets less than its Percentage Ownership of the Gas produced shall be credited with Gas in storage equal to its Percentage Ownership share of the Gas produced, less the Gas actually marketed and taken by said party, and less such Party's Percentage Ownership share of the Gas, vented, used or lost in lease operations.

IV. <u>RIGHT OF UNDERPRODUCED PARTY TO MAKE UP PRODUCTION</u>

Any Underproduced party may commence making up its underproduction provided it has given written notice to the Operator not later than the fifth day of the month preceding the month in which it wishes to commence making up its underproduction, or within such other time as Operator may from time to time reasonably establish.

In addition to its Percentage Ownership and its rights to a non-taking party's Gas under Article III, above, each Underproduced party will be entitled to take up to an additional twenty-five percent (25%) of the monthly Quantity of Gas of each Overproduced party's Percentage Ownership in Gas produced during any month; provided, however, nothing in this Article IV shall reduce the right of any Overproduced party to take a Quantity of Gas available for sale during any month less than seventy-five percent (75%) of its Percentage Ownership in Gas produced in said month.

If at any time more than one Underproduced party is taking a Quantity of Gas in excess of its Percentage Ownership in Gas production in order to balance its Gas production account ("Makeup"), then each such Underproduced party shall be entitled to take such Makeup in proportion that its Percentage Ownership bears to the total Percentage Ownership of all Underproduced parties desiring to take Makeup from the Well. Any portion of the Makeup to which an Underproduced party is entitled and which is not taken by such Underproduced party may be taken by any other Underproduced party in the proportion that its Percentage Ownership bears to the total Percentage Ownership of all Underproduced parties desiring to take such untaken portion of Makeup.

V.  <u>MONTHLY DATA AND STATEMENTS TO BE PROVIDED</u>

The Operator will establish and maintain a current Gas account which shows the Gas balance which exists for all the parties and will furnish each of these parties a monthly statement showing the total Quantity of Gas sold and taken in kind and the current and cumulative over and under account of each party within ninety (90) days following the end of each applicable month.  Operator shall not incur any liability to any party for errors in the data provided by each party or third parties or for other matters pertaining to gas balancing statements (e.g., transporter's allocation of Gas).  Each party shall be responsible for promptly providing written notification to Operator of any error(s) or inaccuracy(ies) contained in any gas balancing statement which it receives.

VI. <u>PAYMENT OF ROYALTIES AND PRODUCTION TAXES</u>

At all times while Gas is produced from a Well, each party hereto will make, or cause to be made, settlement with respective royalty owners to whom each is accountable in accordance with the actual volumes of Gas taken by such party.  Upon written request from any party, any other party shall provide on a monthly basis, any additional information which such requesting party may require in order to comply with its obligation to pay royalty pursuant to the terms hereof including, without limitation, name, address, decimal interest, tax identification and, to the extent it has same, title opinions and abstracts of ownership.  The term "royalty owner" includes owners of royalty, overriding royalties, production payments and similar interests.  Each party agrees to indemnify and hold harmless each other party from any and all claims asserted by its royalty owners and its Gas Purchasers for which said indemnifying party is responsible. Each party producing and/or delivering Gas to its purchaser shall pay, or cause to be paid, any and all production, severance and other similar taxes due on such Gas in accordance with the actual volumes of Gas taken by such party.

3

VII.  CASH SETTLEMENTS

A.      Events Occasioning Cash Settlements

A cash settlement of any imbalance of Gas production: (i) shall be made when production from a Gas Well permanently ceases or the Operating Agreement otherwise terminates (each being referred to herein as "Termination"); and (ii) shall be made by an Overproduced party at the request and option of any Underproduced party or parties upon the sale, transfer, assignment, mortgage or other disposition to an unaffiliated entity (herein individually or collectively referred to as a "Transfer"), by an Overproduced party of all or any portion of its Percentage Ownership in any Gas Well unless (x) the Transfer documentation clearly provides that the assignee has expressly assumed the gas balance position of, and the liability for gas imbalances from, the assignor, (y) the assignee is not a known credit risk and the assignor has provided to the other parties evidence of the creditworthiness of assignee prior to the date that the applicable Transfer becomes effective taking into account the potential liability associated with the applicable gas imbalance.  (A cash settlement pursuant to clause (ii) above may hereinafter be referred to as an "Optional Cash Settlement".)  The parties acknowledge that a cash settlement may be made on more than one occasion pursuant to the terms of this GBA.

B.      Notification of Proposed Transfer By Overproduced Party

When an Overproduced party elects to Transfer all or a portion of its Percentage Ownership (except to an Affiliate, or where the liability for prior period gas imbalances is assumed by, an assignee), it shall give notice to all other parties to the Operating Agreement of its intended Transfer and the anticipated closing date.  Each Underproduced party shall have fifteen (15) days from the receipt of such notice in which to elect to receive a cash settlement from the transferring party for the transferring party's share of overproduction allocable to the Underproduced party.  Such election shall be made in writing and sent to the transferring party and Operator.  An Underproduced party's election not to request a cash settlement at the time of Transfer by an Overproduced party shall not, subject to the provisions of Article VII.E, below, preclude said Underproduced party from sharing in cash settlement at Termination or from requesting a cash settlement upon subsequent Transfer by an Overproduced party.

C.      Quantity of Gas

Within one hundred twenty (120) days after Termination, Operator shall provide a statement captioned "Final Quantity Statement" showing on a party-by-party basis the net unrecouped underproduction, the overproduction and the months and years in which such underproduction and overproduction occurred.  Quantities of Gas for which settlement is due shall be determined by accruing the monthly overproduction and underproduction in the order of accrual of said overproduction and underproduction; i.e. makeup Quantities taken by an Underproduced party shall be applied against the oldest overproduction and underproduction then outstanding.  In the event an Optional Cash Settlement is requested, Operator shall provide to the parties, within fifteen business days, an Interim Quantity Statement through the end of the last quarter for which Operator has production data, which shall contain similar information as would be contained within a Final Quantity Statement.

D.      Pricing

1.      For Overproduction Sold

The amount to be paid by an Overproduced party to an Underproduced party for such Underproduced party's Gas upon cash settlement shall, where the Overproduced party has sold the Gas to an unaffiliated third party, be based upon the  price  received  by the Overproduced party at the time such overproduction occurred (the "price received") shall be the gross proceeds received, less the following:

4

(a) production and/or severance taxes attributable to said Gas production paid by the Overproduced party;

(b) royalties, if any, paid by the Overproduced party to an Underproduced party's royalty owner(s) to the extent said payments amounted to a discharge of said Underproduced party's royalty obligation;

(c) any other payments made by the Overproduced party to obligees of the Underproduced party to the extent said payments by the Overproduced party were required by law and/or amounted to discharge of the obligations of the Underproduced party; and

(d) all reasonable costs and expenses incurred to third parties in connection with the sale of said Gas; e.g., gathering, transportation, compression, storage, marketing and similar fees.

In the event sales by the Overproduced party were made to an Affiliate and the price paid by such Affiliate was less than the prevailing market price in the area of the Well at the time of the sale, then the price received shall be deemed to be the WAHA Index price for the applicable month of overproduction, calculated from a pricing bulletin published at the time such overproduction occurred, less those items set forth in a-d above (the "Adjusted WAHA Index Price"). Any Underproduced party that is entitled to payment with respect to the applicable cash settlement may, based upon competent evidence, object that sales by the Overproduced party to an Affiliate were at a price less than the prevailing market price in the area of the Well at the time of the sale, in which case the Adjusted WAHA Index Price shall be used to price such sales in accordance with the prior sentence.

2.    For Overproduction Taken or Utilized and Not Sold

If there is no actual sale to establish the amount received by the Overproduced party because the Overproduced party took such Gas for its own purposes instead of selling it, the amount to be paid by an Overproduced party to an Underproduced party for such Underproduced party's Gas upon cash settlement shall be based upon the Adjusted WAHA Index Price.

3.    Proceeds for Liquefiable Hydrocarbons Not Included

The parties agree that the terms "price received by an Overproduced party" and "weighted average price received" shall not include any compensation received by a party for liquid hydrocarbons derived from processing its Gas in a Gas processing plant, unless the overproduction for which the Overproduced party is accounting was sold under a Percentage of Proceeds Sale.

.

E.    Calculation, Collection and Distribution of Payments

1.    For Cash Settlements at Termination

In the event of a cash settlement at Termination, within ten (10) days after receipt of the Final Quantity Statement from the Operator, each Overproduced party shall furnish to the Operator and the other parties a statement showing the price received for its overproduction on a monthly basis. Within ten (10) days after receipt of such pricing information from all parties, Operator shall submit to each party a statement showing the calculations and the total amount to be paid by each Overproduced party and to be received by each Underproduced party. Cash settlement shall be calculated on the "FIFO" accounting method.

Within twenty (20) days after receipt of said statement from Operator by an Overproduced party, the Overproduced party shall pay all amounts due and owing as reflected on such statement to the Underproduced parties. In the event that all sums due and owing are not paid by an Overproduced party to the applicable Underproduced parties

5

within the time periods set forth in this provision, interest shall accumulate on such unpaid amounts as provided herein. The amount to be received by each Underproduced party shall be determined by apportioning the total amount to be received by all Underproduced parties from all Overproduced parties among all Underproduced parties in proportion to the total sum to be received by each Underproduced party as a percent of the total sum to be received by all Underproduced parties. The amount to be paid by each Overproduced party to each Underproduced party shall be determined by apportioning the total amount to by paid by all Overproduced parties to each such Underproduced party among all Overproduced parties in proportion to the total sum to be paid by each such Overproduced party to all Underproduced parties as a percent of the total sum to be paid by all Overproduced parties to all Underproduced parties.

2.    Optional Cash Settlement Pursuant to Article VII.A.(ii) from an Overproduced party Who Seeks to Transfer an Interest

In the event of a request for an Optional Cash Settlement by an Underproduced party pursuant to Article VII.A.(ii) from an Overproduced party who wishes to Transfer all or a portion of its Percentage Ownership, within twenty (20) working days after receipt of Operator's Interim Quantity Statement, the Overproduced party from whom cash settlement is sought shall provide to Operator a statement showing the price received for its overproduction on a monthly basis. Within ten (10) working days after receipt of such pricing information, Operator shall: (a) calculate the total amount due and owing by the Overproduced party and the total amount to be received by each Underproduced party requesting cash settlement based on the "FIFO" accounting method; and (b) provide the Overproduced party and each such Underproduced party with a statement showing the calculations and the total sum to be paid to said Underproduced party. The Overproduced party shall pay to each such Underproduced party the total amount due and owing as reflected in said statement within twenty (20) working days after receipt of said statement. In the event that all sums due and owing are not paid by an Overproduced party to the applicable Underproduced parties within the time periods set forth in this provision, interest shall accumulate on such unpaid amounts as provided herein.

The parties acknowledge that production and sales data may not be available for a brief period immediately preceding the closing date and prior to the effective date of the Transfer, and the transferring Overproduced party agrees to cash settle for any Gas produced during said period promptly after closing. In the event that said transferring Overproduced party for any reason fails to make all cash settlement payments required under this GBA, the transferee shall be obligated to make said payments.

3.    Procedures Applicable to All Cash Settlements

For purposes of all price calculations the overproduction of each Overproduced party shall be apportioned to each Underproduced party in proportion to each Underproduced party's underproduction as a percent of the sum of the underproduction of all Underproduced parties. Overproduced volumes shall be matched to Underproduced volumes based on the order in which the overproduction and underproduction arose. The parties recognize that the months of overproduction by an Overproduced party may not coincide with the months of underproduction by an Underproduced party.

4.    Amount Subject to Refund May Be Withheld.

In the event that any portion of the price actually received by an Overproduced party shall be subject to possible refund pursuant to rules and regulations issued by the Federal Energy Regulatory Commission ("FERC"), any state, administrative agency or successor governmental authority having jurisdiction, or any court order, the amount which may be ultimately required to be refunded by FERC or any other entity may be withheld without interest by the Overproduced party until such time as a final determination is made with respect thereto or until the party to whom payment is to be made provides a bond or other security to indemnify the party obligated to make such payments in form satisfactory to the latter.

6

F.    Operator's Liability

Except as otherwise provided herein, Operator is obligated to administer the provisions of this GBA, but shall have no liability to the other parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder except such as may result from Operator's gross negligence or willful misconduct.

VIII.  OPERATING EXPENSES

The operating expenses are to be borne as provided in the Operating Agreement, regardless of whether all parties are selling or using Gas or whether the sales and use of each are in proportion to their Percentage Ownership.

IX.  DELIVERABILITY TESTS

Nothing herein shall be construed to deny any party the right from time to time to produce and take or deliver to the purchaser its full share of the Gas production to meet the deliverability test required by its purchaser. Also, nothing herein shall: (a) require the Operator to produce a Gas Well in excess of its deliverability or the applicable maximum allowable rate where such rate is established by regulatory authority having jurisdiction from time to time; or (b) prevent an Operator from operating the Gas Well in order to conduct such tests as may be required by any applicable regulatory authority from time to time.

X.  NOMINATIONS

For each party wishing to sell, utilize or dispose of Gas from a Gas Well subject to this GBA, Operator shall provide each party an initial nomination by well/delivery point(s) six working days prior to the beginning of each month.   Operator shall provide each party a revised nomination by well/delivery point as necessary during the month to reflect any change in production.  Allocation of gas production in any month in which the total nominations vary from the total production shall be by the Operator according to such procedures as Operator from time to time may reasonably establish.  Each non-operator party agrees to indemnify Operator for any charges or penalties incurred because of over or underdeliveries as compared to its nominations, except where such charges or penalties are solely attributable to action taken by Operator in total disregard of such nominations.

XI.  TERM

This GBA shall remain in full force and effect for so long as the Operating Agreement is in effect and thereafter until the gas balance accounts are settled in full.

XII.  SUCCESSORS AND ASSIGNS

The terms, covenants and conditions of this GBA shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.  The parties hereto agree to give notice of the existence of this GBA to any successor in interest and to make any transfer of any interest subject to the Operating Agreement, or any part thereof, expressly subject to the terms of this GBA.

XIII.  AUDITS

Any Underproduced party shall have the right for a period of two (2) years after receipt of payment pursuant to a final accounting and after giving written notice to all parties, to audit an Overproduced party's accounts and records relating to such payment. The party conducting such audit shall bear its costs of the audit.

XIV.  MISCELLANEOUS

7

DB1/64243914.1

A.   No assignment shall relieve the assignor from any obligation to the other parties with respect to any overproduction taken by assignor to such assignment.

B.   Any amount remaining unpaid under the GBA more than thirty (30) days after it is due shall bear interest (commencing the day after said payment was due) at the rate set forth in the Accounting Procedure (Exhibit C to the Operating Agreement).

C .   Unless the context otherwise clearly indicates, words used in the singular include the plural, and the plural includes the singular.

D.   Each party agrees to maintain the necessary records and documents to enable the gas balancing and cash settlements contemplated hereby to be made.

E.   If any party hereto fails to timely provide to Operator the data required hereby to enable gas balancing statements and cash settlements to be promptly made, Operator, or any other party, without prejudice to other remedies, is authorized to audit the records of the non-providing party and such audit shall be at the expense of the audited party.

F.   To the extent permitted by law, this GBA shall be in lieu of and take precedence over any law, statute, rule or regulation requiring Gas balancing, revenue sharing or marketing of Gas.

G.   In the event that any party is in default of any payment required by this GBA or fails to provide information required under this GBA, Operator is authorized--but not required--upon thirty (30) days notification to said defaulting party, without prejudice to any other remedies it may have, to curtail said party's Gas production from any and all Gas Wells subject to this GBA and such gas may be taken by the other parties in accordance with III.B. above.

H.   In the event of a conflict between the terms of this GBA and the Operating Agreement, the terms of this GBA shall govern except where the conflict is between Article VI of this GBA and the Operating Agreement, in which event the Operating Agreement shall govern.

I.   Nothing in this GBA shall be construed as precluding cash balancing at any time as may be agreed by the parties.

J.   Nothing contained in this GBA shall require an Overproduced Party to pay to an Underproduced Party a sum which would be violative of any law, rule or regulation.

8

Appx0437

EXHIBIT "F"

Attached to and made a part of that certain Operating Agreement dated _____, 20__, between
Chesapeake Appalachia, L. L. C., Operator, and_____,
Non-Operator

**Equal Employment Opportunity**

During the performance of this agreement, the Operator shall be bound by and comply with all terms and provisions of Section 202 of Executive Order 11246 of September 24, 1965, all of which are incorporated herein by references to the same extent as if fully set out herein, and shall be bound by and comply with the rules, regulations and relevant orders adopted pursuant to such Executive Order.

Operator assures Non-Operator that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that he does not and will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  For this purpose, it is understood that the phrase "segregated facilities" includes facilities which are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom or otherwise.  It is further understood and agreed that maintaining or providing segregated facilities for its employees or permitting its employees to perform their services at any location under its control where segregated facilities are maintained is a violation of the equal opportunity clause required by Executive Order 11246 of September 24, 1965.  Operator further understands and agrees that a breach of the assurance herein contained subjects it to the provisions of the Order at 41 CFR Chapter 60 of the Secretary of Labor, dated May 21, 1968, and the provisions of the equal opportunity clause enumerated in contracts between the United States of America and Non-Operator.

AAPL – FORM 610RS – 1989

## MODEL FORM RECORDING SUPPLEMENT TO
## OPERATING AGREEMENT AND FINANCING STATEMENT

THIS AGREEMENT, entered into by and between _____, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated _____ (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1.     This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2.     The parties do hereby agree that:

    A.   The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

    B.   The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

    C.   All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

    D.   Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

    E.   Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

    F.   An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

    G.   The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

    This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

    H.   The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

AAPL – FORM 610RS - 1989

I.    The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J.    Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K.    All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3.    The parties hereby grant reciprocal liens and security interests as follows:

A.    Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B.    Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C.    To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.    If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E.    If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F.    The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G.    To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H.    The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

Appx0440

AAPL – FORM 610RS - 1989

4.    This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5.    This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6.    In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7.    This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8.    Other provisions.

Appx0441

AAPL – FORM 610RS – 1989

_____, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model  Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.

IN WITNESS WHEREOF, this agreement shall be effective as of the _____ day of _____, _____.

**OPERATOR**

**ATTEST OR WITNESS**

By:

**Type or Print Name**

Title:
Date:
Address:

**NON-OPERATORS**

**ATTEST OR WITNESS**

By:

**Type or Print Name**

Title:
Date:
Address:

**ATTEST OR WITNESS**

By:

**Type or Print Name**

Title:
Date:
Address:

**ATTEST OR WITNESS**

By:

**Type or Print Name**

Title:
Date:
Address:

Appx0442

AAPL – FORM 610RS - 1989

## ACKNOWLEDGMENTS

**NOTE:**

     The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

### Individual Acknowledgment

State of _____ §

               § ss.

County of _____ §

     This instrument was acknowledged before me on _____

by _____

(Seal, if any)                              _____

                                     Title (and Rank) _____

                                     My commission expires: _____

### Acknowledgment in Representative Capacity

State of _____ §

               § ss.

County of _____ §

     This instrument was acknowledged before me on _____

by _____ as _____ of

_____.

(Seal, if any)                              _____

                                       Title (and Rank) _____

                                     My commission expires: _____

Appx0443

# EXHIBIT 5

## <u>SETTLEMENT AGREEMENT AND RELEASE</u>

THIS SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is made and entered into to be effective as of the <u>8</u> day of <u>October</u> 2018, by and between Epsilon Energy USA, Inc. ("Epsilon") on the one hand and Chesapeake Appalachia, L.L.C. ("Chesapeake") on the other hand.   Together, Epsilon and Chesapeake are referred to herein as the "Parties."

WHEREAS, Chesapeake and Epsilon, among others, are parties to several Operating Agreements ("JOAs") for the exploration and development of oil and gas interests in production units in Susquehanna and Bradford Counties, Pennsylvania.

WHEREAS, on February 8, 2018, Epsilon proposed, among other wells, the Cannella N SUS 3LH well and the Cannella S SUS 4LH well (collectively, the "Proposed Cannella Wells") to the other working interest owners in the pertinent JOAs.

WHEREAS, on April 11, 2018, Epsilon proposed three wells: a Baltzley N SUS 7LH, Baltzley S SUS 6LH, and Baltzley S SUS 8LH to be located in Rush Township, Susquehanna County, Pennsylvania (the "Proposed Baltzley Wells").

WHEREAS, on August 15, 2018, Chesapeake proposed the Cannella 24HC and the Cannella 25HC Well (collectively, the "Allocation Wells"), as well as the Cannella 6H Well (the "Cannella 6H Well"), to the other working interest owners in the pertinent JOAs.

WHEREAS, on September 14, 2018, Epsilon consented to the Cannella 6H Well, which Chesapeake is drilling or has drilled, but did not consent to the Allocation Wells.

WHEREAS, the Cannella 3LH Well and the Allocation Wells, among other wells, have been made the subject of a Complaint filed as Case No. 3:18-cv-01852 in the United States District Court for the Middle District of Pennsylvania, styled *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, L.L.C.* (the "Lawsuit").

WHEREAS, pursuant to the Lawsuit, Epsilon seeks, among other things, to prevent Chesapeake from drilling the Allocation Wells and seeks to compel Chesapeake to drill the Cannella 3LH Well.

WHEREAS, Chesapeake denies all allegations that Epsilon has made against it in the Lawsuit and otherwise, and would assert additional defenses as a matter of law and fact.

WHEREAS, the undersigned Parties have reached an agreement to resolve all matters arising out of the facts and claims set forth in the Lawsuit.

NOW, THEREFORE, in consideration of the following premises and the mutual covenants, and intending to be legally bound, the Parties hereby agree as follows:

1.    Epsilon consents to the drilling of the Allocation Wells after drilling operations are completed on the Cannella 6H Well.  Chesapeake shall acknowledge Epsilon's consent to participate in these wells (including the Allocation Wells) and turn the wells in line by the end of the first quarter of 2019.

2.    Chesapeake will drill the Cannella 3LH Well according to its revised plans, provided that Chesapeake is able to timely obtain a drilling permit before the drilling rig is moved off the Cannella Well Pad.  Chesapeake will make best efforts to obtain the permit and will submit a complete application for such a permit on or before October 31, 2018.

3.    Chesapeake will drill, complete, and put in line a minimum of 8,000 net linear feet in the Marcellus Formation, including all wells drilled off the Canella Well Pad in 2018, to Epsilon by year-end 2019.  The wells drilled to meet this commitment may include cross-unit wells to which Epsilon will consent.

4.    In addition to Paragraph 3 above, Chesapeake will drill, complete, and turn in line an additional 2,000 net linear feet in the Marcellus Formation to Epsilon by the end of the first quarter of 2020.

5.    Epsilon will not withhold consent to participate in Chesapeake's well proposals to effectuate Paragraphs 3 and 4 above.

6.    Chesapeake will provide Epsilon scheduling and additional details by the end of each quarter, commencing with the last quarter of 2018, to allow Epsilon to confirm on an ongoing basis the commitments identified in Paragraphs 3 and 4 above.  Chesapeake and Epsilon will also hold a fourth quarter meeting annually to discuss the upcoming years' development plans.

HNC

Appx0446

7.    Chesapeake will confirm Epsilon's consent election in the Cannella 6H Well and provide appropriate reporting.

8.    Chesapeake confirms that Epsilon may propose wells under all of the JOAs between them, in accordance with the terms of the JOAs, including but not limited to, for example, compliance with the Conformity to Spacing Pattern requirement.  Chesapeake will meet with Epsilon to discuss the current spacing pattern upon execution of the Agreement and will advise Epsilon of any proposed revisions thereto during its annual fourth quarter meetings.

    a.    Chesapeake confirms it will comply with all obligations under the JOAs and confirms that it will not intentionally consent to proposals for the purpose of allowing them to expire.

    b.    Should Chesapeake consent and confirm operatorship of a well proposed by Epsilon, it will advise Epsilon prior to the expiration of the period for commencement of operations of the status of its activities under the proposal.

    c.    To the extent that a well proposal is made which Chesapeake believes does not conform to JOA requirements, Chesapeake will so advise in its election response.

    d.    If Chesapeake does not consent to a proposal and will not act as the operator for that proposal, Chesapeake will cooperate with the party designated, to the extent permitted under the JOA, as operator, and will not unreasonably withhold cooperation, including but not limited to, permitting and access to co-owned assets, such as water withdrawal points and impoundments.

    e.    Based on the commitments in Paragraphs 3 and 4 above, Epsilon will not make any proposal for wells to be drilled before 2020.

9.    Each Party acknowledges that it will keep the terms of this Agreement confidential, except that the Parties shall have the right to disclose (i) the existence of this Agreement; and (ii) that the matter has been resolved amicably.  In addition, the Parties to this Agreement, and their respective heirs and assigns, shall have the power to make disclosures of the terms of this Agreement as may be required by operation of law, judicial process, or to enforce the provisions of this Agreement.

10.    In compromise and settlement of any and all claims, demands, actions, causes of action, liabilities, obligations, expenses, costs, punitive damages, attorney



fees, or other damages of every kind and character that Epsilon could assert against Chesapeake arising from the Lawsuit including, but not limited to, the proposals for Allocation Wells, proposals for the Proposed Canella Wells and the proposals for Proposed Baltzley Wells, Epsilon shall dismiss the Lawsuit with prejudice and without costs or attorneys' fees.

11.    This Agreement compromises and resolves disputes between the Parties and was reached by the Parties to avoid future costs and to eliminate the uncertainty of further litigation. Execution of this Agreement shall not be construed as an admission of liability of any kind.

12.    Each Party acknowledges that it has relied solely and completely upon its own judgment and the advice of its own legal counsel in entering into this Agreement.

13.    This Agreement is binding upon the Parties hereto and shall inure to the benefit of the parties hereto, their heirs, executors, administrators, successors, parent, subsidiary, and affiliated entities, and assigns.

14.    If any part or provision of this Agreement shall be held void or invalid, the remaining provisions shall remain in full force and effect.

15.    Each Party acknowledges that it has read and understood the effect of this Agreement.

16.    Each Party states that it executes this Agreement of its own free will and accord, for the purposes and consideration set forth in this Agreement.

17.    This Agreement is the complete agreement between the Parties regarding the Lawsuit and may be modified or amended only by a writing signed by all Parties.

18.    Each Party warrants and represents that the person signing this Agreement on its behalf has full and complete authority to do so.

19.    This Agreement shall be deemed to have been made and entered into in the Commonwealth of Pennsylvania and shall be governed by, and construed in accordance with, the substantive laws of the Commonwealth of Pennsylvania.

20.    This Agreement may be executed in any number of counterparts, and by different Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one

Appx0448

and the same instrument.  Signatures by facsimile or email shall be acceptable and sufficient to make this Agreement fully effective.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed.

EPSILON ENERGY USA, INC.

By: HeNRy N. CLANToN
Its:  C O O

CHESAPEAKE APPALACHIA, L.L.C.

By: Sheldon W. Burleson
Its: _Vice President - Appalachia Business Unit_

## ACKNOWLEDGEMENTS

STATE OF *Texas*        §
                     §

COUNTY OF *Harris*      §

On this *8th* day of *October*, 2018, before me personally appeared *Henry Clanton*, to me personally known, who, being by me duly sworn, did say that he is the *Chief Operating Officer* of **Epsilon Energy USA, Inc.,** a corporation, and in that capacity, being authorized to do so, executed the foregoing instrument for the purpose contained therein by signing the name of the corporation by himself as *Chief Operating Officer*

My commission expires: *June 05, 2020*      *Rose Price*
                                             Notary Public

```
ROSE PRICE
MY COMMISSION EXPIRES
JUNE 5, 2020
NOTARY ID: 11992080
```

STATE OF OKLAHOMA      §
                                §

COUNTY OF *OKLAHOMA*     §

On this *9th* day of *October*, 2018, before me personally appeared *Sheldon Burleson* to me personally known, who, being by me duly sworn, did say that he is the *Vice President-Appalachia BU* of **Chesapeake Appalachia, L.L.C.,** a limited liability company, and in that capacity, being authorized to do so, executed the foregoing instrument for the purpose contained therein by signing the name of the limited liability company by himself as *Vice President-Appalachia BU*

My commission expires: *01/20/19*      *Sheryl Y Davis*
                                             Notary Public

```
SHERYL Y. DAVIS
Notary Public
State of Oklahoma
Commission # 11000689 Expires 01/20/19
```

HNC
Appx0450

# EXHIBIT 6

**CHESAPEAKE APPALACHIA, LLC**
**14 CHESAPEAKE LANE**
**SAYRE, PA. 18840**
**Telephone Number: 570-882-7702**

February 9, 2021

Epsilon Energy USA, Inc.
Attn: Henry N. Clanton
16945 Northchase Drive, Suite 1610
Houston, Texas 77060

Re: Shared Agreement
    SRBC Source 12
    Wyalusing Creek Surface Water Withdrawal

Dear Mr. Clanton:

This letter confirms that Chesapeake Appalachia, LLC is willing to supply Epsilon Energy USA, Incorporated with water up to the approved amount per the Docket conditions from its Susquehanna River Basin Commission (SRBC) approved surface water withdrawal source at Wyalusing Creek on SRBC Docket Number 20170605, approved June 16, 2017, located in Rush Township, Susquehanna County, Pennsylvania, for the term of the Docket effective until June 15, 2022; or until the agreement is terminated or discontinued by either party, for use in gas well development operations under 18 CFR Section 806.22(f).

Such supply of water will be provided subject to the terms and conditions of the Water Sharing Agreement that will be entered into by and between Chesapeake Appalachia, LLC and Epsilon Energy USA, Incorporated. Chesapeake Appalachia, LLC understands that it will in any event remain responsible for compliance with the terms and conditions of the SRBC Docket Number 20170605.

This letter does not obligate Chesapeake Appalachia, LLC to sell water to Epsilon Energy USA, Inc.; rather it states a willingness to do so subject to availability as determined by Chesapeake Appalachia, LLC.

Sincerely,

Eric Haskins
Manager, Regulatory Operations

# EXHIBIT 7



# Susquehanna River Basin Commission

*a water management agency serving the Susquehanna River Watershed*

## NOTICE OF REQUEST FOR TRANSFER

The undersigned, a duly authorized agent or officer, hereby provides notice that effective
<u>August 8, 2009</u> (date), <u>Epsilon Energy, Ltd</u> (new owner's name) will take
ownership of the <u>Surface Water Withdrawal-Wyalusing Creek</u> facility, located in
<u>Rush Township, Susquehanna County, PA</u> (municipality, county, and state) currently approved
under Susquehanna River Basin Commission (Commission) Docket No(s). <u>20081227</u>.
<u>Epsilon Energy, Ltd</u> (new owner's name) hereby certifies that it will comply
with all terms and conditions contained in Docket No(s). <u>20081227</u> and assume all
other associated obligations. The undersigned hereby requests that the aforementioned approvals
be transferred to <u>Epsilon Energy, Ltd</u> (new owner's name) pursuant to
Commission Regulations 18 CFR Section 806.6:

    <u>X</u>    806.6(b) as a transfer.

    _____    806.6(c) as a conditional transfer and shall, within ninety (90) days from the date of the change of ownership, complete and submit the required application(s) to modify the conditionally transferred approval.

    _____    806.6(d) as a conditional transfer and shall, within ninety (90) days from the date of the change of ownership, complete and submit the required application(s) for Commission review and approval of the project.

I understand that failure to submit applications as specified nullifies the conditional transfer and subjects the aforementioned owner to enforcement action in accordance with Part 808 of Commission regulations.

I further attest that the undersigned is a legal representative of the organization requesting the docket transfer and has the authority to enter the above organization into binding agreements.

The above statements are made subject to the penalties provided under 18 Pa. C.S. §4904, Section 210.45 of the New York Penal Law, Section 9-101 Maryland Crimes Code and 28 U.S.C. §1746, relating to perjury or unsworn falsification to authorities.

Signature: _David P. Heinz_      Date: _12/7/09_

Printed Name: _David P. Heinz_      Title: _V.P. Exploration_

35731.1



# SUSQUEHANNA RIVER BASIN COMMISSION

1721 North Front Street • Harrisburg, Pennsylvania 17102-2391
Phone (717) 238-0423 • Fax (717) 238-2436
Web   http://www.srbc.net

**Docket No. 20081227**
**Approval Date:  December 4, 2008**

## TURM OIL, INC.

Surface Water Withdrawal (Peak Day) of up to 0.216 mgd, from Wyalusing Creek,
for Development and Completion of Natural Gas Wells,
Rush Township, Susquehanna County, Pennsylvania

### Review Authority

This project is subject to review pursuant to Article 3, Section 3.10, of the Susquehanna River Basin Compact (Compact), P.L. 91-575, 84 Stat. 1509 et seq., and Susquehanna River Basin Commission (Commission) Regulation §806.4, relating to projects requiring review and approval. The Commission received the surface water withdrawal application on September 5, 2008 and additional information on October 30, 2008.

### Description

**Purpose.** The purpose of the application is to request approval of a surface water withdrawal for the development and completion of natural gas wells targeting the Marcellus Shale Formation. The withdrawal will support the consumptive use of water as described in Commission Docket No. 20081223.

**Location.** The surface water withdrawal specified in the application is located in the Middle Susquehanna Subbasin, HUC 02050106070, Wyalusing Creek Watershed, Rush Township, Susquehanna County, Pennsylvania.

**Project Features.** The project sponsor has requested approval of a withdrawal of up to 0.249 million gallons per day (mgd) (peak day) from Wyalusing Creek in Rush Township at a maximum instantaneous rate of withdrawal of 173 gallons per minute (gpm). The withdrawal will support natural gas development in Susquehanna County, Pennsylvania. Commission staff recommends a reduction in the requested amount and maximum instantaneous rate of withdrawal, as described below.

The withdrawal location is specified in the application and has been reviewed for sensitive habitats and threatened and endangered species. Specific location information concerning discrete water-related project features has been withheld for security reasons.

The natural gas development project entails withdrawing water from Wyalusing Creek; pumping it to a tanker truck for transport to drilling pads; or piping directly to a drilling pad for

*A water management agency serving the Susquehanna River watershed*

use in well drilling, development, and completion. Water will be stored on-site in large tanks (approximately 22,000 gallons each) or in storage pits and impoundments. Most of the water will be used for fracture stimulation (or hydrofracing) of natural gas production wells and may be stored for a month or more during the setup period.

The project sponsor has requested a withdrawal (peak day) of up to 0.249 mgd so that water could be withdrawn from Wyalusing Creek and delivered to several drilling pads during any one day.

**Coordination.** Commission staff has coordinated with the Pennsylvania Department of Environmental Protection (PADEP), Department of Conservation and Natural Resources (DCNR), and the Pennsylvania Fish and Boat Commission (PFBC).

### Findings

The project is subject to Commission approval, monitoring, and reporting requirements, as per Commission Regulations §806.4, §806.23, and §806.30.

The project sponsor has requested approval for a surface water withdrawal of up to 0.249 mgd (peak day) from Wyalusing Creek in Rush Township, at a maximum instantaneous withdrawal rate of 173 gpm.

Wyalusing Creek, at the point of taking, is classified as a warm water fishery (WWF) (Title 25, Chapter 93, Pennsylvania Code). Commission staff has calculated the 7-day, 10-year low flow (Q7-10) for Wyalusing Creek at the point of taking to be 6.78 cubic feet per second (cfs) (3,041 gpm), and the average daily flow to be 211 cfs.

The requested rate of withdrawal is less than 10 percent of the low flow rate that occurs for 7 consecutive days during a 10-year period (Q7-10) at the proposed intake location. However, based on its evaluation of adverse cumulative impacts from upstream uses, Commission staff recommends reduction of the maximum instantaneous withdrawal rate to 150 gpm. A protective passby flow requirement is not needed, provided that the withdrawal rate does not exceed 150 gpm.

The project sponsor also has requested the approval for three additional withdrawals in the headwaters of the Wyalusing Creek Watershed: East Branch Wyalusing Creek, Elk Lake Stream, and Deer Lick Creek. To mitigate adverse cumulative impacts of the four withdrawals while providing operational flexibility to the project sponsor, Commission staff recommends that only one withdrawal of the three headwater withdrawals operate at any time, which will allow this withdrawal to be operated at the recommended rate without further protection of passby requirements.

Based on descriptions of the drilling process, estimates regarding the quantity of water needed per well, and the proposed number of drilling pads, the project sponsor requested a peak day withdrawal of 0.249 mgd. Commission staff recommends approval of up to 0.216 mgd, which is the maximum quantity that could be taken at the recommended withdrawal rate.

53035.1

Appx0456

20081227

Commission staff recommends that the surface water intake design minimize potential aquatic impacts associated with impingement and entrainment. The final intake information and the design for the withdrawal device should be submitted to Commission staff for review and approval.

Commission staff recommends that the project sponsor install and then maintain a totalizing meter, accurate to within 5 percent, at the intake to measure the total daily quantity of water withdrawn from Wyalusing Creek at the specified point of taking. The project sponsor should submit a metering plan or metering specifications to the Commission for review and approval prior to the withdrawal of any water from Wyalusing Creek. The project sponsor should record the daily quantity of water withdrawn, the destination water storage location, and the destination drilling pad name(s) and well identification number(s) served by the storage facilities (if any), and electronically submit the required monitoring data to the Commission quarterly, as specified in Commission Regulation §806.30(b)(1).

The project sponsor should submit proof of meter installation prior to the initiation of the withdrawal.

The project sponsor should submit to the Commission information regarding all tanker trucks authorized to pump and haul water from the proposed surface water intake. This information should include: license plate number, owner of the vehicle, and the tanker truck's holding capacity, or other information on hauling contractors acceptable to the Commission. This information should be filed with the Commission prior to the use of any vehicle for the transport of water from the withdrawal point to the project area.

The project sponsor should submit to the Commission information regarding the use of a pipeline to deliver water to drilling pads or centralized storage locations. This information should be filed with the Commission prior to the use of any pipeline for transport of water from the withdrawal point to the project area.

The project sponsor should certify to the Commission that it has been granted access by the property owner to the proposed withdrawal location.

To prevent the spread of aquatic nuisance species, water from surface water sources shall be stored, injected into a well, or discharged according to applicable statutes and regulations. Additionally, equipment, such as vacuum hoses and pumps, should be disinfected according to state guidelines if the equipment is utilized at multiple surface water sources.

Commission staff recommends that the length of the approval be limited to 4 years.

The project is subject to the Commission's water conservation requirements, as per Commission Regulation §806.25(b).

The project sponsor has paid the appropriate application fee, in accordance with Commission Regulation §806.13, and in accordance with Commission Resolution No. 2007-07.

53035.1

Appx0457

The project sponsor has provided all proofs of notification, as required by Commission Regulation §806.15.

No adverse impacts to area surface water or groundwater withdrawals are anticipated. The project is physically feasible, does not conflict with or adversely affect the Commission's Comprehensive Plan, and does not adversely influence the present or future use and development of the water resources of the basin.

### Decision

1. The project's surface water withdrawal of up to 0.216 mgd from Wyalusing Creek at the location specified in the application in Rush Township, Susquehanna County, Pennsylvania, is approved pursuant to Article 3, Section 3.10, of the Compact.

2. The foregoing findings are hereby adopted and shall be incorporated into and made a part of this decision.

3. The project sponsor shall comply with all Commission regulations, including reporting requirements, as per Commission Regulation §806.30.

4. The project sponsor shall submit its intake design/withdrawal device; disinfection plan, if appropriate; and meter specifications or metering plan to measure the quantity of water withdrawn for review and approval by Commission staff prior to any withdrawal. The project sponsor may propose alternative metering and monitoring for Commission staff review and approval. The project sponsor shall not utilize the device until it receives written approval of the design and disinfection plan, if appropriate, from the Commission.

5. Upon approval of the meter specifications or metering plan, and prior to any withdrawal, the project sponsor shall install and maintain metering on the withdrawal from Wyalusing Creek, in accordance with Commission Regulation §806.30. The project sponsor shall notify the Commission, in writing, when the meter is installed and certify the accuracy of the measuring device to within five (5) percent of actual flow.

6. The project sponsor shall keep daily records of the project's surface water withdrawal and shall report the data to the Commission quarterly, and as otherwise required. The project sponsor also shall keep daily records of the well sites receiving the water withdrawn under this approval and shall report the data to the Commission quarterly, and as otherwise required. Quarterly monitoring reports shall be submitted on-line and are due within thirty (30) days after the close of the preceding quarter.

7. The maximum instantaneous rate of withdrawal at the stream intake shall not exceed 150 gpm.

8. The project sponsor shall submit to the Commission information regarding the method of water transport (tanker truck or pipeline). In addition, the project sponsor shall demonstrate to the satisfaction of the Commission that all water withdrawn from surface water

20081227

sources is transported, stored, injected into a well, or discharged with appropriate controls and treatment to prevent the spread of aquatic nuisance species.

9. The project sponsor shall provide to the Commission the following information regarding the trucks transporting water from the Wyalusing Creek intake to the project area: license plate number, owner of the vehicle, and the tanker truck's holding capacity, or other information on hauling contractors acceptable to the Commission. This information shall be submitted prior to the use of the vehicle for water transport for the project.

10. The project sponsor shall certify to the Commission that the property owner has granted access to the proposed withdrawal location.

11. The project sponsor shall maintain any meters or other measuring devices, accurate to within five (5) percent, so as to provide an accurate record of withdrawals and uses, and certify to the Commission once every two (2) years, or as otherwise requested, the accuracy of all measuring devices and methods to within five (5) percent of actual flow.

12. The project sponsor shall comply with the water conservation requirements specified in Commission Regulation §806.25(b).

13. To satisfy the Commission's registration requirement, the project sponsor shall register with the PADEP all surface water and groundwater sources described in this docket in accordance with the Pennsylvania Water Resources Planning Act (Pennsylvania Act 220).

14. If the project sponsor fails to comply with the provisions of the Compact or any rule, regulation, or order of the Commission, or any term or condition of this docket, the project is subject to enforcement actions pursuant to Commission Regulation §808.

15. Commission approval shall not be construed to exempt the project sponsor from obtaining all necessary permits and/or approvals required for the project from other federal, state, or local government agencies having jurisdiction over the project. The Commission reserves the right to modify, suspend, or revoke this action if the project sponsor fails to obtain or maintain such approvals.

16. The Commission reserves the right to reopen any project docket or issue such additional orders, as may be necessary, to mitigate or avoid adverse impacts or otherwise to protect public health, safety, welfare, or the environment.

17. Commission approval confers no property rights upon the project sponsor. The securing of all rights necessary and incident to the project sponsor's development and operation of the project shall be the sole and exclusive responsibility of the project sponsor, and this approval shall be subject thereto.

18. This approval is effective until December 4, 2012. As specified in Commission Regulation §806.31(e), the project sponsor shall submit a renewal application by June 4, 2012, and obtain Commission approval prior to continuing operation beyond December 4, 2012.

53035.1

Appx0459

20081227

19.  The project sponsor has a period of three (3) years from the date of this approval to initiate the project or this approval will automatically expire, unless an extension is requested by the project sponsor and approved by the Commission.  Likewise, if the project is discontinued for such a time and under such circumstances that an abandonment of the project may be reasonably inferred, the Commission may rescind the approval of the project unless a renewal is requested by the project sponsor and approved by the Commission.

**CERTIFICATION:**  I, Stephanie L. Richardson, Secretary to the Susquehanna River Basin Commission, do hereby certify that the foregoing project docket was approved by the Susquehanna River Basin Commission on December 4, 2008.

Dated:  December 5, 2008

*Stephanie L Richardson*

Stephanie L. Richardson

53035.1

Appx0460

# EXHIBIT 8

Classification: DCL-Internal

Thanks Henry, I appreciate your response.  Do you happen to have a copy of the JOA's you are referencing that you could send me?

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Thursday, October 15, 2020 2:50 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] FW: Auburn Development Planning

Julie:

Sorry for the delay in responding to your question on September 29th on the JOA as it relates to operatorship of non-operator new well proposals.  Following our internal review of the relevant JOAs, we believe Article VI, B, 2. Operations By Less Than All Parties, 2nd paragraph is the article of the JOA that will govern the proposals.  In a scenario where a non-operator proposes wells and CHK elects not to participate, and there is 100% subscription of the proposals, our interpretation of the article is that the incumbent Operator (CHK) would serve as Operator on behalf of the consenting parties.

As always, I appreciate your thoughts here.
HNC

---

**From:** Henry Clanton
**Sent:** Wednesday, October 14, 2020 11:07 AM
**To:** 'Julie Woodard' <julie.woodard@chk.com>
**Subject:** RE: Auburn Development Planning

Julie:  Just to keep you in the loop & informed, we have filed the applications for drilling permits this week for the Craige pad development.  While I am hopeful Mike & Jody will be successful in finding a transaction point acceptable to both our companies, we need to advance these development plans should a transaction not come together and need to work out an alternative way forward.  Thx.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Tuesday, October 13, 2020 3:29 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** Re: Auburn Development Planning

Ok sounds good. I'll let Jody know to be expecting the offers.

Get Outlook for iOS

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Tuesday, October 13, 2020 2:26:40 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:  Mike is in direct contact with Jody regarding the sale/purchase of the Craige pad with associated units.  So, our team will continue to support Mike on this effort and I will keep you appraised of our progress.  I are suspending any further work on a potential cash/carry model for now given the pad sale approach above seems to be a workable interim solution for both sides.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Monday, October 12, 2020 3:01 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Perfect, thanks Henry!

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, October 12, 2020 2:33 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Got it, thanks.  Yes, my goal is to get something over to you guys for consideration this week. I'm still catching up from being out last week, but do have a scheduled follow-up discussion with Mike later

today or tomorrow.

Will be in touch.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Monday, October 12, 2020 2:00 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<span style="text-align:center;display:block">Classification: DCL-Internal</span>

We have internally discussed, as well as you and I have, the options available to us moving forward. I shared the same with our BD team last week and they spoke directly with Mike. Mike conveyed Epsilon's interest in all of Auburn and BD conveyed that a buyout of all of Auburn wouldn't be possible during Bankruptcy and suggested smaller pad deals as you and I had already spoke about. Mike sent over the Craige pad as well as a map of several others we operate that you all may be interested in (see attached). I told management that you and I had also discussed a cash/carry scenario, however, I think there is less appetite for that on our end. Our preference would be to entertain offers to purchase the pads and existing laterals that are contained in the units that you all want to drill in the next 3-5 years. We believe we can get these approved while in bankruptcy. I was under the impression that you would have some informal proposals for us sometime this week to evaluate.

Please let me know your thoughts at your convenience.

Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, October 12, 2020 1:39 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Please do. I'm stuck until after 3pm, but can read & reply to your summary. Thx. HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Monday, October 12, 2020 1:07 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<span style="text-align:center;display:block">Classification: DCL-Internal</span>

Henry- I am available until 2pm or at 4:30. If we can't catch up via phone today, I can send you an email summarizing where I think we are at and what our expectations are. Thanks

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, October 12, 2020 12:42 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie: I'm available at 3pm today if that works for you.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Monday, October 12, 2020 8:48 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Good morning Henry,
Hope your vacation was great!  Let me know when you have time to touch base today.

Thanks,
Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, October 5, 2020 10:04 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie, I'm not able to join the c-call. However Shannon will be address all technical components of our well planning. I'll check in with you later this week. HNC

-------- Original message --------
From: Julie Woodard <julie.woodard@chk.com>
Date: 10/2/20 4:59 PM (GMT-06:00)
To: Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
Subject: Re: Auburn Development Planning

Thanks Henry, sounds great!

I look forward to talking with you all next week.

Have a great weekend!

Get Outlook for iOS

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Friday, October 2, 2020 4:44:36 PM

**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie,

Hope you don't mind, but I'm allowing both Paul and Rachel to listen in on the technical discussion on Monday's c-call.  I'm still planning on participating, however our guys are prepared to carry the call should I not be able to join.

Mike has reached out to Derick to re-initiate Auburn wide transaction discussions. Don't believe they have connected yet.  We are also preparing a cash/carry model to bring forward.  Internally, I'm getting some good traction around a model of this type, especially as a work around for the 2021 program.  I am trying get a model over to you sometime next week for consideration.

Still looking at Craige/Cook pad acquisitions also as a way forward.

Thanks to you again for your efforts in finding the way(s) forward here.

Hope you have a good weekend.
HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Wednesday, September 30, 2020 12:44 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Tomorrow looks good, whatever time works best for you.

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Wednesday, September 30, 2020 12:07 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

I'm tied up most of this afternoon, with some brief gaps.  How are you looking tomorrow about 9:30am or after?

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Wednesday, September 30, 2020 11:00 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

I do have Courtney working up the lateral feet you would have in both the LRJ and Koromolan and I intended to schedule a meeting once we hear from Shannon to discuss these as options as well as the Craige pad development.  We will have our Geology, Reservoir, Planning and Land leaders on the call.

We could take a look at any offer you want to make on the Craige pad and/or others as well as a cash/carry option.

I am free at 1:30 this afternoon if you would like to discuss.

Thanks,
Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Wednesday, September 30, 2020 10:52 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Thanks Julie.

Regarding potential LRJ & Koromlan development in 2021, I've asked Shannon to get with your guys & find out what those wells would look like net to our interests so we can evaluate.

Regarding purchase of the Craige pad, could we consider adding a couple other pads to give it a bit more scale?…..others like the Cook pad come to mind.

I think a cash/carry option for Craige development is worthy of discussion.  Maybe you & I can have a brief call later today or tomorrow to kick around what a model of that type might would look like.

Thx.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Tuesday, September 29, 2020 4:51 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Thank you Henry, I have let our team know to be expecting a call/email from Shannon and have also let our VP and BD group know of the interest you all still have in Auburn.

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Tuesday, September 29, 2020 4:49 PM
**To:** Julie Woodard <julie.woodard@chk.com>

**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:  let me look into these alternatives in the morning and thanks for the additional alternatives/scenarios.  I have directed Shannon to contact Nick & resubmit our development planning to him.  Also seeking our interest in purchasing the unit as discussed, and have already reconfirmed we do/would still have interest in a total Auburn transaction.  Thanks Julie.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Tuesday, September 29, 2020 3:52 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

What if I could get a well drilled in the LRJ South and Koromolan North and South in 2021?  I know you all have a WI in those units.

---

**From:** Julie Woodard
**Sent:** Tuesday, September 29, 2020 3:44 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Henry,
Another idea would be a cash/carry deal for the laterals to be drilled from the Craige pad.

I informed our Subsurface team that Shannon would be reaching out.

Thanks for taking time to chat this afternoon, I always appreciate your candor.

Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Tuesday, September 29, 2020 10:36 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Yes, I can make 1:30 work.  I'll call you then.  Thanks Julie.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Tuesday, September 29, 2020 9:28 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Thanks for the quick response Henry.  I certainly understand what your goals are, I know those haven't changed.

Can you verify which article in the JOA you all are relying on?

As to contract operating, that certainly is an option that I figured you all would be vetting.  My concern is that until you are named Operator or one has been named, I don't think we can just sign these agreements that you have sent.

I should be free around 1:30 if you have time for a call.

Thank you,
Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, September 28, 2020 4:42 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie

To be clear we are less interested in who operates the proposed program as long as we believe quality, safety and costs are controlled. We are prioritized on developing the Marcellus reserves in Auburn and the larger resource for the benefit of our shareholders.

As we understand the JOA, CHK has the following options when well proposals are made by others. CHK can; consent and operate, non-consent but operate at the consenting parties request, or decline to operate. In a scenario where CHK elects not to participate and declines to operate, the consenting party or parties have the right to operate.  We need to understand how CHK would transfer operatorship and cooperate with the designated operator, no matter whom.

An alternative approach could be to have one of the consenting parties serve as contract operator (drill/complete/flowback/turn-over to CHK @ TIL) with CHK remaining the operator of record.

Again, thank you for your attention to the resolution of this matter.  We understand development in Auburn may not be a priority to CHK both from a manpower resources and commercial perspective, however it is obviously important to EPSN.

Thx.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>

**Sent:** Monday, September 28, 2020 11:15 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<center>Classification: DCL-Internal</center>

Henry,
If you could send me your plans for how you all intend to gain operations under the JOA, that would be helpful.  We recall bringing it up on our last call and you indicated you would review with your Land/Legal teams.  I don't think we ever heard back on that.

Thanks,
Julie

---

**From:** Julie Woodard
**Sent:** Monday, September 28, 2020 9:57 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<center>Classification: DCL-Internal</center>

Henry,
Thank you for your email.  We are very aware of the Settlement Agreement and will continue to comply with all of its terms.  I do appreciate the openness and candor we do have.  I will call you to discuss.

Thanks,
Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, September 28, 2020 9:30 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

I'm sure you remain aware, but if you haven't already it might be appropriate to make the new members of your management team aware of the settlement agreement that remains in force regarding development in Auburn.  I've attached the final settlement agreement for your convenience and direct you to item 8.d.

Please be clear, development in Auburn in 2021 is our priority.  We continue to work toward and are prepared to propose and operate development in 2021 should CHK elect not to participate (and operate).  No development in Auburn next year is not going to be acceptable outcome for us.

Thank you for your continued professionalism with me and keeping the lines of communication open between our companies.  We remain willing to discuss alternative development scenarios so long as development in 2021 occurs.

Good luck in your discussions with your management team and I'm standing by to help us move forward development planning in Auburn.

Thx.
HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Friday, September 25, 2020 10:48 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<center>Classification: DCL-Internal</center>

I just sent you a note before seeing this!

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Friday, September 25, 2020 10:40 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] FW: Auburn Development Planning

Julie:

I know it hasn't been a pleasant week for you guys, but can you check on the status of this commitment letter.  We need it to move forward with our well permitting.  It's a simple one page, self-explanatory form.  Really just an administrative filing to allow SRBC to check a box.

Thx.
HNC

**From:** Henry Clanton
**Sent:** Friday, September 18, 2020 12:14 PM
**To:** 'Julie Woodard' <julie.woodard@chk.com>
**Subject:** RE: Auburn Development Planning

Julie:  yes, the letter is CHK commitment to EPSN.  HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Friday, September 18, 2020 11:23 AM

**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Hi Henry,
Thanks for sending along.  To clarify, I assume CHK is not intended to be a party to said letter?

Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Friday, September 18, 2020 11:12 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

Hope all is well w/you.

Per our discussions regarding EPSN's well permitting for Auburn (Craige) development, please find attached a draft commitment letter that the SRBC will accept to allow EPSN to apply for and receive the necessary Approval by Rule from the SRBC for water use on the pad.  I believe I've shared with you we have moved recently but I case I haven't, please find below our new address for the letter:

Epsilon Energy USA, Inc.
16945 Northchase Drive; Suite 1610
Houston, TX 77060

Although the regulators only require the commitment letter between us, we are assembling a draft Water Facility Use Agreement that I will forward to you for CHK's review/comments.  Also, legal is continuing to review the Unit Agreements and associated JOA's to identify (and address) any potential issues related to EPSN's operatorship of new wells.  Don't have anything yet to pass along.

Thanks Julie.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Monday, August 24, 2020 3:57 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

I could meet at 8:30 tomorrow, I sent a calendar invite in the event that time works for you.  Thanks Henry!

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, August 24, 2020 3:00 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie;  would you have any time tomorrow for a brief phone conversation with me?  I'd like to update you on our permitting progress and get your input on a couple of related items.  Hope all is well w/you.  HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Friday, August 14, 2020 3:35 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Cc:** Eric Haskins <eric.haskins@chk.com>
**Subject:** Re: Auburn Development Planning

Thank you Henry.  I haven't had a chance to follow up with you, however, I didn't think we would be filing anything since we weren't proposing this well.

Have a good weekend,

Julie

Get Outlook for iOS

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Friday, August 14, 2020 2:11:31 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Cc:** Eric Haskins <eric.haskins@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Eric:

After further discussions this week with Brian Bailey @ PaDEP regarding the below ESCGP for the Craige pad, he has informed EPSN that the Co-Permittee form with CHK will not be required at this time.  Accordingly, please disregard the below request.

Thx.
HNC

**From:** Henry Clanton
**Sent:** Friday, August 07, 2020 1:25 PM
**To:** 'Julie Woodard' <julie.woodard@chk.com>
**Cc:** Eric Haskins <eric.haskins@chk.com>
**Subject:** RE: Auburn Development Planning

Eric:

As discussed below, EPSN is preparing for development on the Craige pad, including permitting wells.  Accordingly, please find attached a PaDEP required form of acknowledgement related to the ESCGP for the Craige pad.  The form is self-explanatory but feel free to reach out to me should you have any questions.

We ask that the form be executed by the appropriate person within CHK and returned to EPSN. Thank you in advance for your cooperation.

Thx.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Wednesday, July 01, 2020 3:39 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Cc:** Eric Haskins <eric.haskins@chk.com>
**Subject:** Re: Auburn Development Planning

Hi Henry- yes, Eric would be the contact for CHK.  I've copied him here.

Yes, looking forward to the future!

Get Outlook for iOS

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Wednesday, July 1, 2020 3:01:50 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

We have begun the well permitting process for the Craige pad development.  As you are aware, Operators are required to submit a Water Management Plan for approval from both the PaDEP and the SRBC as a part of the drilling permitting process.  Is Eric Haskin still the appropriate person within CHK for us to correspond with respect to regulatory permitting/compliance in PA?  If not, could you direct us to the appropriate person.

Saw where CHK filed.  I'll bet you are glad to open a new chapter and move forward.

Hope you are well.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>

**Sent:** Monday, June 15, 2020 2:50 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<p style="text-align:center;color:#5b9bd5;">Classification: DCL-Internal</p>

Thank you Henry, yes unfortunately the hot weather has hit here too!

Take care,
Julie

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, June 15, 2020 2:46 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Hey Julie:

Shannon did have a follow-up discussion with Nick on Friday regarding our Craige pad development planning. Given the feedback provided, just wanted to share that we will be proceeding with the permitting process for the wells. Not sure if it will be necessary, but I may need you to direct us to the appropriate CHK person in the regulatory compliance group.

Hope you had a good weekend. Summer weather has officially arrived in H-town.

Thanks.
HNC

**From:** Henry Clanton
**Sent:** Thursday, June 11, 2020 3:06 PM
**To:** 'Julie Woodard' <julie.woodard@chk.com>
**Subject:** RE: Auburn Development Planning

10-4. Thx. HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Thursday, June 11, 2020 3:02 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<p style="text-align:center;color:#5b9bd5;">Classification: DCL-Internal</p>

Henry, the following is the design information that is in the proposal letters. I have also provided the translation if that helps.

SW-5-35-3000/ Fluid System-Clusters/Stage-Cluster Spacing-Lbs Sand/Ft

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Thursday, June 11, 2020 12:37 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:  we are unable to find any detail on the proposed frac design in the well proposals letters, such as number of proposed frac stages, number and spacing of perf clusters per stage,  sand loading, etc.  Please advise.  Thx.  HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Thursday, June 11, 2020 12:30 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Hi Henry- we have been providing the completion design information within the body of the well proposal letters.  It should be on page 2.  Please let me know if you have any questions.

Julie

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Thursday, June 11, 2020 11:34 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

Who would be the appropriate contact at CHK to get planned completion design information regarding the recent wells proposals for the Maris 22HC, Maris 123HC and the Rosiemar 1HC?

Thx.
HNC

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Monday, June 08, 2020 10:23 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Great, thanks Henry.  Have a great week!

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Monday, June 8, 2020 9:05 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Hey Julie---thanks for the note/status.  Shannon did speak with Nick Friday.  They are expected to discuss the technical evaluations of the well plans/spacing further this week.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Friday, June 05, 2020 11:18 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** Re: Auburn Development Planning

Hi Henry- I wanted you to know that Nick reached out to Shannon today to give her an update on the teams review status (the follow ups I mentioned in my last email).

Get Outlook for iOS

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Wednesday, June 3, 2020 2:48:11 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

10-4.  Thx.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Wednesday, June 03, 2020 2:45 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Yes and there are a few follow ups being vetted.  I anticipate Nick (our Geology Manager) reaching out to Shannon soon.  Thanks

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Wednesday, June 3, 2020 2:43 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

Did the team present the Craige well package to management yesterday as planned?  Any feedback to share?

Thx.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Tuesday, June 02, 2020 1:47 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<p style="text-align:center">Classification: DCL-Internal</p>

The team is presenting to management at 3:30 today and then I would assume I could get back to you, or Nick to Shannon, soon after.

We are doing well, thank you.  I have not been following the hurricane, I hope you all won't suffer damage.  So sorry!  It seems like a lot all at once right now.

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Tuesday, June 2, 2020 1:44 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

Just checking in on the status of the Craige Pad development review by CHK.  Can you give me an update?

Hope all is well with you & your family.  Houston is preparing for hurricane landfall this weekend….adding to Covid19 and protesting/rioting in our area.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Tuesday, May 26, 2020 3:30 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

<p style="text-align:center">Classification: DCL-Internal</p>

Henry- we are hoping to hear from our Technical team early next week and then will plan to get back to you shortly thereafter.

---

**From:** Julie Woodard
**Sent:** Tuesday, May 26, 2020 3:09 PM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

Hi Henry,
I just sent Nick an email to check in.  I know he sent the plan to our technical team for review and then I would expect that we will discuss as a management team.  I'll get back to you on a time frame.

Thanks,
Julie

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Tuesday, May 26, 2020 1:00 PM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Julie:

Shannon has reported to me that she shared with Nick last week our development ideas for the Craige pad.  He mentioned to her that he had what was needed to evaluate the wells.  When would you expect these wells to be presented to the CHK leadership team for consideration?

Hope all is well with you & your family.
HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Friday, May 15, 2020 9:08 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Auburn Development Planning

Classification: DCL-Internal

I am at 405-618-0437

---

**From:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Sent:** Friday, May 15, 2020 8:58 AM
**To:** Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Development Planning

Yes 9:30am is fine.  What number should I call to get you?  Thx.  HNC

---

**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Friday, May 15, 2020 8:05 AM
**To:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** Re: Auburn Development Planning

Hi Henry,

Appx0479

I can be available for a call at 9:30 this morning if that works for you?

Thank you,
Julie

Get [Outlook for iOS](#)

---

**From:** Henry Clanton <[Henry.Clanton@epsilonenergyltd.com](mailto:Henry.Clanton@epsilonenergyltd.com)>
**Sent:** Thursday, May 14, 2020 5:13 PM
**To:** Julie Woodard
**Subject:** [EXTERNAL] FW: Auburn Development Planning

Julie:

Just following up trying to find a good time for us to have a phone conversation about Auburn development planning. Are you available tomorrow morning anytime? Let me know.

Thx.
HNC

---

**From:** Henry Clanton
**Sent:** Tuesday, May 12, 2020 4:17 PM
**To:** Julie Woodard <[julie.woodard@chk.com](mailto:julie.woodard@chk.com)>
**Subject:** Auburn Development Planning

Julie:

I wanted to reach out to you and check your availability this week for a follow-up conversation regarding well planning in Auburn. Since we came to Ok City and met with you guys (which seems like a lifetime ago now), we've not made much progress toward finalizing the 'next wells up' for Auburn. And recently, as a part of the balloting process for reducing the suction pressure at Auburn, we have received data from CHK's commercial group with new volumes being modeled to TIL in 2021 which we'd like to better understand.

Anyway, let me know when would be a convenient time for you.

Hope all is well with you and your family.

HNC

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent respons ble for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly proh bited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

# EXHIBIT 9

Classification: DCL-Internal

Mike, thanks for the kind words.  I appreciate it.

There's a pretty clear disagreement on how the JOA reads that is central to this discussion.  The modifications in VI.2(a) of the JOA were made specifically to preclude non-op partners to force CHK's hand in the development of new wells.  It is clear that VI.2(a) does not apply to new drilling and this seems to be the language that Epsilon is relying on.  We do agree that Epsilon or other non-op parties can propose new wells per VI.1, but if CHK does not want to participate, there is no mechanism in these JOAs to force the operator to drill on behalf of the participants.  These same modifications were in the JOA to the original Farmout Agreement and were also made in other transactions (i.e. our JOA with Equinor under the now expired Development Agreement), with the intent to prevent the development of wells that CHK did not want to drill.  CHK is not trying to prevent Epsilon from any rights that it may have under the JOA.  We simply feel that there is no obligation on the part of CHK to drill these wells.

Certainly agree that communication is key here and we are always open to discussing these matters, but I believe until the parties agree on what the JOA says that we could spin in circles.  Happy to facilitate a call with the teams to discuss the JOA language.

Your suggestion of a joint marketing of the assets is certainly interesting.  As you know we've tried to divest the asset a couple times and I do think we would still consider this upon emergence from bankruptcy.  There are probably many discussions to be had on how that would work, especially

---

given your ownership in the midstream, but I will bring that up to our teams for consideration.

Thank you,
*Jody Taylor*

---

**From:** Mike Raleigh <mraleigh@jvladvisors.com>
**Sent:** Thursday, December 17, 2020 7:09 AM
**To:** Jody Taylor <joseph.taylor@chk.com>
**Subject:** [EXTERNAL] Re: Auburn Units Discussion

Jody, sorry about your COVID infection but also glad that it seems mild as you are answering emails from home. I trust your wife is only mildly affected as well.

As to Auburn development we appreciate CHK not prioritizing development here which would imply a relatively lower value to CHK. EPSN didn't suggest buying a few Pads, the folks in your business unit proposed this to solve a problem unique only to CHK and therefore self-serving. We don't really want to buy the Pads but would to help CHK solve their issues.

We are proposing development that CHK neither wants to consent to develop or non-consent and execute on the non-operators behalf, both options under the JOA. There is no official position here but we have a good open dialog with the business unit folks and appreciate their time and professionalism. We believe good communication goes a long way to solving issues. The third alternative outlined by the JOA provides development opportunity to the subsequently selected operator. The CHK business unit quandary is compounded by the aversion to have an alternative operator on the Pad, we don't understand this one since best practices are well known by industry and routinely employed as standard operating procedures. Hence they proposed we acquire the subject Pad/Pads.

EPSN is simply pursuing its opportunities provided by our mutual JOA and will proceed accordingly.

As you know we are very flexible and willing to facilitate any reasonable solution with our partners in Auburn.

As to a more global solution, we would be interested in exploring ways to jointly market yours and our interests in Auburn including EPSN's interest in the midstream. As you point out below, our pref rights have value.

We can continue the dialog at your convenience, but in the meantime we will continue to pursue our development as that is our preference and right under the JOA.

I hope you and your wife get well soon and your COVID experience is mild, it can be a very serious disease for some.

Regards

Mike
Sent from my iPad

On Dec 16, 2020, at 4:16 PM, Jody Taylor <joseph.taylor@chk.com> wrote:

Classification: DCL-Internal

Hey Mike!  Wish I could say all was well as I'm stuck at the house with COVID.  Both my wife and I have it and are about half-way through quarantine.

The team has continued to look at the proposal and there's a genuine interest in trying to work something out.  There are a few issues getting in the way however.  First off, there's just not much incentive to CHK to work a deal here.  We don't necessarily need the cash and I don't think you are looking to pay aggressively for upside to allow CHK to bring a lot of value forward via the transaction.  Secondly, this deal would only serve to kick the can for another year and doesn't solve the long-term concerns.  Next year, we will be in the same boat and you guys will want to push development in an area of less return for CHK.  I'm trying to think of a deal that solves these issues.  Is there a scenario where Epsilon agrees not to propose on CHK or an agreement to waive future pref rights if CHK were to sell Auburn?  Maybe there's a bigger transaction that gets you development for a couple years?  Willing to be constructive but need something that is compelling to CHK.

Thank you,
*Jody Taylor*

**From:** Mike Raleigh <mraleigh@jvladvisors.com>
**Sent:** Wednesday, December 16, 2020 9:25 AM
**To:** Jody Taylor <joseph.taylor@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Units Discussion

Jody

Hope all is well and everyone is staying healthy.

We are planning out our budgets for next year. Do you think we can transact on the Craige Pad? This may be the simplest way forward and eliminates a lot of frustration on both sides. Maybe you could let me know a reasonable number to acquire that Pad from CHK's perspective, maybe we could close this out before the end of the year.

Regards

Mike

**From:** Jody Taylor <joseph.taylor@chk.com>
**Sent:** Tuesday, October 20, 2020 8:18 AM
**To:** Mike Raleigh <mraleigh@jvladvisors.com>
**Subject:** RE: Auburn Units Discussion

Classification: DCL-Internal

Mike, thanks for providing this information. I've passed everything along to the team and they are reviewing. We are digging in on the COS to see if we come up with similar figures. I'll be in touch when I have something to report.

Thank you,
*Jody Taylor*

**From:** Mike Raleigh <mraleigh@jvladvisors.com>
**Sent:** Friday, October 16, 2020 3:27 PM
**To:** Jody Taylor <joseph.taylor@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Units Discussion

Jody

After we talked I went back to the Williams Cost of Service model to determine the effects of various development volume throughput assumptions on the gathering rate through to 2026. The currently anticipated PUD development contemplated by your business unit team suggests one long reach lateral drilled and completed in the Lower Marcellus per year (we modelled the actual wells). If we incorporate the EPSN proposed development of the Craige Pad and compare the two resulting gathering rates, we determine about $0.10 /mcf lower gathering rate when we included the EPSN proposed development.

This implies that EPSN's proposed development would provide a benefit to CHK of roughly $9 MM of present value discounted at 10% as the lower gathering rate provides a material benefit to the PDP value. We used the current gathering rate of $0.4053/mcf when valuing the proposed trade we discussed for the subject Pads. You can appreciate the implied value would decline given the inevitably higher gathering rate that would result from development that falls short of that assumed in the current Cost of Service Model.

I wanted to bring this to your attention as you gather consensus within CHK as to expectations with regards to our proposal.

Let me know if you would like to discuss, but I'm sure your folks would come to the same conclusion.

Regards

Mike

---

**From:** Jody Taylor <joseph.taylor@chk.com>
**Sent:** Wednesday, October 14, 2020 8:39 AM
**To:** Mike Raleigh <mraleigh@jvladvisors.com>
**Subject:** RE: Auburn Units Discussion

Classification: DCL-Internal

That will work.  405-935-4871

Thank you,
*Jody Taylor*

---

**From:** Mike Raleigh <mraleigh@jvladvisors.com>
**Sent:** Wednesday, October 14, 2020 8:31 AM
**To:** Jody Taylor <joseph.taylor@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Units Discussion

Thanks I will call you at 9:30

---

**From:** Jody Taylor <joseph.taylor@chk.com>
**Sent:** Wednesday, October 14, 2020 8:29 AM
**To:** Mike Raleigh <mraleigh@jvladvisors.com>
**Subject:** RE: Auburn Units Discussion

Classification: DCL-Internal

Mike, I can do 9 or 9:30?

Thank you,
*Jody Taylor*

---

**From:** Mike Raleigh <mraleigh@jvladvisors.com>
**Sent:** Tuesday, October 13, 2020 4:42 PM
**To:** Jody Taylor <joseph.taylor@chk.com>
**Subject:** [EXTERNAL] Re: Auburn Units Discussion

Sorry just saw this, morning OK?

Sent from my iPhone

On Oct 13, 2020, at 3:55 PM, Jody Taylor <joseph.taylor@chk.com>
wrote:

Classification: DCL-Internal

Mike, I can talk at 4 or 4:15 if that works?  Office is 405-935-4871.

Thank you,
*Jody Taylor*

**From:** Mike Raleigh <mraleigh@jvladvisors.com>
**Sent:** Tuesday, October 13, 2020 2:51 PM
**To:** Jody Taylor <joseph.taylor@chk.com>
**Subject:** [EXTERNAL] RE: Auburn Units Discussion

Jody

Let me know when you have a minute to discuss what makes sense to
transact, resolve and move forward.

Mike

**From:** Mike Raleigh
**Sent:** Wednesday, October 7, 2020 2:38 PM
**To:** 'Jody Taylor' <joseph.taylor@chk.com>
**Subject:** Auburn Units Discussion

Jody

Please see the attached map  (Craige Unit well development) showing
existing wells, EPSN planned wells and the subject Units - Baltzley N & S,
Craige, Poulson N & S.

The second map shows the CHK planned locations that we know of.

The average Sept 2020 production from the associated wells averaged as
follows:

Let me know your thoughts, much appreciated

Regards

Mike

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent respons ble for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly proh bited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distr bution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distr bution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distr bution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distr bution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent respons ble for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly proh bited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

# EXHIBIT 10



**Courtney Moad**
*Staff Landman*

January 19, 2021

**VIA ELECTRONIC MAIL**

Ms. Rachel Collins
Epsilon Energy USA, Inc.
16945 Northchase Drive, Suite 1610
Houston, TX 77060

Re:   Epsilon's Craige N 1LH Well
      Baltzley South Unit
      Rush Township
      Susquehanna County, Pennsylvania

Dear Ms. Collins:

Pursuant to Epsilon's proposal letter dated December 22, 2020, enclosed please find Chesapeake Appalachia, L.L.C.'s executed election **NOT** to participate in the Craige N 1LH Well, pursuant to the Operating Agreement dated October 18, 2010 for the Baltzley South Unit.

Further, Article VI.2.a ("Operations by Less Than All Parties: Determination of Participation")  does not apply to new wells and will not govern this election, nor is it applicable to this proposal.  Chesapeake maintains the right to operate the referenced pad site and associated wells, and does not grant approval or authority to Epsilon, or anyone else, to operate from referenced pad.

Should you have any questions in this regard, please do not hesitate to call me at 405-935-9164.

Sincerely,

**Chesapeake Appalachia, L.L.C**

Courtney Moad

Enclosure

**Chesapeake Energy Corporation**
P.O. Box 18496  /  Oklahoma City, OK 73154-0496  /  6100 N. Western Avenue  /  Oklahoma City, OK 73118
405-935-9164  /  / courtney.moad@chk.com

Appx0490

Craige N 1LH
December 22, 2020
Chesapeake Appalachia, L.L.C.


_____**Chesapeake Appalachia LLC** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige 1LH Well pursuant to the Baltzley South JOA.

_____**Chesapeake Appalachia LLC** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige 1LH Well pursuant to the Baltzley South JOA.

__X____**Chesapeake Appalachia LLC** hereby elects **not to operate nor participate** in the drilling of the Craige 1LH Well and elects the Non-Consent provision pursuant to the Baltzley South JOA.

By: _Julie Woodard_

Name: _Julie Woodard_

Title:_Manager of Chesapeake Appalachia, L.L.C._

Date: _1/20/2021_

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0491



**Courtney Moad**
*Staff Landman*

January 19, 2021

<u>**VIA ELECTRONIC MAIL**</u>

Ms. Rachel Collins
Epsilon Energy USA, Inc.
16945 Northchase Drive, Suite 1610
Houston, TX 77060

Re:     Epsilon's Craige N 1UHC Well
         Baltzley South and Baltzley North Units
         Rush Township
         Susquehanna County, Pennsylvania

Dear Ms. Collins:

Pursuant to Epsilon's proposal letter dated December 22, 2020, enclosed please find Chesapeake Appalachia, L.L.C.'s executed election <u>**NOT**</u> to participate in the Craige N 1UHC Well, pursuant to the Operating Agreement dated October 18, 2010 for the Baltzley South Unit, and the Operating Agreement dated October 18, 2010 for the Baltzley North Unit.

Further,  Article VI.2.a ("Operations by Less Than All Parties: Determination of Participation") does not apply to new wells and will not govern this election, nor is it applicable to this proposal.  Chesapeake maintains the right to operate the referenced pad site and associated wells, and does not grant approval or authority to Epsilon, or anyone else, to operate from referenced pad.

Should you have any questions in this regard, please do not hesitate to call me at 405-935-9164.

Sincerely,

**Chesapeake Appalachia, L.L.C**

Courtney Moad

Enclosure

**Chesapeake Energy Corporation**
P.O. Box 18496  /  Oklahoma City, OK 73154-0496  /  6100 N. Western Avenue  /  Oklahoma City, OK 73118
405-935-9164  //  courtney.moad@chk.com

Appx0492

Craige N 1UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley South JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley South JOA.

___X___ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 1UHC Well and elects the Non-Consent provision pursuant to the Baltzley South JOA.

By: _Julie Woodard_

Name: _Julie Woodard_

Title: _Manager of Chesapeake Appalachia, L.L.C._

Date: _1/20/2021_

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley North JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley North JOA.

___X___ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 1UHC Well and elects the Non-Consent provision pursuant to the Baltzley North JOA.

By: _Julie Woodard_

Name: _Julie Woodard_

Title: _Manager of Chesapeake Appalachia, L.L.C._

Date: _1/20/2021_

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0493



**Courtney Moad**
*Staff Landman*

January 19, 2021

<u>**VIA ELECTRONIC MAIL**</u>

Ms. Rachel Collins
Epsilon Energy USA, Inc.
16945 Northchase Drive, Suite 1610
Houston, TX 77060

Re:     Epsilon's Craige N 4UHC Well
        Baltzley South and Baltzley North Units
        Rush Township
        Susquehanna County, Pennsylvania

Dear Ms. Collins:

Pursuant to Epsilon's proposal letter dated December 22, 2020, enclosed please find Chesapeake Appalachia, L.L.C.'s executed election **NOT** to participate in the Craige N 4UHC Well, pursuant to the Operating Agreement dated October 18, 2010 for the Baltzley South Unit, and the Operating Agreement dated October 18, 2010 for the Baltzley North Unit.

Further,  Article VI.2.a ("Operations by Less Than All Parties: Determination of Participation") does not apply to new wells and will not govern this election, nor is it applicable to this proposal.  Chesapeake maintains the right to operate the referenced pad site and associated wells, and does not grant approval or authority to Epsilon, or anyone else, to operate from referenced pad.

Should you have any questions in this regard, please do not hesitate to call me at 405-935-9164.

Sincerely,

**Chesapeake Appalachia, L.L.C**

Courtney Moad

Enclosure

**Chesapeake Energy Corporation**
P.O. Box 18496  /  Oklahoma City, OK 73154-0496  /  6100 N. Western Avenue  /  Oklahoma City, OK 73118
405-935-9164  //  courtney.moad@chk.com

Appx0494

Craige N 4UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley South JOA.

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley South JOA.

___X___**Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 4UHC Well and elects the Non-Consent provision pursuant to the Baltzley South JOA.

By: _Julie Woodard_
Name: _Julie Woodard_
Title: _Manager of Chesapeake Appalachia, L.L.C._
Date: _1/20/2021_

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley North JOA.

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley North JOA.

___X___**Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 4UHC Well and elects the Non-Consent provision pursuant to the Baltzley North JOA.

By: _Julie Woodard_
Name: _Julie Woodard_
Title _Manager of Chesapeake Appalachia, L.L.C._
Date: _1/20/2021_

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0495

# EXHIBIT 11



<div align="right">

**Courtney Moad**
*Staff Landman*

</div>

January 19, 2021

<u>**VIA ELECTRONIC MAIL**</u>

Ms. Rachel Collins
Epsilon Energy USA, Inc.
16945 Northchase Drive, Suite 1610
Houston, TX 77060

Re:    Epsilon's Craige S 3LHC Well
        Craige Unit, Poulsen North Unit, and Poulsen South Unit
        Rush Township, Susquehanna County, Pennsylvania
        Auburn Township, Susquehanna County, Pennsylvania

        Chesapeake's proposed Koromolan 107HC Well
        Koromlan North Unit, Poulsen North Unit and Poulsen South Unit
        Auburn Township, Susquehanna County, Pennsylvania

Dear Ms. Collins:

Pursuant to Epsilon's proposal letter dated December 22, 2020, enclosed please find Chesapeake Appalachia, L.L.C.'s executed election **NOT** to participate in the Craige S 3LHC Well, pursuant to the Operating Agreement dated December 16, 2010 for the Craige Unit, and the Operating Agreement listed under Schedule 7.1.2 of Farmout Agreement dated February 3, 2010 for the Poulsen North and Poulsen South Units.

Further, Article VI.2.a ("Operations by Less Than All Parties: Determination of Participation") does not apply to new wells and will not govern this election, nor is it applicable to this proposal.  Chesapeake maintains the right to operate the referenced pad site and associated wells, and does not grant approval or authority to Epsilon, or anyone else, to operate from referenced pad.

Lastly, the proposed development associated with this proposal is in conflict with the planned drilling of Chesapeake's Koromlan 107HC.

As such, pursuant to Operating Agreement dated December 16, 2010, covering the Craige Unit, Operating Agreement dated July 31, 2014, covering the Davis Unit, Farmout Agreement dated February 3, 2010, covering the Poulsen North and Poulsen South Units, and Operating Agreement dated TBD, covering the Bradbury Unit, Chesapeake Appalachia, L.L.C. ("CHK") hereby proposes to drill the Koromlan 107HC Well (the "Well") with a surface hole location of Latitude 41.738843° and Longitude -76.029805° (NAD 27); and an approximate bottom hole location of Latitude 41.706214° and Longitude -76.000833°, in Auburn Township and, Susquehanna County, Pennsylvania.  The Well will be drilled to an approximate measured depth of 24,607' feet, with an approximate vertical depth of 6,795' feet, to test the Marcellus Formation and all other formations that may be encountered in the wellbore. Estimated costs to drill the Well are $2,898,000.00 with a completed well costing approximately $8,865,000.00.

Accordingly, please indicate your election as to each unit in the space provided below, sign and return this letter to the undersigned within thirty (30) days from receipt.

<div align="center">

**Chesapeake Energy Corporation**
P.O. Box 18496  /  Oklahoma City, OK 73154-0496  /  6100 N. Western Avenue  /  Oklahoma City, OK 73118
405-935-9164  //  courtney.moad@chk.com

</div>

<div align="right">

Appx0497

</div>

Should you have any questions in this regard, please do not hesitate to call me at 405-935-9164.

Sincerely,

**Chesapeake Appalachia, L.L.C**

Courtney Moad

Enclosure

_____ **Epsilon** hereby elects to participate with the full extent of its interest in the drilling of the Koromlan 107HC well under the Poulsen South Unit JOA.

_____ **Epsilon** hereby elects **not** to participate in the drilling of the Koromlan 107HC well and elects to go non-consent under the Poulsen South Unit JOA.

By: _____

Name: _____

Title: _____

Date: _____

_____ **Epsilon** hereby elects to participate with the full extent of its interest in the drilling of the Koromlan 107HC well under the Poulsen North JOA.

_____ **Epsilon** hereby elects **not** to participate in the drilling of the Koromlan 107HC well and elects to go non-consent under the Poulsen North JOA.

By: _____

Name: _____

Title: _____

Date: _____

Election Letter 147_0614

3

# EXHIBIT 12

**From:** Scott Glenn <scott.glenn@chk.com>

**Sent:** Wednesday, January 20, 2021 5:59 PM

**To:** Mike Raleigh <mraleigh@jvladvisors.com>; Henry Clanton <Henry.Clanton@epsilonenergyltd.com>

**Cc:** Rich Snyder <rich.snyder@chk.com>; Julie Woodard <julie.woodard@chk.com>; Jody Taylor <joseph.taylor@chk.com>; Joe Tarantelli <joe.tarantelli@chk.com>

**Subject:** Auburn Development follow-up

Classification: DCL-Internal

Mr. Raleigh:

Thank you for your time last week discussing development in Auburn.  As a follow up to the conversation that you had with Rich Snyder, this letter serves as a response to several items that were discussed.

First, in regards to Epsilon's proposed Craige wells (Craige N 1LH, Craige N 1UUHC, Craige N 4UHC and Craige S 3LHC), Article VI.2.a ("Operations by Less Than All Parties: Determination of Participation"), of all applicable Operating Agreements, does not apply to new wells and thereby will not govern the elections made pursuant to your recent well proposals.  Chesapeake maintains the right to Operate the Craige pad site and associated wells, and hereby does not grant approval or authority to Epsilon, or anyone else, to Operate from referenced pad.   Additionally, said rights are not relinquished or removed according to Article VI.2.a, as such provision expressly states, and was intended to apply to any proposal to Rework, Sidetrack, Deepen, Recomplete or Plug Back under Article VI.B.1.  Subsequently, Chesapeake has plans to drill the Koromolan 107HC in early 2022, which is in conflict with Epsilon's proposed Craige S 3LHC.  As such, Chesapeake's well proposal will be forthcoming along with all elections for Epsilon's proposed wells.

Second, as discussed, there is a gap in value on the Craige pad and associated wells.  We see value at more than double the $5mm offer from Epsilon using the following pricing assumptions and an in-basin view on differentials.  Among other options below, we are willing to continue to discuss a divestiture if the value is intriguing to CHK.

| Year | Pricing Assumptions |
|---|---|
| 2020 | $2.40 |
| 2021 | $2.42 |
| 2022 - 2024 | Yearly escalation up to $2.72 |
| 2025+ | $2.72 Flat |

In addition, there are other options which would result in an increase in return for CHK in Auburn, which would allow the projects to reach the 50% ROR and become more competitive within the corporate portfolio.   The first option is that Epsilon could convey  22% NRI in proposed wells to be drilled by CHK at some date in the future.  Additionally, Epsilon could also convey $0.61/MMBTU of their interest in the Auburn gathering system.

Lastly, our Business Development team is working on an evaluation of the EPSN entity for potential acquisition should that be of interest.  More to come on that as the analysis is finalized.

Thank you,

*Scott Glenn*

Project Manager – Northern Region

Chesapeake Energy Corporation

*Office: (405) 935-6865*
*Mobile: (405) 213-5170*
*E-mail:* [*Scott.Glenn@chk.com*](mailto:Scott.Glenn@chk.com)

---

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent respons ble for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly proh bited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

# EXHIBIT 13



February 9, 2021

<u>VIA ELECTRONIC MAIL</u>

Chesapeake Appalachia, LLC
Attn:  Courtney Moad/Land Dept
6100 N. Western Ave.
Oklahoma City, OK 73118

Re:    Notice of 100% Subscription to Well Proposals
       **Craige N 1LH, Craige N 1UHC,**
       **Craige N 4UHC** and **Craige S 3LHC** Wells,
       Rush and Auburn Townships,
       Susquehanna County, Pennsylvania

Ms. Moad:

Pursuant to the subject Well Proposals submitted by Epsilon Energy USA, Inc. (Epsilon), dated December 22, 2020, we are in receipt of Chesapeake Appalachia, LLC's (Chesapeake) Non-Consent Election Letter, dated January 19, 2021.  Since Chesapeake has elected the Non-Consent Provisions of the Joint Operating Agreements and Farmout Agreement, covering the subject Well Proposals, please note the Non-Consent Provisions state that each Non-Consenting Party shall be deemed to have relinquished its interest in the well and share of production therefrom to the Consenting Parties until the proceeds from the sale of the share relinquished by the Non-Consenting party shall equal the total of the following:

> (i) 200% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping) plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the proposed well or operation from the beginning of the operations; and

> (ii) 400% of (a) that portion of the costs and expenses of Drilling, Reworking, Sidetracking, Deepening, Plugging Back, Testing, Completing and Recompleting, after deducting any such cash contributions received under Article VIII.C., and 400% (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

<u>Notice is hereby given that there is 100% subscription of the available Non-Consent interests of the subject Well Proposals by the consenting parties</u>.  Further, as Chesapeake has elected not to participate in the subject Well Proposals and has also elected not to serve as operator of them, Epsilon will act as the

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

operator of them in accordance with the Joint Operating Agreements under which these proposals were made. Accordingly, Epsilon will commence with the drilling operations within the timeframe set out in the subject Well Proposals.

In order to proceed with the requirements of serving as operator on behalf of the consenting parties, Epsilon renews its request to Chesapeake to provide an executed copy of the SRBC required Commitment Letter (see attached). Please note that Chesapeake's cooperation is required under (1) the Operator provision of the applicable JOAs and (2) those provisions that require good faith cooperation of all working interest owners to develop the collective property interests.

Sincerely,
Epsilon Energy USA Inc.

*Rachel Collins*

Rachel Collins
Sr. Land Administrator

Cc:    Julie Woodard

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0505

**CHESAPEAKE APPALACHIA, LLC**
**14 CHESAPEAKE LANE**
**SAYRE, PA. 18840**
**Telephone Number: 570-882-7702**

February 9, 2021

Epsilon Energy USA, Inc.
Attn: Henry N. Clanton
16945 Northchase Drive, Suite 1610
Houston, Texas 77060

Re: Shared Agreement
    SRBC Source 12
    Wyalusing Creek Surface Water Withdrawal

Dear Mr. Clanton:

This letter confirms that Chesapeake Appalachia, LLC is willing to supply Epsilon Energy USA, Incorporated with water up to the approved amount per the Docket conditions from its Susquehanna River Basin Commission (SRBC) approved surface water withdrawal source at Wyalusing Creek on SRBC Docket Number 20170605, approved June 16, 2017, located in Rush Township, Susquehanna County, Pennsylvania, for the term of the Docket effective until June 15, 2022; or until the agreement is terminated or discontinued by either party, for use in gas well development operations under 18 CFR Section 806.22(f).

Such supply of water will be provided subject to the terms and conditions of the Water Sharing Agreement that will be entered into by and between Chesapeake Appalachia, LLC and Epsilon Energy USA, Incorporated. Chesapeake Appalachia, LLC understands that it will in any event remain responsible for compliance with the terms and conditions of the SRBC Docket Number 20170605.

This letter does not obligate Chesapeake Appalachia, LLC to sell water to Epsilon Energy USA, Inc.; rather it states a willingness to do so subject to availability as determined by Chesapeake Appalachia, LLC.

Sincerely,

Eric Haskins
Manager, Regulatory Operations

# EXHIBIT 14

**From:** Joe Tarantelli <joe.tarantelli@chk.com>
**Sent:** Thursday, February 11, 2021 3:05 PM
**To:** Rachel Collins <rachel.collins@epsilonenergyltd.com>; Julie Woodard
<julie.woodard@chk.com>; Courtney Moad <courtney.moad@chk.com>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: EPSN Well Proposals - 100% Subscription

Classification: DCL-Internal

Rachel:  Respectfully, this is not a good faith/bad faith discussion.  The plain language of the JOA does not allow for Epsilon to assume operatorship.


Thank you,

*Joseph A. Tarantelli*
Managing Attorney –
   Appalachia & Commercial Litigation
Chesapeake Energy Corporation
Office: 405-935-2423
Mobile: 405-213-8912
Email: joe.tarantelli@chk.com




**From:** Rachel Collins <rachel.collins@epsilonenergyltd.com>
**Sent:** Thursday, February 11, 2021 3:03 PM
**To:** Julie Woodard <julie.woodard@chk.com>; Courtney Moad <courtney.moad@chk.com>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>; Joe Tarantelli
<joe.tarantelli@chk.com>
**Subject:** [EXTERNAL] RE: EPSN Well Proposals - 100% Subscription

Julie,

It is hard for Epsilon to understand why Chesapeake takes the position of stopping production by claiming a super veto power that is counter to the JOAs or our prior settlement agreement. It is not in good faith and in fact it is deemed to be in bad faith. Of course, Article VI2 allows for another Operator when the designated Operator will not agree to operate. Again, your interpretation is not in good faith.

Epsilon is interested in promoting the production of the joined resources, which is one of the base reasons for entering a JOA. Epsilon is furthering this interest by proposing wells that will be beneficial for the parties and has also been clear that it is willing to work with Chesapeake to ensure that Chesapeake can also proceed with its proposed well. Epsilon has continued to act in good faith and seeks only to have Chesapeake recognize its rights under the JOA and the settlement agreement and stop Chesapeake's obstruction of developing the resources. The first step in doing so is signing the SRBC letter, which Chesapeake has done in the past for other parties. The next step is confirming that Chesapeake will provide Epsilon with access to the properties, and otherwise cooperate with Epsilon, so that Epsilon can fulfill its responsibilities with respect to the four currently-proposed wells for which it has been designated as the operator.

Thanks,
Rachel



**From:** Julie Woodard <julie.woodard@chk.com>
**Sent:** Thursday, February 11, 2021 9:48 AM
**To:** Rachel Collins <rachel.collins@epsilonenergyltd.com>; Courtney Moad <courtney.moad@chk.com>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>; Joe Tarantelli <joe.tarantelli@chk.com>
**Subject:** RE: EPSN Well Proposals - 100% Subscription

Classification: DCL-Internal

Rachel-

In response to your first question, we will not be signing the SRBC letter that you drafted on our behalf.

As to your second question, I can elaborate. Article VI 2 doesn't apply to new wells, so what are you relying on to claim that Epsilon would be Operator and would perform on behalf of parties that

did not elect to participate?  We have offered to discuss the discrepancies we have on the interpretation of the JOA and that offer still stands.

Thank you,
Julie

**From:** Rachel Collins <rachel.collins@epsilonenergyltd.com>
**Sent:** Thursday, February 11, 2021 9:39 AM
**To:** Courtney Moad <courtney.moad@chk.com>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>; Julie Woodard <julie.woodard@chk.com>
**Subject:** [EXTERNAL] RE: EPSN Well Proposals - 100% Subscription

Courtney,

What is the status of the requested and required SRBC Source 12 Commitment letter?

Also, I'm not sure we understand the below question below. Would you elaborate?

Rachel



**From:** Courtney Moad <courtney.moad@chk.com>
**Sent:** Wednesday, February 10, 2021 4:00 PM
**To:** Rachel Collins <rachel.collins@epsilonenergyltd.com>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>; Julie Woodard <julie.woodard@chk.com>
**Subject:** RE: EPSN Well Proposals - 100% Subscription

Classification: DCL-Internal

Rachel,

Which article in the JOA is the subscription of a 100% in?  Thanks for your help

Thanks,
Courtney

**From:** Rachel Collins <rachel.collins@epsilonenergyltd.com>
**Sent:** Tuesday, February 9, 2021 5:11 PM
**To:** Courtney Moad <courtney.moad@chk.com>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>; Julie Woodard
<julie.woodard@chk.com>
**Subject:** [EXTERNAL] EPSN Well Proposals - 100% Subscription

Courtney,

Please find attached for notice of 100% subscription to EPSN well proposals dated December 22,
2020.

Please provide an executed SRBC Commitment letter at the earliest convenience.

Thanks,
Rachel



This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

This email (and attachments if any) is intended only for the use of the individual or entity to which it is addressed, and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by return email and destroy all copies of the email (and attachments if any).

# EXHIBIT 15

**Henry Clanton**

| | |
|---|---|
| **From:** | Miller, Glenda <gmiller@srbc.net> |
| **Sent:** | Friday, January 29, 2021 11:15 AM |
| **To:** | Walter Jenko; Henry Clanton |
| **Subject:** | FW: Epsilon, Commitment Letter from Chesapeake |
| **Attachments:** | Epsilon_CHK_WyalusingCreek_DRAFT COMMITMENT LETTER FOR SOURCE 12_Revision2_29Jan21.docx |

Hi Walter:

The Commitment Letter is acceptable and includes all the elements needed.

Regards,
Glenda Miller


Glenda Miller
ABR Program Coordinator
Susquehanna River Basin Commission
4423 North Front Street
Harrisburg, PA  17110
717-238-0423, Ext. 1227
Fax: 717-909-0468
gmiller@srbc.net and www.srbc.net

**From:** Walter Jenko <WJenko@ntglobal.com>
**Sent:** Friday, January 29, 2021 11:21 AM
**To:** Miller, Glenda <gmiller@srbc.net>
**Cc:** Henry Clanton <Henry.Clanton@epsilonenergyltd.com>
**Subject:** RE: Epsilon, Commitment Letter from Chesapeake

Glenda,
Good morning. And thank you for assisting me and Henry with authoring the CHK draft letter.
We were hoping that you can review our draft copy attached, prior to Epsilon transmitting the letter to CHK for its use?

Thank you,
Walt
1-29-21

**From:** Miller, Glenda <gmiller@srbc.net>
**Sent:** Friday, January 29, 2021 9:42 AM
**To:** Walter Jenko <WJenko@ntglobal.com>
**Subject:** RE: Epsilon, Commitment Letter from Chesapeake


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hi Walter:

Here is a SAMPLE Commitment Letter that Chesapeake Appalachia, LLC has used recently.  The information highlighted in YELLOW will be the information that will be changed to accommodate Epsilon's needs for the source.

The contacts at Chesapeake are Carla Harris and Eric Haskins.

1.    Carla Harris, Regulatory Analyst II, Chesapeake Appalachia, LLC,  14 Chesapeake Lane, Sayre, PA  18840;  (570) 882-7702, carla.harris@chk.com

2.    Eric Haskins, Manager, Regulatory Operations, Chesapeake Appalachia, LLC,  14 Chesapeake Lane, Sayre, PA  18840:  (570) 882-7702, eric.haskins@chk.com

Here are a few items that must be in the contents of the brief commitment letter:

1.    The letter must be on Chesapeake Appalachia, LLC  Letterhead and Dated
2.    The Docket Number must be listed in the letter.
3.    The Date of the Docket Approval and Expiration Date of the Docket must be listed in the letter.
4.    The GAS COMPANY recipient's Name and Address  (Epilson).
5.    Signed by a Chesapeake Representative.

Recipient's Name and Address goes here

Dear Henry Clanton:

This letter serves to confirm that CHESAPEAKE APPALACHIA, LLC (CHESAPEAKE) is willing to supply water from its Susquehanna River Basin Commission (SRBC) approved surface water source, located on the Susquehanna River, located in Mehoopany Township, Wyoming County, Pennsylvania, as described in SRBC Docket No. 20170603, approved on June 16, 2017 for use by EPSILON ENERGY USA, INC.  (EPSILON) in their natural gas well development operations under 18 C.F.R. 806.22(f).  Such supply of water will be provided subject to the terms and conditions of the Water Sharing Agreement that will be entered into by and between CHESAPEAKE and EPSILON at a future date.  This agreement will remain in effect until June 30, 2022.  CHESAPEAKE understands that it will in any event remain responsible for compliance with the terms and conditions of the SRBC Docket No. 20170603.

Sincerely,

Name of Chesapeake Contact
Chesapeake Appalachia, LLC

If you need anything else, please let me know, cell number 1-717-439-6029, or email.

Regards,
Glenda Miller


Glenda Miller
ABR Program Coordinator
Susquehanna River Basin Commission
4423 North Front Street
Harrisburg, PA  17110
717-238-0423, Ext. 1227
Fax: 717-909-0468
gmiller@srbc.net and www.srbc.net

---

**From:** Walter Jenko <WJenko@ntglobal.com>
**Sent:** Thursday, January 28, 2021 12:48 PM
**To:** Miller, Glenda <gmiller@srbc.net>
**Subject:** Epsilon, Commitment Letter from Chesapeake

Glenda,
I was hoping that you could help me finish-up a Source 12 commitment draft letter that we are trying to have CHK finalize and return to us.
I am preparing this draft for them to use.

Regard to Chesapeake Appalachia, LLC what is the mailing address that they have used on their applications. I want to be sure the letter from them is sent back to us on proper stationary.
Also, who is the name and title of the person at CHK that is the record of contact with SRBC. I did try to look on your WAAV website/list of companies but could not determine these items.

Thank you,
Walt
1-28-21

*Walter W. Jenko, P.E., Techical Lead*
*Registered Professional Engineer-Pa., NY, WV and Ohio*
*New Tech Global Ventures, LLC*
*6000 Town Center Blvd., Suite 220*
*Canonsburg, Pa. 15317*
*Email: WJenko@ntglobal.com*
*(M) 724.470.8664*

Appx0515

# EXHIBIT 16



February 9, 2021

<u>VIA ELECTRONIC MAIL</u>

Chesapeake Appalachia, LLC
Attn:  Courtney Moad/Land Dept
6100 N. Western Ave.
Oklahoma City, OK 73118

Re:     **Koromlan 107HC Well Proposal**
         Craige Unit, Poulson North Unit, Poulson South Unit
         Davis Unit, and To-Be-Formed Bradbury Unit
         Auburn Township,
         Susquehanna County, Pennsylvania

Ms. Moad:

Epsilon Energy USA, Inc., (Epsilon) is in receipt of Chesapeake Appalachia LLC's (Chesapeake) letter
dated January 19, 2021 proposing the subject well.  Because the proposal is incomplete in that it does not
contain all of the requisite information, it is difficult for Epsilon to assess the proposed well.
Nevertheless, Epsilon hereby responds as follows:

1)  It appears the proposed well path will traverse acreage that has not yet been unitized nor even
    proposed to be unitized.  It is also noted, that Epsilon currently holds a leasehold interest in this
    non-unitized area.  Additionally, it is not clear from the information provided how Chesapeake
    plans to avoid the Rushboro Ventures lease within the Craige Unit in which Chesapeake has
    reported to have a title defect that has not been cured.

2)  Due to offset well spacing criteria, the Koromlan 107HC proposed well path is in conflict with
    the approved Craige S 3LHC well proposal that was submitted prior to the subject proposal.  The
    Craige S 3LHC well has already been agreed to by multiple partners and will commence
    operations within the timing set forth in the proposal process.

3)  The well proposal is non-compliant with the information requirements for well proposals as set
    forth in the subject Joint Operating Agreements.

Epsilon has supported (and will continue to support) development similar to the Koromlan 107HC well
proposal in the project area.  However, the Koromlan 107HC well proposal in the form submitted appears
to traverse acreage not unitized, is in conflict with an existing approved well and does not meet the
minimum information requirements of the applicable Joint Operating Agreements.   Epsilon remains
prepared to respond to all development proposals that are submitted in accordance with and compliant

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0517

with the applicable Joint Operating Agreements.  Accordingly, we do not consider the 30-day response period to be activated.


Sincerely,
Epsilon Energy USA Inc.

*Rachel Collins*

Rachel Collins
Sr. Land Administrator

Cc:    Julie Woodard

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0518

# EXHIBIT 17

Craige N 1LH
December 22, 2020
Chesapeake Appalachia, L.L.C.



December 22, 2020


VIA FEDEX AND ELECTRONIC MAIL


Chesapeake Appalachia, L.L.C.
Attn: Ms. Courtney Moad
6100 N. Western Ave.
Oklahoma City, OK 73118


Re:    Epsilon Energy's Proposed Craige N 1LH Well
       API: 37115228010000; Permit Number: 115-22801
       Baltzley South Unit
       Rush Township
       Susquehanna County, Pennsylvania


Ms. Moad:


Epsilon Energy USA Inc. ("EPSN") hereby proposes to drill the Craige N 1LH Well (the "Well") with a surface hole location of Latitude 41.755847° and Longitude -76.028635° (NAD 83); and an approximate bottom hole location of Latitude 41.770464° and Longitude -76.036905°, in Rush Township, Susquehanna County, Pennsylvania. The Well will be drilled to an approximate measured depth of 12,123 feet, with an approximate vertical depth of 6,680 feet, to test the Marcellus Formation and all other formations that may be encountered in the wellbore. Estimated costs to drill the Well are $1,984,000.00 with a completed well costing approximately $5,378,706.00. The anticipated spud date for the Well is on or about April 22, 2021.


This well will be a subsequent well drilled in the Baltzley South Unit, which covers 417.171123 acres.


The table below contains a summary of the working and net revenue interest ownership in the Well.


| Working Interest Owner | Craige N 1LH WI | Craige N 1LH NRI |
|---|---|---|
| Chesapeake Appalachia, L.L.C. | 50.898563% | 41.623478% |
| Equinor USA Onshore Properties Inc. | 25.456292% | 20.821989% |
| Epsilon Energy USA, Inc. | 21.145145% | 18.322130% |
| Jamestown Resources, L.L.C. | 2.500000% | 2.044433% |

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0520

Craige N 1LH
December 22, 2020
Chesapeake Appalachia, L.L.C.

This well proposal is made pursuant to that certain Joint Operating Agreement dated October 18, 2010, covering the Baltzley South Unit. Accordingly, please indicate your election in the space provided below, sign and return this letter to the undersigned within thirty (30) days from receipt. Should you elect to participate in the proposed operation, please also execute and return the enclosed AFE. Failure to make a timely election shall be deemed an election not to participate.

At this time, the planned design summary is SW-5-50-2500. Please note this is subject to change.

Your prompt attention and response to this proposal is appreciated. Should you have any questions, please contact the undersigned at (281) 670-0002 or email at Rachel.Collins@epsilonenergyltd.com.

Sincerely,
Epsilon Energy USA, Inc.

*Rachel Collins*

Rachel Collins
Sr. Land Administrator

Enclosures: AFE, Well Plan, Geological Prognosis, Survey Plat, and Unit Plat

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0521

Craige N 1LH
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____**Chesapeake Appalachia LLC** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige 1LH Well pursuant to the Baltzley South JOA.

_____**Chesapeake Appalachia LLC** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige 1LH Well pursuant to the Baltzley South JOA.

_____**Chesapeake Appalachia LLC** hereby elects **not to operate nor participate** in the drilling of the Craige 1LH Well and elects the Non-Consent provision pursuant to the Baltzley South JOA.

By: _____

Name:_____

Title:_____

Date:_____

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0522

**EPSILON**
Energy USA, Inc.

AFE # : _____ D2110140 _____

| | |
|---|---|
| WELL NAME: | **CRAIGE N 1LH** |
| OPERATOR: | **EPSILON ENERGY USA, INC** |
| PROJECT: | **AUBURN** |
| LOCATION (TRACT): | **CRAIGE** |
| SURFACE OWNER: | **HAROLD C AND GLORIA CRAIGE** |
| API (PERMIT #): | **37-115-22081-0000 (115-22081)** |
| COUNTY, STATE: | **SUSQUEHANNA, PENNSYLVANIA** |
| COMMENTS: | **D&C HZ LOWER MARCELLUS WELL** |

DATE: _____ 11/17/20 _____

PROPOSED TMD: _____ 13,200 _____
PROPOSED TVD: _____ 6,700 _____
PROPOSED CLAT: _____ 5,000 _____

| SUMMARY OF ESTIMATED COSTS | (1) TANGIBLES | (2) INTANGIBLES | (3) TOTAL COSTS |
|---|---|---|---|
| A. DRILLING COST | $ 127,000 | $ 1,857,000 | $ 1,984,000 |
| B. COMPLETION COST | $ 707,000 | $ 2,687,706 | $ 3,394,706 |
| C. PLANT & FACILITY COST | $ - | $ - | $ - |
| D. WORKOVER COST | $ - | $ - | $ - |
| TOTALS: | $ 834,000 | $ 4,544,706 | $ 5,378,706 |
| | | | - |

WELL/PROJECT ID#: _____

EXPLORATORY ☐          DEVELOPMENT ☑

WORKOVER ☐          RECOMPLETION ☐

| WORKING INTEREST OWNER: | | PERCENT: | COST SHARE: |
|---|---|---|---|
| CHESAPEAKE APPALACHIA, L.L.C. | | 50.89856300% | $ 2,737,684 |
| EQUINOR USA ONSHORE PROPERTIES INC. | | 25.45629200% | $ 1,369,219 |
| EPSILON ENERGY USA, INC. | | 21.14514500% | $ 1,137,335 |
| JAMESTOWN RESOURCES, L.L.C. | | 2.50000000% | $ 134,468 |
| | | | |
| | | | |
| | | | |
| | | 100.00000000% | $ 5,378,706 |

**OPERATOR'S APPROVAL**

| | | | |
|---|---|---|---|
| PREPARED BY: | *Henry N. Claster* | OPERATIONS | DATE: 1/6/20 |
| APPROVED BY: | *Rachel Collins* | LAND/LEGAL | DATE: 1/6/2021 |
| APPROVED BY: | *Shannon P. Lemke* | GEOLOGY | DATE: 1/6/21 |
| APPROVED BY: | *B. Lori Bond* | ACCOUNTING | DATE: 1-6-21 |

**NON-OPERATOR'S APPROVAL**

COMPANY NAME: _____          DATE: _____

APPROVED BY: _____

TITLE: _____

The costs on this AFE are estimates only.  In executing this AFE, the participant agrees to pay its proportionate share of all actual costs incurred.  Participant shall be covered by and billed proportionately for Operator's well control and general liability insurance unless participant provides Operator a certificate evidencing its own insurance in amounts acceptable to the Operator by the date of spud.

Case: 22-1280   Document: 21-2   Page: 463   Date Filed: 07/25/2022

| Applicant/Well Operator Name: | Epsilon Operating LLC |
| DEP #: | 328036 |
| Well Name: | Craige |
| Well Number: | N1LH |



Azimuths to Grid North
True North: -1.14°
Magnetic North: -13.24°

Magnetic Field
Strength: 52260.5nT
Dip Angle: 67.27°
Date: 6/22/2020
Model: HDGM

PROJECT DETAILS: Susquehanna County, PA

Geodetic System: US State Plane 1983
Datum: North American Datum 1983
Ellipsoid: GRS 1980
Zone: Pennsylvania Northern Zone
Datum: GE 1533' + KB 20' @ 1553.00usft (Prelim)

DESIGN TARGET DETAILS

| Name | TVD | +N/-S | +E/-W | Northing | Easting | Latitude | Longitude |
|------|-----|-------|-------|----------|---------|----------|-----------|
| SHL (Craige N 1LH) | 0.00 | 0.00 | 0.00 | 583691.91 | 2438141.93 | 41° 45' 21.050 N | 76° 1' 43.087 W |
| PBHL (Craige N 1LH) | 6630.00 | 5280.53 | -2361.33 | 588972.44 | 2435780.60 | 41° 46' 13.672 N | 76° 2' 12.858 W |
| LP (Craige N 1LH) | 6680.00 | 548.45 | -517.53 | 584240.36 | 2437624.40 | 41° 45' 26.569 N | 76° 1' 49.770 W |



Formation est. at SHL

Base Elk SS  4325' TVD
Hamilton  4704' TVD

Formation est. at LP

Marcellus Shale  6420' TVD
Onondaga  6720' TVD



Appx0524

# Epsilon Energy

## Preliminary Geological Prognosis

| | |
|---|---|
| API Number: | 37115228010000 |
| Permit Number: | 115-22801 |
| Well Name: | Craige N 1LH |
| Well Type: | Horizontal, development |
| Well Target: | Lower Marcellus |
| State: | Pennsylvania |
| County: | Susquehanna |
| Township: | Rush |
| Projection: | NAD83/Pennsylvania South |
| Surface Location: | Craige Pad |
| | Lat/Long: 41.755847 / -76.028635 |
| Landing Point: | Baltzley South Unit |
| | Lat/Long: 41.75738 / -76.030491 |
| Bottom Hole: | Baltzley South Unit |
| | Lat/Long: 41.770464 / -76.036905 |
| Surface Elevation: | 1,533' |
| KB (est): | 1,553' |
| Total Depth (est): | 12,123' |

Formations:

| Formation | TVD | Subsea Depth | Notes |
|---|---|---|---|
| Tully LS | 4,593 | -3,040 | TVD @ pentetration point |
| Hamilton SH | 4,714 | -3,161 | TVD @ pentetration point |
| Marcellus | 6,680 | -5,127 | TVD @ pentetration point |
| Target | 6,680 | -5,113 | TVD @ pentetration point |
| Onondaga Limestone | 6,999 | -5,446 | |

| | |
|---|---|
| Well Azimuth: | 339° |
| Lateral Length: | 5,080' |

Contacts:

| | | Office | Mobile | Email |
|---|---|---|---|---|
| Epsilon Energy Main Office | | 281-670-0002 | | |
| Rachel Collins | Land | 281-453-3392 | 832-257-9251 | rachel.collins@epsilonenergyltd.com |
| Shannon Lemke | Geology | 281-453-3386 | 713-204-6768 | shannon.lemke@epsilonenergyltd.com |
| Brian Ramey | Operations | 281-453-3390 | 432-528-0076 | bpramey77@gmail.com |
| Paul Atwood | Marketing | 281-453-3387 | 803-730-3778 | paul.atwood@epsilonenergyltd.com |
| Lilian Hernandez | JIB / AP | 281-453-3393 | | lilian.hernandez@epsilonenergyltd.com |
| Henry Clanton | Corporate | 281-453-3389 | 432-770-3642 | henry.clanton@epsilonenergyltd.com |

8000-PM-OOGM0002  Rev. 6/2014

**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION
OFFICE OF OIL AND GAS MANAGEMENT
# WELL LOCATION PLAT
PAGE 1 Surface Location



| DEP | Auth ID#: | | G: |
| USE | Permit #: | | |
| ONLY | Project #: | | C: |

☐ Denotes location of top of well on topo map.

Surface hole is located on topo map  **13052**  feet south of latitude  **41** ° **47** ' **30** "

**SURFACE HOLE COORDINATES**
**NAD 83**
True Latitude: NORTH
**41° 45' 21.05"**
True Longitude: WEST
**76° 01' 43.09"**

**NAD 83**
N 41.755847°
W 76.028635°

**NAD 27**
N 41.755772°
W 76.028989°

N 583653.43
E 2469558.91

3000' RADIUS

| LINE | BEARING | DISTANCE |
| L1 | N82°13'36"W | 722.91' |
| L2 | N68°23'20"W | 376.54' |

PA-SPC NORTH
GRID NORTH

Surface hole is located on topo map **7813** feet west of longitude **76** ° **00** ' **00** "

PROPOSED
SURFACE
HOLE

LOD

L1

ACCESS RD

EXISTING
PRIVATE ROAD

COUNTY HOME RD

**NOTES**

1. WELL LOCATION POSITION ON A 7.5', 1:24,000 USGS TOPO QUAD WHEN THIS SHEET BORDER IS ADJUSTED TO SCALE AND OVERLAYED AND ORIENTED TO THE RESPECTIVE SECTION GRID.

2. PLAN INFORMATION SHOWN ON THIS PLAT IS BASED ON COUNTY TAX PARCELS, DEED PLOTS, AND BASE DATA FROM PASDA AND USGS. SURVEYED LOCATIONS WERE SOLVED USING DUAL FREQUENCY GPS (L1/L2) THAT WAS POST-PROCESSED WITH THE NGS OPUS SERVICE.

3. THIS PLAT IS FOR WELL LOCATION PURPOSES ONLY. IT IS NOT A BOUNDARY RETRACEMENT SURVEY. TIES TO PINS OR PIPES FOUND IS PROVIDED FOR GAS WELL RE-LOCATION PURPOSES ONLY.

4. BASE STATION CONTROL DATA IS AVAILABLE UPON REQUEST

COMMONWEALTH
REGISTERED
PROFESSIONAL
TODD C. JACOBS
LAND
SURVEYOR
NO. SU 075184
PENNSYLVANIA

**LEGEND**
⚠ Well
● Found corner Iron Pin or Pipe
⊕ Water Supply

**NOTE**
No Wetlands Within 100' of Disturbance
No Wetlands Within 300' of Well Bore

| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID #: 328036 | Well (Farm) Name: CRAIGE | | Well #: N1LH | Serial #: |
| Address: 16945 NORTHCHASE DR, SUITE 1610, HOUSTON, TX 77060 | | County: SUSQUEHANNA | Municipality: RUSH | Well Type: NATURAL GAS | |
| 911 address of well site: 1016 COUNTY HOME ROAD, MONTROSE, PA 18801 | | USGS 7½' Quadrangle Map Name: LAWTON | Map Section: 9 | Surface Elevation: 1533 ft. | |
| Surveyor or Engineer: TODD C. JACOBS, P.L.S. | Phone #: 570-278-3100 | Dwg #: NMPY 26 | Date: 09/16/2020 | Scale: 1" = 1,000' | Tract Acreage: 380 ± |
| Lat. & Long Metadata Method: GPSOF(L1,L2)RTK | Accuracy: 0.033' ft. | Datum: NAD 83 | Elevation Metadata Method: GPSOF (L1,L2)RTK | Accuracy: 0.069 ft. | Datum: NAVD 88 | Survey Date: 07/02/2010 |

PLOT DATE/TIME: 9/16/2020 9:48:23AM

Appx0527

8000-PM-OOGM0002 Rev. 6/2014

## WELL LOCATION PLAT

### PAGE 2 Notifications

DEP Statewide toll—free phone number for reporting cases of water contamination which may be associated with development of oil and gas resources is **1-866-255-5158**.

| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID# 328036 | Well (Farm) Name CRAIGE | Well # N1LH | Serial # |
|---|---|---|---|---|
| Surface Landowner/Lessor: HAROLD C. AND GLORIA CRAIGE | | Angle & Course of Deviation (Drilling): N43°20'22"W 754.01' N21°17'17"W 5078.67' | Anticipated True Vertical Depth Feet (TVD): 6630 | Anticipated Total Measured Depth Feet (TMD): 12122.93 |
| Target Formation(s): MARCELLUS | | Deepest Formation to be penetrated: MARCELLUS | Number of Laterals: 1 | Total footage to be drilled all laterals: 12122.93 |

| Surface Owner/Water Purveyor w/Water Supply within 1000'/3000' | | Latitude Longitude of Water Supply | |
|---|---|---|---|
| ① KEVIN C AND MELANIE A PIERSON | 177-1-33.01 | A N41°45'48.15" W76°01'49.28" | B N41°45'47.86" W76°01'48.22" |
| ② JOSEPH AND DONNAGRILLO | 177-1-32 | N41°45'44.14" W76°01'52.37" | |
| ③ RICHARD F DOLAN | 177-1-30.01 | N41°45'38.92" W76°01'54.84" | |
| ④ STEPHEN JAMES MOLNAR | 176-1-14 | A N41°45'38.40" W76°02'07.48" | B N41°45'38.23" W76°02'07.53" |
| ⑤ STEPHEN J MOLNAR | 177-1-30 | A N41°45'37.02" W76°01'59.72" | B N41°45'35.27" W76°02'02.65" |
| ⑥ ANGELA VERY | 177-1-29 | A N41°45'34.87" W76°01'55.70" C N41°45'33.84" W76°01'56.11" | B N41°45'34.48" W76°01'55.22" |
| ⑦ ALLIANCE TO PROTECT LIFE | 176-1-47 | N41°45'29.17" W76°02'10.17" | |
| ⑧ ALLIANCE TO PROTECT LIFE | 177-1-43 | N41°45'18.88" W76°02'01.21" | |
| ⑨ HAROLD C AND GLORIA CRAIGE | 177-1-28.01 | A N41°45'14.41" W76°02'04.56" | B N41°45'14.78" W76°02'03.55" |
| ⑩ ELIZABETH SPICKERMAN | 176-1-23 | N41°45'04.68" W76°02'09.73" | |
| ⑪ ROBERT N SHAFFER | 176-1-23.01 | N41°44'56.36" W76°02'02.67" | |
| ⑫ RAYMOND AND CHRISTINE K POULSEN | 177-1-26 | A N41°44'56.14" W76°01'59.89" C N41°44'57.94" W76°01'54.90" | B N41°45'01.21" W76°02'00.99" D N41°44'57.58" W76°01'53.49" |

| Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet | Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet |
|---|---|
| RUSH TOWNSHIP, SUSQUEHANNA COUNTY (Well Located in) | |
| AUBURN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| TUSCARORA TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| STEVENS TOWNSHIP, BRADFORD COUNTY (Adjacent) | Coal related parties |
| PIKE TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| MIDDLETOWN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| FOREST LAKE TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| JESSUP TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| DIMOCK TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |

PLOT DATE/TIME: 9/16/2020 9:48:52AM

Appx0528

8000-PM-OOGM0002   Rev. 6/2014

# WELL LOCATION PLAT

## PAGE 3 Plan View of Deviated Well Bore

If well has a lateral other than vertical show the bottom hole location on the plat drawing as ⊗ and include the Coordinates in the provided section at the bottom of the drawing area. The top hole and bottom hole locations are to be connected by a bolded line this is to depict the proposed courses of the actual wellbore to be drilled.



- 3 -

Appx0529



Susquehanna County

Baltzley South

Rush Township

Craige

Auburn Township

0          2,000
FEET

● Surface Location

--→ Proposed well

▭ Unit

Baltzley South Unit & Craige Unit

EPSILON
Energy

Craige N 1UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.



December 22, 2020


<u>VIA FEDEX AND ELECTRONIC MAIL</u>


Chesapeake Appalachia, L.L.C.
Attn: Ms. Courtney Moad
6100 N. Western Ave.
Oklahoma City, OK 73118


Re:    Epsilon Energy's Proposed Craige N 1UHC Well
       API: 37115228000000; Permit Number: 115-22800
       Baltzley South and Baltzley North Unit
       Rush Township
       Susquehanna County, Pennsylvania


Ms. Moad:

Epsilon Energy USA Inc. ("EPSN") hereby proposes to drill the Craige N 1UHC Well (the "Well") with a surface hole location of Latitude 41.755793° and Longitude -76.028656° (NAD 83); and an approximate bottom hole location of Latitude 41.789486° and Longitude -76.048982°, in Rush Township, Susquehanna County, Pennsylvania. The Well will be drilled to an approximate measured depth of 19,344 feet, with an approximate vertical depth of 6,525 feet, to test the Marcellus Formation and all other formations that may be encountered in the wellbore. Estimated costs to drill the Well are $2,657,000.00 with a completed well costing approximately $8,855,452.00. The anticipated spud date for the Well is on or about April 22, 2021.

The Well will be a subsequent well drilled in the following units:
- Baltzley South Unit, which covers 417.171123 acres
- Baltzley North Unit, which covers 589.277374 acres

The Well will be drilled as a Cross Unit Well, pursuant to Allocation Consent Agreement attached hereto as Exhibit "A" and incorporated herein by reference. The preliminary Allocation Factor is an estimate, based on approximately **40.9633345%** of the productive drainhole of the Cross Unit Well being in the Baltzley South Unit, and approximately **59.0366655%** of the productive drainhole of the Cross Unit Well being in the Baltzley North Unit. Please be advised that these percentages may be adjusted following completion of the Well to reflect the actual percentages of the productive drainhole length within each unit. The table below contains a summary of the estimated working and net revenue interest ownership in the Well based on the aforementioned preliminary Allocation Factor.

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0531

Craige N 1UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

| Working Interest Owner | Baltzley South Unit WI | Baltzley North Unit WI | Craige N 1UHC WI | Craige N 1UHC NRI |
|---|---|---|---|---|
| Chesapeake Appalachia, L.L.C. | 50.898563% | 46.589161% | 48.354436% | 39.738353% |
| Equinor USA Onshore Properties Inc. | 25.456292% | 23.189671% | 24.118155% | 19.827832% |
| Epsilon Energy USA, Inc. | 21.145145% | 27.721168% | 25.027410% | 21.313343% |
| Jamestown Resources, L.L.C. | 2.500000% | 2.500000% | 2.500000% | 2.054918% |

Epsilon Energy USA Inc. and Chesapeake Appalachia, L.L.C. hereby acknowledge that the working and net revenue interest ownership set forth above is only an estimate, and that the actual working and net revenue interest ownership will be calculated following completion of the Well. Any necessary revisions will then be made to the working and net revenue interest ownership of the Well, and any necessary reversal and rebooking of funds shall be applied so as to accurately reflect such revisions.

Additionally, final unit configuration and working and net revenue interest is subject to adjustments after receipt of all elections and review of further review of the contributed oil and gas interest.

This well proposal is made pursuant to that certain Joint Operating Agreement dated October 18, 2010, covering the Baltzley South Unit, and that certain Joint Operating Agreement dated October 18, 2010 covering the Baltzley North Unit (collectively referred to hereinafter as the "Subject JOAs"). Accordingly, please indicate your election as to each unit in the space provided below, sign and return this letter to the undersigned within thirty (30) days from receipt. Should you elect to participate in the proposed operation, please also execute and return the enclosed AFE.

At this time, the planned design summary is SW-5-50-3000. Please note this is subject to change.

Your prompt attention and response to this proposal is appreciated. Should you have any questions, please contact the undersigned at (281) 670-0002 or email at Rachel.Collins@epsilonenergyltd.com.

Sincerely,
Epsilon Energy USA Inc.

*Rachel Collins*

Rachel Collins
Sr. Land Administrator

Enclosures: Allocation Consent Agreement Craige N 1UHC, AFE, Well Plan, Geological Prognosis, Survey Plat, and Unit Plat

Craige N 1UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley South JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley South JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 1UHC Well and elects the Non-Consent provision pursuant to the Baltzley South JOA.

By:_____

Name:_____

Title:_____

Date:_____


_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley North JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 1UHC Well pursuant to the Baltzley North JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 1UHC Well and elects the Non-Consent provision pursuant to the Baltzley North JOA.

By:_____

Name:_____

Title:_____

Date:_____

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0533

Craige N 1UHC
December 22, 2020

Exhibit "A"

Allocation Consent Agreement

Epsilon Energy USA, Inc. ("EPSN") intends to drill a well or wells which will extend into two units, the existing Baltzley South Unit and Baltzley North Unit (any well drilled which extends into all of the aforementioned units to be referred to as a "Cross Unit Well"). In accordance therewith, Epsilon desires to establish the method by which production and costs will be allocated via this Allocation Consent Agreement ("ACA"), by and between the following parties (all of which to be collectively referred to herein as the "ACA Parties", and/ or individually as "ACA Party"), each of which own a working interest in one or all of the aforementioned Units under and subject to the following Operating Agreements:

1. That certain Joint Operating Agreement for the Baltzley South Unit, dated October 18, 2010, by and between Chesapeake, as Operator, and Epsilon Energy USA, Inc., et al, as Non-Operators.

2. That certain Joint Operating Agreement for the Baltzley North Unit, dated October 18, 2010, by and between Chesapeake, as Operator, and Epsilon Energy USA, Inc., et al, as Non-Operators.

All costs and production for each Cross Unit Well shall be allocated as follows for each of the ACA Parties: The Allocation Factor for each unit shall be a fraction, the numerator of which is equal to the length of that portion of the productive drainhole length of a Cross Unit Well that lies within each respective unit, and the denominator of which is equal to the entire productive drainhole length of the Cross Unit Well. The Allocation Factor shall be multiplied be each respective ACA Party's working and net revenue interest in each unit, and the equation for each unit will be summed together to determine each respective ACA Party's working and net revenue interest for the Cross Unit Well. The productive drainhole length shall be measured from the first take point to the last take point along the lateral of the Cross Unit Well. A preliminary estimate of those measurements shall be based on GIS measurements and shall be provided by Epsilon with the drilling proposals for the Cross Unit Wells, together with the resulting estimated Allocation Factors and working and net revenue interests of the ACA Parties. Upon completion of the Cross Unit Well, a final Allocation Factor for each unit will be determined.

Except as expressly set forth herein, the above referenced Joint Operating Agreements for the Baltzley North Unit and the Baltzley South Unit will govern the rights and obligations of the parties as to that portion of the productive drainhole length of each Cross Unit Well's lateral lying within each respective unit. By way of example and not limitation, if a party elects to not participate in the Cross Unit Well as to one of the units, then the non-consent penalty in the Joint Operating Agreement for that unit will apply to the costs allocated to that particular unit, and the interest of the non-consenting party will be offered only to the parties subject to that particular Joint Operating Agreement.

Epsilon Energy USA, Inc.
Rachel Collins

By: _____

Name: _____

Title: _____

Date: _____


**EPSILON**
Energy USA, Inc.

AFE # : _____ D2110141

DATE: _____ 11/17/20

WELL NAME: **CRAIGE N 1UHC**
OPERATOR: **EPSILON ENERGY USA, INC**
PROJECT: **AUBURN**
LOCATION (TRACT): **CRAIGE**
SURFACE OWNER: **HAROLD C AND GLORIA CRAIGE**
API (PERMIT #): **37-115-22800-0000 (115-22800)**
COUNTY, STATE: **SUSQUEHANNA, PENNSYLVANIA**
COMMENTS: **D&C HZ UPPER MARCELLUS WELL**

PROPOSED TMD: **20,489**
PROPOSED TVD: **6,525**
PROPOSED CLAT: **12,014**

| SUMMARY OF ESTIMATED COSTS | (1) TANGIBLES | (2) INTANGIBLES | (3) TOTAL COSTS |
|---|---|---|---|
| A. DRILLING COST | $ 119,000 | $ 2,538,000 | $ 2,657,000 |
| B. COMPLETION COST | $ 807,000 | $ 5,391,452 | $ 6,198,452 |
| C. PLANT & FACILITY COST | $ - | $ - | $ - |
| D. WORKOVER COST | $ - | $ - | $ - |
| TOTALS: | $ 926,000 | $ 7,929,452 | $ 8,855,452 |
| | | | - |

WELL/PROJECT ID#: _____

EXPLORATORY ☐    DEVELOPMENT ☑

WORKOVER ☐    RECOMPLETION ☐

| WORKING INTEREST OWNER: | | PERCENT: | COST SHARE: |
|---|---|---|---|
| CHESAPEAKE APPALACHIA, L.L.C. | | 48.35443576% | $ 4,282,004 |
| EQUINOR USA ONSHORE PROPERTIES INC. | | 24.11815454% | $ 2,135,772 |
| EPSILON ENERGY USA, INC. | | 25.02740970% | $ 2,216,290 |
| JAMESTOWN RESOURCES, L.L.C. | | 2.50000000% | $ 221,386 |
| | | | |
| | | | |
| | | | |
| | | 100.00000000% | $ 8,855,452 |

**OPERATOR'S APPROVAL**

PREPARED BY: *Henry N. Claiton*    OPERATIONS    DATE: 1/6/21
APPROVED BY: *Rachel Collins*    LAND/LEGAL    DATE: 1/6/2021
APPROVED BY: *Shannon E. Lemke*    GEOLOGY    DATE: 1/6/21
APPROVED BY: *B Lane Bond*    ACCOUNTING    DATE: 1-6-21

**NON-OPERATOR'S APPROVAL**

COMPANY NAME: _____    DATE: _____

APPROVED BY: _____

TITLE: _____

The costs on this AFE are estimates only. In executing this AFE, the participant agrees to pay its proportionate share of all actual costs incurred. Participant shall be covered by and billed proportionately for Operator's well control and general liability insurance unless participant provides Operator a certificate evidencing its own insurance in amounts acceptable to the Operator by the date of spud.



**Applicant/Well Operator Name: Epsilon Operating LLC**
**DEP #: 328036**
**Well Name: Craige**
**Well Number: N1UHC**

Azimuths to Grid North
True North: -1.14°
Magnetic North: -13.24°

Magnetic Field
Strength: 52260.5nT
Dip Angle: 67.27°
Date: 6/22/2020
Model: HDGM

PROJECT DETAILS: Susquehanna County, PA

Geodetic System: US State Plane 1983
Datum: North American Datum 1983
Ellipsoid: GRS 1980
Zone: Pennsylvania Northern Zone
Datum: GE 1533' + KB 20' @ 1553.00usft (Prelim)

### DESIGN TARGET DETAILS

| Name | TVD | +N/-S | +E/-W | Northing | Easting | Latitude | Longitude |
|---|---|---|---|---|---|---|---|
| SHL (Craige N 1UHC) | 0.00 | 0.00 | 0.00 | 583672.15 | 2438136.73 | 41° 45' 20.856 N | 76° 1' 43.160 W |
| PBHL (Craige N 1UHC) | 6175.00 | 12165.21 | -5786.11 | 595837.36 | 2432350.62 | 41° 47' 22.148 N | 76° 2' 56.336 W |
| WP3 (Craige N 1UHC) | 6225.05 | 10556.81 | -5086.87 | 594228.96 | 2433049.86 | 41° 47' 6.126 N | 76° 2' 47.525 W |
| WP2 (Craige N 1UHC) | 6262.28 | 9335.67 | -4631.43 | 593007.82 | 2433505.30 | 41° 46' 53.975 N | 76° 2' 41.831 W |
| WP1 (Craige N 1UHC) | 6296.45 | 8189.88 | -4279.09 | 591862.03 | 2433857.64 | 41° 46' 42.589 N | 76° 2' 37.479 W |
| LP (Craige N 1UHC) | 6525.00 | 708.94 | -1443.18 | 584381.09 | 2436693.55 | 41° 45' 28.142 N | 76° 2' 2.013 W |

**Formation est. at SHL**

Base Elk SS  4325' TVD
Hamilton  4704' TVD

**Formation est. at LP**

Marcellus Shale  6485' TVD
Onondaga  6785' TVD







# Epsilon Energy

## Preliminary Geological Prognosis

| | |
|---|---|
| API Number: | 37115228000000 |
| Permit Number: | 115-22800 |
| Well Name: | Craige N 1UHC |
| Well Type: | Horizontal, development |
| Well Target: | Upper Marcellus |
| State: | Pennsylvania |
| County: | Susquehanna |
| Township: | Rush |
| Projection: | NAD83/Pennsylvania South |
| Surface Location: | Craige Pad |
| | Lat/Long: 41.755793 / -76.028656 |
| Landing Point: | Baltzley South Unit |
| | Lat/Long: 41.757817 / -76.033893 |
| Bottom Hole: | Baltzley North Unit |
| | Lat/Long: 41.789486 / -76.048982 |
| Surface Elevation: | 1,533' |
| KB (est): | 1,553' |
| Total Depth (est): | 19,344' |

Formations:

| Formation | TVD | Subsea Depth | Notes |
|---|---|---|---|
| Tully LS | 4,580 | -3,027 | TVD @ pentetration point |
| Hamilton SH | 4,670 | -3,117 | TVD @ pentetration point |
| Marcellus | 6,517 | -4,964 | TVD @ pentetration point |
| Target | 6,525 | -4,957 | TVD @ pentetration point |
| Onondaga Limestone | 6,836 | -5,283 | |

| | |
|---|---|
| Well Azimuth: | 339° |
| Lateral Length: | 12,265' |

Contacts:

| | | Office | Mobile | Email |
|---|---|---|---|---|
| Epsilon Energy Main Office | | 281-670-0002 | | |
| Rachel Collins | Land | 281-453-3392 | 832-257-9251 | rachel.collins@epsilonenergyltd.com |
| Shannon Lemke | Geology | 281-453-3386 | 713-204-6768 | shannon.lemke@epsilonenergyltd.com |
| Brian Ramey | Operations | 281-453-3390 | 432-528-0076 | bpramey77@gmail.com |
| Paul Atwood | Marketing | 281-453-3387 | 803-730-3778 | paul.atwood@epsilonenergyltd.com |
| Lilian Hernandez | JIB / AP | 281-453-3393 | | lilian.hernandez@epsilonenergyltd.com |
| Henry Clanton | Corporate | 281-453-3389 | 432-770-3642 | henry.clanton@epsilonenergyltd.com |

8000-PM-OOGM0002    Rev. 6/2014

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**OFFICE OF OIL AND GAS MANAGEMENT**
**WELL LOCATION PLAT**
PAGE 1 Surface Location



**pennsylvania**
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

| DEP | Auth ID#: | | G: |
| USE | Permit #: | | |
| ONLY | Project #: | | C: |

☐ Denotes location of top of well on topo map.

Surface hole is located on topo map 13071 feet south of latitude  41 ' 47 ' 30 "

SURFACE HOLE COORDINATES NAD 83
**True Latitude: NORTH**
**41° 45' 20.86"**
**True Longitude: WEST**
**76° 01' 43.16"**

NAD 83
N 41.755793°
W 76.028656°

NAD 27
N 41.755718°
W 76.029009°

N 583633.67
E 2469553.71

3000' RADIUS

| LINE | BEARING | DISTANCE |
|---|---|---|
| L1 | N80°36'51"W | 720.71' |
| L2 | N65°19'30"W | 379.53' |

PROPOSED SURFACE HOLE

ACCESS RD

**NOTES**

1. WELL LOCATION POSITION ON A 7.5', 1:24,000 USGS TOPO QUAD WHEN THIS SHEET BORDER IS ADJUSTED TO SCALE AND OVERLAYED AND ORIENTED TO THE RESPECTIVE SECTION GRID.

2. PLAN INFORMATION SHOWN ON THIS PLAT IS BASED UPON COUNTY TAX PARCELS, DEED PLOTS, AND BASE DATA FROM PASDA AND USGS. SURVEYED LOCATIONS WERE SOLVED USING DUAL FREQUENCY GPS (L1/L2) THAT WAS POST-PROCESSED WITH THE NGS OPUS SERVICE.

3. THIS PLAT IS FOR WELL LOCATION PURPOSES ONLY. IT IS NOT A BOUNDARY RETRACEMENT SURVEY. TIES TO PINS OR PIPES FOUND IS PROVIDED FOR GAS WELL RE-LOCATION PURPOSES ONLY.

4. BASE STATION CONTROL DATA IS AVAILABLE UPON REQUEST.

EXISTING PRIVATE ROAD

COUNTY HOME RD 1399'

COMMONWEALTH
REGISTERED PROFESSIONAL
**TODD C. JACOBS**
LAND SURVEYOR
NO. SU 075184
PENNSYLVANIA

**LEGEND**
△ Well
● Found corner Iron Pin or Pipe
● Water Supply

**NOTE**
No Wetlands Within 100' of Disturbance
No Wetlands Within 300' of Well Bore

Surface hole is located on topo map 7819 feet west of longitude  76 ' 00 ' 00 "

PA-SPC NORTH    GRID NORTH

| Applicant/Well Operator Name: | | DEP ID #: | Well (Farm) Name: | | Well #: | | Serial #: |
|---|---|---|---|---|---|---|---|
| EPSILON OPERATING LLC | | 328036 | CRAIGE | | N1UHC | | |

| Address: | | | County: | Municipality: | | Well Type: |
|---|---|---|---|---|---|---|
| 16945 NORTHCHASE DR, SUITE 1610, HOUSTON, TX 77060 | | | SUSQUEHANNA | RUSH | | NATURAL GAS |

| 911 address of well site: | | | USGS 7½' Quadrangle Map Name: | Map Section: | Surface Elevation: |
|---|---|---|---|---|---|
| 1016 COUNTY HOME ROAD, MONTROSE, PA 18801 | | | LAWTON | 9 | 1533 ft. |

| Surveyor or Engineer: | Phone #: | Dwg #: | Date: | Scale: | Tract Acreage: | |
|---|---|---|---|---|---|---|
| TODD C. JACOBS, P.L.S. | 570-278-3100 | NMPY 26 | 09/16/2020 | 1" = 1,000' | 856 ± | |

| Lat. & Long Metadata Method: | Accuracy: | Datum: | Elevation Metadata Method: | Accuracy: | Datum: | Survey Date: |
|---|---|---|---|---|---|---|
| GPSOF(L1,L2)RTK | 0.033' ft. | NAD 83 | GPSOF (L1,L2)RTK | 0.069 ft. | NAVD 88 | 07/02/2010 |

Appx0539

8000-PM-OOGM0002  Rev. 6/2014

## WELL LOCATION PLAT

### PAGE 2 Notifications

DEP Statewide toll—free phone number for reporting cases of water contamination which may be associated with development of oil and gas resources is **1-866-255-5158**.

| Applicant/Well Operator Name: | DEP ID# | Well (Farm) Name | Well # | Serial # |
|---|---|---|---|---|
| EPSILON OPERATING LLC | 328036 | CRAIGE | N1UHC | |

| Surface Landowner/Lessor: | Angle & Course of Deviation (Drilling): | Anticipated True Vertical Depth Feet (TVD): | Anticipated Total Measured Depth Feet (TMD): |
|---|---|---|---|
| HAROLD C. AND GLORIA CRAIGE | N63°50'25"W 1607.96'  N20°45'37"W 8000.43'  N17°05'35"W 1198.74'  N20°27'13"W 1303.31'  N23°29'48"W 1753.82' | 6175 | 19343.85 |

| Target Formation(s): | Deepest Formation to be penetrated: | Number of Laterals: | Total footage to be drilled all laterals: |
|---|---|---|---|
| MARCELLUS | MARCELLUS | 1 | 19343.85 |

| Surface Owner/Water Purveyor w/Water Supply within 1000'/3000' | | Latitude Longitude of Water Supply | | |
|---|---|---|---|---|
| ① KEVIN C AND MELANIE A PIERSON | 177-1-33.01 | A N41°45'48.15" W76°01'49.28" | B N41°45'47.86" W76°01'48.22" | |
| ② JOSEPH AND DONNAGRILLO | 177-1-32 | N41°45'44.14" W76°01'52.37" | | |
| ③ RICHARD F DOLAN | 177-1-30.01 | N41°45'38.92" W76°01'54.84" | | |
| ④ STEPHEN JAMES MOLNAR | 176-1-14 | A N41°45'38.40" W76°02'07.48" | B N41°45'38.23" W76°02'07.53" | |
| ⑤ STEPHEN J MOLNAR | 177-1-30 | A N41°45'37.02" W76°01'59.72" | B N41°45'35.27" W76°02'00.65" | |
| ⑥ ANGELA VERY | 177-1-29 | A N41°45'34.87" W76°01'55.70"  C N41°45'33.84" W76°01'56.11" | B N41°45'34.48" W76°01'55.22" | |
| ⑦ ALLIANCE TO PROTECT LIFE | 176-1-47 | N41°45'29.17" W76°02'10.17" | | |
| ⑧ ALLIANCE TO PROTECT LIFE | 177-1-43 | N41°45'18.88" W76°02'01.21" | | |
| ⑨ HAROLD C AND GLORIA CRAIGE | 177-1-28.01 | A N41°45'14.41" W76°02'04.56" | B N41°45'14.78" W76°02'03.55" | |
| ⑩ ELIZABETH SPICKERMAN | 176-1-23 | N41°45'04.68" W76°02'09.73" | | |
| ⑪ ROBERT N SHAFFER | 176-1-23.01 | N41°44'56.36" W76°02'02.67" | | |
| ⑫ RAYMOND AND CHRISTINE K POULSEN | 177-1-26 | A N41°44'56.14" W76°01'59.89"  C N41°44'57.94" W76°01'54.90" | B N41°45'01.21" W76°02'00.99"  D N41°44'57.58" W76°01'53.49" | |

| Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet | Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet |
|---|---|
| RUSH TOWNSHIP, SUSQUEHANNA COUNTY (Well Located in) | |
| AUBURN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| TUSCARORA TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| STEVENS TOWNSHIP, BRADFORD COUNTY (Adjacent) | Coal related parties |
| PIKE TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| MIDDLETOWN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| FOREST LAKE TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| JESSUP TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| DIMOCK TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |

PLOT DATE/TIME: 9/16/2020 10:06:30AM

- 2 -

Appx0540

8000-PM-OOGM0002    Rev. 6/2014

## WELL LOCATION PLAT

### PAGE 3 Plan View of Deviated Well Bore

If well has a lateral other than vertical show the bottom hole location on the plat drawing as ⊗ and include the Coordinates in the provided section at the bottom of the drawing area. The top hole and bottom hole locations are to be connected by a bolded line this is to depict the proposed courses of the actual wellbore to be drilled.



PLOT DATE/TIME: 9/10/2020 1:34:57PM

**LEGEND**
△ Well
⊗ Landing Point and Bottom Hole
● Found corner Iron Pin or Pipe

MAP SCALE: 1"=2,500'

TODD C. JACOBS — REGISTERED PROFESSIONAL LAND SURVEYOR NO. SU 075184 — COMMONWEALTH OF PENNSYLVANIA

- 3A -

Appx0541

8000-PM-OOGM0002    Rev. 6/2014

# WELL LOCATION PLAT

## PAGE 3 Plan View of Deviated Well Bore

If well has a lateral other than vertical show the bottom hole location on the plat drawing as ⊗ and include the Coordinates in the provided section at the bottom of the drawing area. The top hole and bottom hole locations are to be connected by a bolded line this is to depict the proposed courses of the actual wellbore to be drilled.

| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID# 328036 | Well (Farm) Name CRAIGE | Well # N1UHC |
|---|---|---|---|



LEGEND
△ Well
⊗ Landing Point and Bottom Hole
● Found corner Iron Pin or Pipe

MAP SCALE: 1"=1,000'

PLOT DATE/TIME: 9/10/2020  1:35:13PM

- 3B -

Appx0542



Baltzley North Unit, Baltzley South
Unit & Craige Unit

- ● Surface Location
- - - → Proposed multi-unit well
- ☐ Unit

Appx0543

Craige N 4UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.



December 22, 2020


VIA FEDEX AND ELECTRONIC MAIL


Chesapeake Appalachia, L.L.C.
Attn: Ms. Courtney Moad
6100 N. Western Ave.
Oklahoma City, OK 73118


Re:     Epsilon Energy's Proposed Craige N 4UHC Well
        API: 37115228080000; Permit Number: 115-22808
        Baltzley South and Baltzley North Unit
        Rush Township
        Susquehanna County, Pennsylvania

Ms. Moad:

Epsilon Energy USA Inc. ("EPSN") hereby proposes to drill the Craige N 4UHC Well (the "Well") with a surface hole location of Latitude 41.755855° and Longitude -76.028526° (NAD 83); and an approximate bottom hole location of Latitude 41.789462° and Longitude -76.044140°, in Rush Township, Susquehanna County, Pennsylvania. The Well will be drilled to an approximate measured depth of 18,494 feet, with an approximate vertical depth of 6,410 feet, to test the Marcellus Formation and all other formations that may be encountered in the wellbore. Estimated costs to drill the Well are $2,550,000.00 with a completed well costing approximately $8,504,943.00. The anticipated spud date for the Well is on or about April 22, 2021.

The Well will be a subsequent well drilled in the following units:
- Baltzley South Unit, which covers 417.171123 acres
- Baltzley North Unit, which covers 589.277374 acres

The Well will be drilled as a Cross Unit Well, pursuant to Allocation Consent Agreement attached hereto as Exhibit "A" and incorporated herein by reference. The preliminary Allocation Factor is an estimate, based on approximately **41.4203317%** of the productive drainhole of the Cross Unit Well being in the Baltzley South Unit, and approximately **58.5796683%** of the productive drainhole of the Cross Unit Well being in the Baltzley North Unit. Please be advised that these percentages may be adjusted following completion of the Well to reflect the actual percentages of the productive drainhole length within each unit. The table below contains a summary of the estimated working and net revenue interest ownership in the Well based on the aforementioned preliminary Allocation Factor.

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0544

Craige N 4UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

| Working Interest Owner | Baltzley South Unit WI | Baltzley North Unit WI | Craige N 4UHC WI | Craige N 4UHC NRI |
|---|---|---|---|---|
| Chesapeake Appalachia, L.L.C. | 50.898563% | 46.589161% | 48.374130% | 39.752946% |
| Equinor USA Onshore Properties Inc. | 25.456292% | 23.189671% | 24.128513% | 19.835527% |
| Epsilon Energy USA, Inc. | 21.145145% | 27.721168% | 24.997357% | 21.290188% |
| Jamestown Resources, L.L.C. | 2.500000% | 2.500000% | 2.500000% | 2.054837% |

Epsilon Energy USA Inc. and Chesapeake Appalachia, L.L.C. hereby acknowledge that the working and net revenue interest ownership set forth above is only an estimate, and that the actual working and net revenue interest ownership will be calculated following completion of the Well. Any necessary revisions will then be made to the working and net revenue interest ownership of the Well, and any necessary reversal and rebooking of funds shall be applied so as to accurately reflect such revisions.

Additionally, final unit configuration and working and net revenue interest is subject to adjustments after receipt of all elections and review of further review of the contributed oil and gas interest.

This well proposal is made pursuant to that certain Joint Operating Agreement dated October 18, 2010, covering the Baltzley South Unit, and that certain Joint Operating Agreement dated October 18, 2010 covering the Baltzley North Unit (collectively referred to hereinafter as the "Subject JOAs"). Accordingly, please indicate your election as to each unit in the space provided below, sign and return this letter to the undersigned within thirty (30) days from receipt. Should you elect to participate in the proposed operation, please also execute and return the enclosed AFE.

At this time, the planned design summary is SW-5-50-3000. Please note this is subject to change.

Your prompt attention and response to this proposal is appreciated. Should you have any questions, please contact the undersigned at (281) 670-0002 or email at Rachel.Collins@epsilonenergyltd.com.

Sincerely,
Epsilon Energy USA Inc.

Rachel Collins

Rachel Collins
Sr. Land Administrator

Enclosures: Allocation Consent Agreement Craige N 4UHC, AFE, Well Plan, Geological Prognosis, Survey Plat, and Unit Plat

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0545

Craige N 4UHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley South JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley South JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 4UHC Well and elects the Non-Consent provision pursuant to the Baltzley South JOA.

By:_____

Name:_____

Title:_____

Date:_____


_____**Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley North JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige N 4UHC Well pursuant to the Baltzley North JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige N 4UHC Well and elects the Non-Consent provision pursuant to the Baltzley North JOA.

By:_____

Name:_____

Title:_____

Date:_____

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0546

Craige N 4UHC
December 22, 2020

Exhibit "A"

Allocation Consent Agreement

Epsilon Energy USA, Inc. ("EPSN") intends to drill a well or wells which will extend into two units, the existing Baltzley South Unit and Baltzley North Unit (any well drilled which extends into all of the aforementioned units to be referred to as a "Cross Unit Well"). In accordance therewith, Epsilon desires to establish the method by which production and costs will be allocated via this Allocation Consent Agreement ("ACA"), by and between the following parties (all of which to be collectively referred to herein as the "ACA Parties", and/ or individually as "ACA Party"), each of which own a working interest in one or all of the aforementioned Units under and subject to the following Operating Agreements:

1. That certain Joint Operating Agreement for the Baltzley South Unit, dated October 18, 2010, by and between Chesapeake, as Operator, and Epsilon Energy USA, Inc., et al, as Non-Operators.

2. That certain Joint Operating Agreement for the Baltzley North Unit, dated October 18, 2010, by and between Chesapeake, as Operator, and Epsilon Energy USA, Inc., et al, as Non-Operators.

All costs and production for each Cross Unit Well shall be allocated as follows for each of the ACA Parties: The Allocation Factor for each unit shall be a fraction, the numerator of which is equal to the length of that portion of the productive drainhole length of a Cross Unit Well that lies within each respective unit, and the denominator of which is equal to the entire productive drainhole length of the Cross Unit Well. The Allocation Factor shall be multiplied be each respective ACA Party's working and net revenue interest in each unit, and the equation for each unit will be summed together to determine each respective ACA Party's working and net revenue interest for the Cross Unit Well. The productive drainhole length shall be measured from the first take point to the last take point along the lateral of the Cross Unit Well. A preliminary estimate of those measurements shall be based on GIS measurements and shall be provided by Epsilon with the drilling proposals for the Cross Unit Wells, together with the resulting estimated Allocation Factors and working and net revenue interests of the ACA Parties. Upon completion of the Cross Unit Well, a final Allocation Factor for each unit will be determined.

Except as expressly set forth herein, the above referenced Joint Operating Agreements for the Baltzley North Unit and the Baltzley South Unit will govern the rights and obligations of the parties as to that portion of the productive drainhole length of each Cross Unit Well's lateral lying within each respective unit. By way of example and not limitation, if a party elects to not participate in the Cross Unit Well as to one of the units, then the non-consent penalty in the Joint Operating Agreement for that unit will apply to the costs allocated to that particular unit, and the interest of the non-consenting party will be offered only to the parties subject to that particular Joint Operating Agreement.

Epsilon Energy USA, Inc.
Rachel Collins

By: _____

Name: _____

Title: _____

Date: _____

**EPSILON**
**Energy USA, Inc.**

| | | AFE # : | D2110145 |
|---|---|---|---|
| WELL NAME: | CRAIGE N 4UHC | DATE: | 11/17/20 |
| OPERATOR: | EPSILON ENERGY USA, INC | | |
| PROJECT: | AUBURN | | |
| LOCATION (TRACT): | CRAIGE | | |
| SURFACE OWNER: | HAROLD C AND GLORIA CRAIGE | | |
| API (PERMIT #): | 37-115-22808-0000 (115-22808) | PROPOSED TMD: | 19,878 |
| COUNTY, STATE: | SUSQUEHANNA, PENNSYLVANIA | PROPOSED TVD: | 6,410 |
| COMMENTS: | D&C HZ UPPER MARCELLUS WELL | PROPOSED CLAT: | 11,446 |

| SUMMARY OF ESTIMATED COSTS | (1) TANGIBLES | (2) INTANGIBLES | (3) TOTAL COSTS |
|---|---|---|---|
| A. DRILLING COST | $ 119,000 | $ 2,431,000 | $ 2,550,000 |
| B. COMPLETION COST | $ 795,000 | $ 5,159,943 | $ 5,954,943 |
| C. PLANT & FACILITY COST | $ - | $ - | $ - |
| D. WORKOVER COST | $ - | $ - | $ - |
| TOTALS: | $ 914,000 | $ 7,590,943 | $ 8,504,943 |
| | | | - |

WELL/PROJECT ID#: _____

EXPLORATORY ☐     DEVELOPMENT ☑

WORKOVER ☐     RECOMPLETION ☐

| WORKING INTEREST OWNER | | PERCENT: | COST SHARE: |
|---|---|---|---|
| CHESAPEAKE APPALACHIA, L.L.C. | | 48.37413000% | $ 4,114,192 |
| EQUINOR USA ONSHORE PROPERTIES INC. | | 24.12851300% | $ 2,052,116 |
| EPSILON ENERGY USA, INC. | | 24.99735700% | $ 2,126,011 |
| JAMESTOWN RESOURCES, L.L.C. | | 2.50000000% | $ 212,624 |
| | | | |
| | | | |
| | | | |
| | | 100.00000000% | $ 8,504,943 |

**OPERATOR'S APPROVAL**

| | | | | |
|---|---|---|---|---|
| PREPARED BY: | Henry N. Clair | OPERATIONS | DATE: | 1/6/21 |
| APPROVED BY: | Rachel Collins | LAND/LEGAL | DATE: | 1/6/2021 |
| APPROVED BY: | Shannon E. Lemke | GEOLOGY | DATE: | 1/6/21 |
| APPROVED BY: | B Lane Bond | ACCOUNTING | DATE: | 1-6-21 |

**NON-OPERATOR'S APPROVAL**

| | | | |
|---|---|---|---|
| COMPANY NAME: | _____ | DATE: | _____ |
| APPROVED BY: | _____ | | |
| TITLE: | _____ | | |

The costs on this AFE are estimates only. In executing this AFE, the participant agrees to pay its proportionate share of all actual costs incurred. Participant shall be covered by and billed proportionately for Operator's well control and general liability insurance unless participant provides Operator a certificate evidencing its own insurance in amounts acceptable to the Operator by the date of spud.

Case: 22-1280   Document: 21-2   Page: 488   Date Filed: 07/25/2022



| Applicant/Well Operator Name: | **Epsilon Operating LLC** |
| DEP #: | **328036** |
| Well Name: | **Craige** |
| Well Number: | **N4UHC** |

**PROJECT DETAILS:** Susquehanna County, PA

Azimuths to Grid North
True North: -1.14°
Magnetic North: -13.22°

Magnetic Field
Strength: 52231.3nT
Dip Angle: 67.23°
Date: 10/13/2020
Model: HDGM

Geodetic System: US State Plane 1983
Datum: North American Datum 1983
Ellipsoid: GRS 1980
Zone: Pennsylvania Northern Zone
Datum: GE 1533' + KB 20' @ 1553.00usft (Permit)

### DESIGN TARGET DETAILS

| Name | TVD | +N/-S | +E/-W | Northing | Easting | Latitude | Longitude |
|---|---|---|---|---|---|---|---|
| SHL (Craige N 4UHC) | 0.00 | 0.00 | 0.00 | 583695.45 | 2438171.72 | 41° 45' 21.079 N | 76° 1' 42.693 W |
| PBHL (Craige N 4UHC) | 6160.00 | 12159.10 | -4500.73 | 595854.55 | 2433670.99 | 41° 47' 22.062 N | 76° 2' 38.905 W |
| WP2 (Craige N 4UHC) | 6182.96 | 11147.39 | -4158.76 | 594842.84 | 2434012.96 | 41° 47' 12.002 N | 76° 2' 34.654 W |
| WP1 (Craige N 4UHC) | 6202.70 | 10303.89 | -3783.05 | 593999.34 | 2434388.66 | 41° 47' 3.597 N | 76° 2' 29.915 W |
| LP (Craige N 4UHC) | 6410.00 | 1250.62 | -293.49 | 584946.07 | 2437878.23 | 41° 45' 33.490 N | 76° 1' 46.236 W |

**Formation est. at SHL**

Base Elk SS  4325' TVD
Hamilton  4704' TVD

**Formation est. at LP**

Marcellus Shale  6385' TVD
Onondaga  6685' TVD





Appx0549

# Epsilon Energy

## Preliminary Geological Prognosis

API Number:     37115228080000

Permit Number:     115-22808

Well Name:     Craige N 4UHC

Well Type:     Horizontal, development

Well Target:     Upper Marcellus

State:     Pennsylvania

County:     Susquehanna

Township:     Rush

Projection:     NAD83/Pennsylvania South

Surface Location:     Craige Pad

    Lat/Long:  41.755855 / -76.028526

Landing Point:     Baltzley South Unit

    Lat/Long:  41.759303 / -76.029510

Bottom Hole:     Baltzley North Unit

    Lat/Long:  41.789462 / -76.044140

Surface Elevation:     1,533'

KB (est):     1,553'

Total Depth (est):     18,494'

Formations:

| Formation | TVD | Subsea Depth | Notes |
|---|---|---|---|
| Tully LS | 4,540 | -2,987 | TVD @ pentetration point |
| Hamilton SH | 4,650 | -3,097 | TVD @ pentetration point |
| Marcellus | 6,410 | -4,882 | TVD @ pentetration point |
| Target | 6,410 | -4,897 | TVD @ pentetration point |
| Onondaga Limestone | 6,729 | -5,174 | |

Well Azimuth:     339°

Lateral Length:     11,705'

Contacts:

|  |  | Office | Mobile | Email |
|---|---|---|---|---|
| Epsilon Energy Main Office |  | 281-670-0002 |  |  |
| Rachel Collins | Land | 281-453-3392 | 832-257-9251 | rachel.collins@epsilonenergyltd.com |
| Shannon Lemke | Geology | 281-453-3386 | 713-204-6768 | shannon.lemke@epsilonenergyltd.com |
| Brian Ramey | Operations | 281-453-3390 | 432-528-0076 | bpramey77@gmail.com |
| Paul Atwood | Marketing | 281-453-3387 | 803-730-3778 | paul.atwood@epsilonenergyltd.com |
| Lilian Hernandez | JIB / AP | 281-453-3393 |  | lilian.hernandez@epsilonenergyltd.com |
| Henry Clanton | Corporate | 281-453-3389 | 432-770-3642 | henry.clanton@epsilonenergyltd.com |

8000-PM-OOGM0002    Rev. 6/2014

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**OFFICE OF OIL AND GAS MANAGEMENT**
## WELL LOCATION PLAT
PAGE 1 Surface Location



pennsylvania
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

| DEP | Auth ID#: | | G: |
|-----|-----------|---|----|
| USE | Permit #: | | |
| ONLY | Project #: | | C: |

☐ Denotes location of top of well on topo map.

Surface hole is located on topo map  13049  feet south of latitude   41 ° 47 ' 30 "

**SURFACE HOLE COORDINATES NAD 83**
True Latitude: NORTH
41° 45' 21.08"
True Longitude: WEST
76° 01' 42.69"

**NAD 83**
N 41.755855°
W 76.028526°

**NAD 27**
N 41.755780°
W 76.028879°

N  583656.97
E  2469588.70

3000' RADIUS

Surface hole is located on topo map   7783   feet west of longitude   76 ° 00 ' 00 "

PA-SPC NORTH    GRID NORTH

| LINE | BEARING | DISTANCE |
|------|---------|----------|
| L1 | N82°48'04"W | 751.98' |
| L2 | N70°24'59"W | 403.18' |

PROPOSED SURFACE HOLE

LOD

L2

L1

ACCESS RD

EXISTING PRIVATE ROAD

COUNTY HOME RD

**NOTES**
1. WELL LOCATION POSITION ON A 7.5', 1:24,000 USGS TOPO QUAD WHEN THIS SHEET BORDER IS ADJUSTED TO SCALE AND OVERLAYED AND ORIENTED TO THE RESPECTIVE SECTION GRID.

2. PLAN INFORMATION SHOWN ON THIS PLAT IS BASED ON COUNTY TAX PARCELS, DEED PLOTS, AND BASE DATA FROM PASDA AND USGS. SURVEYED LOCATIONS WERE SOLVED USING DUAL FREQUENCY GPS (L1/L2) THAT WAS POST-PROCESSED WITH THE NGS OPUS SERVICE.

3. THIS PLAT IS FOR WELL LOCATION PURPOSES ONLY. IT IS NOT A BOUNDARY RETRACEMENT SURVEY. TIES TO PINS OR PIPES FOUND IS PROVIDED FOR GAS WELL RE-LOCATION PURPOSES ONLY.

4. BASE STATION CONTROL DATA IS AVAILABLE UPON REQUEST

COMMONWEALTH
REGISTERED
PROFESSIONAL
TODD C. JACOBS
LAND
SURVEYOR
NO. SU 075184
PENNSYLVANIA

**LEGEND**
△ Well
● Found corner Iron Pin or Pipe
✦ Water Supply

**NOTE**
No Wetlands Within 100' of Disturbance
No Wetlands Within 300' of Well Bore

| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID #: 328036 | Well (Farm) Name: CRAIGE | | Well #: | Serial #: N4UHC |
|---|---|---|---|---|---|
| Address: 16945 NORTHCHASE DR, SUITE 1610, HOUSTON, TX 77060 | | County: SUSQUEHANNA | Municipality: RUSH | | Well Type: NATURAL GAS |
| 911 address of well site: 1016 COUNTY HOME ROAD, MONTROSE, PA 18801 | | USGS 7½' Quadrangle Map Name: LAWTON | Map Section: 9 | | Surface Elevation: 1533 ft. |
| Surveyor or Engineer: TODD C. JACOBS, P.L.S. | Phone #: 570-278-3100 | Dwg #: NMPY 26 | Date: 10/22/2020 | Scale: 1" = 1,000' | Tract Acreage: 931 ± |
| Lat. & Long Metadata Method: GPSOF(L1,L2)RTK | Accuracy: 0.033' ft. | Datum: NAD 83 | Elevation Metadata Method: GPSOF (L1,L2)RTK | Accuracy: 0.069 ft. | Datum: NAVD 88 | Survey Date: 07/02/2010 |

PLOT DATE/TIME: 10/21/2020 0:36:38PM

- 1 -

Appx0552

8000-PM-OOGM0002  Rev. 6/2014

# WELL LOCATION PLAT
## PAGE 2 Notifications

DEP Statewide toll—free phone number for reporting cases of water contamination which may be associated with development of oil and gas resources is **1-866-255-5158** .

| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID# 328036 | Well (Farm) Name CRAIGE | Well # N4UHC | Serial # |
|---|---|---|---|---|
| Surface Landowner/Lessor: HAROLD C. AND GLORIA CRAIGE | Angle & Course of Deviation (Drilling): N13°12'25"W 1284.60' N21°04'45"W 9702.51' N24°00'31"W 923.39' N18°40'33"W 1067.94' | | Anticipated True Vertical Depth Feet (TVD): 6160 | Anticipated Total Measured Depth Feet (TMD): 18494.09 |
| Target Formation(s): MARCELLUS | Deepest Formation to be penetrated: MARCELLUS | | Number of Laterals: 1 | Total footage to be drilled all laterals: 18494.09 |

| Surface Owner/Water Purveyor w/Water Supply within 1000'/3000' | | Latitude Longitude of Water Supply | |
|---|---|---|---|
| ① KEVIN C AND MELANIE A PIERSON | 177-1-33.01 | A N41°45'48.15" W76°01'49.28" | B N41°45'47.86" W76°01'48.22" |
| ② JOSEPH AND DONNAGRILLO | 177-1-32 | N41°45'44.14" W76°01'52.37" | |
| ③ RICHARD F DOLAN | 177-1-30.01 | N41°45'38.92" W76°01'54.84" | |
| ④ STEPHEN JAMES MOLNAR | 176-1-14 | A N41°45'38.40" W76°02'07.48" | B N41°45'38.23" W76°02'07.53" |
| ⑤ STEPHEN J MOLNAR | 177-1-30 | A N41°45'37.02" W76°01'59.72" | B N41°45'35.27" W76°02'02.65" |
| ⑥ ANGELA VERY | 177-1-29 | A N41°45'34.87" W76°01'55.70" C N41°45'33.84" W76°01'56.11" | B N41°45'34.48" W76°01'55.22" |
| ⑦ ALLIANCE TO PROTECT LIFE | 176-1-47 | N41°45'29.17" W76°02'10.17" | |
| ⑧ ALLIANCE TO PROTECT LIFE | 177-1-43 | N41°45'18.88" W76°02'01.21" | |
| ⑨ HAROLD C AND GLORIA CRAIGE | 177-1-28.01 | A N41°45'14.41" W76°02'04.56" | B N41°45'14.78" W76°02'03.55" |
| ⑩ ELIZABETH SPICKERMAN | 176-1-23 | N41°45'04.68" W76°02'09.73" | |
| ⑪ ROBERT N SHAFFER | 176-1-23.01 | N41°44'56.36" W76°02'02.67" | |
| ⑫ RAYMOND AND CHRISTINE K POULSEN | 177-1-26 | A N41°44'56.14" W76°01'59.89" C N41°44'57.94" W76°01'54.90" | B N41°45'01.21" W76°02'00.99" D N41°44'57.58" W76°01'53.49" |

| Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet | Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet |
|---|---|
| RUSH TOWNSHIP, SUSQUEHANNA COUNTY (Well Located in) | |
| AUBURN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| TUSCARORA TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| STEVENS TOWNSHIP, BRADFORD COUNTY (Adjacent) | Coal related parties |
| PIKE TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| MIDDLETOWN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| FOREST LAKE TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| JESSUP TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| DIMOCK TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |

PLOT DATE/TIME: 10/21/2020 0:37:10PM

Appx0553

8000-PM-OOGM0002    Rev. 6/2014

# WELL LOCATION PLAT

### PAGE 3 Plan View of Deviated Well Bore

If well has a lateral other than vertical show the bottom hole location on the plat drawing as ⊗ and include the Coordinates in the provided section at the bottom of the drawing area. The top hole and bottom hole locations are to be connected by a bolded line this is to depict the proposed courses of the actual wellbore to be drilled.



- 3A -

Appx0554

8000-PM-OOGM0002    Rev. 6/2014

# WELL LOCATION PLAT

## PAGE 3 Plan View of Deviated Well Bore

If well has a lateral other than vertical show the bottom hole location on the plat drawing as ⊗ and include the Coordinates in the provided section at the bottom of the drawing area. The top hole and bottom hole locations are to be connected by a bolded line this is to depict the proposed courses of the actual wellbore to be drilled.



| Applicant/Well Operator Name: | DEP ID# | Well (Farm) Name | Well # |
|---|---|---|---|
| EPSILON OPERATING LLC | 328036 | CRAIGE | N4UHC |

LEGEND
△ Well
⊗ Landing Point and Bottom Hole
● Found corner Iron Pin or Pipe

MAP SCALE: 1"=800'

- 3B -

Appx0555



Surface Location
Proposed multi-unit well
Unit

Baltzley North Unit, Baltzley South
Unit & Craige Unit

Craige S 3LHC
December 22, 2020
Chesapeake Appalachia, L.L.C.



December 22, 2020

<u>VIA FEDEX AND ELECTRONIC MAIL</u>

Chesapeake Appalachia, L.L.C.
Attn: Ms. Courtney Moad
6100 N. Western Ave.
Oklahoma City, OK 73118

Re:    Epsilon Energy's Proposed Craige S 3LHC Well
       API: 37115227970000; Permit Number: 115-22797
       Craige Unit, Poulson North Unit, and Poulson South Unit
       Rush Township, Susquehanna County, Pennsylvania
       Auburn Township, Susquehanna County, Pennsylvania

Ms. Moad:

Epsilon Energy USA Inc. ("EPSN") hereby proposes to drill the Craige S 3LHC Well (the "Well") with a surface hole location of Latitude 41.755814° and Longitude -76.028383° (NAD 83); and an approximate bottom hole location of Latitude 41.723511° and Longitude -76.005438°, in Rush Township, Susquehanna County, and Auburn Township, Susquehanna County, Pennsylvania. The Well will be drilled to an approximate measured depth of 20,248 feet, with an approximate vertical depth of 7,050 feet, to test the Marcellus Formation and all other formations that may be encountered in the wellbore. Estimated costs to drill the Well are $2,660,000.00 with a completed well costing approximately $9,019,243.00. The anticipated spud date for the Well is on or about April 22, 2021.

The Well will be a subsequent well drilled in each of the following units:
- Craige Unit, which covers 591.870858 acres
- Poulson North Unit, which covers 132.810484 acres
- Poulson South Unit, which covers 95.619792 acres

The Well will be drilled as a Cross Unit Well, pursuant to Allocation Consent Agreement attached hereto as Exhibit "A" and incorporated herein by reference. The preliminary Allocation Factor is an estimate, based on approximately **43.0695026%** of the productive drainhole of the Cross Unit Well being in the Craige Unit, approximately **30.8294457%** of the productive drainhole of the Cross Unit well being in the

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0557

Craige S 3LHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

Poulson North Unit, and approximately **26.1010516%** of the productive drainhole of the Cross Unit Well being in the Poulson South Unit. Please be advised that these percentages may be adjusted following completion of the Well to reflect the actual percentages of the productive drainhole length within each unit. The table below contains a summary of the estimated working interest ownership in the Well based on the aforementioned preliminary Allocation Factor.

| Working Interest Owner | Craige Unit WI | Poulson North Unit WI | Poulson South Unit WI | Craige S 3LHC WI |
|---|---|---|---|---|
| Chesapeake Appalachia, L.L.C. | 35.634447% | 35.528850% | 36.941747% | 35.943111% |
| Equinor USA Onshore Properties Inc. | 18.669483% | 17.106484% | 17.786767% | 17.957221% |
| Epsilon Energy USA, Inc. | 33.669160% | 47.364666% | 45.271485% | 40.919737% |
| Jamestown Resources, L.L.C. | 2.500000% | 0.000000% | 0.000000% | 1.076738% |
| Chief Exploration & Development LLC | 5.335070% | 0.000000% | 0.000000% | 2.297788% |
| Enerplus Resources (USA) Corporation | 2.858073% | 0.000000% | 0.000000% | 1.230958% |
| Radler 2000 Limited Partnership | 0.777193% | 0.000000% | 0.000000% | 0.334733% |
| Tug Hill Marcellus, LLC | 0.556574% | 0.000000% | 0.000000% | 0.239714% |
| Unconventionals Natural Gas, LLC | 0.000000% | 0.000000% | 0.000000% | 0.000000% |

EPSN and Chesapeake Appalachia, L.L.C. hereby acknowledge that the working interest ownership set forth above is only an estimate, and that the actual working interest ownership will be calculated following completion of the Well. Any necessary revisions will then be made to the working and net revenue interest ownership of the Well, and any necessary reversal and rebooking of funds shall be applied so as to accurately reflect such revisions.

Additionally, final unit configuration and working and net revenue interest is subject to adjustments after receipt of all elections and review of further review of the contributed oil and gas interest.

This well proposal is made pursuant to that certain Joint Operating Agreement dated December 16, 2010, covering the Craige Unit and that certain Farmout Agreement between Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C. dated effective February 1, 2010 with Exhibit Schedule 7.1.2 as Joint Operating Agreement covering the Poulson North and Poulson South Units (both of these Joint Operating Agreements to be collectively referred to hereinafter as the "Subject JOAs"). Accordingly, please indicate your election as to each unit in the space provided below, sign and return this letter to the undersigned

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0558

Craige S 3LHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

within thirty (30) days from receipt. Should you elect to participate in the proposed operation, please also execute and return the enclosed AFE.

At this time, the planned design summary is SW-5-50-2500. Please note this is subject to change.

Your prompt attention and response to this proposal is appreciated. Should you have any questions, please contact the undersigned at (281) 670-0002 or email at Rachel.Collins@epsilonenergyltd.com.

Sincerely,
Epsilon Energy USA Inc.

Rachel Collins
Sr. Land Administrator

Enclosures: Allocation Consent Agreement Craige S 3LHC, AFE, Well Plan, Geological Prognosis, Survey Plat, and Unit Plat

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Craige S 3LHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige S 3LHC Well pursuant to the Craige JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige S 3LHC Well pursuant to the Craige JOA.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige S 3LHC Well and elects the Non-Consent provision pursuant to the Craige JOA.

By:_____

Name:_____

Title:_____

Date:_____

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige S 3LHC Well pursuant to Farmout Agreement, dated February 1, 2010 and JOA (Schedule 7.1.2), dated February 1, 2010 covering the Poulson North Unit.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige S 3LHC Well pursuant to Farmout Agreement, dated February 1, 2010 and JOA (Schedule 7.1.2), dated February 1, 2010 covering the Poulson North Unit.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige S 3LHC Well and elects the Non-Consent provision pursuant to Farmout Agreement, dated February 1, 2010 and JOA (Schedule 7.1.2), dated February 1, 2010 covering the Poulson North Unit.

By:_____

Name:_____

Title:_____

Date:_____

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0560

Craige S 3LHC
December 22, 2020
Chesapeake Appalachia, L.L.C.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate and participate** with the full extent of its interest in the drilling of the Craige S 3LHC Well pursuant to Farmout Agreement, dated February 1, 2010 and JOA (Schedule 7.1.2), dated February 1, 2010 covering the Poulson South Unit.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects to **operate but not participate** with the full extent of its interest in the drilling of the Craige S 3LHC Well pursuant to Farmout Agreement, dated February 1, 2010 and JOA (Schedule 7.1.2), dated February 1, 2010 covering the Poulson South Unit.

_____ **Chesapeake Appalachia, L.L.C.** hereby elects **not to operate nor participate** in the drilling of the Craige S 3LHC Well and elects the Non-Consent provision pursuant to Farmout Agreement, dated February 1, 2010 and JOA (Schedule 7.1.2), dated February 1, 2010 covering the Poulson South Unit.

By: _____

Name: _____

Title: _____

Date: _____

*Epsilon Energy USA, Inc.*
*16945 Northchase Drive, Suite 1610, Houston, TX 77060*
*Phone: 281.670.0002; Fax: 281.668.0985*

Appx0561

Craige S 3LHC
December 22, 2020

Exhibit "A"

Allocation Consent Agreement

Epsilon Energy USA, Inc. ("EPSN") intends to drill a well or wells which will extend into three units, the existing Craige Unit, Poulson North Unit and Poulson South Unit (any well drilled which extends into all of the aforementioned units to be referred to as a "Cross Unit Well"). In accordance therewith, Epsilon desires to establish the method by which production and costs will be allocated via this Allocation Consent Agreement ("ACA"), by and between the following parties (all of which to be collectively referred to herein as the "ACA Parties", and/ or individually as "ACA Party"), each of which own a working interest in one or all of the aforementioned Units under and subject to the following Operating Agreements:

1.  That certain Operating Agreement for the Craige Unit, dated December 16, 2010, by and between Chesapeake Appalachia, L.L.C., as Operator, and Epsilon Energy USA, Inc., et al, as Non-Operators.

2.  That certain Farmout Agreement dated effective February 1, 2010, between Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C. which includes Exhibit Schedule 7.1.2 as Joint Operating Agreement covering the Poulson North Unit.

3.  That certain Farmout Agreement dated effective February 1, 2010, between Epsilon Energy USA, Inc. and Chesapeake Appalachia, L.L.C. which includes Exhibit Schedule 7.1.2 as Joint Operating Agreement covering the Poulson South Unit.

All costs and production for each Cross Unit Well shall be allocated as follows for each of the ACA Parties: The Allocation Factor for each unit shall be a fraction, the numerator of which is equal to the length of that portion of the productive drainhole length of a Cross Unit Well that lies within each respective unit, and the denominator of which is equal to the entire productive drainhole length of the Cross Unit Well. The Allocation Factor shall be multiplied be each respective ACA Party's working and net revenue interest in each unit, and the equation for each unit will be summed together to determine each respective ACA Party's working and net revenue interest for the Cross Unit Well. The productive drainhole length shall be measured from the first take point to the last take point along the lateral of the Cross Unit Well. A preliminary estimate of those measurements shall be based on GIS measurements and shall be provided by Epsilon with the drilling proposals for the Cross Unit Wells, together with the resulting estimated Allocation Factors and working interests of the ACA Parties. Upon completion of the Cross Unit Well, a final Allocation Factor for each unit will be determined.

Except as expressly set forth herein, the above referenced Operating Agreements for the Craige Unit, Poulson North Unit and Poulson South Unit will govern the rights and obligations of the parties as to that portion of the productive drainhole length of each Cross Unit Well's lateral lying within each respective unit. By way of example and not limitation, if a party elects to not participate in the Cross Unit Well as to one of the units, then the non-consent penalty in the Operating Agreement for that unit will apply to the costs allocated to that particular unit, and the interest of the non-consenting party will be offered only to the parties subject to that particular Operating Agreement.

Epsilon Energy USA, Inc.
Rachel Collins

Craige S 3LHC
December 22, 2020

By:_____

Name:_____

Title:_____

Date:_____


EPSILON
Energy USA, Inc.

| | | |
|---|---|---|
| WELL NAME: | **CRAIGE S 3LHC** | AFE # : **D2110144** |
| OPERATOR: | **EPSILON ENERGY USA, INC** | |
| PROJECT: | **AUBURN** | DATE: **11/17/20** |
| LOCATION (TRACT): | **CRAIGE** | |
| SURFACE OWNER: | **HAROLD C AND GLORIA CRAIGE** | |
| API (PERMIT #): | **37-115-22797-0000 (115-22797)** | PROPOSED TMD: **20,724** |
| COUNTY, STATE: | **SUSQUEHANNA, PENNSYLVANIA** | PROPOSED TVD: **6,875** |
| COMMENTS: | **D&C HZ LOWER MARCELLUS WELL** | PROPOSED CLAT: **12,499** |

| SUMMARY OF ESTIMATED COSTS | (1) TANGIBLES | (2) INTANGIBLES | (3) TOTAL COSTS |
|---|---|---|---|
| A. DRILLING COST | | | |
| B. COMPLETION COST | $ 119,000 | $ 2,541,000 | $ 2,660,000 |
| C. PLANT & FACILITY COST | $ 811,000 | $ 5,548,243 | $ 6,359,243 |
| D. WORKOVER COST | $ - | $ - | $ - |
| | $ - | $ - | $ - |
| TOTALS: | $ 930,000 | $ 8,089,243 | $ 9,019,243 |

WELL/PROJECT ID# :

EXPLORATORY ☐     DEVELOPMENT ☑

WORKOVER ☐     RECOMPLETION ☐

| WORKING INTEREST OWNER | PERCENT | COST SHARE |
|---|---|---|
| CHESAPEAKE APPALACHIA, L.L.C. | 35.94311100% | $ 3,241,797 |
| EQUINOR USA ONSHORE PROPERTIES INC. | 17.95722100% | $ 1,619,605 |
| EPSILON ENERGY USA, INC. | 40.91973700% | $ 3,690,651 |
| JAMESTOWN RESOURCES, L.L.C. | 1.07673800% | $ 97,114 |
| CHIEF EXPLORATION & DEVELOPMENT LLC | 2.29778800% | $ 207,243 |
| ENERPLUS RESOURCES (USA) CORPORATION | 1.23095800% | $ 111,023 |
| RADLER 2000 LIMITED PARTNERSHIP | 0.33473300% | $ 30,190 |
| TUG HILL MARCELLUS, LLC | 0.23971400% | $ 21,620 |
| | 100.00000000% | $ 9,019,243 |

**OPERATOR'S APPROVAL**

| | | | |
|---|---|---|---|
| PREPARED BY: | *Henry N. Clayton* | OPERATIONS | DATE: 12/22/20 |
| APPROVED BY: | *Rachel Collins* | LAND/LEGAL | DATE: 12/22/20 |
| APPROVED BY: | *Shannon Henke* | GEOLOGY | DATE: 12/22/20 |
| APPROVED BY: | *B. Ian Boyd* | ACCOUNTING | DATE: 12-22-20 |

**NON-OPERATOR'S APPROVAL**

COMPANY NAME:

APPROVED BY:     DATE:

TITLE:

The costs on this AFE are estimates only. In executing this AFE, the participant agrees to pay its proportionate share of all actual costs incurred. Participant shall be covered by and billed proportionately for Operator's well control and general liability insurance unless participant provides Operator a certificate evidencing its own insurance in amounts acceptable to the Operator by the date of spud.



# Epsilon Energy

## Preliminary Geological Prognosis

| | |
|---|---|
| API Number: | 37115227970000 |
| Permit Number: | 115-22797 |
| Well Name: | Craige S 3LHC |
| Well Type: | Horizontal, development |
| Well Target: | Lower Marcellus |
| State: | Pennsylvania |
| County: | Susquehanna |
| Township: | Rush & Auburn |
| Projection: | NAD83/Pennsylvania South |
| Surface Location: | Craige Pad |
| | Lat/Long:  41.755814 / -76.028383 |
| Landing Point: | Craige Unit |
| | Lat/Long:  41.755641 / -76.023396 |
| Bottom Hole: | Poulson South Unit |
| | Lat/Long:  41.723511 / -76.005438 |
| Surface Elevation: | 1,533' |
| KB (est): | 1,553' |
| Total Depth (est): | 20,248' |

Formations:

| Formation | TVD | Subsea Depth | Notes |
|---|---|---|---|
| Tully LS | 4,571 | -3,018 | TVD @ pentetration point |
| Hamilton SH | 4,681 | -3,128 | TVD @ pentetration point |
| Marcellus | 6,684 | -5,131 | TVD @ pentetration point |
| Target | 7,050 | -5,347 | TVD @ pentetration point |
| Onondaga Limestone | 7,003 | -5,450 | |

| | |
|---|---|
| Well Azimuth: | 159° |
| Lateral Length: | 12,750' |

Contacts:

| | | Office | Mobile | Email |
|---|---|---|---|---|
| Epsilon Energy Main Office | | 281-670-0002 | | |
| Rachel Collins | Land | 281-453-3392 | 832-257-9251 | rachel.collins@epsilonenergyltd.com |
| Shannon Lemke | Geology | 281-453-3386 | 713-204-6768 | shannon.lemke@epsilonenergyltd.com |
| Brian Ramey | Operations | 281-453-3390 | 432-528-0076 | bpramey77@gmail.com |
| Paul Atwood | Marketing | 281-453-3387 | 803-730-3778 | paul.atwood@epsilonenergyltd.com |
| Lilian Hernandez | JIB / AP | 281-453-3393 | | lilian.hernandez@epsilonenergyltd.com |
| Henry Clanton | Corporate | 281-453-3389 | 432-770-3642 | henry.clanton@epsilonenergyltd.com |

8000-PM-OOGM0002    Rev. 6/2014

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF ENVIRONMENTAL PROTECTION**
**OFFICE OF OIL AND GAS MANAGEMENT**
## WELL LOCATION PLAT
PAGE 1 Surface Location

pennsylvania
DEPARTMENT OF ENVIRONMENTAL PROTECTION

| DEP | Auth ID#: | | G: |
|-----|-----------|--|----|
| USE | Permit #: | | |
| ONLY | Project #: | | C: |



☐ Denotes location of top of well on topo map.

Surface hole is located on topo map 13064 feet south of latitude 41° 47' 30"

Surface hole is located on topo map 7744 feet west of longitude 76° 00' 00"

**SURFACE HOLE COORDINATES NAD 83**
True Latitude: NORTH
**41° 45' 20.93"**
True Longitude: WEST
**76° 01' 42.18"**

**NAD 83**
N 41.755814'
W 76.028383'

**NAD 27**
N 41.755738'
W 76.028736'

N 583642.51
E 2469628.00

| LINE | BEARING | DISTANCE |
|------|---------|----------|
| L1 | N82°07'13"W | 792.84' |
| L2 | N70°21'30"W | 445.06' |

3000' RADIUS

PROPOSED SURFACE HOLE

ACCESS RD

EXISTING PRIVATE ROAD

**NOTES**

1. WELL LOCATION POSITION ON A 7.5', 1:24,000 USGS TOPO QUAD WHEN THIS SHEET BORDER IS ADJUSTED TO SCALE AND OVERLAYED TO AND ORIENTED TO THE RESPECTIVE SECTION GRID.

2. PLAN INFORMATION SHOWN ON THIS PLAT IS BASED ON COUNTY TAX PARCELS, DEED PLOTS, AND BASE DATA FROM PASDA AND USGS. SURVEYED LOCATIONS WERE SOLVED USING DUAL FREQUENCY GPS (L1/L2) THAT WAS POST-PROCESSED WITH THE NGS OPUS SERVICE.

3. THIS PLAT IS FOR WELL LOCATION PURPOSES ONLY. IT IS NOT A BOUNDARY RETRACEMENT SURVEY. TIES TO PINS OR PIPES FOUND IS PROVIDED FOR GAS WELL RE-LOCATION PURPOSES ONLY.

4. BASE STATION CONTROL DATA IS AVAILABLE UPON REQUEST

COMMONWEALTH
REGISTERED
PROFESSIONAL
**TODD C. JACOBS**
LAND SURVEYOR
NO. SU 075184
PENNSYLVANIA

**LEGEND**
△ Well
● Found corner Iron Pin or Pipe
● Water Supply

**NOTE**
*No Wetlands Within 100' of Disturbance*
*No Wetlands Within 300' of Well Bore*

| Applicant/Well Operator Name: | | DEP ID #: | Well (Farm) Name: | | | Well #: | | Serial #: |
|---|---|---|---|---|---|---|---|---|
| EPSILON OPERATING LLC | | 328036 | CRAIGE | | | S3LHC | | |
| Address: | | | County: | Municipality: | | Well Type: | | |
| 16945 NORTHCHASE DR, SUITE 1610, HOUSTON, TX 77060 | | | SUSQUEHANNA | RUSH | | NATURAL GAS | | |
| 911 address of well site: | | | USGS 7½' Quadrangle Map Name: | | Map Section: | | Surface Elevation: | |
| 1016 COUNTY HOME ROAD, MONTROSE, PA 18801 | | | LAWTON | | 9 | | 1533 | ft. |
| Surveyor or Engineer: | Phone #: | Dwg #: | Date: | Scale: | Tract | | | |
| TODD C. JACOBS, P.L.S. | 570-278-3100 | NMPY 26 | 09/16/2020 | 1" = 1,000' | Acreage: 723 ± | | | |
| Lat. & Long Metadata Method: | Accuracy: | Datum: | Elevation Metadata Method: | Accuracy: | | Datum: | | Survey Date: |
| GPSOF(L1,L2)RTK | 0.033' ft. | NAD 83 | GPSOF (L1,L2)RTK | 0.069 ft. | | NAVD 88 | | 07/02/2010 |

PLOT DATE/TIME: 9/16/2020 10:16:16AM

Appx0568

8000-PM-OOGM0002  Rev. 6/2014

# WELL LOCATION PLAT

### PAGE 2 Notifications

DEP Statewide toll—free phone number for reporting cases of water contamination which may be associated with development of oil and gas resources is **1-866-255-5158** .

| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID# 328036 | Well (Farm) Name CRAIGE | Well # S3LHC | Serial # |
|---|---|---|---|---|

| Surface Landowner/Lessor: HAROLD C. AND GLORIA CRAIGE | Angle & Course of Deviation (Drilling): S88°29'19"E 1362.18' S20°42'00"E 2999.92' S19°02'01"E 2238.27' S23°09'51"E 1514.08' S20°42'00"E 2248.74' S31°29'27"E 3740.08' | Anticipated True Vertical Depth Feet (TVD): 7050 | Anticipated Total Measured Depth Feet (TMD): 20248.13 |
|---|---|---|---|

| Target Formation(s): MARCELLUS | Deepest Formation to be penetrated: MARCELLUS | Number of Laterals: 1 | Total footage to be drilled all laterals: 20248.13 |
|---|---|---|---|

| Surface Owner/Water Purveyor w/Water Supply within 1000'/3000' | | Latitude Longitude of Water Supply | |
|---|---|---|---|
| ① KEVIN C AND MELANIE A PIERSON | 177-1-33.01 | A N41°45'48.15" W76°01'49.28" | B N41°45'47.86" W76°01'48.22" |
| ② JOSEPH AND DONNAGRILLO | 177-1-32 | N41°45'44.14" W76°01'52.37" | |
| ③ RICHARD F DOLAN | 177-1-30.01 | N41°45'38.92" W76°01'54.84" | |
| ④ STEPHEN JAMES MOLNAR | 176-1-14 | A N41°45'38.40" W76°02'07.48" | B N41°45'38.23" W76°02'07.53" |
| ⑤ STEPHEN J MOLNAR | 177-1-30 | A N41°45'37.02" W76°01'59.72" | B N41°45'35.27" W76°02'00.65" |
| ⑥ ANGELA VERY | 177-1-29 | A N41°45'34.87" W76°01'55.70" C N41°45'33.84" W76°01'56.11" | B N41°45'34.48" W76°01'55.22" |
| ⑦ ALLIANCE TO PROTECT LIFE | 176-1-47 | N41°45'29.17" W76°02'10.17" | |
| ⑧ ALLIANCE TO PROTECT LIFE | 177-1-43 | N41°45'18.88" W76°02'01.21" | |
| ⑨ HAROLD C AND GLORIA CRAIGE | 177-1-28.01 | A N41°45'14.41" W76°02'04.56" | B N41°45'14.78" W76°02'03.55" |
| ⑩ ELIZABETH SPICKERMAN | 176-1-23 | N41°45'04.68" W76°02'09.73" | |
| ⑪ ROBERT N SHAFFER | 176-1-23.01 | N41°44'56.36" W76°02'02.67" | |
| ⑫ RAYMOND AND CHRISTINE K POULSEN | 177-1-26 | A N41°44'56.14" W76°01'59.89" C N41°44'57.94" W76°01'54.90" | B N41°45'01.21" W76°02'00.99" D N41°44'57.58" W76°01'53.49" |

| Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet | Municipality: where the well will be drilled, adjacent to the well, or within 3000 feet |
|---|---|
| RUSH TOWNSHIP, SUSQUEHANNA COUNTY (Well Located in) | |
| AUBURN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| TUSCARORA TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| STEVENS TOWNSHIP, BRADFORD COUNTY (Adjacent) | Coal related parties |
| PIKE TOWNSHIP, BRADFORD COUNTY (Adjacent) | |
| MIDDLETOWN TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| FOREST LAKE TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| JESSUP TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |
| DIMOCK TOWNSHIP, SUSQUEHANNA COUNTY (Adjacent) | |

PLOT DATE/TIME: 9/16/2020 10:16:51AM

Appx0569

8000-PM-OOGM0002    Rev. 6/2014

# WELL LOCATION PLAT

## PAGE 3 Plan View of Deviated Well Bore

If well has a lateral other than vertical show the bottom hole location on the plat drawing as ⊗ and include the Coordinates in the provided section at the bottom of the drawing area. The top hole and bottom hole locations are to be connected by a bolded line this is to depict the proposed courses of the actual wellbore to be drilled.



| Applicant/Well Operator Name: EPSILON OPERATING LLC | DEP ID# 328036 | Well (Farm) Name CRAIGE | Well # S3LHC |

LEGEND
△ Well
⊗ Landing Point and Bottom Hole
● Found corner Iron Pin or Pipe

| LINE | BEARING | DISTANCE |
|------|---------|----------|
| L1 | N82°07'13"W | 792.84' |
| L2 | N70°21'30"W | 445.06' |
| L3 | S88°29'19"E | 1362.18' |

CRAIGE PAD ORIENTATION
1" = 400'

MAP SCALE: 1"=2,300'

PLOT DATE/TIME: 9/10/2020 1:43:25PM

- 3 -

Appx0570



Bluegrass South Unit, Craige Unit, Poulson
North Unit & Poulson South Unit